## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ASTRAZENECA AB,

       Plaintiff,

   v.

ZYDUS PHARMACEUTICALS (USA) INC.,

       Defendant.

C.A. No. 1:18-cv-00664-RGA



PUBLIC VERSION FILED:
MAY 11, 2021

## PROPOSED JOINT PRETRIAL ORDER

McCarter & English, L.L.P.
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff AstraZeneca AB*

Phillips McLaughlin & Hall, P.A.
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 N. Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendant*
*Zydus Pharmaceuticals (USA)*
*Inc.*

May 4, 2021

**Table of Contents**

List of Exhibits to the Proposed Joint Pretrial Order ....................................................................... ii

I.     NATURE OF THE CASE AND PLEADINGS ................................................................ 1

II.     JURISDICTION ............................................................................................................... 5

III.     STIPULATED FACTS ..................................................................................................... 5

IV.     DISPUTED FACTS .......................................................................................................... 5

V.     ISSUES OF LAW ............................................................................................................. 6

VI.     EXHIBITS ........................................................................................................................ 6

VII.     WITNESSES ................................................................................................................... 11

VIII.     BRIEF STATEMENT OF INTENDED PROOFS .......................................................... 16

IX.     DESIRED AMENDMENTS TO THE PLEADINGS ..................................................... 16

X.     CERTIFICATION OF SETTLEMENT DISCUSSIONS ................................................ 16

XI.     MOTIONS *IN LIMINE* .................................................................................................. 16

XII.     MISCELLANEOUS ISSUES ........................................................................................ 17

         A.     Damages ................................................................................................................ 17

         B.     Plaintiff's Request for a Permanent Injunction Under 35 U.S.C. § 271(e)(4)(B) ...................................................................................................... 17

         C.     The Claims to be Addressed at Trial; Stipulation of Infringement ...................... 18

         D.     Trial Parameters ................................................................................................... 19

**List of Exhibits to the Proposed Joint Pretrial Order**

Exhibit A.     Joint Statement of Stipulated Facts

Exhibit B.     Plaintiff's Statement of Disputed Facts

Exhibit C.     Defendant's Statement of Disputed Facts

Exhibit D.     Plaintiff's Issues of Law

Exhibit E.     Defendant's Issues of Law

Exhibit F.     Plaintiff's Proposed Trial Exhibit List

Exhibit G.     Defendant's Proposed Trial Exhibit List

Exhibit H.     Plaintiff's Witness List

Exhibit I.     Plaintiff's Deposition Designations

Exhibit J.     Defendant's Witness List

Exhibit K.     Defendant's Deposition Designations

Exhibit L.     Plaintiff's Brief Statement of Intended Proofs

Exhibit M.     Defendant's Brief Statement of Intended Proofs

Exhibit N.     Plaintiff's Experts' CVs

Exhibit O.     Defendant's Experts' CVs

Exhibit P.     Plaintiff's Motion *in Limine*, Defendant's Opposition, Plaintiff's
               Reply, and Exhibits Thereto

Exhibit Q.     Defendant's Motions *in Limine*, Plaintiff's Oppositions, Defendant's
               Replies, and Exhibits Thereto

This matter having come before the court at a pretrial conference held pursuant to Fed. R. Civ. P. ("Rule") 16, and:

MCCARTER & ENGLISH, L.L.P.
Renaissance Centre, 405 N. King Street, 8th Floor, Wilmington, Delaware 19801
(302) 984-6300

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
1875 Explorer Street, Suite 800, Reston, Virginia 20190
(571) 203-2700
271 17th Street, N.W., Suite 1400, Atlanta, Georgia 30363
(404) 653-6400
901 New York Avenue, N.W., Washington, DC 20001
(202) 408-4000

having appeared as counsel for Plaintiff AstraZeneca AB ("AstraZeneca" or "Plaintiff");

PHILLIPS MCLAUGHLIN & HALL, P.A.
1200 N. Broom Street, Wilmington, Delaware 19806
(302) 655-4200

LOCKE LORD L.L.P.
111 South Wacker Drive, Chicago, Illinois 60606
(312) 443-0700
Brookfield Place, 200 Vesey Street, 20th Floor, New York, New York 10281
(212) 415-8600

having appeared as counsel for Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus" or "Defendant"), the following actions were taken:

## I.  NATURE OF THE CASE AND PLEADINGS

### A.  AstraZeneca, Its NDA, and the '117 Patent

1.      This is a civil action for patent infringement, arising under the patent laws of the United States, Title 35, Section 101, *et seq.*, as well as the Hatch-Waxman Act, 21 U.S.C. § 355. The action arises out of Defendant Zydus Pharmaceuticals (USA) Inc.'s ("Zydus" or "Defendant") filing of an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA") seeking to market 5 mg and 10 mg dapagliflozin tablets prior to the expiration of AstraZeneca's Orange Book-listed U.S. Patent No. 6,515,117 ("the '117 patent"). One indication of FARXIGA® is an adjunct to diet and exercise to improve glycemic control in adult patients with type 2 diabetes mellitus.

2.      The Plaintiff is AstraZeneca AB ("Plaintiff" or "AstraZeneca"). AstraZeneca is represented by Charles E. Lipsey, John D. Livingstone, Jill K. MacAlpine, M. David Weingarten, Ryan P. O'Quinn, Matthew Hlinka, and Megan L. Meyers of Finnegan, Henderson, Farabow, Garrett, and Dunner L.L.P., and Michael P. Kelly, Daniel M. Silver, and Alexandra M. Joyce of McCarter & English L.L.P.

3.      AstraZeneca AB is the holder of New Drug Application No. 202293 for FARXIGA® (dapagliflozin) tablets for oral administration, which contain the active ingredient dapagliflozin (known as "(2S,3R,4R,5S,6R)-2-[4-chloro-3-[(4-ethoxyphenyl)methyl]phenyl]-6-(hydroxymethyl)oxane-3,4,5-triol" using IUPAC nomenclature and otherwise known as "(2*S*,3*R*,4*R*,5*S*,6*R*)-2-[4-chloro-3-(4-ethoxybenzyl)phenyl]-6-(hydroxymethyl)tetrahydro-2*H*-pyran-3,4,5-triol" and "D-glucitol, 1,5-anhydro-1-*C*-[4-chloro-3-[(4 ethoxyphenyl)methyl]phenyl]-, (1S)"). FARXIGA® (dapagliflozin) tablets were approved by the FDA on January 8, 2014 in 5 mg and 10 mg strengths as an adjunct to diet and exercise to improve glycemic control in adult patients with type 2 diabetes mellitus.

4.　　　AstraZeneca AB is the record owner of the '117 patent.

5.　　　In this action, the parties have stipulated that the contested issues of validity will rise and fall with claims 1-3, 14, and 16 of the '117 patent at trial.

6.　　　Claim 1 of the '117 patent recites:

1. A compound having the structure



or a pharmaceutically acceptable salt, a stereoisomer thereof, or a prodrug ester thereof.

7.　　　Claim 2 of the '117 patent recites:

2. The compound as defined in claim 1 having the structure



8.　　　Claim 3 of the '117 patent recites:

3. A pharmaceutical composition comprising a compound as defined in claim 1 and a pharmaceutically acceptable carrier therefor.

9.　　　Claim 14 of the '117 patent recites:

2

14. A method for treating or delaying the progression or onset of diabetes, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound healing, insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X, diabetic complications, atherosclerosis or hypertension, or for increasing high density lipoprotein levels, which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in claim 1.

10. Claim 16 of the '117 patent recites:

16. A method for treating type II diabetes which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in claim 1 alone or in combination with another antidiabetic agent, an agent for treating the complications of diabetes, an anti-obesity agent, an antihypertensive agent, an antiplatelet agent, an anti-atherosclerotic agent and/or a hypolipidemic agent.

11. The '117 patent is listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") for FARXIGA® (dapagliflozin) tablets (5 mg and 10 mg dosage strengths).

**B.    Zydus**

12. Defendant Zydus filed ANDA No. 211582 with the FDA seeking approval to engage in the commercial manufacture, use, or sale of dapagliflozin tablets, 5 mg and 10 mg ("Zydus's ANDA Products"). Zydus seeks final FDA approval before the expiration of the '117 patent.

13. On May 1, 2018, AstraZeneca filed a Complaint alleging, *inter alia*, that the filing of Zydus's ANDA No. 211582, seeking approval to commercially manufacture, use, offer to sell, sell, and/or import into the United States, Zydus's ANDA Products prior to the expiration of the '117 patent, constitutes an act of infringement under 35 U.S.C. § 271(e)(2)(A). (D.I. 1.)

14. AstraZeneca's Complaint also alleged the infringement of U.S. Patent No. 6,414,126, which was also listed in the Orange Book for FARXIGA®. The '126 patent is no longer being asserted in the present case.

3

15.    On June 22, 2018, Zydus filed its Answer, denying infringement of the '117 and

'126 patents and asserting affirmative defenses. (D.I. 9.) Zydus's Answer also included

counterclaims seeking declaratory judgments of non-infringement of seven other Orange Book-

listed patents for FARXIGA®: U.S. Patent Nos. 7,851,502; 7,919,598; 8,221,786; 8,361,972;

8,501,698; 8,685,934; and 8,716,251. (*Id.* at Counterclaims ¶¶ 35-48.)

16.    On January 25, 2019, the parties dismissed without prejudice all claims relating to

U.S. Patent Nos. 7,851,502; 7,919,598; 8,221,786; 8,361,972; 8,501,698; and 8,716,251. (D.I.

33.) The Court entered the parties' related stipulation on January 28, 2019. (D.I. 34.)

17.    On March 13, 2019, AstraZeneca filed a First Amended Complaint against Zydus

adding allegations that Zydus's ANDA filing also infringed U.S. Patent No. 8,685,934. (D.I. 37.)

On March 26, 2019, Zydus filed an Answer to the First Amended Complaint, reiterating its

denials and defenses from its initial Answer with respect to the '117 and '126 patents, and

adding denials and defenses for the '934 patent. (D.I. 41.)

18.    The '934 patent is no longer asserted in this case pursuant to a stipulation dated

October 4, 2019 between the parties (D.I. 66) that the Court entered on October 8, 2019. (D.I.

68.)

19.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

20.    The regulatory stay of final approval of Zydus's ANDA extends through July 8,

2021—7.5 years after FDA approval of FARXIGA® in the United States.

21.     Zydus is represented by Michael J. Gaertner, Alan B. Clement, Myoka Kim Goodin, Jennifer M. Coronel, Zhibin Li, and Christopher J. Cassella of Locke Lord L.L.P. and John C. Phillips, Jr. and Megan C. Haney of Phillips McLaughlin & Hall, P.A.

## II.     JURISDICTION

22.     This action arises under the patent laws of the United States of America, 35 U.S.C. §§ 100 *et seq.*, including 35 U.S.C. § 271(e)(2)(A). This Court has jurisdiction over the subject matter of this litigation under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. No party contests subject matter jurisdiction.

23.     The Court has personal jurisdiction over the parties. For purposes of this action, no party contests personal jurisdiction.

24.     Venue is proper in this Judicial District under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b). For purposes of this action, no party contests venue.

## III.    STIPULATED FACTS

25.     The parties stipulate to and admit the facts listed in the attached **Exhibit A**. These stipulated facts require no proof at trial and will become part of the evidentiary record in this case.

## IV.    DISPUTED FACTS

26.     Plaintiff's statement of issues of fact which remain to be litigated is attached as **Exhibit B**.

27.     Defendant's statement of issues of fact which remain to be litigated is attached as **Exhibit C**.

28.     If any statement in a party's statement of issues of fact that remain to be litigated should properly be considered an issue of law, then such statement shall be so considered as an issue of law.

## V.      ISSUES OF LAW

29.     Plaintiff's statement of issues of law which remain to be litigated is attached as

**Exhibit D**.

30.     Defendant's statement of issues of law which remain to be litigated is attached as

**Exhibit E**.

31.     If any statement in a party's statement of issues of law that remain to be litigated

should properly be considered an issue of fact, then such statement shall be so considered as an

issue of fact.

## VI.     EXHIBITS

32.     The list of pre-marked trial exhibits that may be offered by Plaintiff, including

Defendant's objections thereto, is attached as **Exhibit F**.

33.     The list of pre-marked trial exhibits that may be offered by Defendant, including

Plaintiff's objections thereto, is attached as **Exhibit G**.

34.     Plaintiff and Defendant each reserve the right to offer exhibits set forth on the

other's exhibit list, even if not set forth on their own exhibit list. All objections to such exhibits

are preserved. Neither party will remove a document once it has been added to the party's exhibit

list without agreement from the other party, unless it provides the other party the opportunity to

add the document to its exhibit list.

35.     Exhibits to which no objection has been made that are offered into evidence at

trial are received in evidence by operation of this Order, without any need for further foundation

testimony, provided they are shown to a witness whether appearing live or by designation.

36.     Exhibits to be used solely for impeachment or cross-examination need not be

included on the lists of trial exhibits or disclosed in advance of being used at trial.  [**AstraZeneca**

**Proposal**: Except as otherwise set forth herein, all documents, whether offered on direct or

cross-examination, must be included on a trial exhibit list to be admitted into evidence and any document not listed in any of **Exhibits F** and **G**, will not be entered into evidence at trial, absent good cause shown.]  [**Zydus Proposal**:  Except as otherwise set forth herein, all documents offered on direct examination must be included on a trial exhibit list to be admitted into evidence, and any document offered on direct examination that is not listed in any of **Exhibits F** and **G**, will not be entered into evidence at trial, absent good cause shown.  However, exhibits used solely for impeachment and/or cross-examination may be admitted into evidence, even if it is not included in **Exhibits F** and **G** or disclosed in advance.]

37.    Any document shall be deemed to be authentic absent a specific objection set forth in an exhibit list challenging that document's authenticity. Any document that on its face appears to have been authored by an employee, officer, or agent of a party shall be deemed to be *prima facie* authentic and not objectionable on grounds of hearsay as a business record pursuant to Fed. R. Evid. 803(6), subject to the right of any party against whom such a document is offered to adduce evidence to the contrary or to require that the offering party provide authenticating evidence if the opposing party has a reasonable basis to believe the document is not authentic. Any document that on its face appears to have been authored by an employee, officer, or agent of Bristol Myers Squibb Co. ("BMS") shall be deemed to be *prima facie* authentic [**AstraZeneca Proposal:** and not objectionable on grounds of hearsay as a business record pursuant to Fed. R. Evid. 803(6)], subject to the right of any party against whom such a document is offered to adduce evidence to the contrary or to require that the offering party provide authenticating evidence if the opposing party has a reasonable basis to believe the document is not authentic. [**Zydus Proposal:**  Zydus reserves all rights to object to any document that on its face appears to have been authored by an employee, officer or agent of

BMS as hearsay and not a business record pursuant to Fed. R. Evid. 803(6).  Zydus has advised

AstraZeneca that it will consider a declaration pursuant to Fed. R. Evid. 902(11) with respect to

documents specifically identified by AstraZeneca.**]** Any document that on its face appears to be a

newspaper, periodical, article, journal, patent, patent publication, other publication or portion

thereof, or printout from a government website, shall be deemed to be *prima facie* authentic,

subject to the right of any party against whom such a document is offered to adduce evidence to

the contrary or require that the offering party provide authenticating evidence if the opposing

party has a reasonable basis to believe the document is not authentic.

38.     The parties agree that any description or date of a document on an exhibit list is

provided for convenience only and shall not be used as an admission or otherwise as evidence

regarding the listed document or any other listed document.

39.     Statements by a party opponent from any request for admission responses,

interrogatory responses, other discovery responses, or pleadings may be read at trial and need not

be included on the exhibit lists.

40.     Legible copies of documents may be offered and received in evidence to the same

extent as an original.

41.     The demonstrative exhibits the parties intend to use at trial do not need to be

described on their respective lists of trial exhibits.

42.     Each demonstrative exhibit shall disclose all trial exhibits that form the basis of

the demonstrative exhibit.

43.     Each party will exchange PDF files or PPT files by email, or by courier a DVD or

CD, full color copies of demonstrative trial exhibits by 7:00 pm EDT one calendar day before

they will be used at trial. However, demonstrative exhibits to be used with opening statements

8

should be exchanged by 5:00 pm EDT one calendar day before the day opening statements are to be given. With respect to only the exchange of demonstrative exhibits to be used with opening statements, the parties agree to exchange all materials they plan to present to the Court during opening statements, including any highlighted or excerpted trial exhibits. For video or animations, the party seeking to use the demonstrative will provide it to the other side in an appropriate electronic format to view the video or animation. For irregularly sized physical exhibits, the party seeking to use the demonstrative will provide a color representation as a PDF of 8.5 x 11 copies of the exhibits. For example, demonstrative trial exhibits intended for use at trial on Monday, May 17, 2021, would be exchanged by email before 7:00 pm EDT on Sunday, May 16, 2021, except the demonstrative exhibits intended for use with opening statements would be exchanged by email before 5:00 pm EDT on Sunday, May 16, 2021. With respect to a potential exchange of demonstrative exhibits to be used with closing statements, the parties will meet and confer.

44.     The party receiving identification of demonstrative trial exhibits shall inform the party identifying the exhibits of any objections by 9:00 pm EDT on the day of receipt, and the parties shall meet and confer as soon as possible thereafter but by no later than 10:30 pm EDT to resolve such objections.  However, with respect to identification of demonstrative trial exhibits to be used with opening statements, the party receiving identification of such demonstrative trial exhibits shall inform the party identifying the exhibits of any objections by 7:30 pm EDT on the day of receipt, and the parties shall meet and confer as soon as possible thereafter but by no later than 9:30 pm EDT to resolve such objections.

45.     Each party will also provide by email to opposing counsel a listing of all exhibits (by exhibit number) a party intends to use in direct examination of non-adverse witnesses by

7:00 pm EDT one calendar day before they will be used at trial. For example, a listing of all exhibits intended for use during direct examination of non-adverse witnesses on Monday, May 17, 2021, would be exchanged by email before 7:00 pm EDT on Sunday, May 16, 2021.

46.     The party receiving identification of exhibits intended for use in direct examination of non-adverse witnesses shall inform the party identifying the exhibits of any objections by 9:00 pm EDT on the day of receipt, and the parties shall meet and confer as soon as possible thereafter, but by no later than 10:30 pm EDT to resolve such objections.

47.     The advance notification provisions for demonstrative trial exhibits and exhibits intended for use in direct examination of non-adverse witnesses do not apply to demonstrative exhibits and trial exhibits used to impeach, during cross-examination, to demonstrative exhibits created in the courtroom during live testimony, or to demonstrative exhibits that contain only excerpts, enlargements, and/or highlights of the text of exhibits that already appear on a party's trial exhibit list or previously have been properly identified for use during the examination of the particular witness.

48.     Prior to the start of direct examination of a particular witness, the party conducting the direct examination will provide the other party with two copies of binders containing all exhibits and demonstrative exhibits that they intend to use with that witness on direct examination and will provide all required copies to the Court. The parties agree that this provision does not require the advanced disclosure of exhibits to be used to impeach or on cross-examination of any witness. However, prior to the start of the cross-examination of any witness, the parties agree to provide the other with two copies of witness binders that contain all of the exhibits expected to be used on cross-examination of that witness and will provide all required copies to the Court.

## VII.   WITNESSES

49.     Plaintiff's list of witnesses they may call live at trial and by deposition is attached as **Exhibit H** to the Proposed Joint Pretrial Order, and **Exhibit N** provides additional information on Plaintiff's experts' specific specialties and qualifications.

50.     For witnesses that will appear by deposition, Plaintiff's list of deposition designations, Defendant's objections to such designations, Defendant's counter-designations, Plaintiff's objections to such counter-designations, Plaintiff's counter-counter-designations, and Defendant's objections thereto, is attached as **Exhibit I**.

51.     Defendant's list of witnesses they may call live at trial and by deposition is attached as **Exhibit J** to the Proposed Joint Pretrial Order, and **Exhibit O** provides additional information on Defendant's experts' specific specialties and qualifications.

52.     For witnesses that will appear by deposition, Defendant's list of deposition designations, Plaintiff's objections to such designations, Plaintiff's counter-designations, Defendant's objections to such counter-designations, Defendant's counter-counter-designations, and Plaintiff's objections thereto, is attached as **Exhibit K**.

53.     Any witness not listed in **Exhibits H** and **J** to the Proposed Joint Pretrial Order will be precluded from testifying at trial absent good cause shown.

54.     The parties' witness lists represent the parties' good faith understanding and expectation about which witnesses are expected to be called live in person or remotely, or by deposition, at trial. To the extent that a witness's circumstances change, or a witness otherwise becomes unavailable for trial, each party reserves the right to call that witness by deposition, subject to resolution of objections by the other party.

55.     Each party will provide to the other a good-faith list of witnesses it intends to call live at the trial by 7:00 pm EDT five calendar days prior to the first day of trial, without

prejudice to the right to remove any witness. Each party will, with its best good faith understanding, identify by e-mail to the opposing party the witnesses it intends to call, the order in which the witnesses will be called, and whether those witnesses will be called live or by deposition, by 7:00 pm EDT **two** calendar days before such witnesses will be called to testify. AstraZeneca reserves the right to revise, in good faith, its witness identifications, including order, following the close of Zydus's case-in-chief relating to invalidity of the patents-in-suit. Zydus reserves the right to revise, in good faith, its reply witness identifications, including order, following the close of AstraZeneca's rebuttal case relating to validity of the patents-in-suit.

56.     The other party will identify any objections to such witnesses by 7:00 pm EDT the following day, and the parties will meet and confer to resolve any objections by 10:00 pm EDT that same evening. If good faith efforts to resolve any objections fail, the party objecting may bring its objections to the Court's attention prior to the witness being called to the witness stand.

57.     The parties further reserve the right to call: (1) one or more additional witnesses whose testimony is necessary to establish authenticity or admissibility of any trial exhibit, if the authenticity or admissibility of the exhibit is challenged by an opposing party; and (2) additional witnesses to respond to any issues raised by the Court's pretrial or trial rulings.

58.     Fact witnesses appearing in person shall be sequestered. Expert witnesses need not be sequestered.

59.     During adjournments in the trial, including breaks during the trial day and overnight, the offering party may discuss with a witness his or her testimony on direct examination until the witness is passed for cross-examination, but is prohibited from discussing with the witness his or her testimony during cross-examination. Once cross-examination of the

witness is concluded and the witness is passed for re-direct examination, the offering party may discuss with the witness his or her testimony on re-direct examination.

60.     The parties may not list deposition designations, counter-designations, or counter-counter-designations, or provide new objections to listed designations, counter-designations, or counter-counter-designations that are not included in this Proposed Joint Pretrial Order except for good cause shown or by agreement of the parties.

61.     Unless otherwise agreed between the parties, the party offering deposition testimony (other than for the purpose of impeachment) shall identify the deposition testimony (i.e., transcript page and line numbers) to be offered from previously-exchanged designations by 7:00 pm EDT at least **three** calendar days prior to the testimony being offered into the record. The party receiving the designations shall inform the opposing party of any objections and counter-designations by 7:00 pm EDT two calendar days prior to the testimony being offered into the record, and by 9:30 pm EDT that same day, the introducing party will identify any objections to the other party's counter-designated testimony. The parties shall meet and confer to resolve any objections to designated testimony by 10:30 pm EDT that same day to permit sufficient time to prepare any necessary video/DVD of the testimony. If good faith efforts to resolve the objections fail, the party objecting to the testimony by deposition shall, no later than 12:00 pm (noon) one calendar day before the witness is to be called at trial, submit to the Court, on behalf of all parties: (i) a copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, and pending objections; and (ii) a cover letter clearly identifying the pending objections as well as a brief indication (i.e., no more than one sentence per objection) of the basis of the objection and the offering party's response to

13

it (i.e., no more than one sentence per response). Failure to conform to this procedure will result in having the objection denied without hearing.

62.     Because AstraZeneca's responsive case on issues pertaining to the validity of the '117 patent is necessarily responsive in nature to Zydus's case-in-chief, AstraZeneca cannot know what deposition testimony will be necessary until Zydus's case is presented. Accordingly, AstraZeneca reserves the right to amend its designations (and/or any objections or counter-designations) following the close of Zydus's case-in-chief but by no later than 7:00 pm EDT one calendar day before any such witnesses in its case are to be called at trial.

63.     Because Zydus's reply case on issues pertaining to the invalidity of the '117 patent is necessarily responsive in nature to AstraZeneca's responsive case, Zydus cannot know what deposition testimony will be necessary until AstraZeneca's case is presented. Accordingly, Zydus reserves the right to amend its designations (and/or any objections or counter-designations) following the close of AstraZeneca's responsive case but by no later than 7:00 pm EDT one calendar day before any such witnesses in its case are to be called at trial.

64.     If a party decides to play less than all of the designated testimony for a witness at trial, or to include less than all of its counter-designations or counter-counter-designations, the opposing party may use such dropped testimony as counter-designations or counter-counter-designations to the extent the usage of such testimony in such manner is otherwise consistent with Fed. R. Evid. 106, Fed. R. Civ. P. 32, and any other applicable Federal Rule of Evidence or Rule of Civil Procedure. Similarly, if a party decides to play less than all of the designated testimony for a witness at trial, a party may present its counter-designation testimony and associated exhibits in response to other specified affirmative testimony by the opposing party, or re-designate its counter-designated testimony affirmatively, or designate testimony identified as

affirmative testimony in this order as a counter-designation or counter-counter-designation to the extent the usage of such testimony in such manner is otherwise consistent with Fed. R. Evid. 106, Fed. R. Civ. P. 32, and any other applicable Federal Rule of Evidence or Rule of Civil Procedure. Plaintiff and Defendant each reserve the right to offer deposition testimony and associated exhibits designated by the other side (whether as a designation, counter-designation, or counter-counter-designation) even if not separately listed on their own deposition designation list, subject to any evidentiary objections.

65.    If applicable, a party's designation of a page and line from a particular transcript shall be automatically deemed to include any errata indicated for that page and line in the attached errata sheets.

66.    To the extent that deposition designations, counter-designations, or counter-counter-designations are admitted into evidence, they must be either played by video or read in open court. If a party opts to introduce deposition testimony, any counter-designation or counter-counter-designation of that same witness's testimony must be admitted in the same medium, and the testimony designated by both sides will be played or read consecutively in the sequence in which the testimony was originally given at deposition. If an exhibit is referenced in a deposition designation, the exhibit is admitted into evidence if it is included on any party's trial exhibit list and is not otherwise objected to, subject to Section VI and, e.g., paragraphs 30 and 32, *supra*.

67.    To the extent deposition designations are read or played in open court, each side will be charged the time taken to read or play its designations (or counter-designations or counter-counter-designations). Specifically, any affirmative designations or counter-counter-designations offered by a party will count against that party's trial presentation time whereas any counter-designations by the other party will count against the party who made the counter-

15

designations. The time charged for designations played by video will be measured by the proportion of the number of lines of testimony for its designations to the total number of lines of testimony read. All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is played or read at trial.

68.     The above procedures regarding deposition designations do not apply to portions of deposition transcripts and/or video of a witness used for impeachment or cross-examination of that witness. Any deposition testimony of a witness may be used at trial for the purpose of impeachment of that witness, regardless of whether a party specifically identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

## VIII.   BRIEF STATEMENT OF INTENDED PROOFS

69.     In support of its claims and defenses relating to the validity of the '117 patent, and in addition to the facts not in dispute, Plaintiff expects to offer the proofs attached as **Exhibit L**.

70.     In support of its claims and defenses relating to the invalidity of the '117 patent, and in addition to the facts not in dispute, Defendant expects to offer the proofs attached as **Exhibit M**.

## IX.   DESIRED AMENDMENTS TO THE PLEADINGS

71.     The parties do not believe any amendments to the pleadings are necessary.

## X.   CERTIFICATION OF SETTLEMENT DISCUSSIONS

72.     The parties have engaged in good-faith efforts to explore resolution of this case by settlement. To date, no agreement has been reached between the parties.

## XI.   MOTIONS *IN LIMINE*

73.     Plaintiff's Motion *in Limine* No. 1, Defendant's Opposition thereto, and Plaintiff's Reply, as well as Plaintiff's Exhibits 1-7 and 12, and Defendant's Exhibits 8-11, are attached to this Order as **Exhibit P**.

74.     Defendant's Motion *in Limine* No. 1, Plaintiff's Response to same, Defendant's Reply, as well as Defendant's Exhibits A and E and Plaintiff's Exhibits B-D; Defendant's Motion *in Limine* No. 2, Plaintiff's Response to same, Defendant's Reply, as well as Defendant's Exhibits A-G; and Defendant's Motion *in Limine* No. 3, Plaintiff's Response to same, Defendant's Reply, as well as Defendant's Exhibits A-C are attached to this Order as **Exhibit Q**.

## XII.   MISCELLANEOUS ISSUES

### A.    <u>Damages</u>

75.     The parties do not intend to seek damages at this time, except AstraZeneca reserves the right to seek attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285. AstraZeneca reserves the right to seek damages if Zydus commercially manufactures, uses, sells, offers to sell, and/or imports into the United States its accused ANDA Products prior to the expiration of the '117 patent. Zydus reserves the right to contest that AstraZeneca is entitled to attorneys' fees, costs, and expenses or any such damages. Zydus also reserves the right to seek attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285.

### B.    <u>Plaintiff's Request for a Permanent Injunction Under 35 U.S.C. § 271(e)(4)(B)</u>

76.     In the event of a finding that at least one claim of the '117 patent is found infringed and not found invalid, AstraZeneca intends to seek, in addition to the relief provided by 35 U.S.C. § 271(e)(4)(A), a permanent injunction pursuant to 35 U.S.C. § 271(e)(4)(B) enjoining Zydus, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, from commercially manufacturing, selling, offering for sale in the United States, or importing into the United States Zydus's ANDA Product(s) prior to the expiration of the '117 patent and any applicable extensions or exclusivities to which they are or may become entitled. With the Court's permission and pursuant to a briefing schedule to be

ordered by the Court, the parties shall, after the issuance of trial opinions in this trial, and prior to entry of final judgment, brief the issue of whether AstraZeneca is entitled to a permanent injunction, and, at the Court's discretion, conduct a separate hearing following the submission of their permanent injunction briefs.

77.     Defendant opposes Plaintiff's request to brief and hold a separate hearing on whether Plaintiff is entitled to a permanent injunction only after the Court issues its opinions on this trial. Plaintiff's proposal would only delay a final resolution as to the issues of validity and the resolution of any appeals. Furthermore, Plaintiff's proposal would unnecessarily consume the Court's limited resources in allowing Plaintiff to separately litigate the injunction issue. Such a separate proceeding is also unnecessary given the statutory remedy in the event Plaintiff's patent is found valid. That remedy is the preclusion of FDA approval for Defendant's ANDA products until patent expiration. 21 U.S.C. § 355(j)(5)(B)(iii)(II). Instead, the Court should require Plaintiff to submit evidence during the scheduled trial and fully brief the basis for any requested permanent injunction in connection with the post-trial briefing in this case.

**C.     The Claims to be Addressed at Trial; Stipulation of Infringement**

78.     Consistent with the parties' October 4, 2019 joint stipulation, entered on October 7, 2019 (D.I. 68), issues of validity of the '117 patent shall stand or fall at trial with asserted claims 1-3, 14, and 16.

79.     Consistent with Zydus's stipulation dated November 25, 2020:



### D. <u>Trial Parameters</u>

80.     The trial for this case is scheduled to begin on May 17, 2021, at 8:30 am, and is currently scheduled for three (3) days.

81.     This is a non-jury trial.

82.     Assuming that three trial days equates to [**AstraZeneca Proposal**: 21 hours] [**Zydus Proposal**: 24 hours] of total time on the record for opening statements, witness examinations, and playing of deposition designations, Plaintiff and Defendant will each be allotted [**AstraZeneca Proposal**: 10.5 hours] [**Zydus Proposal**: 12 hours], which is fifty percent of the total time. Time that a party is presenting opening or closing statements, examining or cross-examining witnesses, presenting deposition designations that are read or played into evidence, or otherwise speaking or arguing on behalf of a party will be counted as the time of the party, subject to paragraph 83. AstraZeneca also respectfully requests the opportunity to present a closing argument. With respect to closing arguments, Zydus defers to the Court's preference.

83.     If the Court charges any trial time for resolving objections, that time will be charged against the party losing the objection.

84.     The following order of proof will apply to trial[1]:

    a.     Opening statements will be delivered in the following order: Defendant, then Plaintiff.

    b.     Defendant shall present its affirmative case on invalidity of the patent-in-suit.

    c.     Plaintiff shall present its rebuttal case on validity of the patent-in-suit, including any presentation of objective indicia of non-obviousness.

---

[1] The parties, to the extent that immovable scheduling conflicts arise, reserve the right to call one or more witnesses out of order from the order of proof described below. The parties will disclose those witnesses at the appropriate time per the procedures described above.

d.    Defendant shall present its reply case, including rebuttal to Plaintiff's presentation of objective indicia of non-obviousness.

e.    [**AstraZeneca Proposal:** Plaintiff shall present its sur-reply case relating to objective indicia of non-obviousness.][2]

[**Zydus Proposal:**  Plaintiff is not granted a sur-reply case relating to objective indicia of non-obviousness.][3]

f.    Closing statements (if any) will be delivered in the following order: Defendant, then Plaintiff.

85.    The parties agree to the following schedule for post-trial briefing:

a.    **June 18, 2021** – Zydus's Opening Brief

b.    **July 16, 2021** – AstraZeneca's Rebuttal Brief

c.    **July 30, 2021** – Zydus's Reply Brief

86.    The Court has entered a Stipulated Protective Order (*see* D.I. 28) to safeguard the

confidentiality of certain of the parties' business and technical information, as well as that of

third parties. Nonetheless, the presentation of evidence at trial shall take place in open court,

---

[2] AstraZeneca believes that for the convenience of the Court, the Court's staff, the parties, and the witnesses, each party should make a single presentation comprising its entire case at one time. This would prevent witnesses being called twice and would minimize the number of individuals in the courthouse at any given time. There is no risk of jury confusion since this is a bench trial.  If the Court is not inclined to structure the presentation in this manner, AstraZeneca respectfully requests the opportunity to reserve a portion of its trial time for a brief sur-reply case. AstraZeneca has the burden of coming forward with objective indicia of non-obviousness; if Zydus is not willing to present evidence relating to those indicia in its case-in-chief, AstraZeneca should be given an opportunity to rebut any such evidence presented for the first time by Zydus in a reply posture.

[3] Zydus disagrees that each party should make a single presentation comprising its entire case at one time.  Zydus believes that the evidence should be presented to the Court in the natural order, as set forth in paragraph 84.  Zydus disagrees that presenting the case in this way would be inconvenient or inefficient for the Court, the Court's staff, the parties and the witnesses for this three-day trial.  As to AstraZeneca's request to present a sur-reply case on validity, AstraZeneca repeatedly asserts that the burden to establish invalidity of the patent-in-suit, including with respect to AstraZeneca's assertion of alleged objective indicia, is on Zydus.  For this reason, the presentation of all evidence should conclude with Zydus, not AstraZeneca.

unless a party specifically requests, and the Court agrees, that the Court be closed to the public during presentation of certain portions of the evidence.

87.     This Order shall control the subsequent course of the action, unless modified by the Court to prevent manifest injustice. This Order may not be amended except by consent of the parties and the Court, or by Order of the Court.


DATED: May 4, 2021

/s/ *Daniel M. Silver*_____
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
ajoyce@mccarter.com

OF COUNSEL:

Charles E. Lipsey (admitted *pro hac vice*)
Ryan P. O'Quinn (admitted *pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
1875 Explorer Street, Suite 800
Reston, VA 20190
(571) 203-2700
Charles.Lipsey@finnegan.com
oquinnr@finnegan.com

John D. Livingstone (admitted *pro hac vice*)
M. David Weingarten (admitted *pro hac vice*)
Megan L. Meyers (admitted *pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
271 17th Street, N.W., Suite 1400
Atlanta, GA 30308-3263
(404) 653-6400
John.Livingstone@finnegan.com
David.Weingarten@finnegan.com
Megan.Meyers@finnegan.com

/s/ *John C. Phillips, Jr.*_____
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
PHILLIPS MCLAUGHLIN & HALL, P.A.
1200 N. Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

OF COUNSEL:

Michael J. Gaertner (admitted *pro hac vice*)
Myoka Kim Goodin (admitted *pro hac vice*)
Jennifer M. Coronel (admitted *pro hac vice*)
Christopher J. Cassella (admitted *pro hac vice*)
LOCKE LORD L.L.P.
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700
mgaertner@lockelord.com
mkgoodin@lockelord.com
jennifer.coronel@lockelord.com
christopher.cassella@lockelord.com

Alan B. Clement (admitted *pro hac vice*)
Zhibin Li (admitted *pro hac vice*)
LOCKE LORD L.L.P.
Brookfield Place
200 Vesey Street, 20th Floor
New York, NY 10281-2101
(212) 415-8600
aclement@lockelord.com
zhibin.li@lockelord.com

*Attorneys for Defendant Zydus Pharmaceuticals (USA), Inc.*


SO ORDERED this _____ day of _____, 2021.

_____

UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

      Plaintiff,

    v.

ZYDUS PHARMACEUTICALS (USA) INC.,

      Defendant.

C.A. No. 1:18-cv-00664-RGA

██████████████████
██████████████████████████
██████████████████████

**EXHIBITS TO PROPOSED JOINT PRETRIAL ORDER**
**VOLUME I (EXHIBITS A-M)**

MCCARTER & ENGLISH, L.L.P.
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff AstraZeneca AB*

May 4, 2021

PHILLIPS MCLAUGHLIN & HALL, P.A.
John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
1200 N. Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

*Attorneys for Defendant*
*Zydus Pharmaceuticals (USA)*
*Inc.*

**List of Exhibits to the Proposed Joint Pretrial Order**

**VOLUME 1:**

Exhibit A.    Joint Statement of Stipulated Facts

Exhibit B.    Plaintiff's Statement of Disputed Facts

Exhibit C.    Defendant's Statement of Disputed Facts

Exhibit D.    Plaintiff's Issues of Law

Exhibit E.    Defendant's Issues of Law

Exhibit F.    Plaintiff's Proposed Trial Exhibit List

Exhibit G.    Defendant's Proposed Trial Exhibit List

Exhibit H.    Plaintiff's Witness List

Exhibit I.    Plaintiff's Deposition Designations

Exhibit J.    Defendant's Witness List

Exhibit K.    Defendant's Deposition Designations

Exhibit L.    Plaintiff's Brief Statement of Intended Proofs

Exhibit M.    Defendant's Brief Statement of Intended Proofs

**VOLUME II:**

Exhibit N.    Plaintiff's Experts' CVs

Exhibit O.    Defendant's Experts' CVs

Exhibit P.    Plaintiff's Motion *in Limine*, Defendant's Opposition, Plaintiff's Reply, and Exhibits Thereto

Exhibit Q.    Defendant's Motions *in Limine*, Plaintiff's Oppositions, Defendant's Replies, and Exhibits Thereto

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

       Plaintiff,

   v.

ZYDUS PHARMACEUTICALS (USA) INC.,

     Defendant.

C.A. No. 1:18-cv-00664-RGA

<u>**JOINT STATEMENT OF UNCONTESTED FACTS**</u>

## I.       INTRODUCTION

In accordance with Local Rule 16.3(c)(3) of the Local Rules of Civil Practice and

Procedure of the United States District Court for the District of Delaware, Plaintiff AstraZeneca

AB ("AstraZeneca") and Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") submit the

following joint statement of the facts which are admitted and require no proof with respect to

claims 1–3, 14, and 16 ("the asserted claims") of U.S. Patent No. 6,515,117 ("the '117 patent").

AstraZeneca and Zydus's identification of these uncontested factual issues is based on

their respective understandings of the pleadings served and discovery taken in this action to date.

If AstraZeneca or Zydus offers arguments different from or in addition to those it has previously

offered, AstraZeneca and Zydus reserve their respective rights to contest those new arguments

and to present any rebuttal evidence.

If the Court concludes that any facts that AstraZeneca and Zydus identify in this Exhibit

A should instead be considered an issue of law, that issue should be treated as if it were an issue

of law that remains to be litigated listed by AstraZeneca in Exhibit D and by Zydus in Exhibit E.

## II.      BACKGROUND FACTS

### A.       The Parties and Nature of the Case

1.        This is a consolidated civil action for patent infringement, arising under the patent

laws of the United States, Title 35, Section 101, *et seq.*, as well as the Hatch-Waxman Act,

21 U.S.C. § 355.  The action arises out of Zydus's filing of an Abbreviated New Drug

Application ("ANDA") with the Food and Drug Administration ("FDA") seeking to market 5 mg

and 10 mg dapagliflozin tablets prior to the expiration of AstraZeneca's '117 patent.

2.        AstraZeneca, the holder of New Drug Application ("NDA") No. 202293 for

FARXIGA® (dapagliflozin), is a company operating and existing under the laws of Sweden, with

its principal place of business at SE-151 85 Södertälje, Sweden.

3.      Zydus is a corporation organized and existing under the laws of the State of New Jersey, having a principal place of business at 73 Route 31 North, Pennington, New Jersey 08534.

**B.      AstraZeneca's FARXIGA® Products**

4.      AstraZeneca is the holder of NDA No. 202293, by which the FDA granted approval for the marketing and sale of 5 mg and 10 mg strength dapagliflozin tablets.

5.      AstraZeneca markets 5 mg and 10 mg strength dapagliflozin tablets in the United States, through its Delaware subsidiary AstraZeneca Pharmaceuticals LP, under the trade name "FARXIGA®".

6.      One indication of FARXIGA® is as an adjunct to diet and exercise to improve glycemic control in adult patients with type 2 diabetes mellitus.

7.      Pursuant to 21 U.S.C. § 355 and attendant FDA regulations, the '117 patent is listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book") for FARXIGA® (dapagliflozin) tablets (5 mg and 10 mg dosage strengths).

**C.      Zydus's Dapagliflozin Tablets**

8.      Under 21 U.S.C. § 355(j), Zydus submitted ANDA No. 211582 to the FDA to obtain approval for the commercial manufacture, use, and sale of 5 mg and 10 mg dapagliflozin tablets ("Zydus's ANDA Products"), in the United States.

9.      Zydus's ANDA No. 211582 contains a certification pursuant to 21 U.S.C. § 355(j)(2)(a)(vii)(IV) ("Paragraph IV Certification"), alleging that the '117 patent is invalid, unenforceable, and/or not infringed.

10.     In a "Notice Letter" dated March 20, 2018, Zydus informed AstraZeneca that ANDA No. 211582 contained, *inter alia*, a Paragraph IV Certification regarding the '117 patent.

11.     Zydus's Notice Letter further indicated that Zydus was seeking FDA approval to engage in the commercial manufacture, use, or sale in the United States of Zydus's ANDA Products.

**D.     Dapagliflozin**

12.     Dapagliflozin is a chemical compound known, under "IUPAC" nomenclature, as (2S,3R,4R,5S,6R)-2-[4-chloro-3-[(4-ethoxyphenyl)methyl]phenyl]-6-(hydroxymethyl)oxane-3,4,5-triol, and has the following chemical structure:



13.     Dapagliflozin is also known by other names, including (2*S*,3*R*,4*R*,5*S*,6*R*)-2-[4-chloro-3-(4-ethoxybenzyl)phenyl]-6-(hydroxymethyl)tetrahydro-2*H*-pyran-3,4,5-triol, D-glucitol, 1,5-anhydro-1-*C*-[4-chloro-3-[(4 ethoxyphenyl)methyl]phenyl]-, (1S), and BMS-512148.

14.     FARXIGA® received initial FDA approval on January 8, 2014 for both the 5 mg and 10 mg strengths with an indication for use as an adjunct to diet and exercise to improve glycemic control in adult patients with type 2 diabetes mellitus.

**III.     THE PATENT-IN-SUIT**

15.     The '117 patent is entitled "C-Aryl Glucoside SGLT2 Inhibitors and Method."

16.     U.S. Patent Application No. 10/151,436 ("the '436 application") was filed with the U.S. Patent and Trademark Office ("USPTO") on May 20, 2002, and issued as the '117 patent on February 4, 2003.

17.     The '117 patent lists on its face the inventors Bruce Ellsworth, William N. Washburn, Philip M. Sher, Gang Wu, and Wei Meng.

18.     A certificate for correction of inventorship pursuant to 35 U.S.C. § 256 issued by the USPTO on November 25, 2008 corrected the inventorship entity to Bruce Ellsworth, William N. Washburn, and Wei Meng.

19.     The named inventors of the '117 patent executed an assignment of their rights to the patent to Bristol-Myers Squibb Co. ("BMS") on May 8, 2002 that was recorded on May 20, 2002 at the USPTO.

20.     BMS assigned its rights to the '117 patent to AstraZeneca on January 30, 2014 in a document that was recorded on March 4, 2014 at the USPTO.

21.     AstraZeneca is the record owner of the '117 patent.

22.     The '436 application, which issued as the '117 patent, is a continuation-in-part of U.S. Patent Application No. 09/679,027 ("the '027 application"), filed October 4, 2000, now U.S. Patent No. 6,414,126.

23.     The '027 application claims priority to U.S. Provisional Patent Application No. 60/194,615, filed April 5, 2000, and U.S. Provisional Patent Application No. 60/158,773, filed October 12, 1999.

24.     The expiration date of the '117 patent under 35 U.S.C. § 154 was October 4, 2020.  The USPTO issued a certificate extending patent term under 35 U.S.C. § 156 on July 29,

2020, extending the term of the '117 patent by five years.  The expiration date of the '117 patent under 35 U.S.C. § 156 is thus October 4, 2025.

25.    U.S. Reissue Patent Application No. 16/014,479 ("the '479 reissue application") was filed on June 21, 2018 as a reissue application of the '117 patent.

26.    AstraZeneca expressly abandoned the '479 reissue application on June 24, 2019.

27.    The USPTO issued a Notice of Abandonment for the '479 reissue application on June 26, 2019.

28.    Claim 1 of the '117 patent recites:

1. A compound having the structure



or a pharmaceutically acceptable salt, a stereoisomer thereof, or a prodrug ester thereof.

29.    Claim 2 of the '117 patent recites:

2. The compound as defined in claim 1 having the structure

30.     Claim 3 of the '117 patent recites:

3. A pharmaceutical composition comprising a compound as defined in claim 1 and a pharmaceutically acceptable carrier therefor.

31.     Claim 14 of the '117 patent recites:

14. A method for treating or delaying the progression or onset of diabetes, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound healing, insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X, diabetic complications, atherosclerosis or hypertension, or for increasing high density lipoprotein levels, which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in claim 1.

32.     Claim 16 of the '117 patent recites:

16. A method for treating type II diabetes which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in claim 1 alone or in combination with another antidiabetic agent, an agent for treating the complications of diabetes, an anti-obesity agent, an antihypertensive agent, an antiplatelet agent, an anti-atherosclerotic agent and/or a hypolipidemic agent.

## IV.     PLAINTIFF'S STANDING

33.     AstraZeneca is the holder of NDA No. 202293 for FARXIGA® (dapagliflozin).

34.     AstraZeneca has standing as the record owner of the patent-in-suit and as the holder of the NDA for FARXIGA® (dapagliflozin) to bring and maintain the present action.

35.     Such standing existed at the time of filing of C.A. No. 1:18-cv-00664-RGA.

## V.     CLAIM CONSTRUCTION

36.     AstraZeneca and Zydus stipulated on October 21, 2019 that, *inter alia*, no terms of the '117 patent required construction by the Court.

37.     The Court entered the parties' stipulation on claim construction on October 22, 2019.

## VI.    FACTS PERTAINING TO INFRINGEMENT OF THE PATENT-IN-SUIT

38.    

## VII.   FACTS PERTAINING TO VALIDITY ANALYSIS OF THE PATENT-IN-SUIT

39.    Dapagliflozin includes an ethoxy group at the 4-position of the distal phenyl ring.

40.    "WO '128"—International Patent Application Publication No. WO 01/27128—is a printed publication that was published on April 19, 2001.

41.    WO '128 is prior art to the '117 patent under 35 U.S.C. § 102(b).

42.    WO '128 does not exemplify a compound having the chemical structure of dapagliflozin.

43.    Example 12 of WO '128 discloses a compound with the structure:



44.    The structure of Example 12 of WO '128 includes a methoxy group at the 4-position of the distal phenyl ring.

45.    "Hongu"—Mitsuya Hongu et al., *Na⁺-Glucose Cotransporter Inhibitors as Antidiabetic Agents. II. Synthesis and Structure-Activity Relationships of 4'-Dehydroxyphlorizin*

*Derivatives*, 46 CHEM. PHARM. BULL. 22 (1998)—is a printed publication that was published in 1998.

46.     Hongu is prior art to the '117 patent under 35 U.S.C. § 102(b).

47.     "Tsujihara"— Kenji Tsujihara et al., *Na$^+$-Glucose Cotransporter Inhibitors as Antidiabetics. I. Synthesis and Pharmacological Properties of 4'-Dehydroxyphlorizin Derivatives Based on a New Concept*, 44 CHEM. PHARM. BULL. 1174 (1996)—is a printed publication that was published in 1996.

48.     Tsujihara is prior art to the '117 patent under 35 U.S.C. § 102(b).

49.     "EP '359"— European Patent Application Publication No. 0598359—is a printed publication that was published in 1994.

50.     EP '359 is prior art to the '117 patent under 35 U.S.C. § 102(b).

51.     "Kees"—Kenneth Kees et al., *New Potent Antihyperglycemic Agents in db/db Mice: Synthesis and Structure-Activity Relationship Studies of (4-Substituted Benzyl)(Trifluoromethyl)Pyrazoles and -Pyrazolones*, 39 J. MED. CHEM. 3920 (1996)—is a printed publication that was published in 1996.

52.     Kees is prior art to the '117 patent under 35 U.S.C. § 102(b).

53.     "WO '697"—International Patent Application Publication No. WO 98/31697—is a printed publication that was published in 1998.

54.     WO '697 is prior art to the '117 patent under 35 U.S.C. § 102(b).

55.     "Patrick"—Graham Patrick, AN INTRODUCTION TO MEDICINAL CHEMISTRY (1st ed. 1995)—is a printed publication that was published in 1995.

56.     Patrick is prior art to the '117 patent under 35 U.S.C. § 102(b).

57.    "Thomas"—Gareth Thomas, MEDICINAL CHEMISTRY: AN INTRODUCTION (2000)—is a printed publication that was published in 2000.

58.    Thomas is prior art to the '117 patent under 35 U.S.C. § 102(b).

59.    "Patani"—George Patani & Edmond LaVoie, *Bioisosterism: A Rational Approach in Drug Design*, 96 CHEM. REV. 3147 (1996)—is a printed publication that was published in 1996.

60.    Patani is prior art to the '117 patent under 35 U.S.C. § 102(b).

61.    "Scheen"—André Scheen, *Drug Treatment of Non-Insulin-Dependent Diabetes Mellitus in the 1990s: Achievements and Future Developments*, 54 DRUGS 355 (1997)—is a printed publication that was published in 1997.

62.    Scheen is prior art to the '117 patent under 35 U.S.C. § 102(b).

63.    "Tang"—Bing-Kou Tang, *Drug Glucosidation*, 46 PHARMACOLOGY & THERAPEUTICS 53 (1990)—is a printed publication that was published in 1990.

64.    Tang is prior art to the '117 patent under 35 U.S.C. § 102(b).

65.    "Dodge"— Jeffrey Dodge et al., *Synthesis and Estrogen Receptor Binding Affinities of the Major Human Metabolites of Raloxifene (LY139481)*, 7 BIOORGANIC & MED. CHEM. LETTERS 993 (1997)—is a printed publication that was published in 1997.

66.    Dodge is prior art to the '117 patent under 35 U.S.C. § 102(b).

67.    "Kuribayashi I"—Takeshi Kuribayashi et al., *C-Glycosylted Aryl Tins: Versatile Building Blocks for Aryl C-Glycoside Glycomimetics*, 18 J. CARBOHYDRATE CHEM. 371 (1999)—is a printed publication that was published in 1999.

68.    Kuribayashi I is prior art to the '117 patent under 35 U.S.C. § 102(b).

69.     "Kuribayashi II"—Takeshi Kuribayashi et al., *C-Glycosylated Diphenylmethanes and Benzophenones: The Stille Coupling Reaction of C-Glycosylated Aryl Tins with Benzyl Bromides and Acid Chlorides*, 18 J. CARBOHYDRATE CHEM. 393 (1999)—is a printed publication that was published in 1999.

70.     Kuribayashi II is prior art to the '117 patent under 35 U.S.C. § 102(b).

71.     "Kuribayashi III"—Takeshi Kuribayashi et al., *C-Glycosylated Diphenylmethanes for Stable Glycoepitope Mimetics*, 6 SYNLETT 737 (1999)—is a printed publication that was published in 1999.

72.     Kuribayashi III is prior art to the '117 patent under 35 U.S.C. § 102(b).

73.     "UKPDS 33"—UK Prospective Diabetes Study (UKPDS) Group, *Intensive Blood-Glucose Control with Sulphonylureas or Insulin Compared with Conventional Treatment and Risk of Complications in Patients with Type 2 Diabetes (UKPDS 33)*, 352 LANCET 837 (1998)—is a printed publication that was published in 1998.

74.     UKPDS 33 is prior art to the '117 patent under 35 U.S.C. § 102(b).

75.     "UKPDS 34"—UK Prospective Diabetes Study (UKPDS) Group, *Effect of Intensive Blood-Glucose Control with Metformin on Complications in Overweight Patients with Type 2 Diabetes (UKPDS 34)*, 352 LANCET 854 (1998)—is a printed publication that was published in 1998.

76.     UKPDS 34 is prior art to the '117 patent under 35 U.S.C. § 102(b).

77.     "DCCTRG"—Diabetes Control & Complications Trial Research Group, *The Effect of Intensive Treatment of Diabetes on the Development and Progression of Long-Term Complications in Insulin-Dependent Diabetes Mellitus*, 329 NEW ENG. J. MED. 977 (1993)—is a printed publication that was published in 1993.

78.     DCCTRG is prior art to the '117 patent under 35 U.S.C. § 102(b).

79.     "Kamran"—Muhammad Kamran et al., *Overexpression of GLUT2 Gene in Renal Proximal Tubules of Diabetic Zucker Rats*, 8 J. AM. SOC'Y NEPHROLOGY 943 (1997)—is a printed publication that was published in 1997.

80.     Kamran is prior art to the '117 patent under 35 U.S.C. § 102(b).

81.     "Noonan"—W.T. Noonan et al., *Renal Glucose Reabsorption During Hypertonic Glucose Infusion in Female Streptozotocin-Induced Diabetic Rats*, 68 LIFE SCI. 2967 (2001)—is a printed publication that was published on May 18, 2001.

82.     Noonan is prior art to the '117 patent under 35 U.S.C. § 102(b).

83.     "Mogensen"—C.E. Mogensen, *Maximum Tubular Reabsorption Capacity for Glucose and Renal Hemodynamics During Rapid Hypertonic Glucose Infusion in Normal and Diabetic Subjects*, 28 SCANDINAVIAN J. CLIN. LAB. INVESTIGATION 101 (1971)—is a printed publication that was published in 1971.

84.     Mogensen is prior art to the '117 patent under 35 U.S.C. § 102(b).

85.     "Chasis"—Herbert Chasis et al., *The Action of Phlorizin on the Excretion of Glucose, Xylose, Sucrose, Creatinine and Urea by Man*, 12 J. CLIN. INVESTIGATION 1083 (1933)—is a printed publication that was published in 1933.

86.     Chasis is prior art to the '117 patent under 35 U.S.C. § 102(b).

87.     "Link"—J.T. Link & Bryan K. Sorensen, *A Method for Preparing C-glycosides Relating to Phlorizin*, 41 TETRAHEDRON LETTERS 9213 (2000)—is a printed publication that was published in 2000.

88.     Link is prior art to the '117 patent under 35 U.S.C. § 102(b).

12

89.     U.S. Patent Application No. 10/117,914 was filed with the USPTO on April 8, 2002, and issued as U.S. Patent No. 6,774,112 ("the '112 patent") on August 10, 2004.

90.     U.S. Patent Application No. 09/791,512 was filed with the USPTO on February 23, 2001, and issued as U.S. Patent No. 6,683,056 on January 27, 2004.

91.     U.S. Patent Application No. 10/221,843 ("the '843 application") was filed with the USPTO on December 30, 2002, claiming priority to International Patent Application No. PCT/JP01/02041, which was filed March 15, 2001 and published September 20, 2001.  The '843 application issued as U.S. Patent No. 7,465,712 ("the '712 patent") on December 16, 2008.

92.     Because International Patent Application No. PCT/JP01/02041 was not in English, the subject matter of the '712 patent is available as prior art only as of its publication date of September 20, 2001.

93.     The streptozotocin (STZ) rat and the Zucker diabetic fatty (ZDF) rat models represent two animal models used to study potential antidiabetic effects of drug candidates.

94.     The STZ model employs Sprague-Dawley rats that are made diabetic by the administration of STZ before dosing with the test compound.

95.     In an STZ model, generally characterized as an acute animal model, the animals are observed to determine the compound's ability to reduce blood glucose over a short time period.

96.     The ZDF model, generally characterized as a chronic animal model, uses rats that are genetically predisposed to become diabetic.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTRAZENECA AB,<br><br>     Plaintiff,<br><br>v.<br><br>ZYDUS PHARMACEUTICALS (USA) INC.,<br><br>     Defendant. | C.A. No. 1:18-cv-00664-RGA<br><br>███████████████████<br>███████████████████ |

**ASTRAZENECA'S RESPONSIVE STATEMENT OF DISPUTED FACTS**

**I.     Introduction**

1.     This case concerns the active pharmaceutical ingredient dapagliflozin, which has been marketed in the United States by AstraZeneca under the brand name FARXIGA® since 2014.

2.     FARXIGA® is indicated as an adjunct to diet and exercise to improve glycemic control in adult patients with type 2 diabetes mellitus, as well as to reduce the risk of hospitalization for heart failure in adults with type 2 diabetes mellitus and established cardiovascular disease or multiple cardiovascular risk factors.

3.     FARXIGA® is further indicated to reduce the risk of cardiovascular death and hospitalization for heart failure in adults with heart failure with reduced ejection fraction (NYHA class II-IV).

## II.    Background

### A.    Factual Background Relating to This Litigation

4.    Under 21 U.S.C. § 355(j), Zydus submitted to the FDA Abbreviated New Drug Application ("ANDA") No. 211582 to obtain approval for the commercial manufacture, use, marketing, and sale of dapagliflozin tablets, generic versions of AstraZeneca's FARXIGA® drug products ("Zydus' ANDA Products"), in the United States.

5.    Zydus filed ANDA No. 211582 to obtain approval to manufacture, use, market, and sell Zydus' ANDA Products in the United States before the expiration of the '117 patent.

6.    In a "Notice Letter" dated March 20, 2018, Zydus informed AstraZeneca that Zydus was seeking FDA approval to commercially manufacture, use, offer to sell, and sell in the United States, and/or import into the United States Zydus' ANDA Products prior to the expiration of the '117 patent.

7.    AstraZeneca AB is the owner of all rights, title, and interest of the '117 patent, and the inventions disclosed therein.

### B.    Drug Discovery and Development

8.    Drug discovery and development is the study and evaluation of new drug therapies.

9.    Those that practice drug discovery and development must have a strong background in organic chemistry and an understanding of fields such as pharmacology, biology, physiology, biochemistry, pharmacokinetics, toxicology, and medicine.

10.    The process for developing new drugs is long, expensive, and unpredictable.

11.    Drug development typically begins with the identification of a biological target.

12.    A pharmacologist will apply compound screening technology in an attempt to identify agents that interact with the biological target.  This is not a simple process and may

require a large number of compounds to be screened to find a lead compound, and there is a high rate of failure.

13.     The progression from early lead compounds to potential drug candidates often utilizes structure-activity relationship ("SAR") studies.

14.     A SAR is the relationship between the structure of a particular molecule and its properties, such as inhibition of the biological target and consequent biological activity.

15.     SAR studies are typically an iterative process of compound design, synthesis, and evaluation wherein a medicinal chemist eventually gains a better understanding of which functional group or groups are responsible for producing a desired effect.

16.     The decision of which compounds to make and test is often guided by what has been learned in earlier iterations of the SAR.  This approach hopefully leads to the identification of compounds with the correct size, shape, and electronic configuration to bind to the biological target.

17.     Functional groups play an important role in medicinal chemistry, particularly in the design of test compounds. A functional group is an atom or group of atoms combined to form a small molecular moiety within a larger molecule.

18.     Functional groups can have a large impact on the chemical and physical characteristics of a compound, and experimentation with the type and position of a functional group within a larger molecule is often an important part of the drug discovery process.

19.     There are numerous types of functional group modifications available to a medicinal chemist.

20.     A medicinal chemist could replace one functional group with another or change the size, shape, location, or electronic configuration of a functional group.  These alterations can

3

have a significant effect on the characteristics of a compound.  This process is normally pursued one modification at a time so that the impact of each change on compound activity can be properly determined.

21.     This iterative process allows construction of SARs which a medicinal chemist uses to design the next compounds for synthesis.

22.     The properties of a compound also depend on the spatial arrangement of functional groups.

23.     The spatial arrangement of the groups within a compound can affect how the compound interacts with its biological target and other molecules in the human body.

24.     One of the most important properties of a compound is potency, which is a measure of the molar concentration of the compound required to produce a given response.

25.     Usually, potency is assessed *in vitro* against isolated target molecules or cells. The ultimate goal, however, is *in vivo* potency, usually assessed in relevant animal models.

26.     For SGLT inhibitors, potency is typically expressed in terms of half maximal effective concentration, or $EC_{50}$, which refers to the concentration of a drug that induces a response halfway between the baseline and maximum after a specified exposure time.  A lower $EC_{50}$ value indicates that a compound is a more potent inhibitor.

27.     Medicinal chemists can use SAR to iteratively evaluate the most potent compounds to determine which aspects of the compound improve potency, as well as selectivity with respect to off-target activity.

28.     A critical step in the identification of drug candidates is demonstration of their activity in animal models of disease.

4

29.     Due to more complex processes affecting drug action *in vivo*, improved potency *in vitro* does not always translate into improved *in vivo* potency.

30.     Compounds found active in *in vitro* assays are evaluated in acute rodent models of disease.

31.     Compounds active in an acute model are progressed to a more rigorous chronic model that is able to better assess the drug molecule properties of a test compound.

32.     Compounds with the best efficacy in a chronic model of type 2 diabetes would be considered as potential drug candidates.

33.     In addition to having sufficient potency against the biological target and efficacy in animal models, a successful drug candidate must have other favorable drug molecule properties, such as bioavailability, stability, and safety.

34.     Finding a compound that meets all desired criteria is a lengthy, complex, and unpredictable process requiring multiple different types of investigations.

35.     The structure of a compound alone is a poor predictor of its properties.

36.     Modifying one portion of a compound in the hopes of improving one property can have unpredictable, and potentially detrimental, consequences on other properties of the modified compound.

37.     Developing a drug candidate often entails balancing competing considerations, and a person of ordinary skill in the art is often required to balance one desired property against another.

38.     Compound safety is another necessary property of a drug candidate.

39.     During the drug development stage, safety is assessed by testing the compound in rodents, e.g., rats or mice, and non-rodents, e.g., dogs or monkeys.

40.     These safety studies are designed to assess the compound's effects on other off-target aspects of its pharmacology, such as effects on cardiac parameters and respiration, and to observe the compound's toxicology profile.

41.     Safety issues, such as neurotoxicity, that are identified but cannot be mitigated can lead to abandonment of promising compounds, further complicating the drug development process.

42.     The safety evaluation is unpredictable.

43.     The majority of drug candidates that enter product development do not reach the market.

**C.     Glucose Metabolism**

44.     The sugar "glucose" is a major source of metabolic energy in the body.

45.     The concentration of glucose in the blood fluctuates and depends on the rate at which glucose enters and leaves the bloodstream.

46.     Blood glucose levels rise following a meal (referred to as the "postprandial" or "fed" state), and the body will work to remove glucose from the blood and store excess in tissues.

47.     Between meals or following exercise, blood glucose levels will fall (referred to as the "fasting" state), and the body will work to deliver glucose back into the bloodstream.

48.     The body regulates glucose uptake, synthesis, and disposal to maintain stable levels of blood glucose (homeostasis).

49.     Homeostasis of blood glucose levels is maintained by the action of key hormones, insulin and glucagon, among others.

50.     When blood glucose levels rise, pancreatic beta cells secrete insulin, which stimulates glucose-utilizing tissues such as liver, muscle, and adipose (fat) tissue to remove the glucose from the blood.

51.     Glucose has three ultimate fates: (1) it can be used as an energy source, (2) it can be stored as glycogen through a process called glycogenesis, or (3) it can be converted to triglycerides for storage in adipose tissue.

52.     When blood glucose levels fall, pancreatic beta cells stop secretion of insulin and pancreatic alpha cells secrete glucagon, which stimulates the liver to convert stored glycogen back into glucose though a process called glycogenolysis.

53.     As glycogen stores are depleted, tissues also may synthesize glucose de novo (gluconeogenesis).

54.     Glucose levels that are too high or too low can have serious, adverse health consequences.

**D.     Type 2 Diabetes**

55.     Diabetes mellitus, commonly known as diabetes, is a metabolic disorder characterized by high blood sugar over a prolonged period of time.

56.     Chronic complications of diabetes include increased risk of heart disease and stroke, diabetic retinopathy (damage to the retinas of the eyes) that can result in vision loss, diabetic nephropathy (damage to the kidneys) that can result in end-stage renal disease that requires dialysis or transplantation and diabetic neuropathy (damage to the peripheral nerves) that can cause pain, numbness and can increase the risk of lower limb amputation.

57.     Diabetes is the leading cause of new cases of adult blindness, end-stage renal disease, and non-traumatic amputations in the United States.

58.     Subtypes of diabetes include type 1 diabetes (previously called juvenile-onset

diabetes), type 2 diabetes (previously called adult-onset diabetes), gestational diabetes (glucose intolerance that develops during pregnancy) and monogenic diabetes (also called maturity-onset diabetes of the young (MODY)).

59.     The most common types of diabetes are type 1 diabetes and type 2 diabetes.

60.     Type 1 diabetes results from the pancreas's inability to make sufficient insulin for the body.

61.     Type 1 diabetes is most commonly diagnosed in the mid-teens and develops when pancreatic beta cells are destroyed by the body's immune system.

62.     Insulin is a hormone that regulates the production, uptake, metabolism, and storage of glucose, ensuring that energy utilization and demand are in balance.

63.     In patients with type 1 diabetes, the production and secretion of insulin is severely reduced or completely eliminated.

64.     With insufficient insulin, glucose builds up in the bloodstream in a condition known as hyperglycemia.

65.     Glucose levels that are too high or too low can have serious, adverse health consequences.

66.     Patients with type 1 diabetes must have exogenous insulin delivered by intermittent injection or by an insulin pump.

67.     Hyperglycemia (abnormally high blood glucose level) in individuals with uncontrolled diabetes can result in acute symptoms including excessive urination, increased thirst, blurred vision, fatigue, weight loss and infections.

68.     Untreated hyperglycemia can lead to damage of the nerves (neuropathy) and blood vessels, causing damage to kidneys (nephropathy) and the cardiovascular system (retinopathy and peripheral vascular disease).

69.     Symptoms of hypoglycemia (abnormally low blood glucose level) can include hunger, headache, racing heart and increased sweating.

70.     Severe hypoglycemia can cause altered mental state, seizures, strokes, coma, or death.

71.     Type 2 diabetes, which makes up about 90-95% of diabetes cases, is characterized by the body's failure to properly respond to insulin.

72.     Insulin resistance causes the pancreas to produce excess insulin in an attempt to regulate glucose levels.  Eventually, the pancreas is unable to produce enough insulin to control blood glucose, resulting in hyperglycemia.

73.     As in type 1 diabetes, untreated hyperglycemia can lead to damage of the nerves, blood vessels, tissues, and organs.

74.     Type 2 diabetes is most commonly diagnosed in adulthood.

75.     The prodromal state of severe insulin resistance may develop years before overt diabetes and is now termed "prediabetes."

76.     For an individual with prediabetes, the risk of developing overt diabetes is approximately 10% per year.

77.     In the late 1990s, an estimated 16 million Americans had type 2 diabetes, and the prevalence was increasingly rapidly.

78.     The development of type 2 diabetes may be a progressive process over many years. Patients may not have symptoms of hyperglycemia, hence the disease may remain undiagnosed for an extended time.

79.     At the time of the invention of the '117 patent, only half of those affected by type 2 diabetes were diagnosed and actively being treated.

80.     Even today, type 2 diabetes cannot be cured.  Rather, it is managed through combinations of anti-diabetic drugs depending on the particular needs of the patient.

**E.     Animal Models of Diabetes**

81.     Compound safety is another necessary property of a drug candidate.

82.     During the drug development stage, safety is assessed by testing the compound in rodents, e.g., rats or mice, and non-rodents, e.g., dogs or monkeys.

83.     These safety studies are designed to assess the compound's effects on other off-target aspects of its pharmacology, such as effects on cardiac parameters and respiration, and to observe the compound's toxicology profile.

84.     Safety issues that are identified but cannot be mitigated can lead to abandonment of promising compounds, further complicating the drug development process.

85.     The safety evaluation is also unpredictable and the majority of drug candidates that enter product development do not reach the market.

86.     The streptozotocin (STZ) rat and the Zucker diabetic fatty (ZDF) rat models are commonly used to test potential antidiabetic agents.

87.      BMS utilized both STZ and ZDF rat models during the drug development program that eventually produced dapagliflozin.

88.     The STZ model employs Sprague-Dawley rats that are made diabetic by the administration of STZ before dosing with the test compound.  In an STZ model, the animals are

observed over, e.g., a period of approximately five hours to determine the compound's ability to reduce blood glucose over a short time period.

89.     The ZDF model uses rats that are genetically predisposed to become diabetic. This model is a more complex model and comprises aspects of insulin resistance that better reflect the condition of type 2 diabetes in man than the STZ model.

90.     The ZDF rat is a chronic model where an effective test compound must maintain activity over the entire course of the study, e.g., 14 days, to demonstrate the desired effect on plasma glucose.  Measures of efficacy, such as blood or plasma glucose levels, result from the test compound's potency against the biological target as well as its pharmacokinetic profile following an oral dose.

91.     *In vivo* evaluation in a chronic rat model, such as the ZDF rat model also allows for an early assessment of compound safety.

92.     Generally, at the time of invention, compounds that showed promising results *in vitro* were tested in the STZ model and those with positive results in the STZ model were then investigated in a ZDF model.  Many unsuitable compounds would be weeded out in each step of this workflow, with only the most promising compounds ultimately tested in the ZDF model. Although the ZDF model was the best predictor for how a compound would work in humans— often considered a "the gold standard"—it has high costs and requires an extended period of administration.

**F.     SGLT2 Inhibitors**

93.     At the time of dapagliflozin's invention, treatments of type 2 diabetes focused on the alleviation of hyperglycemia.

94.     Most commonly used therapies included metformin, sulfonylureas, thiazolidinediones, and insulin, but two-thirds of patients failed to reach their therapeutic goals.

11

95.     Additional therapies were required to improve outcomes for a growing population of type 2 diabetes patients as no diabetes therapy had proven fully effective in helping diabetes practitioners and patients manage symptoms of the disease.

96.     Numerous strategies were available, including the development of long-acting GLP-1 receptor agonists and inhibitors of dipeptidyl peptidase-4 (DPP-4), the enzyme that degrades endogenous GLP-1 and glucose-dependent insulinotropic polypeptide.

97.     Another potential strategy was the inhibition of sodium glucose-linked transporter 2 (SGLT2s), which is a protein predominantly expressed in the proximal tubule of the human kidney, where it executes re-absorption of filtered glucose.

98.     While the predominate SGLT found in the kidney, known as SGLT2, is the biological target, the SGLT found in the intestine, known as SGLT1, plays an important role in absorption of dietary glucose.

99.     When inhibitors of SGLT2 in the kidney block glucose reuptake, allowing it to pass out of the body through the urine, they cause a reduction in glucose levels in plasma.

100.    SGLT2 inhibitors must be highly selective and not block SGLT1 in the intestine because blocking glucose absorption in the intestine can cause severe diarrhea and dehydration.

101.    One of the earliest SGLT inhibitors observed was a naturally occurring compound called phlorizin. Phlorizin is an O-aryl glucoside with the following structure:

**Phlorizin**

102.     Phlorizin was observed to increase the amount of glucose in the urine and lower blood glucose levels.

103.     Phlorizin's effects are not limited to the kidney.  Phlorizin is a non-specific SGLT1 and SGLT2 inhibitor, meaning that it also inhibits glucose absorption in the intestine, which can cause severe diarrhea and dehydration.

104.     Phlorizin is also metabolically unstable.  It is converted to phloretin by β-glucosidases in the intestine.

105.     High doses of Phlorizin have to be given frequently, multiple times per day, to ensure that the circulating phlorizin levels remain high enough to elicit the desired biological response.

106.     Despite phlorizin's unsuitability for use in humans, scientists remained interested in using it as a starting point to develop a treatment for type 2 diabetes.

107.     Researchers at Tanabe Seiyaku studied phlorizin analogues, which led to the discovery of O-glucoside compound "T-1095A" and its prodrug "T-1095."



R=H; **T-1095A**
R=$CO_2$Me; **T-1095**

108.    Administration of T-1095A as the prodrug in animal models was reported to induce urinary glucose excretion and decrease blood glucose levels.

109.    Following Phase 2 clinical studies, testing of T-1095 was eventually stopped.

110.    Researchers at Kissei, Astellas, Taisho, and Sanofi also produced derivatives of phlorizin as potential treatments, which were discontinued at various stages of development.

## III.    Development of Dapagliflozin

111.    The actual experience of the Bristol-Myers Squibb ("BMS") inventors leading to the discovery of dapagliflozin reflects the unpredictability of the drug discovery process described above and is itself strong evidence of the nonobviousness of the discovery.

### A.    Early Work with O-Glucoside Products

112.    While the problems associated with the O-glucoside phlorizin in terms of its potential to be a drug candidate were known, it had served to demonstrate the utility of SGLT2 as a biological target in the treatment of type 2 diabetes.

113.    In early 1998, a team of BMS scientists supervised by William Washburn, armed with the knowledge that O-glucosides such as phlorizin could produce glucosuria, began experimenting with O-glucosides in search of a selective and potent SGLT2 inhibitor.

114.    



116.

**B.    The Accidental Discovery of C-Glucoside Inhibitors**

118.    As we now know, the ultimate solution to the metabolic instability of the O-glucoside inhibitors lay in the discovery by BMS of a class of C-glucoside inhibitors.  But that discovery was made by accident.

119.    

125. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████

  ██   ████████████████████████

  ██   ███████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

127.     BMS experimented with a variety of substituents on the central and distal rings, as well as with the nature and size of the spacer between the rings, ultimately described in the 101 exemplified O-glucoside compounds in BMS's U.S. Patent No. 6,683,056.

128. ████████████████████████████████████████

████████████████████████████████████

  ██   ████████████████████████



130. ████████████████████████████████████████

████████████████████████████████████████████



131. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Link and coworkers made a similar

finding, and published their work as J.T. Link & Bryan K. Sorensen, A Method for Preparing C-

glycosides Relating to Phlorizin, 41 TETRAHEDRON LETTERS 9213, 9213 (2000).

**D.    BMS's Development of C-Glucoside SGLT2 Inhibitors**

132. ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

133. ███████████████████████████████████

████████████████████████████████████████████

██ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████

    **1.** ███████████████████

██ ████████████████████████████████████

██ █████████████████████████████████████████

███████████████████████████████



137. *I* ████████████████████████████████

████████████████████████

██ ███████████████████████████████████

███████

██ ███████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

██ ████████████████████████████████

████████████████████████████████.

141.     

143.     BMS-356103 was described in Example 1 of the patent application leading to U.S. Patent No. 6,414,126.

144.     BMS-356103 was also described in U.S. Patent Application No. 10/117,914, which was filed with the USPTO on April 8, 2002, and issued as U.S. Patent No. 6,774,112 ("the '112 patent") on August 10, 2004.

145.     The '112 patent has an effective filing date prior to the effective filing date of the '117 patent.

146.

147.     80 examples of this new C-glycoside class of molecules were synthesized and described in the application that issued as the '126 patent.

148.     None of the 80 exemplified embodiments in the '126 patent had a p-ethoxy group on the distal ring.

149.     None of the 101 O-glucoside SGLT2 inhibitors synthesized in the '056 patent included a p-ethoxy substituent.

150.

██████████████████████████████████████████████

█████████████████████

151.    That finding was consistent with the reported findings of Tanabe in one of their

O-glucoside series, where substitution of the p-ethoxy on the distal ring also greatly diminished

the activity of the inhibitor compared to the use of p-methoxy.

**2.**    ████████████████████████████

██    ████████████████████████████████████

██████████████████████████████████████████████

█████████████

██    ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████



██████████

██    ████████████████████████████████████

███████████████████████████████████████

155.    ███████████████████████████████████

██████████████████████████████████████████████

█████████████████████████

156.



163.   BMS-512148 has the following structure:

**BMS-512148**

164.     BMS-512148 is now commonly referred to as dapagliflozin.

165.     BMS-512148 is the subject of the '117 patent claims.

166.     BMS-512148 reflects the first C-glucoside made by BMS with a p-ethoxy distal substituent.

167.     BMS evaluated seven of the identified compounds against BMS-356103 and BMS-437133 in an STZ rat study, with the following results:



| BMS # | R | X | cLogP | SGLT2 $EC_{50}$ (nM) | Selectivity vs. SGLT1 | Max % Decrease of Plasma Glucose in STZ Rats @ 0.1 mg/kg p.o. | Dog $t_{1/2}$ (hr) | Rat $t_{1/2}$ (hr) |
|---|---|---|---|---|---|---|---|---|
| 356103 | H | Et | 2.0 | 8 | > 10,000 | 17 | 14 | 2.5 |
| 437133 | Me | SMe | 1.9 | 1 | 800 | 47 | 12.5 | 3.2 |
| | | | | | | | | |
| 435323 | Me | OMe | 1.3 | 1 | 540 | 36 | 8 | 1 |
| 439311 | F | OMe | 1.0 | 4 | > 2000 | 28 | 20 | |
| 451660 | Cl | OMe | 1.5 | 0.8 | 700 | 38 | 14 | 4 |
| 511613 | Me | OEt | 1.8 | 2 | 450 | 44 | | |
| 526661 | F | OEt | 1.5 | 5 | > 1600 | 37 | | |
| 512148 | Cl | OEt | 2.0 | 3 | 700 | 47 | | 4.6 |
| 422459 | Me | Et | 2.4 | 0.6 | 1000 | 41 | 19 | 1.7 |

23

168. ███████████████████████████████████

████████████████████████████████████████████

████████████████

███ ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████

███ ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

███ ████████████████████████████████

██████████████████████████████████████

████████████████████████





172. ████████████████████████████████████████████

████████████████████████████████████████

███ ███████████████████████████████████████

████████████████████████████████████████

███ ████████████████████████████████████████

███████████████████████████████████████

███ ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

███ ██████████████████████████████████████

████████████████████████████████████████████

██████

███ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

178.



183.    BMS filed an IND application covering dapagliflozin on November 21, 2003.

184.    Clinical studies featuring more than 8500 type 2 diabetes patients confirmed that dapagliflozin is safe and effective when administered at 5 or 10 mg daily as a monotherapy or as an add-on therapy with other antidiabetic agents such as insulin, sitagliptin, metformin, pioglitazone, or sulfonylurea.

185.    Dapagliflozin is marketed as FARXIGA® in the United States and FORXIGA® worldwide.

## IV.    The Asserted Claims of the '117 Patent Would Not Have Been Obvious to a Person of Ordinary Skill in the Art

186.    The asserted claims of the '117 patent are directed to dapagliflozin and its use in treating diabetes, its symptoms, its complications, and its related conditions.

187.    The subject matter of asserted claims would not have been obvious to a person of ordinary skill in the art due to the nonobviousness of the combination of structural features in the dapagliflozin molecule, the unpredictability in this field, and the constellation of unpredictable, unexpected, and surprising properties possessed by dapagliflozin that make it such a useful addition to the available treatments for diabetes.

## A.    Alleged Prior Art

### 1.    WO '128

188.    WO '128 discloses compounds having the following structure I:



**I**

where $R^1$, $R^2$, and $R^{2a}$ are independently hydrogen, OH, $OR^5$, lower alkyl, $CF_3$, $OCHF_2$, $OCF_3$, $SR^{5i}$ or halogen, or two of $R^1$, $R^2$ and $R^{2a}$ together with the carbons to which they are attached can form an annelated five, six or seven membered carbocycle or heterocycle;

$R^3$ and $R^4$ are independently hydrogen, OH, $OR^{5a}$, OAryl, $OCH_2Aryl$, lower alkyl, cycloalkyl, $CF_3$, $-OCHF_2$, $-OCF_3$, halogen, -CN, $-CO_2R^{5b}$ , $-CO_2H$, $COR^{6b}$, $-CH(OH)R^{6c}$, $-CH(OR^{5h})R^{6d}$, $-CONR^6R^{6a}$, $-NHCOR^{5c}$, $-NHSO_2R^{5d}$, $-NHSO_2Aryl$, Aryl, $-SR^{5e}$, $-SOR^{5f}$, $-SO_2R^{5g}$, $-SO_2Aryl$, or a five, six or seven membered heterocycle, or $R^3$ and $R^4$ together with the carbons to which they are attached form an annelated five, six or seven membered carbocycle or heterocycle;

$R^5$, $R^{5a}$, $R5b$, $R^{5c}$, $R^{5d}$, $R^{5e}$, $R^{5f}$, $R^{5g}$, $R^{5h}$ and $R^{5l}$ are independently lower alkyl;

$R^6$, $R^{6a}$, $R^{6b}$, $R^{6c}$, and $R^{6d}$ are independently hydrogen, alkyl, aryl, alkylaryl or cycloalkyl, or $R^6$ and $R^{6a}$ together with the nitrogen to which they are attached form an annelated five, six or seven membered heterocycle; A is O, S, NH, or $(CH_2)_n$ where n is 0 – 3.

27

189.    The "most preferred" compounds of WO '128 are compounds with the following structure identified as formula IB ("Structure IB"):



**IB**

where $R^1$ is hydrogen, halogen or lower alkyl and $R^4$ is lower alkyl, $R^{5a}O$, -$OCHF_2$, or -$SR^{5e}$.

190.    In the formula of Structure IB, $R^1$ can be a hydrogen, a halogen, or a lower alkyl and $R^4$ can be lower alkyl, $R^{5a}O$, -$OCHF_2$, or -$SR^{5e}$. WO '128 states that $R^{5a}$ and $R^{5e}$ are independently alkyl.

191.    WO '128 defines "lower alkyl" as including both straight and branched chain hydrocarbons containing 1 to 8 carbons.

192.     WO '128 defines "alkyl" as including both straight and branched chain hydrocarbons containing 1 to 20 carbons, preferably 1 to 10 carbons, more preferably 1 to 8 carbons.

193.    Each "lower alkyl" and "alkyl" group may have up to four substituents, and WO '128 discloses thirty-seven different classes of possible substituents:

[groups] such as halo, for example F, Br, Cl or I or $CF_3$, alkyl, alkoxy, aryl, aryloxy, aryl(aryl) or diaryl, arylalkyl, arylalkyloxy, alkenyl, alkynyl, cycloalkyl, cycloalkenyl, cycloalkylalkyl, cycloalkylalkyloxy, optionally substituted amino, hydroxy, hydroxyalkyl, acyl, alkanoyl, heteroaryl, heteroaryloxy, cycloheteroalkyl, arylheteroaryl, arylalkoxycarbonyl, heteroarylalkyl, heteroarylalkoxy, aryloxyalkyl, aryloxyaryl, alkylamido,

28

alkanoylamino, arylcarbonylamino, nitro, cyano, thiol, haloalkyl, trihaloalkyl and/or alkylthio.

194.    The genus of Structure IB is extremely large, encompassing millions of compounds.

195.    WO '128 contains 80 working examples.

196.    Claim 10 of WO '128 is directed to the compounds of Examples 1-15.

197.    Claim 11 of WO '128 is directed to the compounds of Examples 16-45.

198.    Claim 12 of WO '128 is directed to the compounds of Examples 46-58.

199.    Claim 13 of WO '128 is directed to the compounds of Examples 59-80.

200.    There is nothing in WO '128 specification or its claims that would have led a person of ordinary skill to select a compound for further development from those compounds recited in claim 10 over the compounds of claims 11-13.

201.    WO '128 provides no biological data for any of the 80 working examples.

202.    In the absence of biological data, one of ordinary skill in the art would not have been led to decide which of the innumerable C-aryl glucosides described in WO '128 would be a starting or lead molecule for further development, apart from an apparent preference for the compounds of Examples 1 and 2 based on them having been produced in larger, gram-scale quantities than the other examples.

203.    Of the 25 total examples falling within Structure IB, none feature an ethoxy group on either ring and only three have a chloride on the central ring.

204.    Other than the batch size, which would point away from Example 12, there is nothing in WO '128's specification or its claims that would have led a person of ordinary skill in the art to pluck out any particular example as a "lead compound" or starting point for further

29

modification other than hindsight knowledge of the structure and desirable properties of dapagliflozin.

205.    WO '128 does not disclose a compound having the chemical structure of dapagliflozin.

206.    There is nothing in WO '128 that would have led a person of ordinary skill to select the particular functional groups of dapagliflozin.

### 2.    Hongu

207.    Hongu is directed to the substitution of phlorizin derivatives and would not have motivated one of ordinary skill in the art to modify non-phlorizin derivatives.



**Hongu**

208.    Hongu teaches that there is a strict structural requirement for activity in O-aryl beta-D-glucoside SGLT inhibitors, and any change at the bridge part between the phenyl rings results in complete loss of activity.

209.    The ketone on the bridge part in O-aryl beta-D-glucoside SGLT inhibitors was said to be necessary to exhibit the activity.

210.    Dapagliflozin does not contain a ketone on the bridge.

30

211.    The biological data provided by Hongu is based largely on glucosuria in acute rat studies.

212.    Hongu provides no data on human SGLT2 inhibition.

213.    Only five compounds are shown by Hongu to inhibit rat kidney SGLT and no information on selectivity with respect to SGLT1 is described.

214.    In the absence of any SAR data against human SGLT2 and SGLT1, the applicability of Hongu's findings to C-aryl glucoside inhibitors, especially those lacking a ketone in the compound's bridge, is unclear at best.

215.    To the extent parallels between the SARs of O-glucosides and C-glucosides may have been perceived, Table 1 of Hongu shows that 4-OEt displayed less activity than 4-OMe and several other groups, including H, 3-Me, 4-Me, 4-Et, 4-NMe$_2$, and 4-Cl.

| No. | R¹ | Method | Yield[a] (%) | mp (°C) (Recryst. solvent) | Formula | Anal. Calcd (Found) | | | Urinary glucose excretion[b] (mg/24h) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | C | H | N | p.o. | i.p. |
| 1 | 4-OMe[c] | | | | | | | | $340 \pm 18$ | $204 \pm 8$ |
| 2 | 3-OMe | A | 31 | 105—107 (iso-Pr₂O) | $C_{22}H_{26}O_{6}$ | 60.82 (60.87) | 6.03 6.29) | | $66 \pm 12$ | $88 \pm 6$ |
| 3 | 2-OMe | A | 52 | Amorphous | $C_{22}H_{26}O_{6} \cdot 1/4H_{2}O$ | 60.20 (60.37 | 6.08 6.06) | | $8 \pm 1$ | $11 \pm 2$ |
| 4 | 4-OEt | A | 46 | 76.5—78 (MeO-H₂O) | $C_{23}H_{28}O_{6} \cdot 3/4H_{2}O$ | 59.77 (59.55 | 6.44 6.42) | | $124 \pm 27$ | $77 \pm 9$ |
| 5 | 3-OH | A | 54 | 127—130 (Et₂O) | $C_{21}H_{24}O_{6} \cdot 5/4H_{2}O$ | 56.95 (57.05 | 6.03 5.96) | | $3 \pm 0$ | NT |
| 6 | 2-OH | A | 53 | 128—132 (Et₂O) | $C_{21}H_{24}O_{6} \cdot 1/2H_{2}O$ | 58.74 (58.45 | 5.87 5.69) | | $2 \pm 1$ | $14 \pm 3$ |
| 7 | H | A | 54 | 126—129 (Et₂O-iso-Pr₂O) | $C_{21}H_{24}O_{5} \cdot 1/4H_{2}O$ | 61.68 (61.88 | 6.04 5.91) | | $217 \pm 18$ | $160 \pm 8$ |
| 8 | 2-Me | A | 32 | Amorphous | $C_{22}H_{26}O_{5} \cdot 1/2H_{2}O$ | 62.48 (62.37 | 6.32 6.28) | | $21 \pm 11$ | $9 \pm 3$ |
| 9 | 3-Me | A | 49 | 78—81 (Acetone-H₂O) | $C_{22}H_{26}O_{5} \cdot 3/4H_{2}O$ | 61.17 (61.18 | 6.39 6.42) | | $299 \pm 35$ | $160 \pm 11$ |
| 10 | 4-Me | A | 49 | 105— (iso-Pr₂O) | $C_{22}H_{26}O_{5} \cdot 1/4H_{2}O$ | 62.48 (62.76 | 6.32 6.24) | | $344 \pm 84$ | $144 \pm 10$ |
| 11 | 4-Et | A | 51 | 127.5—129.5 (Et₂O-iso-Pr₂O) | $C_{23}H_{28}O_{5}$ | 63.88 (63.59 | 6.53 6.51) | | $277 \pm 64$ | $76 \pm 6$ |
| 12 | 4-i-Pr | A | 33 | 109—112 (Et₂O-iso-Pr₂O) | $C_{24}H_{30}O_{5}$ | 64.56 (64.28 | 6.77 6.64) | | $31 \pm 6$ | $8 \pm 3$ |
| 13 | 4-Ph | A | 42 | Amorphous | $C_{27}H_{28}O_{5}$ | 67.49 (67.19 | 5.87 6.03) | | NT | $1 \pm 1$ |
| 14 | 4-NMe₂ | A | 32 | Amorphous | $C_{23}H_{29}NO_{5} \cdot 1/4H_{2}O$ | 61.12 (60.99 | 6.58 6.82) | 3.10 2.81) | $178 \pm 22$ | $122 \pm 8$ |
| 15 | 4-COOH | A | 43 | 200.5—204 (MeOH-iso-Pr₂O) | $C_{22}H_{24}O_{10} \cdot 3/4H_{2}O$ | 57.20 (57.21 | 5.56 5.47) | | $4 \pm 1$ | $1 \pm 0$ |
| 16 | 4-CONH₂ | A | 35 | 178—181 (MeOH-iso-Pr₂O) | $C_{22}H_{25}NO_{6} \cdot 1/2H_{2}O$ | 57.89 (57.81 | 5.74 5.66) | 3.07 2.99) | $2 \pm 1$ | $83 \pm 23$ |
| 17 | 4-CN | A | 28 | 155—156.5 (MeOH-iso-Pr₂O) | $C_{22}H_{23}NO_{5} \cdot H_{2}O$ | 59.06 (59.19 | 5.63 5.46) | 3.13 3.01) | $4 \pm 0$ | $10 \pm 1$ |
| 18 | 4-Cl | B | 48 | 142—144 (iso-Pr₂O) | $C_{21}H_{23}ClO_{5}$ | 57.47 (57.47 | 5.28 5.57) | | $253 \pm 23$ | $115 \pm 9$ |
| 19 | 4-SMe | C | 42 | 135—136 (CH₂Cl₂-iso-Pr₂O) | $C_{22}H_{26}O_{5}S \cdot 1/4H_{2}O$ | 58.07 (58.18 | 5.88 5.75) | | $101 \pm 21$ | NT |

*a*) Isolated yield from 35.   *b*) Urinary glucose level was measured after two administrations of the test compound (*p.o.*, 100 mg/kg; i.p., 10 mg/kg).[*b*] NT: not tested.   *c*) Reference 1.

216.    There would have been no motivation for a person of ordinary skill in the art to try 4-OEt over these other alternatives.

217.    That dapagliflozin and its 4-OEt was so potent compared to the alternatives, particularly 4-OMe, is further evidence of both the unpredictability in the art and dapagliflozin's surprising results.

### 3.    Kees

218.    Kees studied the synthesis and structure-activity relationship of 4-(4-sulfur-substituted benzyl)-5-(trifluoromethyl)pyrazol-3-ones (e.g. WAY-123783).



**4-(4-sulfur-substituted benzyl)-5-(trifluoromethyl)pyrazol-3-ones**

219.    Kees did not study phlorizin derivatives.

220.    Kees states that the pharmacological characterization of its compounds was unlike phlorizin.

221.    WAY-123783 represents a new class of antihyperglycemic agents.

222.    A person of ordinary skill in the art would have been discouraged from looking to Kees when developing or modifying phlorizin derivatives or C-aryl glucosides.

223.    Kees does not teach that a methylene linker between two phenyl rings, such as in dapagliflozin, would be critical for activity.

224.    Further illustrating the differences between dapagliflozin and the compounds described in Kees, Kees teaches that a $CF_3$ group is required on the pyrazolone ring and that the most potent of these nonglycosolated compounds include a SMe (n=0) or S(O)Me (n=1) group on the aryl ring, not a hydrogen, a hydroxy, a halogen, or an alkoxy group.

225.    The mechanism for reducing blood glucose in the animal model in Kees, and whether it involved multiple pharmacologies, was unclear.

226.    The extent to which the SAR in Kees can be applied to a series of C-aryl glucosides that inhibit SGLT2 is unknown.

227.    The relevance of the SAR of a series of pyrazol-3-ones to the discovery of

dapagliflozin is brought into question by Kees itself. Kees states:

> There did not appear to be a correlation between the magnitude of glucosuria
> induced in normal mice and potency or efficacy of the compounds as glucose-
> lowering agents in db/db mice. In addition, many acidic azoles prepared by us and
> others produced significant glucosuria in normal mice but were not active at high
> (e.g., 100 mg/ kg) doses in the db/db mice. Consistent with these results, the SAR
> reported here produced several examples where the glucose-lowering effect in
> db/db mice could be titrated away (e.g., 10, 17, 19, 39, 43) while a robust glucosuria
> in the normal mouse was maintained. One significant example of this trend
> concerned the pyrazole isomers 38 and 42. Whereas compound 42 significantly
> lowered plasma glucose levels in db/db mice at 5 mg/kg, 38 showed no glucose-
> lowering effect at this dose, yet each produced approximately equivalent glucosuria
> in normal mice.

228.    Kees failed to provide direct evidence that SGLT2 is the target for the disclosed

pyrazoles and pyrazolones.

229.    The lack of structural similarity between the compounds in Kees and

dapagliflozin minimizes the extent to which their SAR would have been perceived by one of

ordinary skill in the art as relevant to the C-aryl glucoside series.

### 4.    WO '697

230.    WO '697 describes C-glucosides, but it does not describe O-glucosides or provide

any stability data, making it impossible to determine if C-glucosides were in fact more stable

than O-glucosides, and, even if they were more stable, whether other impediments would have

been introduced.

231.    WO '697 does not disclose that its compounds are useful as SGLT2 inhibitors,

which would have discouraged a person of ordinary skill in the art from looking to its teachings

instead of the numerous references focusing on SGLT2 inhibition by O-glucosides.

232.    WO '697 discloses compounds that are used primarily to prevent cell adhesion by

inhibiting E, L, and P-selectins, which are proteins that mediate cell adhesion.

34

233.     Diabetes is only mentioned *once* in the entire 271-page specification of WO '697, and this lone occurrence is part of a laundry list of 23 broad ailments varying from cancer and arthritis to wounds and infections.

234.     The inhibition of E, L, and P-selectins is fundamentally different from the inhibition of SGLT2.

235.     A person of ordinary skill in the art would not have looked to cell adhesion literature like WO '697 instead of the numerous references focusing on SGLT2 inhibition by O-glucosides when designing an SGLT2 inhibitor.

236.     The teachings of WO '697 were not relevant to di-aryl methane glucosides like dapagliflozin.

237.     Most of the compounds disclosed in WO '697 include galactose or other sugars that are not glucose.

238.     WO '697 does not disclose any di-aryl methane glucoside with a distal ethoxy substituent.

### 5.     EP '359

239.     EP '359 discloses:

A hypoglycemic agent which comprises as an active ingredient a dihydrochalcone derivative of the formula [I]:

**I**

wherein Ar is an aryl group, $R^1$ is hydrogen atom or an acyl group, $R^2$ is hydrogen atom, an acyl group or α-D-glucopyranosyl group, or $R^1$ and $R^2$ may combine together to form a substituted methylene group, $R^3$ and $R^4$ are each hydrogen atom or an acyl group, and a group of the formula: $OR^5$ is a protected or unprotected hydroxy group or a lower alkoxy group, or a pharmaceutically acceptable salt thereof.

240. EP '359 encompasses at least hundreds of dihydrochalcone derivatives, some of which are reported to demonstrate hypoglycemic activity in rodent models of diabetes.

241. EP '359 provides that the distal aryl group, which can also be a heteroaryl, may be substituted with:

a lower alkyl group optionally possessing a hydroxy substituent or a halogen substituent; a lower alkoxy group optionally possessing a lower alkoxy substituent; a lower alkoxycarbonyloxy group optionally possessing a lower alkoxy substituent; an amino group possessing one or more lower alkyl substituents; a protected or unprotected amino group; a lower alkanoyloxy group optionally having 1 to 2 substituents selected from a lower alkoxy group, a lower alkoxycarbonyl group, an amino group and a phenyl group; a halogen atom; a hydroxy group; a carbamoyl group; a lower alkylthio group; a lower alkylsulfinyl group; a lower alkylsulfonyl group; a carboxyl group; a formyl group; a cyano group; a di-lower alkylcarbamoyloxy group; a phenoxycarbonyloxy group; a phenyl group; a phenoxy group; an oxo group; a lower alkylenedioxy group; or a benzoyloxy group optionally possessing a lower alkoxy substituent.

36

242.    A person of ordinary skill in the art would have had numerous options from which to choose. And no matter the choice, numerous distinct modifications to the genus of compounds of Formula I of EP '359 would have been required to arrive at dapagliflozin.

243.    Without significantly more, EP '359 is nothing but an opportunity for a person of ordinary skill in the art to try all of its uncountable number of possible permutations and combinations without any guidance for doing so and without any reasonable expectation of success.

244.    While all of the EP '359 compounds are O-glucosides, the mechanism by which these compounds exert their hypoglycemic effect is not described.

245.    In the absence of a description of both SGLT2 and SGLT1 activity, or data reflective thereof, EP '359 not only fails to inform on the mechanism of compound action, but also, if SGLT is involved, to what extent SGLT1 or SGLT2 are responsible for activity.

246.    There is no evidence in EP '359 that the issues that limit phlorizin's utility as a drug candidate, e.g., lack of selectivity for SGLT2 vs. SGLT1 and metabolic instability, have been addressed.

247.    EP '359 lacks several types of information that would be necessary for it to be relevant to the discovery of potent and selective SGLT2 inhibitors.

248.    It is not clear whether the compounds in EP '359 are SGLT inhibitors or whether they demonstrate any selectivity for SGLT2 vs. SGLT1. Without SGLT selectivity information, it is not possible to properly interpret the *in vivo* effects on plasma and urine glucose levels, since the extent to which SGLT1 and/or SGLT2 might be the target is unknown.

249.    It is unknown whether any of the compounds in EP '359 have improved metabolic stability.

250.    There is no evidence that any of the compounds in EP '359 would have pharmacokinetics required to treat chronic diseases, like type 2 diabetes.

251.    One of ordinary skill in the art would not have been led by EP '359 to modify any of its compounds.

### 6.    Tsujihara

252.    Tsujihara discloses 4'-dehydroxyphlorizin derivatives:



| 1 | x |
|---|---|
| a | 4 - OMe |
| b | 3,4 - (OMe)$_2$ |
| c | 2,4 - (OMe)$_2$ |
| d | 3,4,5 - (OMe)$_3$ |
| e | 4 - OH |
| f | 3,4 - (OH)$_2$ |

1a - f

253.    Tsujihara Compound 1a (with a 4-OMe group at the para position), when dosed by the intraperitoneal route, had less effect on urinary glucose excretion in normal rats than both 1e (with a 4-OH group) and phlorizin, as shown in the table below:

| Compound | Urinary glucose (mg/24 h) | |
|---|---|---|
| | 10 mg/kg, i.p. | 100 mg/kg, p.o. |
| Control | 3 ± 1 | 3 ± 1 |
| Phorizin | 320 ± 25 | 11 ± 6 |
| **1a** | 204 ± 8 | 380 ± 52 |
| **1b** | 7 ± 2 | 2 ± 1 |
| **1c** | 5 ± 0 | 3 ± 1 |
| **1d** | 3 ± 0 | 2 ± 1 |
| **1e** | 329 ± 7 | 60 ± 9 |
| **1f** | 43 ± 14 | 2 ± 1 |

Each value represents the mean ± S.E. ($n$ = 3).

38

254.     The 4′-dehydroxyphlorizin derivatives described by Tsujihara represent limited SAR for a class of 6 O-glucosides in the kidney of a rat.

255.     The 4′-dehydroxyphlorizin derivatives described by Tsujihara feature different linkers between the glucoside and the central ring and between the central ring and the distal ring than dapagliflozin.

256.     Tsujihara did not test an ethoxy group at any location on its compounds, nor did it test a chlorine group at any location.

257.     There is no information to suggest the extent to which, if any, the data in Tsuihara could apply to SAR developed for a series of different compounds against a different target— *i.e.*, C-aryl glucosides against human SGLT1 or SGLT2—nor to the metabolic stability of a series of O-glucosides.

258.     A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to apply the teachings of Tsujihara to arrive at dapagliflozin.

### 7.     Patrick

259.     Patrick is a general medicinal chemistry textbook.

260.     Patrick is not drawn to any particular drug, mechanism of action, or problem known in the art.

261.     Patrick does not provide any data specific to the treatment of diabetes or the development of SGLT inhibitors and does not in any way solve the unpredictability associated with drug discovery and development.

262.     Patrick states that varying the substitution pattern of an aromatic compound may give rise to increased activity if the relevant binding groups are not already in the ideal positions for bonding.

39

263.     Patrick states that one must lock the drug into the active conformation to obtain increased activity.

264.     Patrick provides no teachings as to SGLT2 inhibitors, the active conformation of SGLT2 inhibitors, or their important binding groups.

265.     Without knowledge of the receptor-inhibitor complex in the compound being studied, a person of ordinary skill in the art would not have been motivated to vary the substitution pattern, to shorten or lengthen the chain length, or to make the chain more or less rigid.  Nor would a person of ordinary skill in the art have had a reasonable expectation that any such change would increase activity.

266.     The context of any structural modifications is critical.

267.     SAR studies depend upon activity with respect to a specific biological target, and any proposed structural modifications are only relevant when considered in this context.

268.     Patrick does not mention SGLT2 or how inhibition of this transporter may be affected by any particular structural modifications.

269.     Patrick fails to explain why a person of ordinary skill in the art would be concerned by the metabolism of a C-aryl glucoside, or how a person of ordinary skill in the art would determine which groups are "susceptible" and should be replaced.

270.     Patrick fails to explain which groups should be used to prevent metabolism.

271.     Patrick provides a general text on certain topics of medicinal chemistry, but it is not directed to SGLT inhibition or C-aryl glucoside inhibitors.

272.     The context of any proposed structural modifications to test compounds is critical.

273.     Medicinal chemists in the real world make decisions based on the results of earlier experiments. These changes can only be properly interpreted in the context of SGLT2 and

the drug molecule properties required for its inhibition, including potency, selectivity, and metabolic stability.

274.     Patrick is nothing more than an invitation for a person of ordinary skill in the art to try all the numerous possibilities without any guidance for doing so and without any reasonable expectation of success.

### 8.     Thomas

275.     Thomas is an excerpt of a chapter in an introductory textbook on medicinal chemistry.

276.     Thomas is not drawn to any particular drug, mechanism of action, or problem known in the art, let alone to compounds suitable for treating diabetes using SGLT2 inhibitors.

277.     Thomas states that traditional SAR investigations are carried out by making large numbers of analogues of the lead and testing them for biological activity.

278.     Thomas does not provide any guidance about what specific structure to use as a lead compound for an SGLT2 inhibitor, or what changes to make to increase the potency or selectivity of an SGLT2 inhibitor.

279.     Thomas does not refute the practical reality that decisions on avenues of exploration in developing an SAR for a particular property are usually logically based on the earlier results to guide new compound synthesis.

280.     Where an SAR has already indicated that a small substituent at a particular position is best, it would be illogical to continue to explore larger substituents.

281.     Thomas recognizes that the selection of the changes required to produce analogues of a particular lead is made considering the activities of compounds with similar structures.

282.    The complexity of enhancing compound potency through multiple stepwise iterations must be performed while, at the same time, improving selectivity with respect to SGLT1 and ensuring metabolic stability.

283.    One of ordinary skill in the art would have known that SAR studies are context specific and rely upon data from a series of related compounds against a specific biological target.

284.    Thomas does not explain why a person of ordinary skill would have desired an analogue that is more lipophilic and less water soluble.

285.    Thomas teaches that there is an undesirable tendency for halogenated drugs to accumulate in lipid tissue, which would discourage a person of ordinary skill in the art from using a halogen.

286.    A person of ordinary skill in the art would not have favored the use of a halogen over all other potential substituent groups.

### 9.    Patani

287.    Patani is a review article discussing the general topic of bioisosteres.

288.    Patani is not directed to any particular drug, mechanism of action, or problem known in the art, let alone to compounds suitable for treatment of diabetes via SGLT2 inhibition.

289.    Patani does not provide any factual or scientific evidence showing that there was a need for altered or improved metabolic properties of SGLT2 inhibitors at the time of the invention of dapagliflozin.

290.    It would not have been reasonable to expect metabolic stability to be successfully improved in compounds having a chloride substituent or by modifying compounds to include a chloride substituent, or that other important properties would not have been compromised by a chloride substituent.

42

291.    None of the information provided in Patani is focused on inhibition of SGLT2 and none of the information is directly relevant to a series of C-glucosides being developed to treat type 2 diabetes.

292.    Structural modifications to improve potency, selectivity, or metabolic stability of compounds can only be assessed in the context of a specific molecular target.

293.    A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to apply the general teachings of Patani to arrive at dapagliflozin.

### 10.    Scheen

294.    Scheen is a broad and general reference that does not discuss the structure of any O-glucosides or C-aryl glucosides.

295.    Scheen is not drawn to any particular drug, mechanism of action, or problem known in the art, let alone to compounds suitable for treatment of diabetes using SGLT2 inhibitors.

296.    Scheen's teaching that the development of novel therapeutic approaches remains highly desirable further supports the long-felt need that was later satisfied by dapagliflozin.

### B.    Person of Ordinary Skill in the Art

297.    A hypothetical person of ordinary skill in the art relating to the "chemistry aspects" of the '117 patent would have been a pharmaceutical chemist with a Ph.D. in chemistry and several years of practical experience working with pharmaceutical chemical compounds, using synthetic organic chemistry and structure activity relationships (SAR), for potential and eventual clinical use in patients. A person of ordinary skill in the art may also have a B.S. or M.S. degree in chemistry with significantly more experience. The person of ordinary skill in the art also has familiarity with the spectrum of properties needed for a successful drug, the potential

43

difficulties associated with attaining them, and the potential effects of pharmaceuticals in the human body. A person of ordinary skill in the development of drugs for treating diabetes and related conditions would have acquired, or would work as a team with persons who have acquired, a basic knowledge of the condition to be treated, as well as its complications, comorbidities, and related conditions, as well as the biochemical mechanisms of the disease, including the interventional target of interest. A person of ordinary skill in this art would also have acquired, or work as a member of a team with persons who have acquired, a basic knowledge of *in vitro* and *in vivo* assays to evaluate the potency, selectivity, and potential toxicity of drug candidates.

298.    A hypothetical person of ordinary skill in the art relating to the "clinical aspects" of the '117 patent would have significant expertise in the research and/or management of diabetes, including type 2 diabetes, and would be, more specifically, an M.D. or D.O. who has either completed an Endocrinology, Diabetes and Metabolism Fellowship Program and is American Board of Internal Medicine (ABIM) certified in Endocrinology, Diabetes, and Metabolism (or is certified by a comparable organization in another country) or has approximately five to seven years of experience with a clinical focus on diabetes diagnosis and treatment and/or in diabetes clinical or translational research.

**C.    Claims 1-3 are Not Invalid Under 35 USC § 103 as Obvious Over Example 12 of WO '128, Thomas, and/or WO '697, in View of EP '359, Hongu, Kees, Patrick and/or Patani, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art**

**1.    Claims 1 and 2 would not have been obvious to a person of ordinary skill in the art over WO '128, Thomas, and/or WO '697, in view of**

**EP '359, Hongu, Kees, Patrick and/or Patani, and further in view of the knowledge of a person of ordinary skill in the art**

299.    Claims 1 and 2 of the '117 patent would not have been obvious over WO '128, Thomas, and WO '697, alone or in combination, in view of EP '359, Hongu, Kees, Patrick, and Patani, alone or in combination, and the general knowledge in the art.

300.    Zydus's need to rely on a combination of at least eight prior art references and "the general knowledge in the art" to cobble together an allegation of obviousness indicates the complexity and the lack of obviousness of the claimed subject matter as well as Zydus's improper use of hindsight.

<blockquote>

a)       A person of ordinary skill in the art would not have been motivated or have had a reasonable expectation success to look to WO '128 for a lead compound

</blockquote>

301.    A POSA would not have been motivated to look to WO '128 for a lead compound with a reasonable expectation of success.

302.    A person of ordinary skill in the art would have had little reason to believe that C-glucosides, such as the ones described in WO '128, would be sufficiently potent SGLT2 inhibitors to select as a starting point for drug discovery.

303.    WO '128 provides no biological data and thus a person of ordinary skill in the art would not have had any information concerning properties such as potency, selectivity, or stability of its compounds.

304.    There were several references disclosing C-aryl glucosides, as there were disclosing O-glucosides, of which a person of ordinary skill in the art would have been aware.

305.    Zydus does not explain why a person of ordinary skill in the art would focus on WO '128 over other references disclosing C-aryl glucosides or O-glucosides.

306.     A person of ordinary skill in the art would have known that C-glucosides with a carbon linkage between the glucose moiety and the central ring had been found considerably less active than their equivalent O-glucosides.

307.     The authors of Link attempted to make C-glucoside analogues of phlorizin and these compounds were significantly less active than their equivalent O-glucosides.

308.     That multiple pharmaceutical companies at the time were actively developing O-aryl glucosides as SGLT2 inhibitors indicates that persons of ordinary skill at the time were not discouraged from using O-aryl glucosides and continued to experiment with them.

309.     WO '697 discloses compounds that are used primarily to prevent cell adhesion by inhibiting E, L, and P-selectins, which are proteins that mediate cell adhesion.

310.     Diabetes is only mentioned *once* in the entire 271-page specification of WO '697, and this lone occurrence is part of a laundry list of 23 broad ailments varying from cancer and arthritis to wounds and infections.

311.     The inhibition of E, L, and P-selectins is fundamentally different from the inhibition of SGLT2.

312.     A person of ordinary skill in the art would not have looked to cell adhesion literature like WO '697 instead of the numerous references focusing on SGLT2 inhibition by O-glucosides when designing an SGLT2 inhibitor.

313.     WO '697's disclosure that the O-glycoside may lack chemical and physiological stability in comparison to C-glycosides would not have meaningfully guided a preference for C-glucoside SGLT2 inhibitors.

314.    WO '697's disclosure that the synthesis of O-glycosides could be more tedious than the synthesis of C-glycosides would not have meaningfully guided a preference for C-glucoside SGLT2 inhibitors.

315.    While WO '697 describes a handful of C-glucosides, it does not describe the analogous O-glucosides.

316.    It is not possible to determine from WO '697, even if these compounds were more stable, whether other impediments had been introduced.

317.    A person of ordinary skill in the art would not have been motivated to look to WO '128 for a lead compound in view of EP '359.

318.    A person of ordinary skill would not interpret EP '359 as disparaging all O-glucosides, instead of only disparaging the use of phlorizin in particular.

319.    EP '359 describes a series of O-glucosides and provides acute *in vivo* data to support the hypoglycemic activity of some in acute rodent models.

320.    A person of ordinary skill in the art would not have been motivated to look to WO '128 for a lead compound in view of Tsujihara and Hongu.

321.    Hongu is directed to the substitution of phlorizin derivatives and contains no SGLT1 or SGLT2 inhibition data.

322.    Tsujihara provides no information on human SGLT1 or SGLT2, nor on the metabolic stability of a series of O-glucosides.

323.    A person of ordinary skill in the art would not have been motivated to look to WO '128 for a lead compound in view of Kees.

324.    Kees did not study phlorizin derivatives.

325.   Kees expressly states that the pharmacological characterization of its compounds was unlike phlorizin and that WAY-123783 represents a new class of antihyperglycemic agents.

326.   A person of ordinary skill in the art would have been discouraged from looking to Kees when developing or modifying SGLT2 inhibitors.

327.   A person of ordinary skill in the art would not have been motivated to combine the teachings of Hongu (or EP '359 or Tsujihara) and Kees to look to WO '128 for a lead compound with a reasonable expectation of success.

328.   Hongu teaches that there is a strict structural requirement for activity in O-aryl beta-D-glucoside SGLT inhibitors.

329.   Hongu teaches that the ketone on the bridge part, shown below, was necessary to exhibit activity and any change at the bridge part between the phenyl rings results in complete loss of activity.



**Hongu**

330.   Kees, on the other hand, discloses that the methylene linker between the 4-substituted phenyl and pyrazolone rings was critical for activity.

48

**Kees**

331.    The only reason to look to WO '128 for a lead compound would be based on hindsight motivated by the success of dapagliflozin.

> **b)    A person of ordinary skill in the art would not have been motivated to select Example 12 of WO '128 for further modification**

332.    Even if a person of ordinary skill in the art were to look to WO '128 for a lead compound, he or she would not have been motivated to select Example 12 of WO '128 as a lead compound for further modification.

333.    WO '128 does not provide any guidance towards or preference for Example 12.

334.    WO '128 contains 80 working examples.

335.    Claim 10 of WO '128 is directed to the compounds of Examples 1-15.

336.    Claim 11 of WO '128 is directed to the compounds of Examples 16-45.

337.    Claim 12 of WO '128 is directed to the compounds of Examples 46-58.

338.    Claim 13 of WO '128 is directed to the compounds of Examples 59-80.

339.    There is nothing in WO '128's specification or its claims that would have led a person of ordinary skill to select a compound for further development from those compounds recited in claim 10 over the compounds of claims 11-13.

340.    WO '128 provides no biological data for any of the 80 working examples.

49

341.     WO '128 reports no data, such as potency, selectivity, efficacy, or compound stability data, that would have led a person of ordinary skill in the art to differentiate between the disclosed examples in the manner proposed by Zydus.

342.     In the absence of biological data, one of ordinary skill in the art would not have been led to decide which of the innumerable C-aryl glucosides described in WO '128 would be a starting or lead molecule for further development, apart from an apparent preference for the compounds of Examples 1 and 2 based on them having been produced in larger, gram-scale quantities than the other examples.

343.     15 of the 80 working examples described in WO '128 have detailed descriptions.

344.     WO '128 does not provide any guidance towards or preference for those working examples with detailed descriptions over those without detailed descriptions.

345.     One of ordinary skill in the art would not have been motivated to select Example 12 of WO '128 as lead compound over the other 79 working examples included therein.

346.     As shown in the chart below, analyzing the substituents on the central ring of the 80 working examples described in WO '128 would not have led a person of ordinary skill in the art to Example 12 of WO '128.

| Distribution of WO '128 Central Ring Substituents (All Examples) | | |
|---|---|---|
| **Substituent** | **Example No.** | **Total No. of Examples** |
| H | 1-4, 6, 7, 15-58 | 50 |
| Me | 8-10, 59-68, 78-80 | 16 |
| Cl | 11, 12, 70-72 | 5 |
| *i*Pr | 74-76 | 3 |
| OH | 5, 14 | 2 |

| | | |
|---|---|---|
| OMe | 13 | 1 |
| CONHEt | 14 | 1 |
| F | 69 | 1 |
| Et | 73 | 1 |
| OCH$_2$O | 77 | 1 |

347.    50 out of the 80 (60%) exemplified species in WO '128 have hydrogens on the central phenyl ring.

348.    Of the relatively small number of examples in WO '128 utilizing groups other than hydrogen on the central ring, most of these examples feature an alkyl group.

349.    Of the 80 examples in WO '128, only 6 (less than 8%) have a halogen substituent (fluoro or chloro) anywhere on the central ring.

350.    As shown in the chart below, analyzing the substituents on the distal ring of the 80 working examples described in WO '128 would not have led a person of ordinary skill in the art to Example 12 of WO '128.

| Distribution of WO '128 Distal Ring Substituents (All Examples) | | |
|---|---|---|
| Substituent | Example No. | Total No. of Examples |
| H | 19, 46, 49, 51, 54, 55, 67 | 7 |
| OMe | 2, 8, 12, 14, 20, 48, 68, 69, 73, 74, 79 | 11 |
| Me | 5, 15, 16, 18, 47, 50, 52, 53, 57, 58, 66 | 11 |
| Et | 1, 13, 56, 59, 60, 77, 78, 80 | 8 |
| SMe | 4, 10, 11, 75 | 4 |
| SO$_2$Me | 25, 61, 71, 76 | 4 |

| | | |
|---|---|---|
| OCHF$_2$ | 9, 33, 72 | 3 |
| SOMe | 45, 63, 70 | 3 |
| OH | 17, 62 | 2 |
| *i*Pr | 34, 35 | 2 |
| OCF$_3$ | 3 | 1 |
| COMe | 6 | 1 |
| CH(OH)Me | 7 | 1 |
| CO$_2$Me | 21 | 1 |
| OCH$_2$O | 22 | 1 |
| CF$_3$ | 23 | 1 |
| NHCOMe | 24 | 1 |
| Ph | 26 | 1 |
| NHSO$_2$Ph-4'-Me | 27 | 1 |
| NHSO$_2$Me | 28 | 1 |
| CO$_2$H | 29 | 1 |
| Thiadiazole | 30 | 1 |
| Tetrazole | 31 | 1 |
| OCH$_2$Ph-4'-CN | 32 | 1 |
| O-*n*Pr | 36 | 1 |
| Tetrazole-2'-Me | 37 | 1 |
| Tetrazole-1'-Me | 38 | 1 |
| OPh | 39 | 1 |
| *n*Pr | 40 | 1 |
| *n*Bu | 41 | 1 |

| | | |
|---|---|---|
| SO$_2$Et | 42 | 1 |
| SO$_2$-$n$Pr | 43 | 1 |
| SO$_2$Ph | 44 | 1 |
| F | 64 | 1 |
| Cl | 65 | 1 |

351.   WO '128's 80 examples feature 35 different substituents on the distal ring.

352.   While methoxy was used on the distal ring in 11 of WO '128's 80 examples, a methyl group also appeared in 11 examples.

353.   An ethyl group was featured on the distal ring in 8 of WO '128's 80 examples, and hydrogen was used 7 times.

354.   None of WO '128's 80 examples feature an ethoxy—as dapagliflozin does—on the distal ring.

355.   The "most preferred" compounds of WO '128 are compounds with the following structure identified as formula IB ("Structure IB"):



**IB**

where R$^1$ is hydrogen, halogen or lower alkyl and R$^4$ is lower alkyl, R$^{5a}$O, -OCHF$_2$, or -SR$^{5e}$.

356.   The genus of Structure IB is extremely large, encompassing millions of compounds.

53

357.   A person of ordinary skill in the art would not have understood whether WO '128's disclosure of Structure IB as having the most preferred compounds was based on SGLT2 activity, selectivity, or some other biological or physicochemical property.

358.   25 of the 80 working examples described in WO '128 fall within the genus of formula I of Structure IB.

359.   One of ordinary skill in the art would not have been motivated to select Example 12 of WO '128 as lead compound over the other 24 working examples within Structure IB included therein.

360.   As shown in the chart below, analyzing the substituents on the central ring of the 25 working examples falling within Structure IB would not have led a person of ordinary skill in the art to Example 12 of WO '128.

| Distribution of WO '128 Central Ring Substituents (Structure IB Examples) | | |
|---|---|---|
| Substituent | Example No. | Total No. of Examples |
| H | 1, 2, 3, 4, 7, 16, 23, 32, 33, 34, 36, 40, 41 | 13 |
| Me | 8, 9, 10, 60, 66 | 5 |
| Cl | 11, 12, 72 | 3 |
| iPr | 74, 75 | 2 |
| F | 69 | 1 |
| Et | 73 | 1 |

361.   Thirteen of the 25 (52%) examples within Structure IB—including Examples 1 and 2—have hydrogens on the central phenyl ring.

362.    Of the relatively small number of examples within Structure IB utilizing substituents other than hydrogen on the central ring, most of these examples (32%) feature an alkyl group, such as methyl.

363.    Only 4 (12%) of the examples within Structure IB have a halogen substituent (fluoro or chloro) anywhere on the central ring.

364.    Analyzing the substituents on the distal ring of the 25 working examples falling within Structure IB similarly would not have led a person of ordinary skill in the art to Example 12, as shown in the chart below.

| Distribution of WO '128 Distal Ring Substituents (Structure IB Examples) | | |
|---|---|---|
| Substituent | Example No. | Total No. of Examples |
| OMe | 2, 8, 12, 69, 73, 74 | 6 |
| SMe | 4, 10, 11, 75 | 4 |
| $OCHF_2$ | 9, 33, 72 | 3 |
| Me | 16, 66 | 2 |
| Et | 1, 60 | 2 |
| $OCF_3$ | 3 | 1 |

365.    Methoxy is only used in 6 of the 25 examples (24%) falling within Structure IB, while thiomethyl is used in 4 of the 25 examples (16%) and an alkyl group is used in 4 of the 25 examples (16%).  There is no clear preference for the methoxy substituent.

366.    A person of ordinary skill in the art would not have been motivated to select the methoxy group over the thiomethyl group because of commercial accessibility or ease of handling.

367.    Thiomethyl groups are acceptable substituents and in the absence of data a person of ordinary skill in the art would have had no reason to ignore them when selecting a lead compound for further modification.

368.    In *Mitsubishi Tanabe Pharma et al. v. Sandoz Inc.*, C.A. No. 3:17-cv-0531-FLW-DEA (D.N.J.), which involved the later-invented canagliflozin (INVOKANA®), Zydus's expert Dr. Bannister submitted an expert report identifying Example 10 of U.S. 6,414,126 as the lead compound. Example 10 of U.S. 6,414,126 is identical to Example 10 of WO '128. Example 10 features a thiomethyl group on the distal aryl ring.

369.    The first 15 working examples of WO '128 are not described as an SAR and a person of ordinary skill in the art would not have recognized them as such.

370.    A person of ordinary skill in the art would not have looked to the ten compounds of claim 10, ignoring the 15 compounds of claims 11-13, that fall within Structure IB when selecting a lead compound for further modification.

371.    A person of ordinary skill in the art would not have ignored compounds having a hydrogen on the central ring when selecting a lead compound for further modification.

372.    A person of ordinary skill in the art would not have any understanding based on the disclosure of WO '128 as to the order in which the working examples where performed.

373.    WO '128 does not describe any of its 80 examples as being part of an SAR study, and WO '128 does not report any data, such as potency, selectivity, efficacy, or compound stability data, that a person of ordinary skill in the art would need to draw any conclusions about any purported SAR studies described in WO '128.

374.    To the extent a person of ordinary skill in the art would rely on the number of times a substituent is used in an example, a person of ordinary skill in the art would have recognized that

56

ethoxy—the distal ring substituent featured on dapagliflozin—does not appear in any of the 80 working examples of WO '128.

375.   A person of ordinary skill in the art would not have understood WO '128 as identifying methoxy and thiomethyl as the two best $R^4$ groups.

376.   A person of ordinary skill in the art would also not have been motivated to select a lead compound with a chlorine, instead of, for example, a methyl group, attached at the $R^1$ position.

377.   None of Thomas, WO '697, EP '359, Hongu, Kees, Patrick, and Patani, alone or in combination, cure the deficiencies of WO '128 or would have led a person of ordinary skill in the art to select Example 12 of WO '128 as a lead compound.

378.   Patani's alleged teaching that a chlorine substituent is often viewed to be isoteric and isolipophilic with the methyl substituent would not have led a person of ordinary skill in the art to select Example 12 of WO '128 as a lead compound.

379.   Patani does not provide any factual or scientific evidence showing that there was a need for altered or improved metabolic properties of SGLT2 inhibitors at the time of the invention of dapagliflozin.

380.   It would not have been reasonable to expect metabolic stability to be successfully improved in compounds having a chloride substituent or by modifying compounds to include a chloride substituent, or that other important properties would not have been compromised by a chloride substituent.

381.   None of the information provided in Patani is focused on inhibition of SGLT2 and none of the information is directly relevant to a series of C-glucosides being developed to treat type 2 diabetes.

382.     Structural modifications to improve potency, selectivity, or metabolic stability of compounds can only be assessed in the context of a specific molecular target.

383.     A person of ordinary skill in the art would have been discouraged from selecting Example 12 in view of Thomas's teaching that there is an undesirable tendency for halogenated drugs to accumulate in lipid tissue.

384.     Patrick's alleged teaching that the substitution of a chlorine atom for a methyl group would have improved metabolic stability would not have led a person of ordinary skill in the art to select Example 12 of WO '128 as a lead compound.

385.     Patrick fails to explain why a person of ordinary skill in the art would be concerned by the metabolism of a C-aryl glucoside, or how a person of ordinary skill in the art would determine which groups are "susceptible" and should be replaced.

386.     There would have been no reasonable expectation that metabolic stability would have been successfully improved by choosing a lead compound having a chloride (instead of a methyl) substituent at the para position of the central ring, or that other important properties would not have been compromised by that substitution.

387.     The lack of context for any of the proposed changes for the discovery of human SGLT2 inhibitors diminishes the value of these suggestions.

388.     In *Mitsubishi Tanabe Pharma et al. v. Sandoz Inc.*, C.A. No. 3:17-cv-0531-FLW-DEA (D.N.J.), which involved the later-invented canagliflozin (INVOKANA®), Zydus's expert Dr. Bannister submitted an expert report identifying Example 10 of U.S. 6,414,126 as the lead compound. Example 10 of U.S. 6,414,126 is identical to Example 10 of WO '128. Like canagliflozin—but unlike dapagliflozin—Example 10 features a methyl group on the central aryl ring.

389.    When asked at trial why he had chosen Example 10 as the lead compound, Dr. Bannister cited the alleged later reporting of a large-scale production of Example 10 in kilogram amounts because "a POSA knows that if you are making such large amounts, that it's an important compound."

390.    The only reason to look to Example 12 for a lead compound would be based on improper hindsight motivated by the success of dapagliflozin.

c)    **A person of ordinary skill in the art would not have been motivated to modify Example 12 of WO '128 to achieve dapagliflozin with a reasonable expectation of success**

391.    A person of ordinary skill would not have known that the activity of SGLT2-inhibiting compounds could be improved by modifying the methoxy substituent, including by replacing the methoxy group with an ethoxy group.

392.    The selection of the changes required to produce analogues of a particular lead is made considering the activities of compounds with similar structures and also the possible chemistry and biochemistry of the intended analogue.

393.    WO '128 does not provide any activity data and, therefore, no SARs, for any of the exemplified compounds or for any of the structural modifications to those compounds.

394.    Without knowing the activity of the starting compounds, Thomas is nothing more than—at best—an invitation to try all possibilities without guidance or any reasonable expectation of success.

395.    More likely, the specification of WO '128 would have *discouraged* a person of ordinary skill from modifying Example 12 by replacing (only) its methoxy substituent on the distal aryl ring with an ethoxy group.

396.    WO '128 expresses a clear preference for hydrogen on the central phenyl ring, with more than 60% of the examples containing hydrogen on the central ring.

59

397.    Regarding the distal phenyl ring in the compounds of WO '128, the specification of WO '128 identifies a broad variety of substituted and unsubstituted alkyl and alkoxy groups as optional substituents.

398.    Even looking at only the exemplified compounds, WO '128 identifies 38 different substituents on the distal phenyl ring. Not a single one is ethoxy, much less an ethoxy at the 4-position of the distal ring as in dapagliflozin.

399.    Ethoxy was also not exemplified in BMS's patented work with O-glucosides, and Hongu reported that ethoxy diminished activity in relation to the smaller methoxy substituents.

400.    Medicinal chemists in the real world must base decisions on next steps on the results of earlier experiments.

401.    The exclusion of ethoxy substituents from the WO '128 examples would be interpreted as reflecting the belief of those researchers that there was no advantage to be gained by using ethoxy in view of what had already been learned from work with the smaller methyl and methoxy substituents.

402.    Patrick provides no teachings concerning SGLT2 inhibitors, the active conformation of SGLT2 inhibitors, or their binding group(s), and thus would not have provided any motivation to modify the methoxy group of Example 12 of WO '128—let alone to replace it with an ethoxy group—nor would it have provided any reasonable expectation of success in such a modification.

403.    Without knowing the activity of the starting compounds, Patrick is—at best—an invitation to try all possibilities without any guidance for how to do so or any reasonable expectation of success.

404.    One of ordinary skill in the art would not have been motivated by Hongu to modify non-phlorizin derivatives, such as Example 12 of WO '128, in the quest for an SGLT2 inhibitor.

405.    Hongu's alleged teaching is directed to the substitution of phlorizin derivatives and contains no SGLT1 or SGLT2 inhibition data.

406.    There is no teaching in Hongu to suggest that the structural activity requirements for the two classes of compounds are the same or even relatable.

407.    To the contrary, Hongu teaches that there was a strict structural requirement for activity in the phlorizin derivatives and that any change at the bridge part between the A and B phenyl rings or in the sugar moiety resulted in complete loss of activity.

408.    Example 12 of WO '128 features a methylene bridge between the two phenyl rings, which is a marked departure from the structure of Hongu's phlorizin derivatives.

409.    To the extent the Hongu compounds were perceived by persons of ordinary skill in the art as reflecting SGLT2 inhibitors, and success with O-glucosides perceived as presaging success with C-glucosides, Hongu taught that substituting ethoxy for the smaller methoxy group would significantly reduce activity.

410.    Table 1 of Hongu shows that 4-OEt displayed less activity than 4-OMe and several other groups, including H, 3-Me, 4-Me, 4-Et, 4-NMe$_2$, and 4-Cl.

411.    Hongu did not provide a person of ordinary skill in the art with motivation to try 4-OEt over these other alternatives with a reasonable expectation of success.

412.    The fact that dapagliflozin and its 4-OEt was so potent compared to the alternatives, particularly 4-OMe, is further evidence of both the unpredictability in the art, and dapagliflozin's surprising results.

413.     Even if a change from methoxy to ethoxy had been considered, a person of ordinary skill in the art would have had no expectation of success in increasing the activity of Example 12 and no reasonable expectation that other detrimental properties would not be introduced.

414.     The cited references, taken as a whole, teach away from making the proposed change, i.e., replacing (only) the methoxy group with an ethoxy group.

415.     The references cited are—at best—an invitation to experiment, and the only reason to have modified Example 12 in the way proposed by Zydus would have been based entirely on hindsight motivated by the success of dapagliflozin.

> **2.     Claim 3 would not have been obvious to a person of ordinary skill in the art over WO '128, Thomas, and/or WO '697, in view of EP '359, Hongu, Kees, Patrick and/or Patani, and further in view of the knowledge of a person of ordinary skill in the art**

416.     For at least the reasons stated above with respect to claims 1 and 2, claim 3 would not have been obvious to a person of ordinary skill in the art at the time of the invention. (*See* Section IV.C.1, *supra*.)

> **D.     Claims 1-3 are Not Invalid Under 35 USC § 103 as Obvious Over Formula I of the Structure IB WO '128, in View of WO '697, EP '359, Hongu, and/or Kees, Optionally in View of Thomas, Patrick and/or Patani, and Further in View of the Knowledge of a Person of Ordinary Skill in the Art**

> **1.     Claims 1 and 2 would not have been obvious to a person of ordinary skill in the art over WO '128, in view of WO '697, EP '359, Hongu, and/or Kees, optionally in view of Thomas, Patrick and/or Patani, and further in view of the knowledge of a person of ordinary skill in the art**

417.     Claims 1 and 2 of the '117 patent would not have been obvious over WO '128 in view of WO '697, EP '359, Hongu, and Kees, alone or in combination, optionally in view of Thomas, Patrick, and Patani, alone or in combination, and the general knowledge in the art.

418.     Zydus's need to rely on a combination of at least eight prior art references and "the general knowledge in the art" to cobble together an allegation of obviousness indicates the

complexity and the lack of obviousness of the claimed subject matter as well as Zydus's improper use of hindsight.

        a)     **A person of ordinary skill in the art would not have been motivated or have had a reasonable expectation success to look to WO '128 for a lead compound**

419.    The prior art relating to SGLT inhibitors, such as EP '359, Tsujihara, Hongu, and Kees, would not have led a person of ordinary skill in the art to C-aryl glucosides in general or to look to compounds of formula I of the structure IB of WO '128 in particular.

420.    A person of ordinary skill in the art would have had little reason to believe that C-glucosides, such as the ones described in WO '128, would be sufficiently potent SGLT2 inhibitors to select as a starting point for drug discovery.

421.    WO '128 provides no biological data and thus a person of ordinary skill in the art would not have had any information concerning properties such as potency, selectivity, or stability of its compounds.

422.    There were several references disclosing C-aryl glucosides (as there were disclosing O-glucosides) of which a person of ordinary skill in the art would have been aware.

423.    Zydus does not explain why a person of ordinary skill in the art would focus on WO '128 over other references disclosing C-aryl glucosides (or O-glucosides).

424.    A person of ordinary skill in the art would have known that C-glucosides with a carbon linkage between the glucose moiety and the central ring had been found considerably less active than their equivalent O-glucosides.

425.    The authors of Link attempted to make C-glucoside analogues of phlorizin and these compounds were significantly less active than their equivalent O-glucosides.

426.    That multiple pharmaceutical companies at the time were actively developing O-aryl glucosides as SGLT2 inhibitors indicates that persons of ordinary skill at the time were not discouraged from using O-aryl glucosides and continued to experiment with them.

427.    WO '697's disclosure that the O-glycoside may lack chemical and physiological stability in comparison to C-glycosides would not have meaningfully guided a preference for C-glucoside SGLT2 inhibitors.

428.    WO '697's disclosure that the synthesis of O-glycosides could be more tedious than the synthesis of C-glycosides would not have meaningfully guided a preference for C-glucoside SGLT2 inhibitors.

429.    While WO '697 describes a handful of C-glucosides, it does not describe the analogous O-glucosides.

430.    It is not possible to determine from WO '697, even if these compounds were more stable, whether other impediments had been introduced.

431.    WO '697 discloses compounds that are used primarily to prevent cell adhesion by inhibiting E, L, and P-selectins, which are proteins that mediate cell adhesion.

432.    Diabetes is only mentioned *once* in the entire 271-page specification of WO '697, and this lone occurrence is part of a laundry list of 23 broad ailments varying from cancer and arthritis to wounds and infections.

433.    The inhibition of E, L, and P-selectins is fundamentally different from the inhibition of SGLT2.

434.    A person of ordinary skill in the art would not have looked to cell adhesion literature like WO '697 instead of the numerous references focusing on SGLT2 inhibition by O-glucosides when designing an SGLT2 inhibitor.

435.    A person of ordinary skill in the art would not have been motivated to look to WO '128 for a lead compound in view of EP '359.

436.    A person of ordinary skill would not interpret EP '359 as disparaging all O-glucosides, instead of only disparaging the use of phlorizin in particular.

437.    EP '359 describes a series of O-glucosides and provides acute *in vivo* data to support the hypoglycemic activity of some in acute rodent models.

438.    A person of ordinary skill in the art would not have been motivated to look to WO '128 for a lead compound in view of Tsujihara and Hongu.

439.    Hongu is directed to the substitution of phlorizin derivatives and contains no SGLT1 or SGLT2 inhibition data.

440.    Tsujihara provides no information on human SGLT1 or SGLT2, nor on the metabolic stability of a series of O-glucosides.

441.    A person of ordinary skill in the art would not have been motivated to look to WO '128 for a lead compound in view of Kees.

442.    Kees did not study phlorizin derivatives.

443.    Kees expressly states that the pharmacological characterization of its compounds was unlike phlorizin and that WAY-123783 represents a new class of antihyperglycemic agents.

444.    A person of ordinary skill in the art would have been discouraged from looking to Kees when developing or modifying SGLT2 inhibitors.

445.    A person of ordinary skill in the art would not have been motivated to combine the teachings of Hongu (or EP '359 or Tsujihara) and Kees to look to WO '128 for a lead compound with a reasonable expectation of success.

65

446.    Hongu teaches that there is a strict structural requirement for activity in O-aryl beta-D-glucoside SGLT inhibitors.

447.    Hongu teaches that the ketone on the bridge part, shown below, was necessary to exhibit activity and any change at the bridge part between the phenyl rings results in complete loss of activity.



**Hongu**

448.    Kees, on the other hand, discloses that the methylene linker between the 4-substituted phenyl and pyrazolone rings was critical for activity.



**Kees**

449.    The only reason to look to WO '128 for a lead compound would be based on hindsight motivated by the success of dapagliflozin.

b)    **A person of ordinary skill in the art would not have been motivated to select/evaluate the species of the genus compounds**

66

**of formula I of the structure IB and arrive at dapagliflozin with a reasonable expectation of success**

450.    From the available information, one skilled in the art would not have been motivated, with a reasonable expectation of success, to look to Structure IB of WO '128 for further modification when designing an SGLT2 inhibitor.

451.    Structure IB of WO '128 has the following structure:



**Structure IB**

where $R^1$ is hydrogen, halogen, or lower alkyl and $R^4$ is lower alkyl, $R^{5a}O$, -$OCHF_2$, or -$SR^{5e}$.

452.    In the formula of Structure IB, $R^1$ can be a hydrogen, a halogen, or a lower alkyl and $R^4$ can be lower alkyl, $R^{5a}O$, -$OCHF_2$, or -$SR^{5e}$. WO '128 states that $R^{5a}$ and $R^{5e}$ are independently alkyl.

453.    WO '128 defines "lower alkyl" as including both straight and branched chain hydrocarbons containing 1 to 8 carbons.

454.     WO '128 defines "alkyl" as including both straight and branched chain hydrocarbons containing 1 to 20 carbons, preferably 1 to 10 carbons, more preferably 1 to 8 carbons.

455.    Each "lower alkyl" and "alkyl" group may have up to four substituents, and WO '128 discloses thirty-seven different classes of possible substituents:

[groups] such as halo, for example F, Br, Cl or I or $CF_3$, alkyl, alkoxy, aryl, aryloxy, aryl(aryl) or diaryl, arylalkyl, arylalkyloxy, alkenyl, alkynyl, cycloalkyl, cycloalkenyl, cycloalkylalkyl, cycloalkylalkyloxy, optionally substituted amino, hydroxy, hydroxyalkyl, acyl, alkanoyl, heteroaryl, heteroaryloxy, cycloheteroalkyl, arylheteroaryl, arylalkoxycarbonyl, heteroarylalkyl, heteroarylalkoxy, aryloxyalkyl, aryloxyaryl, alkylamido, alkanoylamino, arylcarbonylamino, nitro, cyano, thiol, haloalkyl, trihaloalkyl and/or alkylthio.

456.    The genus of Structure IB is extremely large, encompassing millions of compounds.

457.    WO '128 provides no SGLT inhibition data to determine compound potency, selectivity, or metabolic stability.

458.    In the absence of biological data, one of ordinary skill in the art would not have been led to decide which of the innumerable C-aryl glucosides described in that reference would be a starting or lead molecule for further development, apart from an apparent preference for the compounds of Examples 1 and 2 based on them having been produced in larger, gram-scale quantities than the other examples.

459.    Creating a potent and selective SGLT2 inhibitor is a highly unpredictable endeavor.

460.    Determining the preferred substituents for a given structure is context specific and typically must be determined by experimentation.

461.    Even if the millions of compounds in the genus of Structure IB of WO '128 would have been chosen for modification, a person of ordinary skill in the art would not have been led to the subject matter of claims 1 and 2 of the '117 patent.

462.    Structure IB expressly allows for $R^1$ to be hydrogen, a halogen, or a lower alkyl. WO '128 provides no preference for one of these classes of substituents over another.

463.    To the extent a person of ordinary skill in the art looked to the number of examples featuring a given substituent, he or she would not have been motivated to select chlorine as one of

68

the limited substituents for $R^1$ with a reasonable expectation of success of arriving at a compound with increased SGLT2 activity.

464.    More than half (13 of 25) of the exemplified species in WO '128 falling within the genus of Structure IB have a hydrogen at $R^1$.

465.    A person of ordinary skill in the art would have first looked to utilize a hydrogen at $R^1$ considering WO '128's clear preference for that selection.

466.    Regarding a lower alkyl at $R^1$, WO '128 defines the term as both straight and branched chain hydrocarbons containing 1 to 8 carbons. This definition encompasses a large number of possible "lower alkyl" groups.

467.    Of the minority of examples that feature a group other than hydrogen on the central phenyl ring, 67% (8 out of 12) feature a lower alkyl group. Therefore, a person of ordinary skill in the art would have been motivated to also look at lower alkyls before halogens.

468.    Only 4 of the 25 (16%) exemplified Structure IB compounds contain a halogen substituent on the central phenyl ring—a distant third among the three substituent class options.

469.    From the available information, one skilled in the art would not have been motivated, with a reasonable expectation of success, to choose chlorine over the numerous alternatives for inclusion at the $R^1$ position.

470.    There is no evidence of superior activity or selectivity in C-glucosides or SGLT2 inhibitors that would justify choosing chlorine over the other halogens (fluorine, bromine, iodine, and astatine).

471.    A person of ordinary skill in the art would not choose chlorine based solely on chlorine being a commonly used halogen in SAR studies.

472.    A person of ordinary skill in the art also would not have been motivated to select an ethoxy at the $R^4$ position on the distal phenyl ring.

473.    Structure IB expressly allows for $R^4$, to be "lower alkyl, $R^{5a}O$, -$OCHF_2$, or -$SR^{5e}$." In the section of the specification directed to compounds having Structure I, WO '128 defines $R^{5a}$ and $R^{5e}$ as "independently alkyl." WO '128 provides no preference for one of these classes of substituents over another.

474.    To the extent a person of ordinary skill in the art looked to the number of examples featuring a given substituent, a person of ordinary skill in the art would have recognized that ethoxy—the distal ring substituent featured on dapagliflozin—does not appear in any of the 80 working examples of WO '128.

475.    Over 50% (13 of 25) of the Examples in WO '128 that fall within the genus of Structure IB have an alky or thioalkyl at $R^4$.

476.    Of the remaining examples that fall within the genus of Structure IB, none contain an ethoxy group.

477.    Distal ethoxy substituents were disfavored or not tested in earlier O-glucoside work by BMS and were not exemplified at all in WO '697's disclosure of C-glycosides for other uses.

478.    The logical inference is that no benefit was perceived in substituting distal ethoxy for distal methoxy in the O- and C-glucosides.

479.    In the absence of any data to guide the compound design, one skilled in the art would not have been motivated, with a reasonable expectation of success, to choose an ethoxy group over the numerous alternatives for inclusion at the $R^4$ position.

480.    The specification of WO '128 would discourage a person of ordinary skill from modifying Structure IB to obtain dapagliflozin.

70

481.    WO '128 expresses a clear preference for hydrogen on the central phenyl ring, with more than 50% of the exemplified species falling within Structure IB in WO '128 utilizing a hydrogen on the central phenyl ring, and shows no interest whatsoever in a distal ethoxy substituent.

482.    New synthesis decisions are based on what one has already learned, whereby the disdain for a distal ethoxy substituent would be interpreted as a perception that no advantage was to be gained by substituting distal ethoxy for distal methoxy.

483.    A person of ordinary skill in the art would not have been motivated by Thomas, Patrick, and Patani to modify Structure IB to include a chlorine substituent at $R^1$.

484.    None of the information provided in these general chemistry texts is focused on the inhibition of SGLT2 or a series of C-glucosides being developed to treat type 2 diabetes.

485.    The fact that the incorporation of a halogen may result in analogues that are more lipophilic and less water soluble and that the incorporation of a chlorine substituent, specifically, results in analogues with improved metabolic properties, does not explain why a person of ordinary skill in the art would desire an analogue that is more lipophilic or less water-soluble.

486.    Even if lipophilicity and water-solubility were known issues, there would not have been a reasonable expectation that either property would be successfully improved by choosing a lead compound having a chloride (instead of a methyl) substituent at the para position of the central ring.

487.    Patani provides no factual or scientific evidence showing a need for altered or improved metabolic properties existed at the time of dapagliflozin's invention. Nor is there any evidence indicating that aromatic hydroxylation of SGLT2 inhibitors was an issue.

488.     Even if metabolic stability was an issue known to those of ordinary skill in the art, there was no reasonable expectation that this property would have been successfully improved by choosing a lead compound having a chlorine or modifying a lead to include a chlorine, or that other important properties would not have been compromised by that selection.

489.     Structural modifications made to improve potency, selectivity, or metabolic stability of test compounds can only be done in the context of a specific biological target.

490.     Patani's lack of context for any of Zydus's proposed changes for the discovery of human SGLT2 inhibitors diminishes the value of these suggestions, and thus, a person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to apply the general teachings of Patani to arrive at dapagliflozin.

491.     Patrick fails to explain why a person of ordinary skill in the art would be concerned by the metabolism of a C-aryl glucoside, or how a person of ordinary skill in the art would determine which groups are "susceptible" and should be replaced.

492.     Patrick also fails to explain which groups should be used to prevent metabolism.

493.     The context of any proposed structural modifications of test compounds is critical. Medicinal chemists in the real world make decisions based on the results of earlier experiments.

494.     These changes can only be properly interpreted in the context of SGLT2 and the drug molecule properties required for its inhibition, including potency, selectivity, and metabolic stability.

495.     Without significantly more, Thomas, Patrick, and Patani are—at best—an invitation for a person of ordinary skill in the art to try all the numerous possibilities without any reasonable expectation of success.

496.    A person of ordinary skill in the art would not have been motivated by Hongu to use an ethoxy group at the $R^4$ position.

497.    Hongu's alleged teaching is directed to the substitution of phlorizin derivatives and contains no SGLT1 or SGLT2 inhibition data.

498.    There is no teaching in Hongu to suggest that the structural activity requirements for Hongu's O-glucoside phlorizin derivatives and WO '128's C-glucosides are the same or even relatable.

499.    Hongu teaches that there was a strict structural requirement for activity in the phlorizin derivatives and that any change at the bridge part between the A and B phenyl rings or in the sugar moiety resulted in complete loss of activity.

500.    Structure IB of WO '128 features a methylene bridge between the two phenyl rings, which is a marked departure from the structure of Hongu's phlorizin derivatives.

501.    To the extent the Hongu compounds were perceived by persons of ordinary skill in the art as reflecting SGLT2 inhibitors, and success with O-glucosides perceived as presaging success with C-glucosides, Table 1 of Hongu shows that 4-OEt displayed less activity than 4-OMe and several other groups, including H, 3-Me, 4-Me, 4-Et, 4-NMe2, and 4-Cl.

502.    There was no motivation for a person of ordinary skill in the art to try 4-OEt over these other alternatives.

503.    That dapagliflozin and its 4-OEt was so potent compared to the alternatives is further evidence of both the unpredictability in the art and dapagliflozin's surprising results.

504.    Even if using ethoxy at the $R^4$ position had been considered, a person of ordinary skill in the art would have had no expectation of success in producing a potent, selective, and stable SGLT2 inhibitor.

505.    A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to use/evaluate a chlorine at the $R^1$ position to arrive at a compound with increased SGLT2 activity and selectivity.

506.    A person of ordinary skill would not have been motivated with a reasonable expectation of success to use/evaluate the ethoxy group at the $R^4$ position.

507.    The cited references, taken as a whole, teach away from featuring the ethoxy group at the $R^4$ position on the distal ring.

508.    These references are at best an invitation to experiment, and the only reason to have modified Structure IB in the way proposed by Zydus would have been based entirely on hindsight and motivated by the success of dapagliflozin.

><blockquote>

**2.    Claim 3 would not have been obvious to a person of ordinary skill in the art over WO '128, Thomas, and/or WO '697, in view of EP '359, Hongu, Kees, Patrick and/or Patani, and further in view of the knowledge of a person of ordinary skill in the art**
</blockquote>

509.    For at least the reasons stated above with respect to claims 1 and 2, claim 3 would not have been obvious to a person of ordinary skill in the art at the time of the invention. (*See* Section IV.D.1, *supra*.)

**E.    Claims 1-3 are Not Invalid Under 35 USC § 103 as Obvious Over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, and Patani, optionally in view of Scheen, and further in view of the knowledge of a person of ordinary skill in the art**

><blockquote>

**1.    Claims 1 and 2 would not have been obvious to a person of ordinary skill in the art over one or more of EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, and Patani, optionally in view of Scheen, and further in view of the knowledge of a person of ordinary skill in the art**
</blockquote>

510.    Claims 1 and 2 of the '117 patent would not have been obvious over EP '359, Tsujihara, and Hongu, alone or in combination, in view of Kees, Patrick, WO '697, and Patani,

alone or in combination, optionally in view of Scheen, and in view of the general knowledge in the art.

511.    Zydus's need to rely on a combination of at least eight prior art references and "the general knowledge in the art" to cobble together an allegation of obviousness indicates the complexity and the lack of obviousness of the claimed subject matter as well as Zydus's improper use of hindsight.

512.    A person of ordinary skill in the art would not have identified "Compound II" from EP '359 as a lead compound for further evaluation, modification, and study.  Compound II, shown below with Zydus's added identifiers, is a phlorizin derivative.



**Compound II**

513.    EP '359 lacks several types of necessary information relevant to the discovery of potent and selective SGLT2 inhibitors.

514.    EP '359 has no data on the potency and selectivity of any compounds with respect to SGLT2.

515.    EP '359 lacks data on the metabolic stability of any compounds and has only limited acute *in vivo* data to support utility for type 2 diabetes.

75

516.    A person of skill in the art would also not have been motivated by Hongu or Tsujihara to choose Compound II as a lead compound.

517.    Hongu is directed to the substitution of phlorizin derivatives and contains no SGLT1 or SGLT2 inhibition data.

518.    Tsujihara provides no information on human SGLT1 or SGLT2, nor on the metabolic stability of a series of O-glucosides. While it was known that phlorizin itself is labile, progress regarding the stabilization of O-glucosides was not reported.

519.    Even assuming, *arguendo*, that one of ordinary skill in the art would have selected Compound II for modification, a person of ordinary skill in the art would not have been motivated to make the five separate modifications listed below, alone or in combination, with any reasonable expectation of success.

(1) modify the linker between the distal aromatic ring A and central aromatic ring B;

(2) modify the connection between the glucoside and aromatic ring B (O-glycoside in Compound II vs. C-glucoside in dapagliflozin);

(3) modify the position of the glucoside in relation to the linker (ortho position in Compound II vs. meta position in dapagliflozin);

(4) modify the substituent on aromatic ring B (hydroxyl in Compound II vs. chloride in dapagliflozin); and

(5) modify the substituent on aromatic ring A (various substituents in Compound II vs. ethoxy in dapagliflozin) as part of routine optimization to arrive at dapagliflozin.

520.    A person of ordinary skill in the art would not be motivated to make these *five* specific modifications—and no others—out of all the potential modifications to Compound II, and in such a way to arrive exactly at dapagliflozin.

76

521.    Because each of these five modifications creates a new compound with unknown and unpredictable properties, there can be no motivation to further modify each compound with a reasonable expectation of success to arrive at dapagliflozin and its constellation of unexpected properties.

      **a)**      **There was no motivation to modify the linker between aromatic ring A and aromatic ring B with a reasonable expectation of success**

522.    A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to alter the linker between the two aromatic rings (A and B rings in Compound II) to improve pharmaceutical activity, as shown below.



**Compound II**                    **Compound VI**

523.    Patrick provides no motivation or reasonable expectation of success for this proposed modification.

524.    Patrick teaches that, for drugs having two important binding groups linked together by a chain, shortening or *lengthening* the chain length is a useful tactic to try.

525.    While Patrick refers to a strategy of rigidification, it also states that one must lock the drug into the active conformation to obtain increased activity.

526.    Patrick provides no teachings concerning SGLT2 inhibitors, the active conformation of SGLT inhibitors, or any of their binding group(s), and thus would not have

provided any motivation to shorten or make rigid the linker between the two aromatic rings (A

and B rings) in Compound II with any reasonable expectation of success.

527.    Kees provides no motivation or reasonable expectation of success for modifying

the linker between the two aromatic rings (A and B rings in Compound II) to improve

pharmaceutical activity.

528.    Kees studied the synthesis and structure-activity relationship of 4-(4-sulfur-

substituted benzyl)-5-(trifluoromethyl)pyrazol-3-ones (e.g. WAY-123783), not phlorizin

derivatives such as Compound II.

529.    Kees expressly states that the pharmacological characterization of its compounds

was unlike phlorizin and WAY-123783 represents a new class of antihyperglycemic agents.

530.    Given the apparent and stated differences between Compounds III and IV of Kees

(not phlorizin derivatives) and Compound II (a phlorizin derivative), one of ordinary skill in the

art would not have been motivated to modify the linker between the distal aromatic ring A and

central aromatic ring B to achieve Compound VI based on the teachings of Patrick and Kees.



**Compound III**              **Compound IV**
**(R=Me, n=0; WAY-123783)**

531.    Neither Kees nor Hongu discloses SGLT2 potency and selectivity data that would

allow any decisions regarding the linker length in either series to be made with confidence.

532.    The references cited by Zydus would have discouraged this proposed

modification.

78

533.    Hongu teaches that there is a strict structural requirement for activity in O-aryl beta-D-glucoside SGLT inhibitors, and any change at the bridge part between the phenyl rings results in complete loss of activity.

534.    The ketone on the bridge part of Hongu was said to be necessary to exhibit the activity.

535.    There would have been no motivation to modify the linker between the distal aromatic ring A and central aromatic ring B with a reasonable expectation of success in increasing rigidity and the compound's desired pharmaceutical activity to achieve Compound VI.

> **b)    There was no motivation to modify the connection between the glucoside and aromatic ring B with a reasonable expectation of success**

536.    A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to alter the linkage between the glucoside of the already modified lead Compound VI and the aromatic ring to avoid hydrolysis that occurs at the O-glucoside site, as shown below:



**Compound VI**                              **Compound VII**

537.    WO '697 does not disclose that its compounds are useful as SGLT2 inhibitors.

538.    WO '697 discloses compounds that are used primarily to prevent cell adhesion by inhibiting E, L, and P-selectins, which are proteins that mediate cell adhesion.

79

539.     Diabetes is only mentioned *once* in the entire 271-page specification of WO '697, and this lone occurrence is part of a laundry list of 23 broad ailments varying from cancer and arthritis to wounds and infections.

540.     Inhibition of E, L, and P-selectins is fundamentally different from inhibition of SGLT2, and there would have been no reason to expect that a SAR developed for E, L, and P-selectins would have any relevance to the inhibition of SGLT2.

541.     There is no data in WO '697 showing that its C-glucosides may be more stable than the analogous O-glucosides, nor does WO '697 examine whether such modifications introduce unwanted diminution of other important properties, including potency, safety, and selectivity.

542.     WO '697, does not describe a single di-aryl methane glucoside, much less a di-aryl methane glucoside with an ethoxy on the distal ring.

543.     A person of ordinary skill in the art would not have looked to cell adhesion literature like WO '697 to provide guidance with any reasonable expectation of success when designing an SGLT2 inhibitor.

544.     WO '697 is generally directed to compounds composed of 6-deoxy-beta-L-galactose or beta-D-galactose, which, as shown below, are structurally different from Compound VII.



**6-deoxy-beta-L-galactose**      **beta-D-galactose**      **Compound VII**

545.    WO '697 discloses only two compounds with a beta-D-glucose group, shown below as Examples 17 and 88.



**Example 17**                    **Example 88**

546.    Neither of these compounds, and in fact none of the compounds disclosed in WO '697, comprise a beta-D-glucose bonded to a phenyl-linker-phenyl moiety as in Compound VII.

547.    Thus, one of ordinary skill in the art would have had no motivation to use the teachings of WO '697 to arrive at Compound VII.

548.    One of ordinary skill in the art could not have predicted *a priori* based on the teachings of WO '697 (or any other cited reference cited) whether a C-linked compound such as Compound VII would be a SGLT inhibitor, much less a selective SGLT2 inhibitor, or suffer from stability issues.

549.    Indeed, it was known in the art at the time of the invention that C-glucosides where the sugar is attached via a methylene bridge to the central aryl ring are considerably less active than the equivalent O-glucoside analogue.

550.    ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████

81

551.    EP '359 and Tsujihara do not cure the deficiencies of WO '697.

552.    EP '359 and Tsujihara are directed to phlorizin derivatives, and a person of ordinary skill would not interpret this teaching as disparaging all O-glucosides instead of only disparaging the use of phlorizin and its derivatives.

553.    EP '359 describes a series of O-glucosides and provides acute *in vivo* data to support the hypoglycemic activity of some in acute rodent models.

554.    EP '359 does not state whether metabolic stability of any of these O-glucosides had been improved by modifications made to the phlorizin structure, nor even whether these compounds were potent or selective SGLT2 inhibitors.

555.    Tsujihara provides no information on human SGLT1 or SGLT2, nor on the metabolic stability of a series of O-glucosides. While it was known that phlorizin itself is labile, progress regarding the stabilization of O-glucosides was not reported.

556.    Even if a person of ordinary skill in the art were to modify Compound VI to arrive at Compound VII, there would have been no reasonable expectation that such a compound would be a stable, potent, and selective SGLT2 inhibitor.

> **c)    There was no motivation to modify the position of the glucoside relative to the linker with a reasonable expectation of success**

557.    A person of ordinary skill in the art would not have been further motivated to test the activity of compounds having a substituent at both the meta and para positions.

558.    Patrick states that varying the substitution pattern may give rise to increased activity if the relevant binding groups are not already in the ideal positions for bonding. But Patrick does not provide any data specific to the treatment of diabetes or the development of SGLT2 inhibitors and does not solve the unpredictability associated with drug discovery and development.

559.   A person of ordinary skill in the art would not have been motivated by a desire to prevent interaction with some unknown, hypothetical unwanted receptor to modify the position of the glucoside relative to the linker.

560.   Without knowledge of the receptor-inhibitor complex or any SAR information regarding SGLT2, a person of ordinary skill in the art would not have been motivated to vary the substitution pattern or to shorten or make rigid the linker, nor would a person of ordinary skill have had a reasonable expectation that such change would increase activity.

### d)   There was no motivation to modify the substituent on aromatic ring B with a reasonable expectation of success

561.   A person of ordinary skill in the art would not have been further motivated to modify and test the $R^1$ substituent of Compound VII, shown below.



**Compound VII**

562.   Patani does not provide any factual or scientific evidence showing that a need for altered or improved metabolic properties existed at the time of dapagliflozin's invention.

563.   There is nothing in the prior art indicating that aromatic hydroxylation of SGLT2 inhibitors was an issue. Even if metabolic stability was an issue known to those of ordinary skill in the art, there would have been no reasonable expectation that this property would have been improved by choosing a lead having a chloride or modifying a lead to include a chloride, or that other important properties would not have been compromised by that choice.

564.    Structural modifications to improve potency, selectivity, or metabolic stability of test compounds can only be done in the context of a specific biological target. But none of the information provided in this broad medicinal chemistry text is focused on inhibition of SGLT2 and none of the information is directly relevant to a series of C-glucosides being developed to treat type 2 diabetes.

565.    Patani's lack of context for any proposed changes for the discovery of human SGLT2 inhibitors diminishes the value of these suggestions, and thus, a person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to apply the general teachings of Patani to arrive at dapagliflozin.

566.    Patrick fails to explain why a person of ordinary skill in the art would be concerned by the metabolism of a C-aryl glucoside, or how a person of ordinary skill in the art would determine which groups are "susceptible" and should be replaced. Patrick also fails to explain which groups should be used to prevent metabolism.

567.    Patrick is merely a general text on some principles of medicinal chemistry, and it is not directed to SGLT inhibition or C-aryl glucoside inhibitors. The context of any proposed structural modifications of test compounds is critical. Medicinal chemists in the real world make decisions based on the results of earlier experiments. These changes can only be properly interpreted in the context of SGLT2 and the drug molecule properties required for its inhibition, including potency, selectivity, and metabolic stability.

568.    Without significantly more, Patrick is nothing more than—at best—an invitation for a person of ordinary skill in the art to try all the numerous possibilities without any reasonable expectation of success.

569.     There was also nothing in the art suggesting that Compound VII, wherein $R^1$ is in the ortho or meta position, would undergo unwanted metabolic oxidation, or that there would be an expectation of success in inhibiting the oxidation by making $R^1$ para. A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to include a chlorine at the $R^1$ para position to arrive at a compound with increased SGLT2 activity.

570.     There is no reason to select a chlorine substituent over the numerous other potential substituents in the art, including at least hydrogen, alkyls, and the other possible halogens (fluorine, bromine, iodine, and astatine).

571.     Any changes suggested by the works of Patrick and Patani are context dependent, and those authors do not describe SGLT2 inhibitors, or their special issues of potency, selectivity, and metabolic stability. These issues can only be addressed in the specific drug class being pursued.

572.     A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to include a chlorine at the $R^1$ position to arrive at a compound with increased SGLT2 activity and selectivity.

> **e)     There was no motivation to modify the substituent on aromatic ring A with a reasonable expectation of success**

573.     A person of ordinary skill in the art would not have been motivated to add a 4-OEt at the $R^2$ position of Compound VII, shown below.

## Compound VII

574.    The 4′-dehydroxyphlorizin derivatives described by Tsujihara represent limited SAR for a class of 6 O-glucosides in rat kidney.

575.    There is no information to suggest the extent to which these data could apply to SAR developed for a series of different compounds against a different target—i.e., C-aryl glucosides against human SGLT1 or SGLT2—or to the metabolic stability of a series of O-glucosides.

576.    Hongu's alleged teaching is directed to the substitution of phlorizin derivatives and contains no SGLT1 or SGLT2 inhibition data.

577.    Hongu teaches that there was a strict structural requirement for activity in the compounds discussed therein and that any change at the bridge part between the A and B phenyl rings or in the sugar moiety resulted in complete loss of activity.

578.    The previously proposed modification to the linker between the A and B phenyl rings by shortening it from a three-carbon linker into a single-carbon methylene linker is a marked departure from the structure of Hongu's phlorizin derivatives.

579.    There is nothing in Hongu that would suggest that the structural activity requirements of Hongu's compounds, featuring the critical ketone linker, would also apply to Compound VII and its methylene linker.

580.    Thus, even if a modification to the substituent of $R^2$ had been considered, a person of ordinary skill in the art would have had no expectation that adding a p-ethoxy to Compound VII would increase activity in view of the prior art as a whole.

581.    The cited references, taken as a whole, teach away from making the proposed change.

86

582.     To the extent that parallels between the SARs of O-glucosides and C-glucosides may have been perceived, Table 1 of Hongu shows that 4-OEt displayed less activity than 4-OMe and several other groups, including H, 3-Me, 4-Me, 4-Et, 4-NMe2, and 4-Cl.  There would have been no motivation to select 4-OEt over one of these alternatives, nor any reasonable expectation of success in doing so.

583.     The fact that dapagliflozin and its 4-OEt was so potent compared to the alternatives, particularly 4-OMe, is further evidence of both the unpredictability in the art, and dapagliflozin's surprising results.

584.     The cited references create nothing more than an invitation to experiment, and the only reason to modify Compound VII in this way would be based on hindsight motivated by the success of dapagliflozin.

585.     For all the reasons discussed above, claims 1-2 are not obvious in view of EP '359, Tsujihara, Hongu, Kees, Patrick, WO '697, Patani, and Scheen.

**2.      Claim 3 would not have been obvious to a person of ordinary skill in the art over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, and Patani, optionally in view of Scheen, and further in view of the knowledge of a person of ordinary skill in the art**

586.     For at least the reasons stated above with respect to claims 1 and 2, claim 3 would not have been obvious to a person of ordinary skill in the art. (*See* Section IV.E.1, *supra*.)

587.     A person of ordinary skill in the art would not have been motivated with a reasonable expectation of success to select Compound II as a lead compound, nor would a person of ordinary skill in the art have been motivated with a reasonable expectation of success to modify Compound II to achieve dapagliflozin.

**F.    Claims 14 and 16 are Not Invalid Under 35 USC § 103 as Obvious**

**1.    Claim 14 would not have been obvious**

588.    For at least the reasons stated above with respect to claims 1-3, claim 14 would not have been obvious to a person of ordinary skill in the art at the time of the invention. (*See* Sections IV.C.-E., *supra*.)

589.    Because the dapagliflozin compound is itself not obvious, a method of using dapagliflozin must also be not obvious.

590.    A person of ordinary skill in the art would not have had a reasonable expectation of success in using dapagliflozin to treat the conditions recited in claim 14 at the time of the invention.

591.    Numerous compounds, including numerous SGLT2 inhibitors, had been tried by clinicians as new treatment options for the conditions recited in claim 14 by May 20, 2002, and many of those compounds failed.

592.    Scheen, which is a general reference that does not discuss the structure of any O-glucosides or C-aryl glucosides, does not cure the deficiencies of the cited art.

**2.    Claim 16 would not have been obvious**

593.    For at least the reasons stated above with respect to claims 1-3, claim 16 would not have been obvious to a person of ordinary skill in the art at the time of the invention. (*See* Sections IV.C.-E., *supra*.)

594.    Because the dapagliflozin compound is itself not obvious, a method of using dapagliflozin must also be not obvious.

595.    A person of ordinary skill in the art would not have had a reasonable expectation of success in using dapagliflozin to treat the conditions recited in claim 16 at the time of the invention.

596.   Numerous compounds, including numerous SGLT2 inhibitors, had been tried by clinicians as new treatment options for the conditions recited in claim 16 by May 20, 2002, and many of those compounds failed.

597.   Scheen, which is a general reference that does not discuss the structure of any O-glucosides or C-aryl glucosides, does not cure the deficiencies of the cited art.

## G.   Claims 14 and 16 are Not Invalid Under 35 USC § 112

### 1.   Claim 14 Does Not Lack Written Description

598.   A person of ordinary skill in the art at the time of the invention would have known from the state of the art at that time and from the specification of the '117 patent itself that the conditions listed in claim 14 are related and have common underlying causes.

599.   A drug that effectively treats one condition listed in claim 14, i.e., diabetes, could reasonably be expected by a person of ordinary skill in the art to be effective in treating the other, related conditions listed in claim 14.

600.   The specification of the '117 patent links the various disease states recited in claim 14 to diabetes, and discloses that they are each closely tied to the focus of the invention, which is treatment of diabetes.

601.   The specification of the '117 patent provides that long-term treatment of ZDF rats with an SGLT2 inhibitor improves insulin response to glycemia, improves insulin sensitivity, and delays onset of nephropathy and neuropathy in these animals. ('117 patent, col. 1, ll. 55-61.)

602.   The specification of the '117 patent further would have taught one of ordinary skill in the art that selective inhibition of SGLT2 in diabetic patients would be expected to normalize plasma glucose and improve insulin sensitivity, thereby delaying the development of diabetic complications. ('117 patent, col. 1, ll. 61-65.)

603.    The specification of the '117 patent repeatedly teaches that dapagliflozin is an SGLT2 inhibitor.

604.    The specification of the '117 patent repeatedly links the conditions recited in claim 14 to treatment of diabetes generally.

605.    For the reasons discussed above, the specification of the '117 patent would convey to a person of ordinary skill in the art that the inventors were in possession of the methods of treatment using dapagliflozin recited in claim 14 of the '117 patent.

606.    Claim 14 of the '117 patent does not lack adequate written description pursuant to 35 U.S.C. § 112, first paragraph.

## 2.    Claim 16 Does Not Lack Written Description

607.    A person of ordinary skill in the art at the time of the invention would have known from the state of the art at that time and from the specification of the '117 patent itself that a drug that inhibits SGLT2 effectively treats type 2 diabetes, either alone or in combination with other drugs or agents as recited in claim 16.

608.    The specification of the '117 patent provides that long-term treatment of ZDF rats with an SGLT2 inhibitor improves insulin response to glycemia, improves insulin sensitivity, and delays onset of nephropathy and neuropathy in these animals. ('117 patent, col. 1, ll. 55-61.)

609.    The specification of the '117 patent further would have taught one of ordinary skill in the art that selective inhibition of SGLT2 in diabetic patients would be expected to normalize plasma glucose and improve insulin sensitivity, thereby delaying the development of diabetic complications. ('117 patent, col. 1, ll. 61-65.)

610.    The specification of the '117 patent repeatedly teaches that dapagliflozin is an SGLT2 inhibitor.

611.    The specification of the '117 patent demonstrates that the inventors had possession of methods to treat mammalian species, including but not limited to humans.

612.    The specification of the '117 patent states that the compounds disclosed therein "can be administered to mammalian species including humans, monkeys, dogs, etc. …" ('117 patent, col. 20, ll. 10-12.)

613.    The specification of the '117 patent states that the compounds disclosed therein possess "activity as inhibitors of sodium dependent glucose transporters found in the intestine and kidney of mammals and is useful in treatment of diabetes…" ('117 patent, col. 4, ll. 44-49.)

614.    For the reasons discussed above, the specification of the '117 patent would convey to a person of ordinary skill in the art that the inventors were in possession of the methods of treatment for mammalian species using dapagliflozin recited in claim 16 of the '117 patent.

615.    Claim 16 of the '117 patent does not lack adequate written description pursuant to 35 U.S.C. § 112, first paragraph.

### 3.    The Full Scope of Claim 14 Is Enabled

616.    A person of ordinary skill in the art at the time of invention of the '117 patent would have understood that SGLT inhibitors were potentially effective for treatment of diabetes and related conditions.

617.    The specification of the '117 patent states that the method of treatments claimed employ "an SGLT2 inhibiting compound" and an "SGLT2 inhibiting amount" of dapagliflozin. ('117 patent at Abstract.)

618.    The specification of the '117 patent states that the invention relates to C-aryl glucosides, which one of ordinary skill would have understood to be a class of SGLT2-inhibiting compounds as of the time of invention. (See '117 patent, col. 1, ll. 11-21; col. 4, ll. 25-50.)

91

619.    The specification of the '117 patent states that the "dose for adults is preferably between 10 and 2,000 mg per day." ('117 patent, col. 20, ll. 16-17.)

620.    Given this guidance, a person of ordinary skill in the art would have had no issues in determining a "therapeutically effective amount" of dapagliflozin for treating diabetes and the related conditions recited in claim 14 of the '117 patent without undue experimentation.

621.    A 10 mg dose of dapagliflozin is a recommended dose of FARXIGA®.

622.    A person of ordinary skill in the art at the time of the invention would have known from the state of the art at that time and from the specification of the '117 patent itself that the conditions listed in claim 14 are related and have common underlying causes.

623.    A drug that effectively treats one condition listed in claim 14, i.e., diabetes, could reasonably be expected by a person of ordinary skill in the art to be effective in treating the other, related conditions listed in claim 14.

624.    The Background of the Invention section of the specification of the '117 patent notes that type II diabetes "is characterized by hyperglycemia . . . and peripheral insulin resistance . . ." ('117 patent, col. 1, ll. 24-26.)

625.    The specification of the '117 patent also notes that an SGLT2 inhibitor in the kidney would be expected to aid in "normalization of plasma glucose levels, and perhaps body weight, by enhancing glucose secretion." ('117 patent, col. 1, ll. 33-37.)

626.    The specification of the '117 patent directly characterizes hyperglycemia as "a hallmark of type II diabetes." ('117 patent, col. 1, l. 44.)

627.    The methods of treatment recited in claim 14 of the '117 patent have utility, since a person of ordinary skill in the art at the time of the invention would have recognized that

dapagliflozin was a novel, non-obvious SGLT2 inhibitor, and that it was known that SGLT inhibitors could be effective to treat diabetes and related conditions.

628.   A person of ordinary skill in the art at the time of invention of the '117 patent would have been able to make dapagliflozin and use it to effectively treat the conditions recited n claim 14 of the '117 patent without undue experimentation.

### 4.   The Full Scope of Claim 16 Is Enabled

629.   A person of ordinary skill in the art at the time of invention of the '117 patent would have understood that SGLT inhibitors were potentially effective for treatment of diabetes and related conditions.

630.   The specification of the '117 patent states that the method of treatments claimed employ "an SGLT2 inhibiting compound" and an "SGLT2 inhibiting amount" of dapagliflozin. ('117 patent at Abstract.)

631.   The specification of the '117 patent states that the invention relates to C-aryl glucosides, which one of ordinary skill would have understood to be a class of SGLT2-inhibiting compounds as of the time of invention. (See '117 patent, col. 1, ll. 11-21; col. 4, ll. 25-50.)

632.   The specification of the '117 patent states that the "dose for adults is preferably between 10 and 2,000 mg per day." ('117 patent, col. 20, ll. 16-17.)

633.   Given this guidance, a person of ordinary skill in the art would have had no issues in determining a "therapeutically effective amount" of dapagliflozin for treating diabetes and the related conditions recited in claim 14 of the '117 patent without undue experimentation.

634.   A 10 mg dose of dapagliflozin is a recommended dose of FARXIGA®.

635.   The specification of the '117 patent states throughout that the SGLT2 inhibitors and C-aryl glucosides of the invention, alone or in combination with other antidiabetic agents

and/or other therapeutic agents can be used to treat type II diabetes. ('117 patent, col. 1, ll. 13-21; col. 1, ll. 61-65; col. 4, ll. 43-67; col. 5, ll. 1-20.)

636.    The Background of the Invention section of the specification of the '117 patent notes that type II diabetes "is characterized by hyperglycemia . . . and peripheral insulin resistance . . ." ('117 patent, col. 1, ll. 24-26.)

637.    The specification of the '117 patent also notes that an SGLT2 inhibitor in the kidney would be expected to aid in "normalization of plasma glucose levels, and perhaps body weight, by enhancing glucose secretion." ('117 patent, col. 1, ll. 33-37.)

638.    The specification of the '117 patent directly characterizes hyperglycemia as "a hallmark of type II diabetes." ('117 patent, col. 1, l. 44.)

639.    The specification of the '117 patent outlines various weight ratios for using dapagliflozin in combination with other antidiabetic and/or other therapeutic agents.

640.    The specification of the '117 patent discloses that where the other antidiabetic agent is a biguanide, such as metformin, "the compound of structure I will be employed in a weight ratio to the biguanide within the range from about 0.01:1..." ('117 patent, col. 14, ll. 12-14.)

641.    The specification of the '117 patent discloses that when present, metformin may be employed in amounts within the range from about 500 to about 2000 mg per day. ('117 patent, col. 15, ll. 6-8.)

642.    Metformin had been in clinical use for decades to treat diabetes prior to the time of the invention of the '117 patent.

643.    The methods of treatment recited in claim 16 of the '117 patent have utility, since a person of ordinary skill in the art at the time of the invention would have recognized that

dapagliflozin was a novel, non-obvious SGLT2 inhibitor, and that it was known that SGLT inhibitors could be effective to treat diabetes and related conditions.

644.    A person of ordinary skill in the art at the time of invention of the '117 patent would have been able to make dapagliflozin and use it alone or in combination with another agent at the suggested weight rations disclosed in the '117 patent to effectively treat type II diabetes as recited in claim 16 of the '117 patent without undue experimentation.

### 5.    Claim 14 Is Not Indefinite

645.    The parties in this case have entered into a stipulation whereby no claim terms of the '117 patent required a construction by the Court.

646.    Each term of each claim of the '117 patent is therefore to be given its plain and ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention in view of the intrinsic evidence, including but not limited to the specification and the prosecution history of the '117 patent.

647.    The term "treating" in claim 14 of the '117 patent would have had its usual, well-understood meaning at the time of the invention when used in the context of diabetes and related conditions.

648.    The specification of the '117 patent discloses what it would mean to "treat" diabetes and related conditions.

649.    According to the specification of the '117 patent, "[n]ormalization of plasma glucose in NIDDM patients would be predicted to improve insulin action, and to offset the development of diabetic complications. An inhibitor of the sodium-dependent glucose transporter SGLT2 in the kidney would be expected to aid in the normalization of plasma glucose levels, and perhaps body weight, by enhancing glucose excretion." ('117 patent, col. 1, ll. 30-38.)

650.    The term "treating" in claim 14 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

651.    The phrase "delaying the progression or onset of" in claim 14 of the '117 patent would have had its usual, well-understood meaning at the time of the invention when used in the context of diabetes and related conditions, i.e., to "slow" the progression or onset of a disease state.

652.    Diabetes and its related conditions are progressive, chronic diseases.

653.    The phrase "delaying the progression or onset of" in claim 14 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

654.    The phrase "therapeutically effective amount" in claim 14 of the '117 patent would have had its usual, well-understood meaning at the time of the invention when used in the context of diabetes and related conditions.

655.    Zydus's expert Dr. Tobin opines in his Opening Expert Report that "determination of a therapeutically effective amount of dapagliflozin would have been a matter of routine skill for a POSA," "[a] therapeutically effective dosage amount could have been determined empirically, by conventional procedures known to those of skill in the art," and "determination of the therapeutically effective dose would have been within the knowledge and skill of a POSA." (*See* Tobin Opening Report at ¶¶ 81-84.)

656.    The phrase "therapeutically effective amount" in claim 14 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

657.    The recitations of claim 14 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

96

### 6. Claim 16 Is Not Indefinite

658. The parties in this case have entered into a stipulation whereby no claim terms of the '117 patent required a construction by the Court.

659. Each term of each claim of the '117 patent is therefore to be given its plain and ordinary meaning as understood by a person of ordinary skill in the art at the time of the invention in view of the intrinsic evidence, including but not limited to the specification and the prosecution history of the '117 patent.

660. The term "treating" in claim 16 of the '117 patent would have had its usual, well-understood meaning at the time of the invention when used in the context of diabetes and related conditions.

661. The specification of the '117 patent discloses what it would mean to "treat" diabetes and related conditions.

662. According to the specification of the '117 patent, "[n]ormalization of plasma glucose in NIDDM patients would be predicted to improve insulin action, and to offset the development of diabetic complications. An inhibitor of the sodium-dependent glucose transporter SGLT2 in the kidney would be expected to aid in the normalization of plasma glucose levels, and perhaps body weight, by enhancing glucose excretion." ('117 patent, col. 1, ll. 30-38.)

663. The term "treating" in claim 16 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

664. The phrase "therapeutically effective amount" in claim 14 of the '117 patent would have had its usual, well-understood meaning at the time of the invention when used in the context of diabetes and related conditions.

665.     Zydus's expert Dr. Tobin opines in his Opening Expert Report that "determination of a therapeutically effective amount of dapagliflozin would have been a matter of routine skill for a POSA," "[a] therapeutically effective dosage amount could have been determined empirically, by conventional procedures known to those of skill in the art," and "determination of the therapeutically effective dose would have been within the knowledge and skill of a POSA." (*See* Tobin Opening Report at ¶¶ 81-84.)

666.     The phrase "therapeutically effective amount" in claim 16 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

667.     The recitations of claim 16 of the '117 patent would not have been indefinite to one of ordinary skill in the art at the time of invention.

### H.     Objective Indicia of Non-Obviousness Supports the Patentability of the '117 Patent

668.     Dapagliflozin and its *in vivo* efficacy in chronic diabetes models, discovered and demonstrated no later than July 23, 2001, was the first-invented member of an entirely new class of FDA-approved diabetes therapies—the SGLT2 inhibitors now dubbed "gliflozins," which as a group have provided a badly needed additional tool in the armamentarium of therapies for the treatment of type 2 diabetes.

669.     Many of the now approved gliflozin products borrow structural characteristics from dapagliflozin, and the time spent by the industry as a whole in attempting to develop these products (from at least as early as the mid-1990s) attests to the non-obviousness of the development task.

670.     The history of dapagliflozin's development at BMS clearly demonstrates what those who actually worked in the field had also learned—that the path to a successful SGLT2

inhibitor was filled with unpredictable pitfalls and littered with the carcasses of drug candidates that appeared promising at first only to fail unpredictably along the development path.

671.    BMS, like the rest of the industry, was originally drawn to the O-glucosides, similar to phlorizin, which presented stubbornly difficult development problems because compounds that were potent *in vitro* failed to perform *in vivo* due to instability of the O-glucoside bond.

672.    It was only by accident that BMS discovered the new C-glucoside class of SGLT2 inhibitors and, through trial and error, the need in that class to change the spatial relationship between the sugar and distal substituent in the molecule.

673.    

674.    Equally surprising and unexpected were the results of the ongoing multiple ascending dose study in diabetic patents suggesting that the original clinical candidate was not sufficiently potent, even at 400 mg/day, to lower glucose levels in patients.

675.    

677.



685.   ████████████████████████████████████████████

686.   FARXIGA® has been widely prescribed by physicians in the United States for treatment of type 2 diabetes since 2014, and many patients suffering from type 2 diabetes benefit from treatment with this drug.

687.   Physicians prescribe FARXIGA® based on its significant therapeutic properties and advantages, including its safety, efficacy, mechanism of action, and favorable side effect profile.

688.   The favorable and unexpected properties of FARXIGA® are directly tied to its active pharmaceutical ingredient, dapagliflozin, which is claimed in the '117 patent.

### 1.   Unpredictable, surprising, and unexpected results

689.   Dapagliflozin, the active pharmaceutical ingredient in FARXIGA®, embodied in the claimed invention of the '117 patent, possesses unpredictable and unexpected benefits relative to the prior art, including the compounds of WO '128 relied on by Zydus as a primary obviousness reference.

690.   The unpredictable, surprising, and unexpected results arising from dapagliflozin's invention and subsequent testing and evaluation include, but are not limited to, an enhanced selectivity for SGLT2 versus SGLT1, an enhanced ability to reduce blood glucose concentration in short term animal models, an enhanced ability to reduce plasma glucose concentration in longer term animal models, avoidance of toxicities and stability problems, and significant medical benefits in clinical use.

### a)   Enhanced selectivity for SGLT2 versus SGLT1

691.   The *in vitro* investigation of the SGLT inhibitory potential ($EC_{50}$) of dapagliflozin showed dapagliflozin to be highly selective for SGLT2 over SGLT1.

692.     Selectivity is an important and unpredictable advantage for dapagliflozin over other SGLT2 inhibitors, as co-inhibition of SGLT1 is known to also result in other material adverse effects, such as those observed in the hereditary syndrome glucose/galactose malabsorption (GGM), in which mutations in the SGLT1 cotransporter result in impaired glucose uptake in the intestine, and life-threatening diarrhea and dehydration.

693.     A person of ordinary skill in the art would have sought a compound demonstrating selective inhibition of SGLT2 over SGLT1 due to the side effects of phlorizin and its contemporaries, but it could not have been predicted from the prior art specifically what structural changes in the molecule would result in that selectivity.

694.     BMS assessed the enhanced SGLT inhibitory potential of dapagliflozin compared to Example 12 of WO '128 by monitoring the inhibition of accumulated radiolabeled α-methyl-*D*-glucopyranoside (AMG) by Chinese hamster ovary cells stably expressing human SGLT2 and SGLT1.

695.     The results of this comparison are shown in the table below:

| SGLT2 and SGLT1 Inhibitory Activity for Example 12 of WO '128 and Dapagliflozin | | | | |
|---|---|---|---|---|
| **Example** | **Structure** | **SGLT2 EC$_{50}$ (nM)** | **SGLT1 EC$_{50}$ (nM)** | **Selectivity for SGLT2** |
| Example 12 of WO '128 |  | 1.0 | 762 | 762-fold |
| Dapagliflozin |  | 1.1 | 1390 | 1263-fold |

696.     The dapagliflozin data was the mean result of multiple repeated measurements reported separately by BMS.

697.     Values for the compound of Example 12 of WO '128 previously reported in connection with patent procurement efforts around the world were likewise based on accumulated data for that compound.

698.     BMS-451660 (Example 12 of WO '128) was reported by BMS as having $EC_{50}$ values for SGLT2 of ███████████████████████████████████████ ████████████████ the mean for this compound is 1.0, as reported.

699.     BMS-451660 (Example 12 of WO '128) was reported by BMS as having $EC_{50}$ values for SGLT1 of █████████████████████ The mean of these values is 729 nM, whereby the reported value of 762 nM for SGLT1 is, if anything, generous, making the compound of Example 12 appear even more selective than it may actually be.

700.     The selectivity data in the table above confirms that dapagliflozin is significantly more selective for SGLT2 over SGLT1 than the compound of Example 12.

701.     A person of ordinary skill in the art would not have expected or predicted the replacement of the methoxy group on Example 12 of WO '128 with the ethoxy group on dapagliflozin to result in the enhanced selectivity for SGLT2 over SGLT1 that has been observed in dapagliflozin.

702.     A person of ordinary skill in the art would have recognized the enhanced selectivity for SGLT2 over SGLT1 as a significant result in view of the known material adverse effects arising from SGLT1 inhibition discussed above.

> **b)** **Enhanced ability to reduce blood glucose at 5 hours after oral administration to diabetic STZ rats (short term animal model)**

703.    Dapagliflozin has demonstrated an unexpectedly enhanced ability to reduce blood glucose in short-term animal models.

704.    The *in vivo* potency of dapagliflozin and the compound of Example 12 of WO '128 was examined using a rat model employing Sprague Dawley rats made diabetic by prior administration of streptozotocin (STZ).

705.    Dapagliflozin was administered to the animals orally at a dose of 0.03 or 0.1 mg/kg. The hourly blood glucose levels were measured over five hours, during which time the rats were deprived of food. In separate studies with identical protocols, Example 12 of WO '128 was administered orally to the animals at the same single 0.03 or 0.1 mg/kg dosages.

706.    The results of these studies are summarized in the table below, as previously reported.

| Acute Blood Glucose Reduction Following Oral Administration of Example 12 of WO '128 or Dapagliflozin in Hyperglycemic STZ Rats | | | | |
|---|---|---|---|---|
| Compound | Dose (mg/kg) | Mean % Decrease in Blood Glucose Level at 5 h post dose | Mean % Decrease in Blood Glucose after Correction for Decrease of Controls | Average Blood Glucose Reduction (%) Relative to Control |
| at a dose of 0.03 mg/kg | | | | |
| Example 12 of WO '128 | 0.03 | 55.10 | 26.25 | 26.2 |
| | 0.03 | 53.42 | 26.16 | |
| Dapagliflozin | 0.03 | 57.54 | 32.86 | 32.9 |
| at a dose of 0.1 mg/kg | | | | |
| Example 12 of WO '128 | 0.1 | 61.87 | 38.06 | 35.9 |
| | 0.1 | 64.50 | 35.64 | |
| | 0.1 | 59.37 | 34.13 | |
| Dapagliflozin | 0.1 | 69.23 | 40.45 | 42.7 |
| | 0.1 | 68.69 | 44.01 | |
| | 0.1 | 75.50 | 43.57 | |

707.    The figures in column 3 of the above table are the average percentage changes (from initial dosing) across the six experimental animals in each group. The figures in column 4 are these same percentage reductions from baseline after subtracting the corresponding average percentage change in the six vehicle control rats for that experiment. These figures represent the effect of the experimental drug in reducing blood glucose levels over and above the natural reduction over time observed in the control group. The fifth column of the above table averages the control-adjusted drug effects over experiments using the same drug at the same dose.

708.    Of the nine experimental groups reported in the above table, *see* ¶ 706 *supra*, five are from studies of the compound of Example 12 of WO '128 and four are from studies of dapagliflozin.

709.    A statistical significance test is a formal comparison of an observed effect (such as the difference between two compounds in the average reduction in blood glucose that they produce) to what one would expect to see if the true effect were zero (for example, if there were no difference in average blood glucose reduction between the two compounds, so that any observed differences between the two is due to random chance).

710.    For most statistical tests, the result is summarized in a quantity called the p-value, a numerical quantity ranging between 0 and 1. Smaller p-values, that is, those closer to zero, are considered to be "more significant."

711.    The closer a p-value is to 1, the more consistent the observed data are with the "random chance" scenario—in the case of the example, with the two compounds having the same average reduction in blood glucose. Conversely, the closer a p-value is to zero, the less plausible it is that the difference is due to "random chance."

712.     By convention, when the p-value is less than 0.05, the observed difference in means is said to be "statistically significantly different from zero", or "statistically significant." The terms "statistical significance" and "statistically significant" are statistical terms of art that always refer to the results of a specific statistical test of a specific comparison carried out on a specific data set derived from a specific study design.

713.     When comparing two compounds in this way, the term "statistical significance" means that the data used in the test, standing by themselves, exhibit differences between the compounds that are sufficiently great that they cannot plausibly be attributed to chance.

714.     The larger the true difference in average response to the two compounds, the greater the chance that a statistical test will attain statistical significance. That is, the statistical test has greater power to detect larger differences than smaller ones.[1]

715.     When a statistical comparison does not attain statistical significance, it means only that the possibility that the difference resulted purely from chance cannot be ruled out. It does not mean that there is no actual difference.

716.     Except for dose levels, all nine studies were carried out using the same experimental protocol, measuring the same outcome (blood glucose levels over time) in the same way. Thus, to assess the differences in effect, if any, between dapagliflozin and the compound of Example 12 of WO '128, the data from these studies can be combined using the statistical method of "meta-analysis" described below.

717.     A meta-analysis is useful when there are multiple studies, each of which measures similar outcomes, using similar or identical protocols, in similar or identical populations.

---

[1] "Detecting a difference" in this context means producing data which results in a difference that is statistically significant, that is, that produces a p-value less than 0.05.

106

718.    When the studies are sufficiently similar in outcome, protocol, and populations, the information from each study can be combined statistically to produce a better estimate of treatment effects based on more information than any individual study can provide.

719.    Because meta-analysis is often used to combine information from studies that have some differences in outcome measurement, protocol, and/or populations, a first step in carrying out a meta-analysis is to determine whether the results from the various studies are sufficiently homogeneous that they can be considered to be estimating the same thing—and thus, the results can be combined.

720.    This examination of homogeneity between studies results in a measure ($I^2$) which ranges from 0 to 100%.

721.    A value of $I^2$ at or near 0% indicates that the studies exhibit no evidence of heterogeneity in the results; a large value of $I^2$ indicates that there are potential differences across the studies not taken into account in the analysis, and may indicate that the studies should not be combined (because they appear to be measuring different things from one another).

722.    In addition, the homogeneity analysis includes a statistical test of homogeneity ("the Q test"); if the result of this test is statistically significant, then that also indicates that combining results from the studies may not be advisable.

723.    When a collection of studies have the same (or highly similar) measured outcomes, measured in the same (or highly similar) manner, but they systematically differ in one or two other design variables (such as dosage, or compound being tested), the statistical method called "meta-regression" can be used to determine (a) whether there are systematic differences in outcomes associated with differences in the design variables, and (b) whether the collection of studies are homogeneous, aside from any differences due to the design variables.

724.    Meta-analysis and meta-regression make it possible to provide a more accurate answer to questions of effect sizes than any of the individual studies could provide by themselves, by combining the evidence from all of the studies that speak to the specific question at hand.

725.    ██████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███   ████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████

███   ████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████



733. 

737.     A person of ordinary skill in the art would not have expected or predicted the use of an ethoxy group as on dapagliflozin instead of an methoxy group as on Example 12 of WO '128 to result in the increased reduction of blood glucose levels *in vivo* that has been observed with dapagliflozin.

738.     A person of ordinary skill in the art would have recognized this increase as a significant and desired result in view of the prior art.

> **c)**     **Enhanced ability to reduce plasma glucose over a 15-day period after oral administration to ZDF rats (longer-term animal model)**

739.     The *in vivo* potency of dapagliflozin and Example 12 of WO '128 was also investigated in a two-week head-to-head study using Zucker diabetic fatty (ZDF) rats genetically predisposed to become diabetic.

740.    The chronic ZDF rat model of diabetes was one of the best preclinical tests of *in vivo* efficacy of antidiabetic compounds available at the time of the discovery of dapagliflozin's properties.

741.    Dapagliflozin produced results that were surprising and unexpectedly beneficial.

742.    54 male ZDF rats of 12 weeks of age were delivered to BMS on June 11, 2001.

743.    Rats used for the ZDF study were 15 weeks of age, with an average body weight of 397 g.

744.    Rats used for the ZDF study were fasted overnight before the initial experiment day, weighed, bled via the tail tip then randomized into groups where body weight and plasma glucose values were not statistically different between groups.

745.    In the ZDF study, there were nine treatment groups, and of those—Group 1 (vehicle group), Group 5 (rats treated with 0.5 mg/kg daily of the compound of Example 12 of WO '128), and Group 8 (rats treated with 0.5 mg/kg daily of dapagliflozin) are particularly relevant for the statistical analyses discussed herein.

746.    Each Group contained an equal number of rats.

747.    Defendant advanced the possibility that the data for the sixth rat in each group in the data for the ZDF study may not have been experimentally determined.

748.    There are no documents or testimony indicating that the data for the sixth rat in each Group are anything other than that which was recorded.

749.    Nevertheless, a data set containing only data for five rats per Group and a data set containing data for six rats per Group – the five plus one additional rat per Group (six total) – were both analyzed.

750.     Regardless of whether the five rat or six rat data sets for each Group are used, the ultimate conclusions reflected by the data do not change—dapagliflozin was statistically superior at lowering plasma glucose Example 12.

751.     In the ZDF study, the glucose concentration was measured at baseline, that is, the initial plasma glucose level before the first dose was administered, and after the 8th and 15th days of treatment following 18 hours of fasting.

752.







**(1)    Five rat data**

771.    The results from the data set reflecting five rats are summarized first:

| Plasma Glucose Reduction in ZDF Rats Following Oral Administration of Example 12 of WO '128 or Dapagliflozin in a Two Week Subchronic Study (5 rats) | | | | | | |
|---|---|---|---|---|---|---|
| Compound | Dose (mg/kg) | Initial Mean Plasma | Mean Plasma Glucose on the 8th | Mean % Reduction of Plasma Glucose on | Mean Plasma Glucose on the 15th | Mean % Reduction of Plasma Glucose on |

114

| | | Glucose (mg/dL) | day (mg/dL) | the 8th day Relative to Control | day (mg/dL) | the 15th day Relative to Control |
|---|---|---|---|---|---|---|
| Control | 0.5/day, 2 weeks | 307.0 | 319.0 | - | 295.2 | - |
| Example 12 of WO '128 | 0.5/day, 2 weeks | 308.8 | 192.1 | 39.8 | 196.0 | 33.6 |
| Dapagliflozin | 0.5/day, 2 weeks | 309.6 | 142.1 | 55.5 | 138.2 | 53.2 |

772.   The mean fasting plasma glucose values were compared between the vehicle and the drug-treated rats at Days 8 and 15. There was no evidence to suggest that the mean plasma glucose levels changed from Day 1 to Day 8 to Day 15 in rats administered vehicle (p=0.31). Dr. Thisted used a mixed-effects regression model that accounts for the within-rat correlation across days for that analysis.

773.   A t-test is a very commonly used statistical test.

774.   A t-test may be used to evaluate whether a single group differs from a known value (a one-sample t-test), whether two groups differ from each other (an independent two-sample t-test), or whether there is a significant difference in paired measurements (a paired, or dependent samples t-test).





**(2)   Six rat data**

783.   As with the five rat data, the decrease in plasma glucose at Day 15 with dapagliflozin was statistically significantly greater when compared to control and also when compared to the same dose of the compound of Example 12 of WO '128.

116

784.    The results from the data set reflecting six rats, which is the five rat data above plus one additional rat per compound, is summarized below:

| Plasma Glucose Reduction in ZDF Rats Following Oral Administration of Example 12 of WO '128 or Dapagliflozin in a Two Week Subchronic Study (6 rats) | | | | | | |
|---|---|---|---|---|---|---|
| Compound | Dose (mg/kg) | Initial Mean Plasma Glucose (mg/dL) | Mean Plasma Glucose on the 8th day (mg/dL) | Mean % Reduction of Plasma Glucose on the 8th day Relative to Control | Mean Plasma Glucose on the 15th day (mg/dL) | Mean % Reduction of Plasma Glucose on the 15th day Relative to Control |
| Control | 0.5/day, 2 weeks | 303.7 | 318.8 | - | 295.2 | - |
| Example 12 of WO '128 | 0.5/day, 2 weeks | 303.5 | 192.1 | 39.7 | 196.0 | 33.6 |
| Dapagliflozin | 0.5/day, 2 weeks | 303.8 | 142.1 | 55.4 | 138.2 | 53.2 |







802. 

805.    Based on these results, BMS committed to dapagliflozin the vast resources required for clinical drug development.

806.    Taken individually or together, one of ordinary skill in the art would understand that the reduction of glucose levels obtained with dapagliflozin compared to Example 12 of WO '128 in the STZ and ZDF rat models was pharmacologically significant, unpredictable, surprising, and unexpected.

807.    A person of ordinary skill in the art could not have predicted such differences in properties from the structural difference between dapagliflozin and Example 12 of WO '128.

**d)      Unexpected and surprising medical benefits**

808.    Dapagliflozin has a number of surprising medical benefits and properties when prescribed as FARXIGA®/FORXIGA®, including its clinically relevant HbA$_{1c}$ reductions, enhanced weight loss, and reduction of systolic blood pressure.

809.    FARXIGA® (dapagliflozin) has been approved in the U.S. to reduce the risk of hospitalization for heart failure in adult patients with type 2 diabetes and established

cardiovascular (CV) disease or multiple cardiovascular risk factors, based on the results of the

DECLARE-TIMI 58 CV outcomes trial (CVOT).

### 2. Long-felt but unmet need

810. At the time of dapagliflozin's invention, there existed a long-felt need for

improved drug treatment options in addition to diet and exercise monitoring for patients

suffering from type 2 diabetes.

811. At the time of dapagliflozin's invention, drug therapy for patients with severe

insulin resistance syndromes was unsatisfactory.  Novel therapies targeted at correcting the

underlying defects in a specific manner were very much needed.

812. In the late 1990s, there was an unmet need for improved oral drug treatment

options that were both safe and effective for type 2 diabetes patients in addition to diet and

exercise and the then available oral agents.

813. Therapeutic agents marketed in the United States in the late 1990s had significant

limitations and side effects including risks of hypoglycemia, weight gain, lactic acidosis,

congestive heart failure, and hepatic toxicity.

814. According to the American Diabetes Association, only 7.3% of diabetes patients

achieved the three treatment goals of low blood pressure, low cholesterol, and low hemoglobin

A$_{1C}$.

815. Because of the significant likelihood of primary and secondary failure, many

patients initially treated with the then-available agents would eventually require the addition of a

second (or third) agent to effectively treat the disease.

816. If a patient did not respond adequately to the limited number of oral agents then

available, the patient might require the addition of injected insulin with further risks of

hypoglycemia and weight gain, as well as increased complexity of therapy, which increased the likelihood of nonadherence.

817.    Although the DPP-4 inhibitor class of treatments for type 2 diabetes was under clinical development in the late 1990s, it was not known at the time of the invention for the '117 patent how this class of agents would compare to other available treatments or to SGLT2 inhibitors.

818.    Sitagliptin, the first agent of the DPP-4 class to be approved by the FDA, was not released until 2006.

819.    Although efforts to improve these outcomes were being implemented, it was reported that the challenge of providing uniformly effective diabetes care had thus far defied a simple solution.

820.    The FDA recognized this long-felt, unmet need during the medical review process in 2013 that led to the approval of FARXIGA®.

821.    The FDA stated in its review that "For these reasons, and because [type 2 diabetes mellitus] is a disease that is heterogenous in both pathogenesis and clinical manifestation, there is an unmet need for new anti-diabetic therapies and reliance on the use of combination therapies."

822.    The prevailing drug therapies available for diabetes leading up to the invention of dapagliflozin and the development of FARXIGA® often failed to effectively manage critical disease markers in diabetes patients, such as $HbA_{1C}$, cholesterol levels, and blood pressure.

823.    The long-felt need in the diabetes community for novel, reliable treatment options was met by the invention described in the '117 patent, reflected by the success of SGLT2 inhibitors in general and dapagliflozin in particular.

824.    This long-felt need for improved drug treatment options in addition to diet and exercise monitoring for patients suffering from type II diabetes would not have persisted if the solution had been obvious.

825.    While dapagliflozin was not the first SGLT2 inhibitor approved by the FDA, it was the first invented. Its actual approval by the FDA was delayed by initial (and unfounded) safety concerns.

826.    Many independent experts and industry professionals have recognized that the invention claimed in the '117 patent, as embodied in its dapagliflozin products, satisfied a long-felt need.

827.    Dapagliflozin was a very useful and welcome addition to the armamentarium for managing patients with type 2 diabetes.

828.    Dapagliflozin was the first invented SGLT2 inhibitor, and the first to be marketed (initially only in Europe), and thus premiered a new class of drugs (known as gliflozins) for the treatment of type 2 diabetes.

829.    Dapagliflozin was a significant contribution to the range of therapies available for the optimal management of patients with type 2 diabetes.

830.    Dapagliflozin introduced a versatile therapy that can be used in patients who are drug-naïve, as well as those on established blood glucose-lowering therapy.

831.    Gliflozins as a class had medical benefits and a favorable side effect profile that were distinct from other available or anticipated classes of oral treatment options.

832.    As the first invented SGLT2 inhibitor for treatment of diabetes, the class benefits of gliflozins inure to the benefit of dapagliflozin.

123

833.     Dapagliflozin is effective in improving glycemic control, and enhancing weight loss, with a low risk of side effects, making it an excellent drug for treating type 2 diabetes, especially compared to many of the other classes of agents available in the late 1990s and early 2000s.

834.     The prevailing drug therapies available at the time of invention often failed to effectively manage critical disease markers in diabetes patients, such as $HbA_{1C}$, lipid levels, blood pressure, and body weight.

835.     The Phase III clinical trials with dapagliflozin demonstrated that treatment with FARXIGA® as a monotherapy and in combination with other oral agents provided significant improvements in $HbA_{1C}$ and the fasting plasma glucose (FPG) compared with placebo.

836.     In clinical trials, FARXIGA® was evaluated as monotherapy, as initial therapy in combination with metformin, as add-on therapy to metformin and as add-on therapy with other antidiabetic agents including glimepiride (a sulfonylurea), pioglitazone (a thiazolidinedione), sitagliptin (a DPP-4 inhibitor), insulin, and exenatide (a GLP-1 receptor agonist, GLP-1 RA).

837.     An SGLT2 inhibitor was recommended as the preferable add-on therapy for patients with established atherosclerotic cardiovascular disease (ASCVD) or indicators of ASCVD high risk, and as an initial add-on therapy for patients with a compelling need to minimize hypoglycemia or a compelling need to minimize weight gain or promote weight loss.

838.     Notably, there have not been any new classes of treatment options introduced for type 2 diabetes since the SGLT2 inhibitors. While the SGLT2 inhibitors have been marketed in combination formulations with other classes of oral agents, such as metformin and/or the DPP-4 inhibitors, there has been no new class of monotherapy treatment approved by the FDA.

839.    The invention described in the '117 patent has been specifically recognized by independent groups as meeting a long-felt, unmet need.

840.    The inventors of the '117 patent were awarded the 2009 Thomas A. Edison Patent Prize. This prize has been awarded annually for nearly four decades by the Research & Development Council of New Jersey to recognize the "best and brightest patented inventions" from the state of New Jersey. Inventions considered for the award are judged on the significance of the problem solved, the patent's commercial impact, its novelty and utility.

841.    In 2012, The Cleveland Clinic named the gliflozin class of SGLT2 inhibitors (of which dapagliflozin was the first invented), a "Top 10 Medical Innovation for 2012."

842.    The announcement of this award stated, *inter alia*, that dapagliflozin represents a paradigm shift in diabetes treatment because it reduces blood sugar in a totally new way – by causing it to be excreted during urination.

843.    These examples of industry professionals recognizing the novelty and success of dapagliflozin evidences the satisfied long-felt need for an invention like dapagliflozin and further supports the non-obviousness of the invention.

844.    In a recently decided Hatch-Waxman case involving the later-invented canagliflozin, which is marketed in the U.S. as INVOKANA®, the District of New Jersey found—at Zydus's urging—that there was an unmet need for an SGLT inhibitor and that need had been met by dapagliflozin prior to the invention of canagliflozin.

### 3.    Failure of others

845.    Despite years of research and the unsuccessful efforts by others, no diabetes therapy had proven fully effective in helping practitioners and patients to manage symptoms of type 2 diabetes. (*See* Section IV.H.2., *supra*.) Other drug candidates had been proposed and either failed or demonstrated severe side effects.

125

846.   The naturally occurring O-glucoside phlorizin was a known glucosuric agent, but further testing of phlorizin showed it had poor stability in the body, and its lack of selectivity for SGLT2 over SGLT1—and the resulting severe gastrointestinal symptoms—was problematic. Phlorizin was not further developed as a serious drug candidate for diabetes treatment.

847.   Many research teams pursued derivatives of O-glucoside compounds like phlorizin.

848.   Researchers at Tanabe Seiyaku studied the SAR of phlorizin, leading to the discovery of compound "T-1095A." Testing of this drug initially showed a promising decline in glycemic levels, but further development was eventually stopped because the O-glucoside bond was cleaved in the intestinal tract, limiting the duration of its action.

849.   Researchers at Kissei produced derivatives of phlorizin that initially appeared promising but were also found to be unstable in the gut.

850.   It was not until the inventors of the '117 patent developed and tested C-aryl glucoside derivatives and investigated the unique structural features of dapagliflozin that the potency, selectivity, and stability problems encountered by others in the field were solved in a safe, potent, and effective drug.

851.   That the inventors of dapagliflozin were able to learn from the failures of others does not diminish the non-obviousness of dapagliflozin or erase the futility of the work performed by those others.

852.   Even other later-developed compounds in the gliflozin class, which dapagliflozin pioneered, have suffered setbacks and failures.

853.     To date, all but three gliflozins have failed to secure FDA approval. Further, some

of the other approved SGLT2 inhibitors have risks of severe side effects not reported with

dapagliflozin.

854.     Sotagliflozin has never received FDA approval, and was found to have inferior

gastrointestinal side effect profiles compared to dapagliflozin, the subject of the '117 patent.

855.     Canagliflozin (marketed in the U.S. as INVOKANA®) was found by FDA to

cause an increased risk of amputation when administered to diabetic patients. FDA then required

Janssen—INVOKANA®'s manufacturer—to label the product with its highest "black box"

warning.  This black box warning was considered a significant set-back by the industry.

856.     Canagliflozin's black box warning stood for three years before ultimately being

removed in August 2020.  The risk of amputation associated with canagliflozin still remains and

is described in the *Warnings and Precautions* section of INVOKANA®'s prescribing

information.

857.     The withdrawn black box warning for INVOKANA®, and the warning that still

remains on its product label today, has had an effect on the likelihood of practicing physicians

prescribing it, to this day.

858.     Ertugliflozin, sold under the trade name STEGLATRO™, also contains a specific

warning in the label to consider patient-specific factors that could increase the risk of lower-limb

amputation.

859.     Dapagliflozin, which is contained in FDA approved products FARXIGA®,

XIGDUO XR®, QTERN®, and QTERNMENT®, was never viewed as creating this enhanced

risk, and its label does not contain a lower-limb amputation warning.

860.    The many failures in this field further support the non-obviousness of the invention and serve to highlight the significant unpredictability in this field.

### 4.    Industry acquiescence

861.    Twenty generic drug companies filed ANDAs seeking permission to market generic versions of AstraZeneca's FARXIGA® dapagliflozin tablet products.

862.    Nineteen of those twenty generic drug companies filed so-called "Paragraph III" certifications, wherein each generic company respected AstraZeneca's patent rights and declined to challenge the validity of the '117 patent.

863.    These decisions to file Paragraph III certifications were not influenced by the '117 patent's original October 4, 2020 expiration date.

864.    The twenty generic drug companies are all sophisticated and familiar with the U.S. patent system. They would have each understood that patents covering New Chemical Entities, like dapagliflozin and the '117 patent, are routinely entitled to patent term extension as compensation for the lengthy regulatory process.

865.    Only Zydus filed a Paragraph IV certification challenging the validity of the '117 patent.

866.    Such widespread industry acquiescence to the validity of the '117 patent further supports the non-obviousness of the invention.

### 5.    Copying by others

867.    Dapagliflozin's surprising potency and selectivity transformed the pharmaceutical industry's approach to drug development of SGLT2 inhibitors for the treatment of type 2 diabetes.

868.    The industry moved away from O-glucosides and began pursuing C-glucoside-based structures in the hopes of discovering novel SGLT2 inhibitors.

869.    Today, the market has many SGLT2 inhibitors available and, in the U.S., these are all C-glucosides originating from BMS's pioneering invention of dapagliflozin.

870.    Examples include Merck and Pfizer's STEGLATRO® (ertugliflozin), Boehringer Ingelheim's JARDIANCE® (empagliflozin), Janssen's INVOKANA® (canagliflozin), and Astellas's SUGLAT® (ipragliflozin).

871.    Other C-glucosides are available abroad, including Chugai's tofoglizon product in Japan, Taisho's luseogliflozin product in Japan, and Lexicon and Sanofi's sotagliflozin product in Europe.  Theracos's bexagliflozin is currently undergoing phase 3 clinical studies.

Dapagliflozin



Ertugliflozin



Empagliflozin



Canagliflozin



Ipragliflozin



Tofogliflozin



Sotagliflozin



Bexagliflozin



Luseogliflozin

872.    An examination of the competitor structures above reveals the influence of the breakthrough dapagliflozin compound.

873.    All eight compounds share dapagliflozin's c-aryl-glucoside structure.

874.    All eight competitor compounds feature a single methylene linker between the two rings.

875.    Five of the competitor compounds include a chlorine atom at the same location on the central ring as dapagliflozin.

130

876.   Dapagliflozin was the first compound to show that a chlorine atom at the 4 position of the central ring could result in a potent, selective, and stable SGLT2 inhibitor.

877.   Three of the competitor compounds have an ethoxy group at the same location on the distal ring as dapagliflozin.

878.   Dapagliflozin was the first compound to show that an ethoxy atom at that position could result in a potent, selective, and stable SGLT2 inhibitor. It is also noteworthy that none of the above compounds include a 4-OMe group on the distal ring.

879.   Such widespread copying by AstraZeneca's competitors of the key features of the dapagliflozin compound is further evidence of the non-obviousness of the invention described in the '117 patent.

880.   Twenty generic drug companies, including Zydus, have sought permission to market generic copies of dapagliflozin due to its medical benefits and success.

### 6.   Skepticism of skilled artisans

881.   Practitioners in the field of diabetes treatment were unsure how or if SGLT2 inhibitors, including dapagliflozin, would provide any benefits over the existing DPP-4 class of treatments.

882.   Practitioners were concerned prior to publication of clinical trial data that inhibition of SGLT2 would result in unacceptable levels of dehydration and glycosuria, increasing the risk for genital and urinary tract infections.

883.   There was an initial mistrust among practitioners regarding prescribing SGLT2 inhibitors, with dapagliflozin as the first-invented member of the class.

884.   Even the Food and Drug Administration (FDA) announced initial skepticism of dapagliflozin's benefits, leading to a long delay in the approval of FARXIGA®.

131

885.     Despite industry skepticism, SGLT2 inhibitors, like dapagliflozin, have become a go-to treatment option in the arsenal of prescribing physicians.

886.     The initial skepticism was assuaged by the published results of dapagliflozin clinical trials as well as careful evaluation, selection, observation, and education of patients.

887.     The skepticism was also overcome based on the greater $HbA_{1C}$ reduction benefits of dapagliflozin compared to DPP-4 inhibitors, as well as the added benefits of weight loss and reduction in systolic blood pressure.

**I.     In the Reissue Application, the USPTO Found the Asserted Claims Non-Obvious over the Art Asserted by Zydus, including Example 12 of WO '128**

888.     A reissue application of the '117 patent, U.S. Reissue Patent Application No. 16/014,479, was filed on June 21, 2018.

889.     Zydus's invalidity contentions and the art cited therein, including WO '128, were provided to the USPTO during the reissue proceeding.

890.     The USPTO found the reissue claims patentable over the art of record, including Example 12 of WO '128 and all of the art raised in Zydus's obviousness challenges herein, and issued a Notice of Allowance for U.S. Reissue Patent Application No. 16/014,479 on June 21, 2019.

891.     Allowed claim 1-3, 14, and 16 of U.S. Reissue Patent Application No. 16/014,479 are identical to the asserted claims in the '117 patent and recite:

1. A compound having the structure

or a pharmaceutically acceptable salt, a stereoisomer thereof, or a prodrug ester thereof.

2. The compound as defined in claim 1 having the structure



.

3. A pharmaceutical composition comprising a compound as defined in claim 1 and a pharmaceutically acceptable carrier therefor.

14. A method for treating or delaying the progression or onset of diabetes, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound healing, insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X, diabetic complications, atherosclerosis or hypertension, or for increasing high density lipoprotein levels, which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in claim 1.

16. A method for treating type II diabetes which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in claim 1 alone or in combination with another antidiabetic agent, an agent for treating the complications of diabetes, an anti-obesity agent, an antihypertensive agent, an antiplatelet agent, an anti-atherosclerotic agent and/or a hypolipidemic agent.

133

892.     As acknowledged by the USPTO, claims 1-3, 14, and 16 would not have been obvious over Example 12 of WO '128 to a person of ordinary skill in the art at the time of the invention.

893.     U.S. Reissue Patent Application No. 16/014,479 was expressly abandoned by AstraZeneca on June 24, 2019.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

                Plaintiff,

      v.

ZYDUS PHARMACEUTICALS (USA)
INC.,

              Defendant.

C.A. No. 1:18-cv-00664-RGA



**ZYDUS PHARMACEUTICALS (USA) INC.'S
STATEMENT OF THE ISSUES OF FACT THAT REMAIN TO BE LITIGATED**

i

# TABLE OF CONTENTS

ZYDUS'S STATEMENT OF FACTS THAT REMAIN TO BE LITIGATED ........................... 1

I.    INTRODUCTION ................................................................................................. 1

II.   THE '117 PATENT ............................................................................................. 1

III.  PERSON OF ORDINARY SKILL IN THE ART ("POSA") ........................... 1

IV.   BACKGROUND ................................................................................................. 3

   A.    Diabetes ........................................................................................................ 3

   B.    Sodium Glucose Cotransporters and the Use of SGLT2 Inhibitors to Treat Diabetes Before the Priority Date ........................................................................................ 4

   C.    Structure-Activity Relationship ("SAR") Studies ................................... 11

V.    THE ASSERTED CLAIMS OF THE '117 PATENT ARE INVALID AS OBVIOUS ...... 13

   A.    Prior Art to the '117 Patent ..................................................................... 13

      1.    International Patent Application Publication No. WO 01/27128 ("WO '128") ......... 13

      2.    Mitsuya Hongu et al., *Na+-Glucose Cotransporter Inhibitors as Antidiabetic Agents. II. Synthesis and Structure-Activity Relationships of 4'-Dehydroxyphlorizin Derivatives*, 46 CHEM. PHARM. BULL. 22 (1998) ("Hongu") ......................................................... 16

      3.    Kenneth L. Kees et al., *New Potent Antihyperglycemic Agents in db/db Mice: Synthesis and Structure-Activity Relationship Studies of (4-Substituted Benzyl)(Trifluoromethyl)Pyrazoles and -Pyrazolones*, 39 J. MED. CHEM. 3920 (1996) ("Kees") ......................................................................................................... 18

      4.    International Patent Application Publication No. WO 98/31697 ("WO '697") ......... 20

      5.    European Patent Application Publication No. 0598359 ("EP '359") ......................... 21

      6.    Kenji Tsujihara et al., *Na+-Glucose Cotransporter Inhibitors as Antidiabetics. I. Synthesis and Pharmacological Properties of 4'-Dehydroxyphlorizin Derivatives Based on a New Concept*, 44 CHEM. PHARM. BULL. 1174 (1996) ("Tsujihara") ............................... 23

      7.    Graham L. Patrick, AN INTRODUCTION TO MEDICINAL CHEMISTRY (1st ed. 1995) ("Patrick") ........................................................................................................ 24

      8.    Gareth Thomas, MEDICINAL CHEMISTRY: AN INTRODUCTION (2000) ("Thomas") ... 27

      9.    George A. Patani & Edmond J. LaVoie, *Bioisosterism: A Rational Approach in Drug Design*, 96 CHEM. REV. 3147 (1996) ("Patani") .............................................. 28

      10.   André J. Scheen, *Drug Treatment of Non-Insulin-Dependent Diabetes Mellitus in the 1990s: Achievements and Future Developments*, 54 DRUGS 355 (1997) ("Scheen") .......... 29

   B.    Claims 1–3 of the '117 patent are invalid as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations ....................................... 29

      1.    Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of

ii

one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations ..................... 29

2.     Claim 3 is invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations ...................................... 41

C.     Claims 1–3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations ........................................................................................................... 42

1.     Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of one or more of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations ........................................................................................................... 42

2.     Claim 3 is invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of one or more of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations .. 53

D.     Claims 1–3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations ........................................................................................................... 54

1.     Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations .. 54

2.     Claim 3 is invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations .................... 67

E.     Claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious ..... 68

1.     Claim 14 of the '117 Patent is Invalid as Obvious .................................................... 68

2.     Claim 16 of the '117 Patent is Invalid as Obvious .................................................... 74

VI.     ASTRAZENECA'S EVIDENCE OF ALLEGED OBJECTIVE INDICIA OF NON-OBVIOUSNESS DO NOT SUPPORT THE VALIDITY OF THE ASSERTED CLAIMS ....... 81

A.     No Unpredictable, Surprising, or Unexpected Results ................................................. 81

1.     Dapagliflozin's selectivity for SGLT2 was not surprising or unexpected ................ 82

2.     Background on statistical analyses relating to AstraZeneca's assertion of unexpected or surprising results in support of non-obviousness ............................................................ 84

3.     The difference in STZ rat data was not surprising or unexpected............................. 92

4.     The difference in ZDF rat data was also not surprising or unexpected.................... 103

5.   Any alleged unexpected medical benefits are irrelevant .......................................... 132

B.   Background Facts Relating to AstraZeneca's Assertion of Additional Secondary Considerations....................................................................................................................... 132

1.   Treatment options for type 2 diabetes before SGLT2 inhibitors obtained FDA approval.................................................................................................................. 132

2.   Treatment of patients with type 2 diabetes ............................................................. 134

C.   Alleged Long Felt, Unmet Need ........................................................................................ 136

1.   There has been and continues to be a long-felt, unmet need for improved type 2 diabetes treatments................................................................................................... 137

2.   Dapagliflozin is one of many therapies a physician may use today to treat type 2 diabetes and has associated risks ............................................................................. 138

3.   AstraZeneca's comparison of dapagliflozin to other agents as add-on therapy fails to sufficiently take GLP-1 RAs into account ........................................................ 141

4.   It is irrelevant that additional classes of monotherapy treatments have not been developed since SGLT Inhibitors ............................................................................ 141

D.   Phlorizin and Other "Gliflozins" are not Failures of Others ......................................... 142

E.   Filing of Paragraph III Certifications does not Constitute Industry Acquiescence...... 145

F.   AstraZeneca's Evidence of Alleged Copying by Others does not Support the Non-Obviousness of the Asserted Claims........................................................................................ 145

G.   Subjective opinions are not demonstrative of industry skepticism .............................. 146

VII.   CLAIMS 14 AND 16 OF THE '117 PATENT ARE INVALID UNDER 35 U.S.C. § 112 147

A.   Claims 14 and 16 are Invalid under 35 U.S.C. § 112, ¶ 1 for Lack of Enablement..... 147

1.   Claim 14 is not enabled to its full scope................................................................ 147

2.   Claims 14 and 16 lack utility and therefore lack enablement.................................. 149

B.   Claims 14 and 16 are Invalid under 35 U.S.C. § 112, ¶ 1 for Lack of Written Description ............................................................................................................................... 150

C.   Claims 14 and 16 are Invalid under 35 U.S.C. § 112, ¶ 2 as Indefinite ...................... 152

1.   Claim 14 ................................................................................................................. 152

2.   Claim 16 ................................................................................................................. 154

## ZYDUS'S STATEMENT OF FACTS THAT REMAIN TO BE LITIGATED

### I.      INTRODUCTION

In accordance with Local Rule 16.3(c)(4) of the Local Rules of Civil Practice and

Procedure of the United States District Court for the District Of Delaware, Zydus

Pharmaceuticals (USA) Inc. ("Zydus") submits the following statement of the issues of fact that

remain to be litigated with respect to the invalidity of claims 1–3, 14, and 16 ("the asserted

claims") of U.S. Patent No. 6,5151,117 ("the '117 patent").

Zydus's identification of these factual issues is based on its understanding of the

pleadings served and discovery taken in this action to date.  If AstraZeneca AB ("AstraZeneca")

offers arguments different from or in addition to those it has previously offered, Zydus reserves

its right to contest those new arguments and to present any rebuttal evidence.  Moreover, nothing

in this statement should be construed as Zydus's agreement or acquiescence to AstraZeneca's

statement of issues of fact that remain to be litigated.

If the Court concludes that any issue of fact that Zydus identifies in this Exhibit C should

instead be considered an issue of law, that issue should be treated as if it were an issue of law

that remains to be litigated listed by Zydus in Exhibit E.

### II.     THE '117 PATENT

1.      The priority date of the '117 patent is not earlier than the May 20, 2002 filing date

of U.S. Patent Application No. 10/151,436, which issued as the '117 patent.

### III.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")

2.      The POSA with respect to the compound limitations of claims 1–3, 14, and 16 of

the '117 patent as of the relevant time would have been a scientist who has a Ph.D. in a field

such as chemistry, biochemistry, medicinal chemistry, organic chemistry, pharmaceutical

chemistry, pharmaceutics, or the like, with one or two years of experience in the research,

development, or characterization of new compounds.  Alternatively, the POSA would have an

M.S. or similar degree and an additional three or more years of experience in the research,

development, and characterization of new compounds.  Further, the POSA has access to and

would consult with a collaborative team of ordinarily skilled artisans, including a medical doctor,

Ph.D., or lesser degree with similar levels of training and experience in related areas of research

and development of new drugs, such as those that treat diabetes, pharmaceutical formulation,

pharmacology, pharmacokinetics, medicine, preclinical and clinical research, computational

methodology, immunology, analytical characterization and development, and the like.

3. A POSA with respect to the method of treatment limitations of claims 14 and 16

of the '117 patent as of the relevant time would have been a medical doctor or other scientist

who specializes in the treatment of diabetes who would have access to and could consult with a

scientist who has a Ph.D. in a field such as chemistry, biochemistry, medicinal chemistry,

organic chemistry, pharmaceutical chemistry, and/or pharmaceutics, or the like, with one or two

years of experience in the research, development or characterization or new compounds, or who

has a M.S. or similar degree in those fields and three or more years of experience in the research,

development, and characterization of new drugs.  A POSA could consult with others as part of a

team having the foregoing training and experience, plus similar levels of training and experience

in a related area(s) of research and development of new drugs, such as pharmaceutical

formulation, pharmacology, pharmacokinetics, medicine, preclinical and clinical research,

computational methodology, immunology, analytical characterization and development, and the

like.

## IV.    BACKGROUND

### A.    Diabetes

4.    Diabetes is a derangement of glucose (sugar) metabolism in which the body is unable to maintain the blood sugar in the physiologic (i.e., normal) range.  It is a complex disease and highlights the systems that the body uses to maintain nutrient and fuel balance. When the body is in the fed state (as opposed to the fasting state), the body secretes the hormone insulin to help remove glucose from the blood stream and store nutrients as glycogen and fat. When an individual has diabetes, the body either does not make enough insulin or cannot use its own insulin as well as it should.  As a result, this leads to an inefficient removal of glucose from the blood and causes glucose to build up in one's blood.  The body does not properly process food for use as energy.

5.    Diabetes is a chronic condition that affects patients from diagnosis through the remainder of their lives.  Many patients with diabetes will be on medication for numerous years.

6.    Type II diabetes was previously called non-insulin-dependent diabetes mellitus ("NIDDM") or adult-onset diabetes and accounts for about 90-95 % of all diagnosed cases of diabetes.  Risk factors for type II diabetes include older age, obesity, and family history of diabetes, prior history of gestational diabetes, impaired glucose tolerance, physical inactivity, and race/ethnicity.  African Americans, Hispanic/Latino Americans, American Indians, and some Asian Americans and Pacific Islanders are at particularly high risk for type II diabetes.

7.    Hyperglycemia (*i.e.*, high levels of glucose in plasma) is one of the main characteristics of type II diabetes.  One of the defects found in type II diabetes is a dysfunctional response of the kidney to high plasma glucose levels, leading to increased absorption of glucose from the urine.  Cells lining the blood vessels are damaged by high plasma glucose levels, which

3

leads to the devastating complications of diabetes including heart disease, blindness, kidney failure, and lower-leg amputations.

8.      Control of blood sugar (*i.e.*, plasma glucose levels) treats diabetes (including type II diabetes) and decreases the complications (*i.e.*, mortality and morbidity) of the disease.  This has been shown in both type I and type II diabetic trials.

9.      The exact amount (effective dose) of the agent used to control blood sugar levels can vary from subject to subject, depending on, for example, the sex, age, and general or clinical condition of the subject, the severity or mechanism of any disorder being treated, the existence of any comorbidities, the particular agent or vehicle used, the method and scheduling of administration, and the like.

10.     As of the late 1990s, the oral treatments for type II diabetes that were available included sulfonylureas, meglitinides, biguanides such as metformin, thiazolidinediones ("TZDs"), and alpha-glucosidase inhibitors.  Insulin was also available as an injectable treatment for type II diabetes.  Each of these treatment options employed a different mechanism of action. Additionally, in the 1990s, glucagon-like peptide 1 ("GLP-1") injectables and dipeptidyl peptidase-4 ("DPP-4"), which act as incretin agents, were under active investigation.

11.     Despite the fact that as of the late 1990s, there were various medicaments available to treat type II diabetes, a need for improved treatment options still existed. Furthermore, it was known that SGLT2 inhibitors could be used to treat type II diabetes.

**B.      Sodium Glucose Cotransporters and the Use of SGLT2 Inhibitors to Treat Diabetes Before the Priority Date**

12.     Sodium glucose cotransporters SGLT1 and SGLT2 are important mediators of epithelial glucose transport.  In healthy adults, the renal proximal tubule reabsorbs all filtered

glucose from the kidney—a process that is mediated by the sodium glucose cotransporters SGLT1 and SGLT2.

13.     While SGLT1 accounts for most of the dietary glucose uptake in the intestine, SGLT2 is responsible for the majority of glucose reuptake in the tubular system of the kidney, with SGLT1 reabsorption responsible for the remainder of the filter glucose.  90% of glucose reuptake in the kidney takes place in the S1 segment of the renal tubule, and at the time of the earliest effective priority date, it was thought that SGLT2 was the "major transporter responsible for this reuptake."  *Id.*

14.     When SGLT2 is inhibited, the capacity for renal reabsorption of glucose declines. Any glucose that has not been filtered then spills into the urine due to the renal safety valve, which acts to prevent extreme hyperglycemia.

15.     The below figure depicts the role of SGLT1 and SGLT2 in reabsorption of glucose, when SGLT2 is inhibited:



16.    Prior to 2001, it had been known that in diabetic animal models, as well as in diabetic humans, the maximal renal tubular reabsorptive capacity, or Tm, for glucose is increased, as compared to non-diabetic animals and non-diabetic humans.  This means that the renal tubule in the kidney in a diabetic animal or human is able to reabsorb an increased amount of glucose into plasma.

17.    Phlorizin is a naturally occurring inhibitor of SGLT1 and SGLT2 cotransporters that was discovered over 150 years ago in the 19th century and was found to increase urinary glucose excretion in healthy humans.

18.    Phlorizin is an O-aryl glucoside compound having the following structure:



Phlorizin

An O-aryl glucoside compound has multiple parts:



6

a glucoside sugar portion bonded through an oxygen molecule to a portion having two aromatic rings B and A that are connected to each other by a linker.

19.     As of 2002, it was known that phlorizin inhibits not only SGLT2 but also SGLT1, causing undesired side effects.  It was further known as of 2002 that phlorizin was hydrolyzed in the intestine into phloretin and glucose:



and that phloretin was predicted to "exacerbate peripheral insulin resistance as well as promote hypoglycemia" in the central nervous system.  International Patent Application Publication No. WO 01/27128 ("WO '128") at 4.

20.     Because phlorizin's mechanism of action to increase glucose in the urine was important, various companies created analogs of phlorizin and those analogs were used to inhibit the reuptake of glucose in animal models by promoting glucose excretion to normalize plasma glucose levels.  WO '128 at 2.

21.     As of 2002, various companies worked to improve upon phlorizin's pharmaceutical activity and to prevent the unwanted hydrolysis into phloretin and glucose by modifying the phlorizin molecule.

22.     As of well before 2002, Kenji Tsujihara et al., *Na⁺-Glucose Cotransporter Inhibitors as Antidiabetics. I. Synthesis and Pharmacological Properties of 4'-Dehydroxyphlorizin Derivatives Based on a New Concept*, 44 CHEM. PHARM. BULL. 1174 (1996)

("Tsujihara") taught that "the 4′-OH group on the B ring is not essential for SGLT inhibition and the 4-OH group on the A ring is exchangeable for other groups." Tsujihara at 1175. Therefore Tsujihara and others each modified phlorizin by first removing the 4′-OH group on the B ring.



See, e.g., European Patent Application Publication No. 0598359 ("EP '359") at Abstract; Tsujihara at 1175; Mitsuya Hongu et al., *Na$^+$-Glucose Cotransporter Inhibitors as Antidiabetic Agents. II. Synthesis and Structure-Activity Relationships of 4′-Dehydroxyphlorizin Derivatives*, 46 CHEM. PHARM. BULL. 22 (1998) ("Hongu") at 25 (Table 1).

    23.    As of well before 2002, to further improve upon the pharmaceutical activity of phlorizin, both Tsujihara and Hongu evaluated the $R^1$ substituent of Compound **II**.

Tsujihara at 1175; Hongu at 25 (Table 1); *see also* EP '359 at Abstract.

24.     As of well before 2002, Tsujihara also taught that different substituents on the A ring could produce compounds with different levels of activities.

25.     As of well before 2002, other prior art disclosed potent antihyperglycemic agents having two aromatic rings like phlorizin —4-(4-sulfur-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones (Compound **III** below) and 4-(carbon-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones (Compound **IV** below)—but with a methylene linker (a –CH$_2$– linker) between the aromatic rings instead of the carbonyl group linker in phlorizin, as shown below:



**III**                                                                                       **IV**

Kenneth L. Kees et al., *New Potent Antihyperglycemic Agents in db/db Mice: Synthesis and Structure-Activity Relationship Studies of (4-Substituted Benzyl)(Trifluoromethyl)Pyrazoles and -Pyrazolones*, 39 J. MED. CHEM. 3920 (1996) ("Kees") at 3922 (Tables 1–2) (emphasis added).

26.     As of well before 2002, Kees further discloses that "the methylene linker between the [two aromatic rings] … was critical for activity." *Id.* at 3923.

27.     As of well before 2002, International Patent Application Publication No. WO 98/31697 ("WO '697") also addressed the instability associated with the hydrolysis of the phlorizin into glucose and phloretin.  WO '697 disclosed that "the oligosaccharides may lack chemical and physiological stability.  Since sugar chains are basically composed of an O-glycoside bond having a hemiacetal structure, they are essentially unstable under acidic conditions."  WO '697 at 6–7.  WO '697 addressed the undesired instability and hydrolysis

9

issues by removing the oxygen between the glucoside and aromatic B ring, producing a more stable C-glucoside compound.

28.     A C-glucoside or a C-aryl glucoside compound has a structure like this:



wherein the glucoside sugar portion is bonded directly to one of the two aromatic rings that are connected to each other by a linker.

29.     As of well before 2002, WO '697 also taught that the synthesis of an O-glycoside molecule could be more tedious than the synthesis of a C-glycoside molecule.  *Id.* at 6.

30.     Before 2002, motivated by this "well known" improved stability of the C-glucoside over the O-glucoside compounds, the inventors of International Patent Application Publication No. WO 01/27128 ("WO '128") synthesized many C-glucoside compounds having the general formula I intended to be used as a treatment for diabetes:

WO '128 at Abstract.

### C.    Structure-Activity Relationship ("SAR") Studies

31.    As of well before 2002, modification of prior art compounds was a well-known approach to find compounds with improved pharmacological activities.  In drug development, the rational drug design approach has typically involved three basic strategies: (i) making systematic functional group or structural changes to key points on the lead compound's structure, also referred to as a scaffold; (ii) taking pieces of the scaffold and reordering them in different combinations; and (iii) combining features of lead compounds known to exhibit activity against a particular target with one's sight set on synergistic activity.

32.    As of well before 2002, all of these strategies were (and still are) considered important in any drug development program for improving activity and reducing side effects and involve what is commonly known as a structure activity relationship ("SAR") study.  *See, e.g.*, Patrick at 84; Thomas at 37–38.

33.    The purpose of a series of routine SAR studies is to identify a more desirable substituent at each position.

34.    In conducting a typical SAR study, a POSA would normally start with one position of the molecule as the point of modification and keep constant the other parts of the molecule and measure the pharmacologic activity of the compound with each modification.

35.    For example, altering the $R^1$ substituent of the 4′-dehydroxyphlorizin derivatives in Hongu is a typical SAR study to evaluate the impact of varying $R^1$ substituents on the physical and biological properties of such compounds.  Hongu at 25 (Table 1).

| No. | R¹ | Method | Yield[a] (%) | mp (°C) (Recryst. solvent) | Formula | Anal. Calcd (Found) | | | Urinary glucose excretion[b] (mg/24 h) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | C | H | N | p.o. | i.p. |
| 1 | 4-OMe[c] | | | | | | | | 340±18 | 204± 8 |
| 2 | 3-OMe | A | 31 | 105—107 (iso-Pr₂O) | C₂₁H₂₆O₉ | 60.82 (60.87) | 6.03 (6.29) | | 66±12 | 88± 6 |
| 3 | 2-OMe | A | 52 | Amorphous | C₂₁H₂₆O₉·1/4H₂O | 60.20 (60.37) | 6.08 (6.06) | | 8± 1 | 11± 2 |
| 4 | 4-OEt | A | 46 | 76.5—78 (MeO-H₂O) | C₂₂H₂₈O₉·3/4H₂O | 59.77 (59.55) | 6.44 (6.42) | | 124±27 | 77± 9 |
| 5 | 3-OH | A | 54 | 127—130 (Et₂O) | C₂₁H₂₄O₉·5/4H₂O | 56.95 (57.05) | 6.03 (5.96) | | 3± 0 | NT |
| 6 | 2-OH | A | 53 | 128—132 (Et₂O) | C₂₁H₂₄O₉·1/2H₂O | 58.74 (58.45) | 5.87 (5.69) | | 2± 1 | 14± 3 |
| 7 | H | A | 54 | 126—129 (Et₂O-iso-Pr₂O) | C₂₁H₂₄O₈·1/4H₂O | 61.68 (61.88) | 6.04 (5.91) | | 217±18 | 160± 8 |
| 8 | 2-Me | A | 32 | Amorphous | C₂₂H₂₆O₈·1/4H₂O | 62.48 (62.37) | 6.32 (6.28) | | 21±11 | 9± 3 |
| 9 | 3-Me | A | 49 | 78—81 (Acetone-H₂O) | C₂₂H₂₆O₈·3/4H₂O | 61.17 (61.18) | 6.39 (6.42) | | 299±35 | 160±11 |
| 10 | 4-Me | A | 49 | 105— (iso-Pr₂O) | C₂₂H₂₆O₈·1/4H₂O | 62.48 (62.76) | 6.32 (6.24) | | 344±84 | 144±10 |
| 11 | 4-Et | A | 51 | 127.5—129.5 (Et₂O-iso-Pr₂O) | C₂₃H₂₈O₈ | 63.88 (63.59) | 6.53 (6.51) | | 277±64 | 76± 6 |
| 12 | 4-i-Pr | A | 33 | 109—112 (Et₂O-iso-Pr₂O) | C₂₄H₃₀O₈ | 64.56 (64.28) | 6.77 (6.64) | | 31± 6 | 8± 3 |
| 13 | 4-Ph | A | 42 | Amorphous | C₂₇H₂₈O₈ | 67.49 (67.19) | 5.87 (6.03) | | NT | 1± 1 |
| 14 | 4-NMe₂ | A | 32 | Amorphous | C₂₃H₂₉NO₈·1/4H₂O | 61.12 (60.99) | 6.58 (6.82) | 3.10 (2.81) | 178±22 | 122± 8 |
| 15 | 4-COOH | A | 43 | 200.5—204 (MeOH-iso-Pr₂O) | C₂₂H₂₄O₁₀·3/4H₂O | 57.20 (57.21) | 5.56 (5.47) | | 4± 1 | 1± 0 |
| 16 | 4-CONH₂ | A | 35 | 178—181 (MeOH-iso-Pr₂O) | C₂₂H₂₅NO₉·1/2H₂O | 57.89 (57.81) | 5.74 (5.66) | 3.07 (2.99) | 2± 1 | 83±23 |
| 17 | 4-CN | A | 28 | 155—156.5 (MeOH-iso-Pr₂O) | C₂₂H₂₃NO₈·H₂O | 59.06 (59.19) | 5.63 (5.46) | 3.13 (3.01) | 4± 0 | 10± 1 |
| 18 | 4-Cl | B | 48 | 142—144 (iso-Pr₂O) | C₂₁H₂₃ClO₈ | 57.47 (57.47) | 5.28 (5.57) | | 253±23 | 115± 9 |
| 19 | 4-SMe | C | 42 | 135—136 (CH₂Cl₂-iso-Pr₂O) | C₂₂H₂₆O₈S·1/4H₂O | 58.07 (58.18) | 5.88 (5.75) | | 101±21 | NT |

36.    In this SAR study, Hongu evaluated the impact of relative positions of the substituents—i.e., ortho (2-), meta (3-), or para (4-) positions—with respect to the linker.  *See id.* (compounds 1–3 and 8–10); *see also* Patrick at 91 ("A favourite approach for aromatic compounds is to vary the substitution pattern.").  Hongu also evaluated the impact of the characteristics of substituents, such as electron-donating substituents or electron-withdrawing substituents.  *See* Hongu at 25 (Table 1) (compounds 1, 4, 10–11, and 14–17).  For similar types of substituents, such as lower alkyl or alkoxy, Hongu also evaluated the impact of hydrocarbon

chain length.  *See id.* (compounds 10–12 having alkyl group with 1-3 carbons, respectively; compounds 1 and 4 having alkoxy group with 1 and 2 carbons, respectively).

37.    Once a POSA has gained relative pharmacologic activity information for various substituents at one position of the molecule, they would then fix the substituent at that position and move to the next, and continue this exercise.  *See* Patrick at 90; *see also id.* at 96. Oftentimes a POSA would come back modify the substituents to evaluate the original position once they have evaluated the other parts of the compound until the POSA identifies a "most" desired compound.  *See* Patrick at 89.

38.    As of well before 2002, a POSA would have understood that "[s]tructure-activity relationships are usually determined by making minor changes to the structure of the lead and assessing the effect that this has on biological activity."  Thomas at 38.

## V.    THE ASSERTED CLAIMS OF THE '117 PATENT ARE INVALID AS OBVIOUS

39.    Each of the Asserted Claims of the '117 patent would have been obvious to a POSA in view of the teachings of the prior art.

### A.    Prior Art to the '117 Patent

40.    The following references are prior art to the '117 patent.

#### 1.    International Patent Application Publication No. WO 01/27128 ("WO '128")

41.    WO '128 was available to the public more than one year prior to May 20, 2002.

42.    WO '128 examines references disclosing O-aryl glucosides SGLT2 inhibitors for treating diabetes, and also discloses a reference that teaches the use of C-aryl glucosides compounds.  WO '128 at 4–8.

43.     WO '128 discloses "C-aryl glucosides, which are inhibitors of sodium-dependent glucose transporters found in the intestine and kidney (SGLT2)" and "a method for treating diabetes, especially type II diabetes." *Id.* at 1.

44.     WO '128 further discloses a method for treating diabetes and related diseases by employing an SGLT2-inhibiting amount of the compound of formula I alone or in combination with another antidiabetic agent or other therapeutic agent. *Id.*

45.     WO '128 discloses preferred compounds of formula I of structure IB and working examples that represent preferred embodiments. *Id.* at 10–12, 53–98.  WO '128 further discloses that the most preferred compounds are compounds with the following structure:



where $R^1$ is hydrogen, halogen or lower alkyl and $R^4$ is lower alkyl, $R^{5a}O$, -OCHF$_2$, or -SR$^{5e}$.  It is preferred that $R^1$ be linked para to the glucoside bond and the $R^4$ substituent be linked at the para position.

*Id.* at 12.

46.     WO '128 discloses thirteen detailed examples that match structure IB: Examples 1–7 are directed to compounds with $R^1$ being fixed as hydrogen and $R^4$ being ethyl, methoxy, trifluoromethoxy, thiomethyl, methyl, acetyl, and ethanol, respectively. *Id.* at 53–72.  Examples 8–10 are directed to compounds with $R^1$ being methyl and $R^4$ being methoxy, difluoromethoxy, and thiomethyl, respectively. *Id.* at 72–83.  Examples 11–12 are directed to compounds with $R^1$

being chlorine and R$^4$ being thiomethyl and methoxy, respectively. *Id.* at 83–90. Example 13 is directed a compound with R$^1$ being methoxy and R$^4$ being ethyl. *Id.* at 90–94.

47.     WO '128 also discloses Examples with detailed description, including Example 12, which is one of only fifteen compounds claimed in claim 10, with the following specific structure:



WO '128 at 87.

### a)     The Publication Date of WO '128 is April 19, 2001

48.     WO '128 is a printed publication that was available to the public on April 19, 2001, and a person of ordinary skill in the art exercising reasonable diligence would have located it.

49.     WO '128 was available to the public on April 19, 2001, which is more than one year prior to the earliest effective priority date of the '117 patent. Therefore, WO '128 is 35 U.S.C. 102(b) prior art to claims 1–3, 14, and 16 of the '117 patent.

### b)     Claims 1–3, 14, and 16 of the '117 patent is not entitled to the filing date of the applications which matured into U.S. Patent No. 6,414,126 (the "'126 patent") or published as WO '128

50.     U.S. Patent Application No. 10/151,436 ("'436 application"), issued as the '117 patent, was filed on May 20, 2002.

15

51.     The '436 application was filed as a continuation-in-part of U.S. Patent Application No. 09/679,027 ("'027 application") and issued as the '126 patent.

52.     The '436 application is the first public disclosure of the subject matter claimed in claims 1–3, 14, and 16 of the '117 patent.

53.     WO '128 does not specifically disclose a compound having the chemical structure of dapagliflozin, the subject matter claimed in claims 1 or 2 of the '117 patent.

54.     During the prosecution of U.S. Patent Application No. 16/014,479 ("the '479 application"), the reissue application of the '117 patent, AstraZeneca (the Applicant of the '479 application) stated that "the claimed compound [dapagliflozin] was first specifically recited in the '117 patent."  ('479 application prosecution history, December 28, 2018 Amendment at 16.)

55.     The Examiner also specifically stated that the '117 patent claims are only accorded the benefit of the filing date of the '117 patent.

56.     AstraZeneca did not object to the Examiner's finding or argue in favor of a different filing date.  ('479 application prosecution history, January 31, 2019 Office Action at 4, and March 29, 2019 Amendment at 15.)

> **2.** **Mitsuya Hongu et al.,** *Na$^+$-Glucose Cotransporter Inhibitors as Antidiabetic Agents. II. Synthesis and Structure-Activity Relationships of 4'-Dehydroxyphlorizin Derivatives*, **46 CHEM. PHARM. BULL. 22 (1998) ("Hongu")**

57.     Hongu was available to the public more than one year prior to May 20, 2002.

58.     Hongu discloses O-glucoside SGLT inhibitors.

59.     Hongu discloses that, because "[p]hlorizin is known to cause renal diabetes, and this effect has been attributed to its SGLT-inhibitory activity … we designed some analogues of phlorizin, synthesized them, and examined their pharmacological properties related to antidiabetic activity."  Hongu at 22.

60.     Hongu synthesized, mostly in a convenient one-pot procedure, a "series of 4′-dehydroxyphlorizin derivatives" and "the effects of these compounds on urinary glucose excretion were evaluated in rats." *Id.* at Abstract, 22.

61.     Hongu discloses that the physical and biological properties of 4′-dehydroxyphlorizin derivatives of structure (1) could be impacted by altering the $R^1$ substituents. *Id.* at 25 (Table 1).

62.     Hongu teaches that $R^1$ substituents at the para (4-) position are preferred to produce better urinary glucose excretion. *Id.* (showing data for compounds 1–3, with compound 1 having the best activity among them); *see also id.* (showing data for compounds 8–10, with compound 10 have the best activity among them).

63.     Hongu further teaches that different $R^1$ substituents could produce compounds with different activities, and that $R^1$ to the below structure can be a 4-OEt group, among other options:



17

| No. | R[1] | Method | Yield[a] (%) | mp (°C) (Recryst. solvent) | Formula | Anal. Calcd (Found) | | | Urinary glucose excretion[b] (mg/24 h) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | C | H | N | p.o. | i.p. |
| 1 | 4-OMe[c] | | | | | | | | 340 ± 18 | 204 ± 8 |
| 2 | 3-OMe | A | 31 | 105—107 (iso-Pr₂O) | C₂₂H₂₆O₆ | 60.82 (60.87) | 6.03 (6.29) | | 66 ± 12 | 88 ± 6 |
| 3 | 2-OMe | A | 52 | Amorphous | C₂₂H₂₆O₆·1/4H₂O | 60.20 (60.37) | 6.08 (6.06) | | 8 ± 1 | 11 ± 2 |
| 4 | 4-OEt | A | 46 | 76.5—78 (MeOH-H₂O) | C₂₃H₂₈O₆·3/4H₂O | 59.77 (59.55) | 6.44 (6.42) | | 124 ± 27 | 77 ± 9 |
| 5 | 3-OH | A | 54 | 127—130 (Et₂O) | C₂₁H₂₄O₆·5/4H₂O | 56.95 (57.05) | 6.03 (5.96) | | 3 ± 0 | NT |
| 6 | 2-OH | A | 53 | 128—132 (Et₂O) | C₂₁H₂₄O₆·1/2H₂O | 58.74 (58.45) | 5.87 (5.69) | | 2 ± 1 | 14 ± 3 |
| 7 | H | A | 54 | 126—129 (Et₂O-iso-Pr₂O) | C₂₁H₂₄O₆·1/4H₂O | 61.68 (61.88) | 6.04 (5.91) | | 217 ± 18 | 160 ± 8 |
| 8 | 2-Me | A | 32 | Amorphous | C₂₂H₂₆O₆·1/4H₂O | 62.48 (62.37) | 6.32 (6.28) | | 21 ± 11 | 9 ± 3 |
| 9 | 3-Me | A | 49 | 78—81 (Acetone-H₂O) | C₂₂H₂₆O₆·3/4H₂O | 61.17 (61.18) | 6.39 (6.42) | | 299 ± 35 | 160 ± 11 |
| 10 | 4-Me | A | 49 | 105— (iso-Pr₂O) | C₂₂H₂₆O₆·1/4H₂O | 62.48 (62.76) | 6.32 (6.24) | | 344 ± 84 | 144 ± 10 |
| 11 | 4-Et | A | 51 | 127.5—129.5 (Et₂O-iso-Pr₂O) | C₂₃H₂₈O₆ | 63.88 (63.59) | 6.53 (6.51) | | 277 ± 64 | 76 ± 6 |
| 12 | 4-i-Pr | A | 33 | 109—112 (Et₂O-iso-Pr₂O) | C₂₄H₃₀O₆ | 64.56 (64.28) | 6.77 (6.64) | | 31 ± 6 | 8 ± 3 |
| 13 | 4-Ph | A | 42 | Amorphous | C₂₇H₂₈O₆ | 67.49 (67.19) | 5.87 (6.03) | | NT | 1 ± 1 |
| 14 | 4-NMe₂ | A | 32 | Amorphous | C₂₃H₂₉NO₄·1/4H₂O | 61.12 (60.99) | 6.58 (6.82) | 3.10 (2.81) | 178 ± 22 | 122 ± 8 |
| 15 | 4-COOH | A | 43 | 200.5—204 (MeOH-iso-Pr₂O) | C₂₂H₂₄O₁₀·3/4H₂O | 57.20 (57.21) | 5.56 (5.47) | | 4 ± 1 | 1 ± 0 |
| 16 | 4-CONH₂ | A | 35 | 178—181 (MeOH-iso-Pr₂O) | C₂₂H₂₅NO₄·1/2H₂O | 57.89 (57.81) | 5.74 (5.66) | 3.07 (2.99) | 2 ± 1 | 83 ± 23 |
| 17 | 4-CN | A | 28 | 155—156.5 (MeOH-iso-Pr₂O) | C₂₂H₂₃NO₄·H₂O | 59.06 (59.19) | 5.63 (5.46) | 3.13 (3.01) | 4 ± 0 | 10 ± 1 |
| 18 | 4-Cl | B | 48 | 142—144 (iso-Pr₂O) | C₂₁H₂₃ClO₆ | 57.47 (57.47) | 5.87 (5.57) | | 253 ± 23 | 115 ± 9 |
| 19 | 4-SMe | C | 42 | 135—136 (CH₂Cl₂-iso-Pr₂O) | C₂₂H₂₆O₅S·1/4H₂O | 58.07 (58.18) | 5.88 (5.75) | | 101 ± 21 | NT |

*Id.*

> **3.**   **Kenneth L. Kees et al.,** *New Potent Antihyperglycemic Agents in db/db Mice: Synthesis and Structure-Activity Relationship Studies of (4-Substituted Benzyl)(Trifluoromethyl)Pyrazoles and -Pyrazolones*, 39 J. MED. CHEM. 3920 (1996) ("Kees")

64.   Kees was available to the public more than one year prior to May 20, 2002.

65.   Kees discloses SGLT inhibitors having two aryl/aromatic rings connected through a methylene linker.

66.   Kees describes the "synthesis, structure-activity relationship (SAR) studies, and antidiabetic characterization of 1,2-dihydro-4-[[4-(methylthio)phenyl]methyl]-5-(trifluoromethyl)-3H-pyrazol-3-one." Kees at Abstract.

67.   Kees discloses the structure-activity relationship of 4-(4-sulfur-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones:

| no. | R | $n$ | yield[a] (%) | mp (°C)[b] | dose (mg/kg) | db/db[c] change (%) |
|---|---|---|---|---|---|---|
| **4** | Me | 0 | 20 | 147.5–148.5 | 100 | $-68 \pm 2$** |
| | | | | | 20 | $-57 \pm 1$**[d] |
| | | | | | 5 | $-43 \pm 4$**[e] |
| | | | | | 2 | $-29 \pm 2$*[f] |
| | | | | | 0.5 | $-13 \pm 5$ |
| **5** | Me | 1 | 29 | 200.5–201.5 | 5 | $-33 \pm 2$** |
| | | | | | 2 | $-25 \pm 2$* |
| **6** | Me | 2 | 56 | 223–225 | 5 | $2 \pm 5$ |
| **7** | CF$_3$ | 0 | 6 | 125–127 | 20 | $-15 \pm 6$[e] |
| | | | | | 5 | $5 \pm 6$ |
| **8** | Et | 0 | 7 | 133–134 | 20 | $-38 \pm 2$** |
| | | | | | 5 | $-25 \pm 3$* |
| | | | | | 2 | $-23 \pm 3$ |
| **9** | $i$-Pr | 0 | 9 | 169–170 | 20 | $-32 \pm 5$** |
| **10** | $n$-Bu | 0 | 18 | 95–97.5 | 20 | $-3 \pm 9$ |

*Id*. at 3922 (Table 1).

68.     Kees also discloses the structure-activity relationship of 4-(carbon-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones:



| no. | R | yield[a] (%) | mp (°C)[b] | dose (mg/kg) | db/db[c] change (%) |
|---|---|---|---|---|---|
| **11** | Me | 34 | 150–151.5 | 20 | $-36 \pm 3$* |
| **12** | Et | 44 | 128–130 | 5 | $-39 \pm 4$** |
| | | | | 2 | $-28 \pm 12$** |
| | | | | 0.5 | $-11 \pm 3$ |
| **13** | $n$-Pr | 54 | 114–116[d] | 20 | $-44 \pm 3$** |
| **14** | $i$-Pr | 13 | 139–141 | 5 | $-17 \pm 3$ |
| **15** | $n$-Bu | 9 | 105.5–108 | 5 | $-7 \pm 5$ |
| **16** | $t$-Bu | 27 | 194.5–196 | 20 | $-7 \pm 4$[e] |
| **17** | $n$-hexyl | 25 | 102–103[f] | 20 | $5 \pm 4$ |
| **18** | CF$_3$ | 56 | 123–124.5 | 5 | $-15 \pm 6$** |
| **19** | (CF$_3$)$_2$CF | 25 | 170–172 | 20 | $1 \pm 5$ |
| **20** | acetyl | 6 | 218.5–219.5 | 5 | $-19 \pm 7$** |
| **21** | CH$_3$C=NOH | 74 | 194–196 | 5 | $-28 \pm 5$** |
| **22** | CH$_3$CHOH | 64 | 154–155 | 5 | $-18 \pm 6$ |
| **23** | (CH$_3$)$_3$CCO | 88 | 204–206 | 100 | $-23 \pm 4$ |

*Id.* at 3922 (Table 2).

69.     Kees discloses that compounds 4 (4-SMe) and 12 (4-Et) are distinct, efficacious, and potent.  *Id.*

70.     Kees further discloses that "the methylene linker between the 4-substituted phenyl and pyrazolone rings was critical for activity."  *Id.*

71.     Kees teaches:

Pharmacological characterization of the lead [compound 4] revealed a robust glucosuric effect produced by the compound when administered to normal mice. Subsequent evaluation of all of the analogs indicated that plasma glucose lowering in diabetic animals is likely a (secondary) consequence of glucosuria induction, but there did not appear to be a correlation between the magnitude of the glucosuria (qualitatively determined as 0.1-12 g/dL) produced in normal mice and the potency or efficacy of glucose lowering in db/db mice.  Oral glucose tolerance tests in normal, 18 h fasted rats with a single, high dose of [compound 4] (100 mg/kg) administered 1 h prior to glucose challenge indicated that, unlike phlorizin, the pyrazolone does not appear to block intestinal glucose absorption.  Our data suggest that [compound 4] represents a new class of low-dose effective antihyperglycemic agents which correct hyperglycemia by selective inhibition of renal glucose reabsorption.  The recent identification of SGLT2, a low-affinity, high-Km Na+-glucose cotransporter responsible for ~90% of filtered glucose reabsorption in the early proximal tubule, provides a possible molecular mechanism for the observed effects of the compound on basal circulating glucose levels in diabetic rodents and the changes in plasma glucose following administration of an oral glucose load.

*Id.* at 3925.

###    4.    International Patent Application Publication No. WO 98/31697 ("WO '697")

72.     WO '697 was available to the public more than one year prior to May 20, 2002.

73.     WO '697 teaches that C-glycoside compounds have multiple advantages over O-glycoside.  WO '697 at 1, 6–7.

74.     For example, WO '697 discloses that "the oligosaccharides may lack chemical and physiological stability.  Since sugar chains are basically composed of an O-glycoside bond having a hemiacetal structure, they are essentially unstable under acidic conditions."  *Id.* at 6–7.

75.     WO '697 further teaches that the synthesis of O-glycoside could be more tedious than the synthesis of C-glycoside.  *Id.* at 1, 6.

76.     WO '697 discloses (1) compounds having a methylene linker between two substituted phenyl rings and (2) compounds having a methylene linker attached to meta or para positions of the C-glycoside phenyl ring.  *Id.* at 232–34.  For example, the structures of compounds 106 and 116 are as follows:



*Id*. at 232–33.

77.     WO '697 teaches that these compounds can be used to treat and/or prevent diabetes mellitus.  *Id.* at 46.

78.     WO '697 further discloses a "pharmaceutical composition for treating or preventing an inflammatory disease, an autoimmune disease, an infection, a cancer, a reperfusion disorder, a thrombosis, an ulcer, a wound or osteoporosis comprising a pharmaceutically effective amount of the aryl C-glycoside of claim 1 in admixture with a pharmaceutically acceptable excipient."  *Id.* at 260.

**5.     European Patent Application Publication No. 0598359 ("EP '359")**

79.  EP '359 was available to the public more than one year prior to May 20, 2002.

80. EP '359 discloses O-glucoside SGLT inhibitors.

81. EP '359 discloses:

A hypoglycemic agent which comprises as an active ingredient a dihydrochalcone derivative of the formula [I]:



[I]

wherein Ar is an aryl group, $R^1$ is hydrogen atom or an acyl group, $R^2$ is hydrogen atom, an acyl group or α-D-glucopyranosyl group, or $R^1$ and $R^2$ may combine together to form a substituted methylene group, $R^3$ and $R^4$ are each hydrogen atom or an acyl group, and a group of the formula: $OR^5$ is a protected or unprotected hydroxy group or a lower alkoxy group, or a pharmaceutically acceptable salt thereof.

EP '359 at Abstract.

82. EP '359 further discloses that formula [I] was developed based on the known activities of phlorizin. *Id.* at 3–4.

83. EP '359 teaches that, "when the active ingredient [I] of the present invention is orally administered to glucose-loading diabetic mice, the increment in the blood glucose concentration thereof is remarkably attenuated. Thus, the hypoglycemic agent of the present invention is useful in the prophylaxis or treatment of diabetes." *Id.* at 4.

84. EP '359 further teaches:

The active ingredient [I] of the present invention and pharmaceutically acceptable salts thereof may be administered either orally or parenterally, and or in the form of a pharmaceutical preparation in admixture with an excipient suitable for oral administration or parenteral administration. The pharmaceutical preparation is solid preparations such as tablets, capsules, powders, etc., or liquid preparations such as solutions, suspensions, emulsions, etc. … When the active ingredient [I] is administered parenterally, an injection form is preferable.

22

*Id.* at 10; *see also id.* at 73 (claim 40 reciting "[a] pharmaceutical composition which comprises a therapeutically effective amount of a compound as set forth in any of the claims 13 to 32 or a pharmaceutically acceptable salt thereof in admixture with a conventional pharmaceutically acceptable carrier or diluent").

> **6.** **Kenji Tsujihara et al., *Na⁺-Glucose Cotransporter Inhibitors as Antidiabetics. I. Synthesis and Pharmacological Properties of 4′-Dehydroxyphlorizin Derivatives Based on a New Concept*, 44 CHEM. PHARM. BULL. 1174 (1996) ("Tsujihara")**

85.     Tsujihara was available to the public more than one year prior to May 20, 2002.

86.     Tsujihara discloses O-glucoside SGLT inhibitors.

87.     Tsujihara teaches that compound 1a (with a 4-OMe group at the para position) is more biologically active than both compound 1b (with a 3,4-(OMe)$_2$ group) and compound 1d (with a 3,4,5-(OMe)$_3$ group).  Tsujihara at 1176.



| 1 | X |
|---|---|
| a | 4 - OMe |
| b | 3,4 - (OMe)$_2$ |
| c | 2,4 - (OMe)$_2$ |
| d | 3,4,5 - (OMe)$_3$ |
| e | 4 - OH |
| f | 3,4 - (OH)$_2$ |

**1a - f**

*Id.* at 1175.

88.     Tsujihara discloses that compound 1a (with a 4-OMe group at the para position) "markedly increased urinary glucose and hence 1a was considered to be more stable to β-glucosidase than phlorizin."  *Id.*

23

89.   Tsujihara discloses that "[c]ompound 1e also moderately induced urinary glucose excretion, but the polysubstituted compounds lb–d, f had no effect."  *Id.*

90.   Tsujihara discloses that "[c]ompound 1a is considered to be a suitable lead compound for new-type antidiabetics."  *Id.* at 1178.

### 7.   Graham L. Patrick, AN INTRODUCTION TO MEDICINAL CHEMISTRY (1st ed. 1995) ("Patrick")

91.   Patrick was available to the public more than one year prior to May 20, 2002.

92.   Patrick is a general medicinal chemistry textbook.

93.   Patrick teaches:

Once the structure of a biologically active compound is known, the medicinal chemist is ready to move on to study the structure-activity relationships of the compound.

The aim of such a study is to discover which parts of the molecule are important to biological activity and which are not.  The chemist makes a selected number of compounds, which vary slightly from the original molecule, and studies what effect that has on the biological activity.

Patrick at 84.

94.   Patrick states that a medicinal chemist develops drugs with three objectives in mind: increasing activity, reducing side effects, and providing easy and efficient administration to the patient.  *Id.* at 89.

95.   Patrick discloses that, "[o]nce the essential groups for biological activity have been identified, substituents are varied" with an "aim … to fine tune the molecule and to optimize its activity."  *Id.* at 90.

96.   Patrick further discloses that "[b]iological activity may depend not only on how well the compound interacts with its receptor, but also on a whole range of physical features such as basicity, lipophilicity, electronic distribution, and size."  *Id.*

24

97.     Patrick teaches that "[t]he idea of varying substituents is to attach a series of substituents such that these physical features are varied one by one," but that, "[i]n reality, it is rarely possible to change one physical feature without affecting another."  *Id.*

98.     Patrick discloses that "[a] favourite approach for aromatic compounds is to vary the substitution pattern," such as comparing a substitution in the para position to a substitution in the meta position.  *Id.* at 91.

99.     Patrick teaches that "[s]ome drugs have two important binding groups linked together by a chain."  *Id.* at 93.

100.    Patrick further teaches that "[i]t is possible that the chain length is not ideal for the best interaction," and, "[t]herefore, shortening or lengthening the chain length is a useful tactic to try."  *Id.*

101.    Patrick also teaches that drug molecules "have to be sturdy enough to travel through the body and consequently will interact with all the receptors which are prepared to accept them."  *Id.* at 96.

102.    Patrick further teaches that "[t]he more flexible a drug molecule is, the more likely it will interact with more than one receptor and produce other biological responses (side-effects)."  *Id.* at 96–97.

103.    Patrick further teaches:

The strategy of rigidification is to 'lock' the drug molecule into a more rigid conformation such that it cannot take up these other shapes or conformations. Consequently, other receptor interactions and side-effects are eliminated.  This same strategy should also increase activity since, by locking the drug into the active conformation, the drug is ready to fit its target receptor site more readily and does not need to 'find' the correct conformation.

*Id.* at 97.

104.    Patrick teaches that, "[i]n order to design a drug with a particular biological activity, the medicinal chemist requires a lead compound—a compound which shows a useful pharmaceutical activity." *Id.* at 103.

105.    Patrick further teaches that "[l]ead compounds are often found from natural sources" as well as "novel compounds synthesized in industrial and academic laboratories." *Id.*

106.    Patrick discloses:

Drugs are foreign substances as far as the body is concerned and the body has its own method of getting rid of such chemical invaders.  Non-specific enzymes (particularly in the liver) are able to add polar functional groups to a wide variety of drugs.  Once the polar functional group has been added, the overall drug is more polar and water soluble, and is therefore more likely to be excreted when it passes through the kidneys.

An alternative set of non-specific enzymatic reactions can reveal 'masked' polar functional groups which might be present in a drug.  For example, there are enzymes which can demethylate a methyl ether to reveal a more polar hydroxyl group.  Once again, the more polar product (metabolite) is excreted more efficiently.

These reactions are classed as phase I reactions in the overall process of drug metabolism.  They generally involve oxidation, reduction, and hydrolysis.

*Id.* at 112.

107.    Patrick teaches that "[s]ome drugs are metabolized at particular positions in their skeletons," and "[t]he introduction of a stable group such as a methyl group … can block metabolism and so prolong the activity of the drug." *Id.* at 117.

108.    Patrick further teaches that "[s]usceptible groups can sometimes be replaced with groups that are stable to oxidation in order to prolong the lifetime of the drug" once in the body. *Id.* at 118.  For example, substitution of the methyl group of the antidiabetic tolbutamide with a chlorine atom produces chlorpropamide, which remains effective in the body longer:

*Id.*

### 8. Gareth Thomas, MEDICINAL CHEMISTRY: AN INTRODUCTION (2000) ("Thomas")

109. Thomas was available to the public more than one year prior to May 20, 2002.

110. Thomas is another general medicinal chemistry textbook that would be well

known to the POSA.

111. Thomas discloses:

Compounds with similar structures often tend to have similar pharmacological activity. However, they usually exhibit differences in potency and unwanted side effects and in some cases different activities. These structurally related differences are commonly referred to as structure-activity relationships (SAR). A study of the structure-activity relationships of a lead compound and its analogues can be used to determine the parts of the structure of the lead that are responsible for its biological activity, that is, its pharmacophore and also its unwanted side effects. This information is subsequently used to develop a new drug that has increased activity (optimise its SAR), a different activity from an existing drug, fewer unwanted side effects and improved ease of administration to the patient.

Thomas at 37–38 (emphasis omitted).

112. Thomas further discloses that "[s]tructure-activity relationships are usually

determined by making minor changes to the structure of the lead and assessing the effect that this

has on biological activity." *Id.* at 38.

113. Thomas also discloses:

The formation of analogues by the introduction of new substituents into the structure of a lead may result in an analogue with significantly different chemical and hence pharmacokinetic properties. For example, the introduction of a new substituent may cause significant changes in lipophilicity that affect transport of the analogue through membranes and the various fluids found in the body. It would also change the shape, which could result in conformational restrictions that affect

27

the binding to the target site.  In addition, the presence of a new group may introduce a new metabolic pathway for the analogue.  These changes will in turn affect the pharmacodynamic properties of the analogue.

*Id.* at 42–43.

114.    Thomas further discloses that the "incorporation of halogen atoms into a lead results in analogues that are more lipophilic and so less water soluble.  Consequently, halogen atoms are used to improve the penetration of lipid membranes."  *Id.* at 45.

> 9.    **George A. Patani & Edmond J. LaVoie,** *Bioisosterism: A Rational Approach in Drug Design***, 96 C**HEM**. R**EV**. 3147 (1996) ("Patani")**

115.    Patani was available to the public more than one year prior to May 20, 2002.

116.    Patani teaches the use of bioisosterism as a rational approach in drug design.

117.    Patani discloses that "[a] lead compound with a desired pharmacological activity may have associated with it undesirable side effects, characteristics that limit its bioavailability, or structural features which adversely influence its metabolism and excretion from the body." Patani at 3147.

118.    Patani further discloses that "[b]ioisosterism represents one approach used by the medicinal chemist for the rational modification of lead compounds into safer and more clinically effective agents."  *Id.*

119.    Patani discloses:

[A]n attempt has been made to quantitate, in specific instances, physicochemical effects such as electronegativity, steric size, and lipophilicity and to correlate these values to the observed biological activity.  Thus, an additional objective of this review was to demonstrate the opportunities that one has in employing bioisosteres to gain more specific insight into the quantitative structure-activity relationships (QSAR) associated with a specific class of drugs.

*Id.* at 3148.

120.    Patani teaches that, "[w]hile the chlorine atom is often viewed to be isosteric and isolipophilic with the methyl group, it is very often selected as a bioisosteric replacement because of its ability to alter the metabolism" of the compound.  *Id.* at 3154.

###### 10.    André J. Scheen, *Drug Treatment of Non-Insulin-Dependent Diabetes Mellitus in the 1990s: Achievements and Future Developments*, 54 DRUGS 355 (1997) ("Scheen")

121.    Scheen was available to the public more than one year prior to May 20, 2002.

122.    Scheen is a review article, summarizing therapeutically active candidates in treating non-insulin-dependent diabetes mellitus.  Scheen at Abstract.

123.    Scheen discloses that "[t]he pharmacological treatment of [type II diabetes] has remained quite stable for decades with the use of sulphonylureas, biguanides and insulin"; "[n]umerous new pharmacological approaches are under active investigation with the aim of promoting insulin secretion, improving the action of insulin or slowing carbohydrate absorption"; and "the development of novel therapeutic approaches remains highly desirable." *Id.* at 361, 365.

##### B.    Claims 1–3 of the '117 patent are invalid as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations

###### 1.    Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations

####### a)    A POSA would have been motivated to look to WO '128 for a lead compound

124.    At the time of the claimed invention, a POSA seeking to develop a treatment for type II diabetes would have been motivated to review prior art relating to SGLT inhibitors, such

29

as EP '359, Tsujihara, Hongu, and Kees, because phlorizin, an inhibitor of SGLT, was an O-aryl glucoside and provided the rationale and proof of concept to pursue glucosides for the treatment of diabetes and because multiple pharmaceutical companies at the time were actively developing O-aryl glucosides as SGLT2 inhibitors.  EP '359 at Abstract; Tsujihara at 1174; Hongu at 22.

125.    A POSA would have understood that, to further improve upon the pharmaceutical activity of phlorizin, both Tsujihara and Hongu evaluated the $R^1$ substituent of Compound **II**.



**II**

Tsujihara at 1175; Hongu at 25 (Table 1); *see also* EP '359 at Abstract.

126.    Tsujihara discloses that different substituents on the A ring could produce compounds with different levels of activities.

127.    A POSA would have understood that other potent antihyperglycemic agents having two aromatic rings like phlorizin —4-(4-sulfur-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones (Compound **III** below) and 4-(carbon-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones (Compound **IV** below)—were known in the art but with a methylene linker between the aromatic rings, as shown below:

**III**                                                                    **IV**

Kees at 3922 (Tables 1–2) (emphasis added).

128.    Kees also discloses "[p]harmacological characterization of [WAY-123783, a species of Compound **III**] revealed a robust glucosuric effect produced by the compound when administered to normal mice." *Id.* at 3925.

129.    Kees further discloses "the methylene linker between the [two aromatic rings] … was critical for activity." *Id*. at 3923.

130.    A POSA, however, would have understood that while all these prior art references discussed increasing the potency or selectivity of phlorizin-type compounds (from Tsujihara, Hongu, EP '359, and Kees), they had not addressed the instability associated with the hydrolysis of the phlorizin, a O-glucoside compound.

131.    Other prior art, such as, WO '697 addressed this stability issue by removing the oxygen between the glucoside and aromatic B ring (*see* Compound **II** above), which leads to a more stable C-glucoside compound.

132.    Specifically, WO '697 discloses "the oligosaccharides may lack chemical and physiological stability.  Since sugar chains are basically composed of an O-glycoside bond having a hemiacetal structure, they are essentially unstable under acidic conditions."  WO '697 at 6–7.

133.    WO '697 further teaches that the synthesis of O-glycoside could be more tedious than the synthesis of C-glycoside. *Id.* at 6.

31

134.    Indeed, one of the named inventors of WO '128, Mr. Gang Wu, confirmed that it is well known from literature that C-glucoside is much more stable than O-glucoside compounds. Wu Dep. Trans. at 61:9–62:4.

135.    A POSA would have been motivated to identify a lead SGLT2 compound for further development that is a C-aryl glucoside and would have identified WO '128, at least because WO '128 discusses EP '359, Tsujihara, and Hongu, all of which disclose O-glucoside SGLT2 inhibitors for treating diabetes (WO '128 at 5–7).

136.    WO '128 also discusses WO '697, which discloses C-glucoside compounds for treating  diabetes mellitus (WO '128 at 8); and WO '128 discloses "C-aryl glucosides which are inhibitors of sodium dependent glucose transporters found in the intestine and kidney (SGLT2)" and "a method for treating diabetes, especially type II diabetes." *Id*. at 1.

      **b)**    **Example 12 of WO '128 would have been selected as a lead compound for further modification**

          (1)    <u>During the prosecution of the '479 application, the Examiner rejected AstraZeneca's argument that a POSA would not select Example 12 of WO '128 as a lead compound</u>

137.    During the prosecution of the '479 application, the Examiner rejected AstraZeneca's argument that a POSA would not select Example 12 of WO '128 as a lead compound.  ('479 application prosecution history, January 31, 2019 Office Action at 6.)

138.    The Examiner reasoned "Example 12 is a preferred compound according to the most preferred compounds of figure IB and one of only 15 compounds specifically claimed in claim 10 of [WO '128]. Accordingly, one having ordinary skill in the art would clearly recognize that the compound of Example 12 is one of the preferred compounds taught by [WO '128] sufficient to serve as a 'lead compound'."  (*Id*.)

> (2)   A POSA would have selected Example 12 of WO '128 as a
> lead compound for further modification based on the
> disclosures of WO '128

139.   WO '128 discloses preferred compounds and the working examples represent

preferred embodiments.  *Id.* at 10–12, 53–98.

140.   WO '128 further discloses that the most preferred compounds are compounds

having the following structure:



where $R^1$ is hydrogen, halogen or lower alkyl and $R^4$ is lower alkyl, $R^{5a}O$,
-$OCHF_2$, or -$SR^{5e}$.  It is preferred that $R^1$ be linked *para* to the glucoside bond and
the $R^4$ substituent be linked at the *para* position.

*Id.* at 12.

141.   WO '128 discloses ten detailed Examples (Examples 1-4, 7-12)  that match

structure IB.  *Id.* at 53–98.  A POSA reading WO '128, would have selected one of these ten

specific compounds as a lead compound for further modification.

142.   Reading WO '128, a POSA would have understood that based on the SAR studies

of Examples 1-4, 6, 7, and 16-58 (and additional Examples in Table 2 and Examples 8-15), the

named inventors of WO '128 confirmed that the most preferred compounds are those of formula

I of the structure IB having (a) a methylene linker between the central aryl ring and distal aryl

ring, and (b) a para (4-) substituent on the distal aryl ring, which is lower alkyl, $R^{5a}O$, -OCHF2, or -$SR^{5e}$.

143.    A POSA reading WO '128 would have also understood that, the named inventors necessarily must have based their conclusion that the most preferred compounds have the structure of formula I of the structure IB on underlying activity data from SAR studies.

144.    Examples 1-4, 6, 7, and 16–58 of WO '128 keep the structure of the central aryl ring of formula I of the structure IB constant, to evaluate either linker A between the central aryl ring and distal aryl ring or the different substituents at different positions on the distal aryl ring, such as the $R^4$ substituent, keeping both the central aryl ring and linker A constant.

145.    Once a POSA has gained relative information of the substituents at that first position of the molecule, for instance, at the $R^4$ position on the distal aryl ring of, for example, the preferred compounds of formula I of the structure IB, the POSA would then keep that substituent constant and move to the next position, repeating these steps and continuing with this exercise.  (*See* Op. Rep. at ¶¶ 57-59 and 62.)

146.    Examples 8-13 and 59-80 of the WO '128 are various SAR studies that evaluate the central aryl ring substituent $R^1$ by using different substituents—selected based on SAR studies of Examples 1-4, 6, 7, and 16-45—at the para (4-) position of the distal aryl ring (*see also*, *infra*, ¶¶ 49 and 50).  (*See*, *e.g.*, Wu Dep. Trans at 131:11-132:11.)

147.    A POSA would have understood that keeping "hydrogens on the central phenyl ring" constant while changing the substituents ($R^4$) on the distal aryl ring is the first step of a SAR study, not the end of it.

148.    A POSA reading WO '128 would have understood that listed inventors of WO

'128 evaluated the effect of modifying the $R^1$ substituent (as done in Examples 8–13) once they

had assessed the effect of a specific $R^4$ group.  WO '128 at 72–90; *see also* Thomas at 42–43.

149.    Reading WO '128, a POSA would also have understood that the methoxy

substituent is the most investigated $R^4$ group on the structure of formula I of structure IB among

Examples 59-80 and Examples 8-12.  That is, the methoxy substituent is the most used $R^4$ group

in WO '128 for evaluating different $R^1$ substituents.  *See* table below (summarizing all $R^4$

substituents that are listed in WO '128 Table 2 and Examples 8-12 that fit the structure of

formula I of structure IB below (having different $R^1$ substituents in the 4-position with no other

substituent on the central aryl ring)):

| $R^4$ groups ($R^3$ in Table 2) | # of appearances | Examples |
|---|---|---|
| 4-OMe | 5 | 8, 12, 69, 73, and 74 |
| 4-Et | 1 | 60 |
| 4-Me | 1 | 66 |
| 4-OCHF$_2$ | 2 | 9, and 72 |
| 4-SMe | 3 | 10, 11, and 75 |

150.    A POSA would have also known that a compound with a methoxy group at the $R^4$

position is more commercially accessible and easier to handle than a compound with a

thiomethyl group at the $R^4$ position because of, *e.g.*, the smell of thiol compounds.  Therefore, a

POSA would have been motivated to select a lead compound having a methoxy group at the $R^4$

position, as seen in the below image:

151.    A POSA reading WO '128 would have understood that Examples 8–10 of

WO '128 are directed to compounds with the $R^1$ substituent being a methyl group and Examples

11–12 of WO '128 are directed to compounds with the $R^1$ substituent being a chlorine, where

methyl and chlorine are the most investigated substituents among Examples 8-12 and 59-80 that

fit the most preferred compounds in WO '128, structure of formula I of the structure IB.  (*See

also* WO '128 at 72, 76, 80, 83, 87, 101-102 (disclosing methyl as the most investigated $R^1$

substituent among Examples 59-80).)  *See* table below, summarizing all $R^1$ substituents that are

listed in WO '128 Table 2 and Examples 8-12 that fit the structure of formula I of the structure

IB below (having different substituents in the distal aryl ring (either $R^3$ on Table 2 or $R^4$ in the

structure IB)):

| $R^1$ groups | # of appearances | Examples |
|---|---|---|
| 4-Me | 5 | 8, 9, 10, 60, and 66 |
| 4-Cl | 3 | 11, 12, and 72 |
| 4-F | 1 | 69 |
| 4-Et | 1 | 73 |
| 4-iPr | 2 | 74 and 75 |

152.    A POSA would have also been motivated to evaluate the halogen atoms in a

SARS for medicinal drug discovery based on the disclosures in general medicinal chemistry

texts like Patrick and review articles that are directed to rational approaches in drug design like

Patani.  As Patrick and Patani discuss, a POSA would have understood that in conducting a

SARS, incorporation of a chlorine substituent into a lead compound results in analogues with

improved metabolic properties.  Patani at 3154; Patrick at 117–18.

153.    Patani teaches that in the process of optimizing a lead compound, the chlorine

substituent is often viewed to be isosteric and isolipophilic with the methyl substituent.  Patani at

3154.

154.    Patani also teaches that the chlorine substituent is very often selected as a

bioisosteric replacement for the methyl group on a lead compound because of its ability to

prevent the metabolism of the compound caused by the presence of the methyl group.  *Id.*

155.    Patrick further teaches that "[s]ome drugs are metabolized at particular positions

in their skeleton[s]," and the introduction of stable groups "can block metabolism and so prolong

the activity of the drug."  Patrick at 117.

156.    Patrick also teaches the replacement of susceptible groups with other groups "that

are stable to oxidation in order to prolong the lifetime of the drug," for  example, the substitution

of the methyl group on the antidiabetic tolbutamide molecule with a chlorine atom to yield a

much longer acting chlorpropamide:



*Id.* at 118.

157.    Based on the above, a POSA would have been motivated to select Example 12 of

WO '128 for further modification.

> **c)**     **A POSA would have been motivated, with a reasonable**
> **expectation of success, to modify the methoxy group of**
> **Example 12 of WO '128 and arrive at the ethoxy group**

158.     Based on the teachings of the prior art, a POSA would have been motivated to

continue to study the lead compound (Example 12 of WO '128) for further modification and

optimization.

159.     The POSA would have known that the activity of SGLT2-inhibiting compounds

could be improved by modifying the methoxy substituent on the distal aryl ring of Example 12.

160.     One obvious small conservative modification of the substituent on the distal aryl

ring of Example 12 would be to increase the alkoxy group methoxy by one carbon to ethoxy as

this is a common sequence in SAR studies.  Other alkoxy groups are studied in WO '128 at 53–

72 (Examples 1–7); including ethoxy in Hongu at 25 (Table 1).

161.     Thomas discloses that structure-activity relationship studies to assess the effect of

structural changes on biological activity are usually carried out by making minor changes to the

structure of a lead compound to produce analogues.  Thomas at 38.

162.     Patrick discloses that once the essential groups for biological activity are

identified, a variety of substituents should be tried to optimize its activity.  Patrick at 90.  Patrick

also discloses that "[b]iological activity may depend not only on how well the compound

interacts with its receptor, but also on a whole range of physical features, such as basicity,

lipophilicity, electronic distribution, and size."  *Id.*

163.     Patrick teaches that substituents can be varied by attaching "a series of

substituents such that [the compound's] physical features are varied one by one."  *Id.*  Patrick

further teaches that "it is rarely possible to change one physical feature [of a compound] without

affecting another."  *Id.*

38

164.    Therefore, a POSA, after selecting a lead compound with a chlorine attached at the $R^1$ position, would have been motivated with a reasonable expectation of success to first modify the methoxy substituent at the $R^4$ position in Example 12 of WO '128 when seeking a more active compound.

165.    Also knowing, based on Hongu, that the ethoxy group substituent at the $R^4$ position shows good activity on a different but related scaffold, a POSA would have been motivated with a reasonable expectation of success to make the same conservative modification on the scaffold of Example 12 of WO '128.  *See* Hongu at 25 (Table 1, compound 4).

166.    It would also have been a routine design choice for a POSA to replace the methoxy substituent in Example 12 of WO '128 with the ethoxy group, and the POSA would have had a reasonable expectation of success in producing a compound with a potentially superior activity.  Indeed, WO '128 discloses only a small subset of compounds that would be most preferred compounds, including ethoxy substituent at the $R^4$ position, and this substitution of the methoxy in Example 12 of WO '128 to ethoxy would have been a small, conservative change for a POSA.

> **d)**    **Comparing a POSA's motivation to modify the lead compound to Claims 1-2 of the '117 patent shows that any difference is a small conservative and obvious difference**

167.    Claims 1–2 of the '117 patent are directed to dapagliflozin, or derivatives thereof, having the following structure:

168.    Example 12 of WO '128 has the following structure:



WO '128 at 87.

169.    The claimed compounds recited in asserted claims 1–2 are structurally similar to Example 12 of WO '128, such that the only difference between them is the ethoxy and methoxy group, respectively, at the $R^4$ position.

170.    As demonstrated above, such difference would have been obvious, small, conservative change to a POSA conducting a SAR study starting with Example 12 of WO '128, to which a POSA would have had a reasonable expectation of success of producing a pharmaceutically active SGLT2 inhibitor.

171.    ███████████████████████████████████████████
████████████████████████████████████████
████████████████████████ ███████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

172.    Because the difference between Example 12 of WO '128 and the compound recited in claims 1 and 2 is only that small conservative change, the modification of Example 12

40

of WO '128 from a methoxy group to an ethoxy group to provide a more active compound would have been obvious to the POSA.

173.    Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

> **2.      Claim 3 is invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

174.    Claim 3 differs from claim 1 only in that it recites that the compound of claim 1 (dapagliflozin) is in a pharmaceutical composition with a pharmaceutically acceptable carrier.

175.    A POSA would understand that pharmaceutically active ingredients or compounds generally are formulated into pharmaceutical compositions along with pharmaceutically acceptable carriers.

176.    For example, Claim 15 of WO '128 reads: "[a] pharmaceutical composition comprising a compound as defined in Claim 1 and a pharmaceutically acceptable carrier therefor."  WO '128 at 110 (claim 15).

177.    EP '359 discloses that phlorizin derivatives "may be administered either orally or parenterally, and or in the form of a pharmaceutical preparation in admixture with an excipient suitable for oral administration or parenteral administration."  EP '359 at 10.

178.    Claim 40 of EP '359 recites a pharmaceutical composition comprising the phlorizin derivative "in admixture with a conventional pharmaceutically acceptable carrier or diluent."  *Id.* at 73.

179.    As of the earliest effective priority date for the claim 3, a POSA would have been motivated with a reasonable expectation of success to make and use a pharmaceutical composition comprising the compound as defined in claim 1, also known as dapagliflozin, in combination with a pharmaceutically acceptable carrier.

180.    Claim 3 is invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

**C.    Claims 1–3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

**1.    Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of one or more of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

**a)    A POSA would have been motivated to select compounds of formula I of the structure IB of WO '128 for further modification and/or evaluation**

181.    At the time of the claimed invention, a POSA seeking to develop treatments for type II diabetes would have been motivated to review prior art relating to SGLT inhibitors, such as EP '359, Tsujihara, Hongu, and Kees, because phlorizin, an inhibitor of SGLT, was an O-aryl glucoside and provided the rationale and proof of concept to pursue glucosides for the treatment of diabetes and because multiple pharmaceutical companies at the time were actively developing O-aryl glucosides as SGLT2 inhibitors.  EP '359 at Abstract; Tsujihara at 1174; Hongu at 22.

182.    A POSA would have understood that, to further improve upon the pharmaceutical

activity of phlorizin, both Tsujihara and Hongu evaluated the $R^1$ substituent of Compound **II**.



**II**

Tsujihara at 1175; Hongu at 25 (Table 1); *see also* EP '359 at Abstract.

183.    Tsujihara discloses that different substituents on the A ring could produce

compounds with different levels of activities.

184.    A POSA would have understood that other potent antihyperglycemic agents

having two aromatic rings like phlorizin —4-(4-sulfur-substitutedbenzyl)-5-

(trifluoromethyl)pyrazol-3-ones (Compound **III** below) and 4-(carbon-substitutedbenzyl)-5-

(trifluoromethyl)pyrazol-3-ones (Compound **IV** below)—were known in the art but with a

methylene linker between the aromatic rings, as shown below:



**III**                                                                              **IV**

Kees at 3922 (Tables 1–2) (emphasis added).

43

185.    Kees also discloses "[p]harmacological characterization of [WAY-123783, a species of Compound **III**] revealed a robust glucosuric effect produced by the compound when administered to normal mice." *Id.* at 3925.

186.    Kees further discloses "the methylene linker between the [two aromatic rings] … was critical for activity." *Id*. at 3923.

187.    A POSA, however, would have understood that while all these prior art references discussed increasing the potency or selectivity of phlorizin-type compounds (from Tsujihara, Hongu, EP '359, and Kees), they had not addressed the instability associated with the hydrolysis of the phlorizin, a O-glucoside compound.

188.    Other prior art, such as, WO '697 addressed this stability issue by removing the oxygen between the glucoside and aromatic B ring (*see* Compound **II** above), which leads to a more stable C-glucoside compound.

189.    Specifically, WO '697 discloses "the oligosaccharides may lack chemical and physiological stability.  Since sugar chains are basically composed of an O-glycoside bond having a hemiacetal structure, they are essentially unstable under acidic conditions."  WO '697 at 6–7.

190.    WO '697 further teaches that the synthesis of O-glycoside could be more tedious than the synthesis of C-glycoside.  *Id.* at 6.

191.    Indeed, one of the named inventors of WO '128, Mr. Gang Wu, confirmed that it is well known from literature that C-glucoside is much more stable than O-glucoside compounds.  Wu Dep. Trans. at 61:9–62:4.

192.    A POSA would have been motivated to identify a lead SGLT2 compound for further development that is a C-aryl glucoside and would have identified WO '128, at least

because WO '128 discusses EP '359, Tsujihara, and Hongu, all of which disclose O-glucoside

SGLT2 inhibitors for treating diabetes (WO '128 at 5–7).

193.    WO '128 also discusses WO '697, which discloses C-glucoside compounds for

treating  diabetes mellitus (WO '128 at 8); and WO '128 discloses "C-aryl glucosides which are

inhibitors of sodium dependent glucose transporters found in the intestine and kidney (SGLT2)"

and "a method for treating diabetes, especially type II diabetes."  *Id*. at 1.

194.    Upon review of WO '128, a POSA would have identified compounds of formula I

of the structure IB for further modification and/or evaluation, at least because WO '128 discloses

that such compounds are the most preferred compounds.  The preferred compounds of WO '128

have the following structure IB:



where $R^1$ is hydrogen, halogen or lower alkyl and $R^4$ is lower alkyl, $R^{5a}O$,
-OCHF$_2$, or -SR$^{5e}$.  It is preferred that $R^1$ be linked para to the glucoside bond and
the $R^4$ substituent be linked at the para position.

WO '128 at 12.

        **b)    A POSA would have been motivated to select/evaluate the
species of the genus compounds of formula I of the structure
IB and arrive at dapagliflozin with a reasonable expectation of
success**

195.    At the time of the claimed invention, a POSA would have been motivated to

select/evaluate the species of the genus compounds of formula I of the structure IB based on the

teachings of the prior art and would have had a reasonable expectation of success at improving the activity of SGLT2-inhibiting compounds by modifying/evaluating the $R^1$ and $R^4$ substituents in those compounds of formula I of the structure IB.  *See* WO '128 at 53–72 (Examples 1–7); Hongu at 25 (Table 1); Kees at 3922.

196.    First, a POSA would also have been motivated with a reasonable expectation of success to select/evaluate the species of the genus compounds of formula I of the structure IB and arrive at a compound with improved pharmaceutical activity based on the knowledge of the POSA.

197.    A POSA would have recognized that structure IB is static and has fixed ring positions.

198.    WO '128 expressly discloses that it is preferred that $R^1$ be linked *para* to the glucoside bond and the $R^4$ substituent be linked at the *para* position to the linker between the two phenyl rings.  WO '128 at 12.

199.    A POSA would also have recognized that WO '128 limits the number of substituents for $R^1$ and $R^4$.

200.    With respect to $R^1$, WO '128 limits $R^1$ to hydrogen, halogen, or lower alkyl.  *Id.* WO '128 discloses that halogen refers to chlorine, bromine, fluorine, and iodine, with chlorine or fluorine being preferred.  WO '128 at 32.  In addition, a POSA would also understand that halogen is a group of elements in the periodic table consisting of five chemically related elements: fluorine (F), chlorine (Cl), bromine (Br), and iodine (I), and astatine (At).  However, in medicinal chemistry, when attaching directly to an aromatic ring, not all the halogen elements are treated equally.  For example, a POSA is unlikely to select astatine (At) as $R^1$.  This chemical element is unstable and highly radioactive.  In fact, the most stable isotope of astatine is astatine-

210, which has a half-life of only a few hours.  Moreover, astatine is the rarest naturally

occurring element on Earth.  Indeed, one of the named inventors of WO '128, Mr. Gang Wu,

who possesses ordinary skill in the art, confirmed that ███████████████████████████

███████████████████████████████████

201.    Iodine is a halogen that is the next least frequently attached to an aromatic ring.

The chemical bonds involving iodine, for example, the bond between carbon and iodine, are

much weaker than those between a carbon and each of the other three halogens (chlorine,

fluorine, and bromine).

202.    Again, WO '128 inventor Mr. Wu confirmed that ██████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

203.    A POSA therefore would use chlorine, a commonly used halogen, as the option

for the already limited potential halogen substituents for $R^1$.

204.    Mr. Wu, a WO '128 inventor, also confirmed that ████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████

205.    WO '128 also defines "lower alkyl" as "both straight and branched chain

hydrocarbons containing 1 to 8 carbons."  WO '128 at 28.

206.    However, a POSA would not evaluate $R^1$ with straight and branched chain hydrocarbons containing 5 carbons or more being used, at least because none of the cited prior art discloses a lower alkyl substituent with 5 carbons or more.  *See*, *e.g.*, WO '128 Compounds 1-80 (disclosing no "lower alkyl" substituents with 5 carbons or more); Hongu at 22, Table 1 (disclosing no "lower alkyl" substituents with 5 carbons or more).

207.    Rather, a POSA would first evaluate hydrocarbons with 1, 2, or 3 carbons for attachment to an aromatic ring.

208.    Therefore, a POSA would have been motivated to select chlorine (Cl) as one of the limited substituents for $R^1$ with a reasonable expectation of success of arriving at a compound with increased SGLT2 activity.

209.    With respect to $R^4$, WO '128 limits $R^4$ to lower alkyl, $R^{5a}O$, $-OCHF_2$, or $-SR^{5e}$. *Id.* at 12.  WO '128 further limits $R^{5a}$ and $R^{5e}$ as independently "lower alkyl." *Id.* at Abstract.

210.    As discussed above, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

211.    Therefore, a POSA would have been motivated to select EtO—a commonly used $R^{5a}O$ group—as one of the few options for $R^4$ with a reasonable expectation of success in arriving at a compound with increased SGLT2 activity.

48

c) **Comparing a POSA's motivation to select/evaluate the species of the genus compounds of formula I of the structure IB to Claims 1-2 of the '117 patent shows that any difference is a small conservative and obvious difference**

212.    Claims 1–2 are directed to a compound, or derivatives thereof, having the following structure:



which is known to be the structure of the compound dapagliflozin.  '117 patent col. 25 ll. 32–64.

213.    A POSA would have understood that dapagliflozin is a species of the genus of compounds of formula I of the structure IB of WO '128, where $R^1$ is a halogen (chlorine) and $R^4$ is an $R^{5a}O$ group (EtO), wherein $R^{5a}$ is a lower alkyl—an alkyl (ethyl) group having 2 carbons. For the reasons discussed above, a POSA would have been motivated with a reasonable expectation of success to select/evaluate the species of the genus compounds of formula I of the structure IB and arrive at dapagliflozin.

214.    In addition and/or alternatively, a POSA would also have been motivated to select/evaluate the species of the genus compounds of formula I of the structure IB and arrive at dapagliflozin based on prior art, with a reasonable expectation of success.

215.    Thomas discloses that structure-activity relationship studies to assess the effect of structural changes on biological activity are usually carried out by making minor changes to the structure of a lead compound to produce analogues.  Thomas at 38.

216.    Patrick discloses that once the essential groups for biological activity are identified, a variety of substituents should be tried to optimize its activity.  Patrick at 90.  Patrick

also discloses that "[b]iological activity may depend not only on how well the compound interacts with its receptor, but also on a whole range of physical features, such as basicity, lipophilicity, electronic distribution, and size." *Id.*

217. Patrick teaches that substituents can be varied by attaching "a series of substituents such that [the compound's] physical features are varied one by one." *Id.* Patrick further teaches that "it is rarely possible to change one physical feature [of a compound] without affecting another." *Id.*

218. Therefore, a POSA, knowing that the compounds of formula I of the structure IB are most preferred, would have been motivated to select/evaluate the species of the genus of the compounds of formula I of the structure IB with a reasonable expectation of success at arriving at dapagliflozin, a compound with increased SGLT2 activity.

219. A POSA would also have known that compounds of formula I of the structure IB are directed to a finite number of identified, predictable solutions, with a reasonable expectation of success, at least because WO '128 specifically discloses that $R^1$ is hydrogen, halogen, or lower alkyl and $R^4$ is lower alkyl, $R^{5a}O$, -$OCHF_2$, or -$SR^{5e}$, where $R^1$ is linked *para* to the glucoside bond and the $R^4$ substituent is linked at the *para* position. WO '128 at 12.

220. With respect to the $R^1$ substituent, a POSA would have known that the "incorporation of halogen atoms into a lead results in analogues that are more lipophilic and [also] less water soluble." Thomas at 45.

221. In addition, a POSA would have also been motivated to evaluate the halogen atoms based on the disclosures in general medicinal chemistry texts like Patrick and review articles that are directed to rational approaches in drug design like Patani.

50

222.    WO '128 also discloses that halogen refers to chlorine, bromine, fluorine, and iodine, with chlorine or fluorine being preferred.  WO '128 at 32.

223.    As Patrick and Patani discuss, a POSA would have had a reasonable expectation of success that incorporating a chlorine substituent into a lead compound results in analogues with improved metabolic properties.  Patani at 3154; Patrick at 117–18.

224.    Patani teaches that, in the process of optimizing a lead compound, the chlorine substituent is often viewed to be isosteric and isolipophilic with the methyl substituent.  Patani at 3154.  Patani also teaches that the chlorine substituent is very often selected as a bioisosteric replacement for the methyl group on a lead compound because of its ability to prevent the metabolism of the compound caused by the presence of the methyl group.  *Id.*

225.    Patrick further teaches that "[s]ome drugs are metabolized at particular positions in their skeleton[s]," and the introduction of stable groups "can block metabolism and so prolong the activity of the drug."  Patrick at 117.

226.    Patrick also teaches the replacement of susceptible groups with other groups "that are stable to oxidation in order to prolong the lifetime of the drug," for example, the substitution of the methyl group on the antidiabetic tolbutamide molecule with a chlorine atom to yield a much longer acting chlorpropamide:



*Id.* at 118.

227.   Based on the above, a POSA would have been motivated to select/evaluate compounds with a chlorine attached at the $R^1$ position with a reasonable expectation of success of arriving at a compound with increased SGLT2 activity.

228.   With respect to the $R^4$ substituent, because a POSA would have known, based on Hongu, that the ethoxy group substituent at the $R^4$ position shows good activity, the POSA would have been motivated with a reasonable expectation of success to use/evaluate the ethoxy group at the $R^4$ position.  Hongu at 25 (Table 1, compound 4).

229.   Indeed, it would also have been a routine design choice for a POSA to select/evaluate an ethoxy substituent, considering that WO '128 had evaluated methoxy and thiomethyl groups, and a POSA would have also known that a compound with an ethoxy group at the $R^4$ position is more commercially accessible and easier to handle than a compound with a thiol substituent at the $R^4$ position because of, e.g., the smell of thiol compounds.  Furthermore, the inventors of WO '128 tested methyl, ethyl, and n-propyl (structure similar analogues having 1, 2, and 3 carbons, respectively) in evaluating lower alkyl at $R^4$ position; a POSA would have known that methoxy and ethoxy are also structurally similar analogues differing only in having 1 and 2 carbons (with an oxygen attached to the carbon), respectively, and therefore, a POSA would have been motivated with a reasonable expectation of success to evaluate both the methoxy and ethoxy and arrive at a compound with better activities.  Therefore, a POSA would have been motivated with a reasonable expectation of success to select/evaluate an ethoxy group at the $R^4$ position.

230.   Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or

52

Kees, optionally in further view of Thomas, Patrick, and/or Patani, and further in view of the

knowledge of a POSA and AstraZeneca's asserted secondary considerations.

> **2.      Claim 3 is invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of one or more of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

231.    Claim 3 differs from claim 1 only in that it recites that the compound of claim 1

(dapagliflozin) is in a pharmaceutical composition with a pharmaceutically acceptable carrier.

232.    A POSA would understand that pharmaceutically active ingredients or

compounds generally are formulated into pharmaceutical compositions along with

pharmaceutically acceptable carriers.

233.    For example, Claim 15 of WO '128 reads: "[a] pharmaceutical composition

comprising a compound as defined in Claim 1 and a pharmaceutically acceptable carrier

therefor."  WO '128 at 110 (claim 15).

234.    In addition, EP '359 discloses that phlorizin derivatives "may be administered

either orally or parenterally, and or in the form of a pharmaceutical preparation in admixture with

an excipient suitable for oral administration or parenteral administration."  EP '359 at 10.

235.    Claim 40 of EP '359 recites a pharmaceutical composition comprising the

phlorizin derivative "in admixture with a conventional pharmaceutically acceptable carrier or

diluent."  *Id.* at 73.

236.    As of the earliest effective priority date for the claim 3, a POSA would have been

motivated with a reasonable expectation of success to make and use a pharmaceutical

composition comprising the compound as defined in claim 1, also known as dapagliflozin, and a

pharmaceutically acceptable carrier.

237.     Claim 3 is invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of one or more of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

**D.     Claims 1–3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

**1.     Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

238.     Before the earliest effective priority date for the '117 patent, it was known that, "when diet therapy does not sufficiently control the conditions of patients, insulin or oral antidiabetic is additionally used."  EP '359 at 3.

239.     Antidiabetic biguanide compounds and sulfonyl urea compounds were known oral antidiabetics; however, these antidiabetics had been known to cause unwanted side effects. *Id.*  For example, biguanide compounds had been known to cause lactic acidosis, and sulfonyl urea compounds had been known to cause significant hypoglycemia.  *Id.*

240.     A POSA, therefore, would have been motivated to identify and develop other drugs to treat diabetes with reduced side effects.  *Id.*

241.     Scheen discloses that, as of 1997, "[t]he pharmacological treatment of [type II diabetes] has remained quite stable for decades with the use of sulphonylureas, biguanides and insulin"; "[n]umerous new pharmacological approaches are under active investigation with the aim of promoting insulin secretion, improving the action of insulin or slowing carbohydrate absorption"; and "the development of novel therapeutic approaches remains highly desirable." Scheen at 361, 365.

242.    A POSA, based on the teachings of the prior art, including those of Tsujihara and Hongu, would have been motivated with a reasonable expectation of success to synthesize a new SGLT2 inhibitor for the treatment of diabetes and other related diseases.  Tsujihara at Abstract, 1174; Hongu at 22.

243.    EP '359, Tsujihara, and Hongu each had identified phlorizin as a lead compound for further investigation or development of an SGLT2 inhibitor:



Phlorizin

EP '359 at 3; Tsujihara at Abstract, 1174; Hongu at 22.

244.    A POSA would have known, based on the disclosures of EP '359, Tsujihara, and Hongu, that phlorizin and its related pharmaceutical compounds are SGLT inhibitors useful for the treatment of diabetes.  EP '359 at 3; Tsujihara at Abstract, 1174; Hongu at 22.

245.    A POSA would have also known that phlorizin, an O-glucoside discovered in the 19th century, "is an inhibitor of $Na^+$-glucose co-transporter which exists only at chorionic membrane of the intestine and the kidney, and that phlorizin inhibits the renal tubular glucose reabsorption and promotes the excretion of glucose so that the blood glucose is controlled."  EP '359 at 3.

246.    Phlorizin, the O-aryl glucoside depicted below, was known to have little effect when administered orally, however, "because it is hydrolyzed into glucose and phloretin, the aglycon of phlorizin, by β-glucosidase in the intestine" as follows:

55

Tsujihara at 1174–75.

247.    To obtain improved pharmaceutical activity of phlorizin, and to avoid its

unwanted hydrolysis, prior art references, such as EP '359, Tsujihara, and Hongu, teach the

modification of phlorizin.

248.    Tsujihara discloses that the 4′-OH group on the B ring may be responsible for the

toxic effects of phloretin, which inhibits certain glucose transporters, which in turn causes

injuries to various organs.  *Id.* at 1175.  Tsujihara also discloses that the 4′-OH group on the B

ring is not essential for SGLT inhibition and the 4-OH group on the A ring is exchangeable for

other groups.  *Id.*

249.    Therefore, EP '359, Tsujihara, and Hongu each modified phlorizin:



by first removing the 4′-OH group on the B ring to produce derivatives of Compound **I** wherein

Ar could be an aryl group; $R^1$, $R^2$, $R^3$, and $R^4$ could each be hydrogen atoms; and $OR^5$ could be a

56

protected or unprotected hydroxy group or a lower alkoxy group, or a pharmaceutically

acceptable salt thereof:



**I**

EP '359 at Abstract; Tsujihara at 1174–75; Hongu at 25 (Table 1).

250.    Based on the teachings of EP '359, Tsujihara, and Hongu, a POSA would have

been motivated to identify as a lead compound for further evaluation, modification, and study

with a reasonable expectation of success in developing a new SGLT2 inhibitor to use for the

treatment of diabetes, a derivative of Compound **I**, hereinafter referred to as Compound **II**,

which is disclosed in each of EP '359, Tsujihara, and Hongu:



**II**

EP '359 at Abstract; Tsujihara at 1175; Hongu at 25 (Table 1) (emphasis added).

251.    A POSA looking at compound **II** would conduct a series of routine SAR studies,

some of which had been demonstrated in prior art, based on certain aspects of the molecule and

the teachings of prior art.

57

**a)      SAR study of the substituent on aromatic ring A**

252.    For example, to further improve the pharmaceutical activity of this lead compound, both Tsujihara and Hongu evaluate the $R^1$ substituent of Compound **II**.  Tsujihara discloses that different substituents on the A ring could produce compounds with different levels of activities:



| 1 | X |
|---|---|
| a | 4 - OMe |
| b | 3,4 - (OMe)$_2$ |
| c | 2,4 - (OMe)$_2$ |
| d | 3,4,5 - (OMe)$_3$ |
| e | 4 - OH |
| f | 3,4 - (OH)$_2$ |

Tsujihara at 1175 (emphasis added).

253.    Tsujihara teaches that a single 4-OMe (at the para position, compound 1a) group on the A ring in the 4′-dehydroxy-4-O-methylphlorizin is more biologically active than either a 3,4-dimethoxy (3,4-(OMe)$_2$, compound 1b) group or a 3,4,5-trimethoxy (3,4,5-(OMe)$_3$, compound 1d) group on the A ring.  *Id.* at 1176.

254.    Hongu also discloses that altering the $R^1$ substituent of the 4′-dehydroxyphlorizin derivatives of Compound **II** would impact the physical and biological properties of such compounds.  Hongu at 25 (Table 1).

255.    A POSA, finding that the effects of altering the $R^1$ substituent of Compound **II** have been extensively investigated (through structure-activity relationship studies) as disclosed in at least EP '359, Tsujihara, and Hongu, would have been motivated to look at additional ways to modify the lead compound to improve pharmaceutical activities.

58

**b)** **SAR study of the linker between the aromatic rings A and B**

256.    Based on the disclosures of Patrick, Kees, and WO '697, a POSA would have

been motivated with a reasonable expectation of success to alter the linker between the two

aromatic rings (A and B rings in Compound **II** above) to improve pharmaceutical activity.

257.    A POSA would have been motivated to adjust the linker chain length based on the

disclosures in general medicinal chemistry texts like Patrick, which teach that adjusting the

linker chain length can increase activity because the linker chain length of a lead compound,

once adjusted, and would have had a reasonable expectation to produce better interactions with

the target receptors.  Patrick at 93.

258.    A POSA would have also been motivated to decrease the three-carbon chain

linker length of the lead Compound **II** with a reasonable expectation of success to increase

activity based on the disclosures of Patrick.

259.    Patrick, for example, discloses that it would be beneficial to "'lock' the drug

molecule into a more rigid conformation such that it cannot take up … other shapes or

conformations."  *Id.* at 97.  This "rigidification" of the drug molecule consequently eliminates

unwanted interactions with other unwanted receptors and reduces side effects.  *Id.*  Patrick also

teaches that drug molecules "have to be sturdy enough to travel through the body and

consequently will interact with all the receptors which are prepared to accept them."  *Id.* at 96.

Patrick further teaches that, "[t]he more flexible a drug molecule is, the more likely it will

interact with more than one receptor and produce other [unwanted] biological responses (side-

effects)."  *Id.* at 96–97.

260.    A POSA would have further known that reducing the chain linker length from

three carbons (including the carbon in the carbonyl group) to one carbon would increase rigidity

and, consequently, increase the desired pharmaceutical activity.  *Id.* at 97.  Activity increases

because, "by locking the drug into the active conformation, the drug is ready to fit its target receptor site more readily and does not need to 'find' the correct conformation." *Id.*

261.    Based further on the disclosure of Kees, a POSA would have been motivated to modify the linker between the A and B rings of the modified lead compound from a three-carbon linker into a single-carbon methylene linker.  Kees discloses potent antihyperglycemic agents— 4-(4-sulfur-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones (Compound **III** below) and 4-(carbon-substitutedbenzyl)-5-(trifluoromethyl)pyrazol-3-ones (Compound **IV** below)—with a methylene linker between the aromatic rings, as shown below:



|        **III**        |        **IV**        |

Kees at 3922 (Tables 1–2) (emphasis added).

262.    Kees also *discloses* that "[p]harmacological characterization of [WAY-123783, a species of Compound **III**] revealed a robust glucosuric effect produced by the compound when administered to normal mice." *Id.* at 3925.  Kees further discloses that "the methylene linker between the 4-substituted phenyl and pyrazolone rings was critical for activity." *Id.* at 3923.

263.    Based on the disclosures of Kees, combined with Patrick's teachings regarding decreasing the linker length to increase rigidity and pharmaceutical activity, a POSA would have known that the *in vivo* glucosylation of Compounds **III** or **IV** would produce the following Compound **V** and its analogs, which, like phlorizin, are antihyperglycemic agents that inhibit SGLT in the kidney:

**V**

*See id.* at 3925 (depicting the compound resulting from the disclosed *in vivo* glucosylation); *see also, e.g.*, Bing-Kou Tang, *Drug Glucosidation*, 46 PHARMACOLOGY & THERAPEUTICS 53 (1990); Jeffrey A. Dodge et al., *Synthesis and Estrogen Receptor Binding Affinities of the Major Human Metabolites of Raloxifene (LY139481)*, 7 BIOORGANIC & MED. CHEM. LETTERS 993 (1997).

264.    As of the earliest effective priority date for the '117 patent, a POSA seeking to develop SGLT2 inhibitors to effectively treat type II diabetes and related disorders would have been motivated to combine the disclosures of EP '359, Tsujihara, and/or Hongu with those of Kees, at least because these references all disclose SGLT2 inhibitors that "are antihyperglycemic agents which act by blocking SGLT in the kidney."  *Id.*

265.    Further, based on at least the teachings of Patrick regarding linker length (Patrick at 96–97) and Kees' disclosure regarding the criticality for activity of the methylene linker between the aromatic rings (Kees at 3923), a POSA would have been motivated to make another finite, small, and easily traversed modification to the lead compound by replacing the carbonyl linker of Compound **II**:

**II**

with a methylene linker and would have had a reasonable expectation of success in increasing rigidity and the compound's desired pharmaceutical activity to arrive at Compound **VI**:



**VI**

wherein X is a hydrogen, a hydroxy, a halogen, or an alkoxy group and $X^1$ is a hydroxy, or an alkoxy group.  Hongu at 25 (Table 1); Tsujihara at 1175; EP '359 at Abstract; Kees at 3922–33.

### c)   SAR study of the connection between the glucoside and aromatic ring B

266.    Next, in order to synthesize a compound that is more versatile and results in increased patient compliance in that it can be administered orally and effectively to patients in need thereof, a POSA would have been motivated with a reasonable expectation of success to alter the linkage between the glucoside of the already modified lead Compound **VI** and the

aromatic ring to avoid the hydrolysis that was well known to occur at the O-glucoside site as disclosed by Tsujihara and other references.  Tsujihara at 1174–75; EP '395 at 3.

267.    WO '697 also discloses that the O-glycoside may lack chemical and physiological stability in comparison to the C-glycoside and that the synthesis of O-glycoside could be more tedious than the synthesis of C-glycoside.  WO '697 at 6–7.  WO '697 further discloses that the C-glycoside can be used to treat diabetes mellitus, among other diseases and conditions.  *Id*. at 46.

268.    Therefore, as of the earliest effective priority date for the '117 patent, a POSA would have been motivated with a reasonable expectation of success to make a finite, small, and easily traversed change by converting Compound **VI** from an O-glycoside to a C-glycoside based on the disclosures of WO '697 alone or in combination with Tsujihara or EP '359, at least because all these references disclose compounds used to treat diabetes mellitus, Tsujihara and EP '359 disclose that O-glycoside is easily hydrolyzed when orally administered, and WO '697 discloses that C-glycoside compounds have multiple advantages over O-glycoside compounds. EP '359 at 3; Tsujihara at 1174–75; WO '697 at 6–7.

269.    Based on the disclosures of WO '697, a POSA would have been motivated to make and would have had a reasonable expectation of success in arriving at the following Compound **VII** from Compound **VI**:



VII

63

### d)   SAR study of the glucoside position in relation to the linker

270.    In addition, POSA would have been motivated to optimize Compound **VII**, with a reasonable expectation of success in obtaining further improved pharmaceutical activity.

271.    Upon combining the disclosures of WO '697 with the disclosures of EP '359 and/or Hongu, Tsujihara, and Kees, a POSA would have understood from routine structure-activity relationship studies  that $R^1$ and $R^2$ of the above Compound **VII** could independently be hydrogen, hydroxy, halogen, or an alkoxy group.  *See* Hongu at 25 (Table 1); Tsujihara at 1175; EP '359 at Abstract; Kees at 3922–33.

272.    Patrick teaches that "[t]he idea of varying substituents is to attach a series of substituents such that these physical features are varied one by one."  Patrick at 90.  Patrick further teaches that "it is rarely possible to change one physical feature without affecting another."  *Id.*

273.    A POSA would have understood, as of the earliest effective priority date for the '117 patent that eliminating the oxygen between the glucoside and the B ring to convert the O-glucoside into a C-glucoside compound would affect the pharmaceutical activity of the molecules and would require further modification of the molecule.

274.    A POSA would have known or would have learned from texts such as Patrick that a commonly utilized modification of aromatic compounds is to vary the substitution position, such as by evaluating the effects of a substitution at the para position compared to the substitution at the meta position.  *Id.* at 91.

275.    In addition, a POSA would have been further motivated, as part of routine optimization, to test the activity of compounds having a substituent at both the meta and para positions.

276.   A POSA would have had a reasonable expectation of success in arriving at compounds with a methylene linkage at the meta position to the C-glucoside because Patrick teaches that increased activity could result for drug molecules having more than one binding group linked together by a chain if the length between the binding groups is shortened to increase rigidity to prevent interaction with unwanted receptors.  *Id.* at 96–97.

277.   Routine testing would have shown a POSA that the methylene linker at the meta position provides a desirable chain length and interaction with the receptor for increased activity.

### e)   SAR studies of selecting the substituents on aromatic ring B and the substituent on aromatic ring A

278.   A POSA would have been further motivated to modify and test different $R^1$ and $R^2$ substituents in Compound **VII** as part of routine optimization, and would have consulted references such as Patrick and Patani, a review article on a rational approach in drug design.

279.   For $R^1$, a POSA reading Patrick and Patani would also have understood that incorporation of a chlorine substituent into a lead compound results in analogues with improved metabolic properties.  Patani at 3154.

280.   Patani teaches that, "[w]hile the chlorine atom is often viewed to be isosteric and isolipophilic with the methyl group, it is very often selected as a bioisosteric replacement because of its ability to alter the metabolism" of the compound.  *Id.*  Patani also discloses that the addition of a para chlorine substituent can be effective in inhibiting the metabolic oxidation of an aromatic drug molecule through hydroxylation at the para position.  *Id.*

281.   Patrick also teaches that "[s]ome drugs are metabolized at particular positions in their skeletons," and "[t]he introduction of a stable group such as a methyl group … can block metabolism and so prolong the activity of the drug."  Patrick at 117.

282.    Patrick further teaches that "[s]usceptible groups can sometimes be replaced with groups that are stable to oxidation in order to prolong the lifetime of the drug." *Id.* at 118.  For example, substitution of the methyl group of the antidiabetic tolbutamide with a chlorine atom produces chlorpropamide, which remains effective in the body longer:



*Id.*

283.    Therefore, a POSA, based on the disclosures of medicinal chemistry texts like Patrick and references on drug design like Patani, would have been motivated to make a finite, small, and easily traversed modification and would have used a chlorine substituent for the $R^1$ substituent at the para position in Compound **VII**.

284.    Based further on Tsujihara, a POSA would have understood that different substituents on the A ring could produce compounds with different activities.  Tsujihara at 1175.

285.    Hongu teaches that $R^2$ substituents at the para (4-) position are preferred because substituents at the para position result in better urinary glucose excretion.  Hongu at 25 (Table 1) (showing data for compounds 1–3, with the para substituent of compound 1 having the best activity among them); *see also id.* (showing data for compounds 8–10, with the para substituent of compound 10 having the best activity among them).

286.    A POSA would have been motivated with a reasonable expectation of success to test compounds with both the 4-OMe and 4-OEt substituents because, at the time of the claimed invention, it would have been routine practice to conduct a structure-activity relationship evaluation of the effect of different $R^2$ substituents in Compound **VII**, including 4-OMe and 4-

OEt, to proceed with the substituent that produces improved activities.  Tsujihara at 1175; Kees at 3922; Hongu at 25 (Table 1).

287.    Therefore, upon testing both 4-OMe and 4-OEt substituents, a POSA would have been motivated with a reasonable expectation of success to make a finite, small, and easily traversed modification to the lead compound (Compound **VII**) by adding a 4-chlorine at the $R^1$ position and an 4-OEt at the $R^2$ position.

288.    Accordingly, a POSA would have had a reasonable expectation of success in arriving at the compound with the following structure:



of claims 1–2, also known as dapagliflozin.

289.    Claims 1–2 are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

> **2.    Claim 3 is invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations**

290.    Claim 3 differs from claim 1 only in that it recites that the compound of claim 1 (dapagliflozin) is in a pharmaceutical composition with a pharmaceutically acceptable carrier.

291.    A POSA would understand that pharmaceutically active ingredients or compounds generally are formulated into pharmaceutical compositions along with pharmaceutically acceptable carriers.

292.    EP '359 discloses that phlorizin derivatives "may be administered either orally or parenterally, and or in the form of a pharmaceutical preparation in admixture with an excipient suitable for oral administration or parenteral administration."  EP '359 at 10.

293.    Claim 40 of EP '359 recites a pharmaceutical composition comprising the phlorizin derivative "in admixture with a conventional pharmaceutically acceptable carrier or diluent."  *Id*. at 73.

294.    As of the earliest effective priority date for the '117 patent, a POSA would have been motivated with a reasonable expectation of success to make and use a pharmaceutical composition comprising the compound as defined in claim 1, also known as dapagliflozin, and a pharmaceutically acceptable carrier.

295.    Claim 3 is invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

**E.      Claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious**

      **1.      Claim 14 of the '117 Patent is Invalid as Obvious**

296.    The claim limitation "a compound as defined in claim 1" is obvious to a POSA over the prior art as discussed above.  *See supra* Sections V.B.1, V.C.1, and V.D.1.

297.    As of the earliest effective priority date, a POSA in search of a new treatment for diabetes would have been motivated to develop SGLT2 inhibitors and would have had a reasonable expectation of success that such SGLT2 inhibitors would be effective to treat diabetes, including type II diabetes.

298.     Generally, WO '128 claims "C-aryl glucosides, which are inhibitors of sodium-dependent glucose transporters found in the intestine and kidney (SGLT2)" and "a method for treating diabetes, especially type II diabetes."  WO '128 at 1.

299.     Due to these disclosures, and others in WO '128 that are identified below, a POSA motivated to identify or develop an SGLT2 inhibitor for the treatment of diabetes would have reviewed this reference.

300.     WO '128 discloses that type II diabetes is characterized by hyperglycemia and states that "[a]n inhibitor of the sodium-dependent glucose transporter SGLT2 in the kidney would be expected to aid in the normalization of plasma glucose levels, and perhaps body weight, by enhancing glucose excretion." *Id.*

301.     WO '128 further states that "consistent control of plasma glucose levels in diabetes can offset the development of diabetic complications … Plasma glucose is normally filtered in the kidney in the glomerulus and actively reabsorbed in the proximal tubule.  SGLT2 appears to be the major transporter responsible for the reuptake of glucose at this site." *Id.* at 2.

302.     Therefore, a POSA motivated to develop an SGLT2 inhibitor to be used to normalize plasma glucose levels would have had a reasonable expectation of success in treating diabetes.

303.     In fact, WO '128 claims that the compounds are useful in treating the same diseases as recited in the '117 patent.  Claim 26 of WO '128 reads:

> A method for treating or delaying the progression or onset of diabetes, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound healing, insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X, diabetic complications, atherosclerosis or hypertension, or for increasing high density lipoprotein levels, which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in Claim 1.

*Id.* at 112.  The text of claim 26 of WO '128 is the same as claim 14 of the '117 patent.  *Id.*

304.    Claim 28 of WO '128 reads:

A method for treating type II diabetes which comprises administering to a mammalian species in need of treatment a therapeutically effective amount of a compound as defined in Claim 1 alone or in combination with another antidiabetic agent, an agent for treating the complications of diabetes, an anti-obesity agent, an antihypertensive agent, an antiplatelet agent, an anti-atherosclerotic agent and/or a hypolipidemic agent.

*Id.* at 113.  The text of claim 28 of WO '128 is the same as claim 16 of the '117 patent.  *Id.*

305.    Further, WO '128 discloses using a structural genus of C-aryl glucoside compounds (the structure of which would include dapagliflozin) to treat the conditions and diseases of claim 14 of the '117 patent and type II diabetes (in claim 16 of the '117 patent).

306.    As a result, a POSA would have been motivated to use dapagliflozin and would have had a reasonable expectation of success in treating diabetes, one of the conditions and diseases listed in claim 14 of the '117 patent, including type II diabetes.

307.    Another prior art reference, WO '697 discloses that aryl C-glycosides can be used to treat or prevent diabetes mellitus (WO '697 at 46), which includes both type I and type II diabetes.

308.    WO '697 claims:

A *pharmaceutical composition for treating* or preventing an inflammatory disease, an autoimmune disease, an infection, a cancer, a reperfusion disorder, a thrombosis, an ulcer, a wound or osteoporosis comprising a pharmaceutically effective amount of the *aryl C-glycoside* of claim 1 in admixture with a pharmaceutically acceptable excipient.

*Id.* at 260 (claim 47) (emphasis added).  A POSA would have known that diabetes is an inflammatory disease.  WO '697 further discloses that the C-glycoside can be used to treat diabetes mellitus, among other diseases and conditions.  *Id.* at 46; *see also* WO '128 at 7-8 (noting that WO '697 discloses SGLT2 inhibitors).

70

309.     Furthermore, WO '128 describes another prior art reference, EP '359, as disclosing "O-aryl glucosides SGLT2 inhibitors for treating diabetes."  WO '128 at 5.  EP '359 discloses that Compound I, the hypoglycemic agent disclosed therein, and "pharmaceutically acceptable salts thereof may be administered either orally or parenterally, and or [sic] in the form of a pharmaceutical preparation in admixture with an excipient suitable for oral administration." EP '359 at 10; *see also id.* at 73 (claiming a "[a] pharmaceutical composition which comprises a therapeutically effective amount of a compound as set forth in any of the claims 13 to 32 or a pharmaceutically acceptable salt thereof in admixture with a conventional pharmaceutically acceptable carrier or diluent").

310.     EP '359 also states that, "when the active ingredient [I] of the present invention is orally administered to glucose-loading diabetic mice, the increment in the blood glucose concentration thereof is remarkably attenuated.  Thus, the hypoglycemic agent of the present invention is *useful in the prophylaxis or treatment of diabetes*."  *Id.* at 4 (emphasis added).

311.     A POSA would have been motivated to combine the disclosures of WO '697 and EP '359 with those of WO '128, because the two former references are disclosed by WO '128 and teach that SGLT2 inhibitors treat diabetes.  WO '128 at 5, 8.

312.     A POSA combining the disclosures of each of these references would have had a reasonable expectation of success effectively treating diabetes, including type II diabetes, using dapagliflozin, an SGLT2 inhibitor.

313.     Thus, a POSA would have had a reasonable expectation of success in using dapagliflozin to treat or delay the progression or onset of diabetes (one of the diseases and symptoms listed in claim 14), including type II diabetes.

314.   For the same reasons discussed above, a POSA would have been motivated to administer the relevant compound (dapagliflozin) to a mammalian species (*i.e.*, a human) in need of such treatment, with a reasonable expectation of success in treating or delaying the progression or onset of diabetes, one of the diseases and symptoms listed in claim 14, including type II diabetes.

315.   Finally, determination of a therapeutically effective amount of dapagliflozin would have been a matter of routine skill for a POSA.  A therapeutically effective dosage amount could have been determined empirically, by conventional procedures known to those of skill in the art.

316.   For example, an effective dose could be estimated initially either in cell culture assays or in suitable animal models.  The animal model may also be used to determine the appropriate concentration ranges.  Such information can then be used to determine useful dosage amounts for administration in humans.

317.   A therapeutic dose can also be selected by analogy to dosages for comparable therapeutic agents. The exact amount (effective dose) of the agent will vary depending on the subject being treated.  For example, the species, age, and general or clinical condition of the subject, the severity or mechanism of any disorder being treated, the particular agent or vehicle used, the method and scheduling of administration are relevant facts in determining a therapeutically effective dose of an agent.  However, determination of the therapeutically effective dose would have been within the knowledge and skill of a POSA.

318.   WO '128 claims a method for treating or delaying the progression or onset of the various diseases and symptoms listed in claim 14 of the '117 patent and a method for treating

type II diabetes, as required by claim 16 of the '117 patent, using a therapeutically effective amount of the claimed compound.  WO '128 at 112-13 (claims 26 and 28).

319.    WO '128 discloses that "[t]he dose for adults is preferably between 10 and 2,000 mg per day, which can be administered in a single dose or in the form of individual doses from 1-4 times per day."  *Id.* at 51-52.  Based on these disclosures and the knowledge of a POSA, it is within the skill of a POSA to arrive at the therapeutically effective amount of the compound as defined in claim 1 when administering the compound to a human.

320.    A POSA reading WO '128 would have reasonably expected that a compound disclosed by WO '128 as being therapeutically effective would also be effective to treat or delay the progression or onset of diabetes, at least one of the diseases and symptoms listed in claim 14, including type II diabetes.

321.    A POSA would have been motivated to administer a therapeutically effective amount of dapagliflozin to a mammalian species in need of treatment and would have had a reasonable expectation of success in treating or delaying the progression or onset of diabetes (one of the diseases and symptoms listed in claim 14).

322.    As discussed in preceding sections, the compound as defined in claim 1 is invalid under 35 U.S.C. § 103 as obvious over: (1) WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations; (2) WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally in further view of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations; and/or (3) EP '359, Tsujihara, and/or Hongu,

in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

323.    Claim 14 differs from claim 1 only in its recitation of the method of treatment which, as shown above, are found in one or more of WO '128, WO '697, and/or EP '359, and thus claim 14 is invalid under 35 U.S.C. § 103 as obvious.

## 2.    Claim 16 of the '117 Patent is Invalid as Obvious

324.    The claim limitation "a compound as defined in claim 1" is obvious over the prior art as discussed above.  *See supra* Sections V.B.1, V.C.1, and V.D.1.

325.    As of the earliest effective priority date, a POSA in search of a new treatment for diabetes would have been motivated to develop SGLT2 inhibitors and would have had a reasonable expectation of success that such SGLT2 inhibitors would be effective to treat diabetes, including type II diabetes.

326.    Generally, WO '128 claims "C-aryl glucosides, which are inhibitors of sodium-dependent glucose transporters found in the intestine and kidney (SGLT2)" and "a method for treating diabetes, especially type II diabetes."  WO '128 at 1.

327.    Due to these disclosures, and others in WO '128 that are identified below, a POSA motivated to identify or develop an SGLT2 inhibitor for the treatment of diabetes would have reviewed this reference.

328.    WO '128 discloses that type II diabetes is characterized by hyperglycemia and states that "[a]n inhibitor of the sodium-dependent glucose transporter SGLT2 in the kidney would be expected to aid in the normalization of plasma glucose levels, and perhaps body weight, by enhancing glucose excretion."  *Id.*

329.    WO '128 further states that "consistent control of plasma glucose levels in diabetes can offset the development of diabetic complications … Plasma glucose is normally

74

filtered in the kidney in the glomerulus and actively reabsorbed in the proximal tubule.  SGLT2

appears to be the major transporter responsible for the reuptake of glucose at this site." *Id.* at 2.

330.    Therefore, a POSA motivated to develop an SGLT2 inhibitor to be used to

normalize plasma glucose levels would have had a reasonable expectation of success in treating

diabetes.

331.    Claim 26 of WO '128 reads:

A method for treating or delaying the progression or onset of diabetes, diabetic
retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound healing,
insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty
acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X,
diabetic complications, atherosclerosis or hypertension, or for increasing high
density lipoprotein levels, which comprises administering to a mammalian species
in need of treatment a therapeutically effective amount of a compound as defined
in Claim 1.

*Id.* at 112.  The text of claim 26 of WO '128 is the same as claim 14 of the '117 patent.  *Id.*

332.    Claim 28 of WO '128 reads:

A method for treating type II diabetes which comprises administering to a
mammalian species in need of treatment a therapeutically effective amount of a
compound as defined in Claim 1 alone or in combination with another antidiabetic
agent, an agent for treating the complications of diabetes, an anti-obesity agent, an
antihypertensive agent, an antiplatelet agent, an anti-atherosclerotic agent and/or a
hypolipidemic agent.

*Id.* at 113.  The text of claim 28 of WO '128 is the same as claim 16 of the '117 patent.  *Id.*

333.    Further, WO '128 discloses using a structural genus of C-aryl glucoside

compounds (the structure of which would include dapagliflozin) to treat the conditions and

diseases of claim 14 of the '117 patent and type II diabetes (in claim 16 of the '117 patent).

334.    As a result, a POSA would have been motivated to use dapagliflozin and would

have had a reasonable expectation of success in treating diabetes, one of the conditions and

diseases listed in claim 14 of the '117 patent, including type II diabetes.

335.    Another prior art reference, WO '697 discloses that aryl C-glycosides can be used to treat or prevent diabetes mellitus (WO '697 at 46), which includes both type I and type II diabetes.

336.    WO '697 claims:

A *pharmaceutical composition for treating* or preventing an inflammatory disease, an autoimmune disease, an infection, a cancer, a reperfusion disorder, a thrombosis, an ulcer, a wound or osteoporosis comprising a pharmaceutically effective amount of the *aryl C-glycoside* of claim 1 in admixture with a pharmaceutically acceptable excipient.

*Id.* at 260 (claim 47) (emphasis added).  A POSA would have known that diabetes is an inflammatory disease.  WO '697 further discloses that the C-glycoside can be used to treat diabetes mellitus, among other diseases and conditions.  *Id*. at 46; *see also* WO '128 at 7-8 (noting that WO '697 discloses SGLT2 inhibitors).

337.    Furthermore, WO '128 describes another prior art reference, EP '359, as disclosing "O-aryl glucosides SGLT2 inhibitors for treating diabetes."  WO '128 at 5.  EP '359 discloses that Compound I, the hypoglycemic agent disclosed therein, and "pharmaceutically acceptable salts thereof may be administered either orally or parenterally, and or [sic] in the form of a pharmaceutical preparation in admixture with an excipient suitable for oral administration."  EP '359 at 10; *see also id.* at 73 (claiming a "[a] pharmaceutical composition which comprises a therapeutically effective amount of a compound as set forth in any of the claims 13 to 32 or a pharmaceutically acceptable salt thereof in admixture with a conventional pharmaceutically acceptable carrier or diluent").

338.    EP '359 also states that, "when the active ingredient [I] of the present invention is orally administered to glucose-loading diabetic mice, the increment in the blood glucose concentration thereof is remarkably attenuated.  Thus, the hypoglycemic agent of the present invention is *useful in the prophylaxis or treatment of diabetes*."  *Id.* at 4 (emphasis added).

339.   A POSA would have been motivated to combine the disclosures of WO '697 and EP '359 with those of WO '128, because the two former references are disclosed by WO '128 and teach that SGLT2 inhibitors treat diabetes.  WO '128 at 5, 8.

340.   A POSA combining the disclosures of each of these references would have had a reasonable expectation of success effectively treating diabetes, including type II diabetes, using dapagliflozin, an SGLT2 inhibitor.

341.   Thus, a POSA would have had a reasonable expectation of success in using dapagliflozin to treat or delay the progression or onset of diabetes (one of the diseases and symptoms listed in claim 14), including type II diabetes.

342.   For the same reasons discussed above, a POSA would have been motivated to administer the relevant compound (dapagliflozin) to a mammalian species (*i.e.*, a human) in need of such treatment, with a reasonable expectation of success in treating or delaying the progression or onset of diabetes, one of the diseases and symptoms listed in claim 14, including type II diabetes.

343.   Finally, determination of a therapeutically effective amount of dapagliflozin would have been a matter of routine skill for a POSA.  A therapeutically effective dosage amount could have been determined empirically, by conventional procedures known to those of skill in the art.

344.   For example, an effective dose could be estimated initially either in cell culture assays or in suitable animal models.  The animal model may also be used to determine the appropriate concentration ranges.  Such information can then be used to determine useful dosage amounts for administration in humans.

345.     A therapeutic dose can also be selected by analogy to dosages for comparable therapeutic agents. The exact amount (effective dose) of the agent will vary depending on the subject being treated.  For example, the species, age, and general or clinical condition of the subject, the severity or mechanism of any disorder being treated, the particular agent or vehicle used, the method and scheduling of administration are relevant facts in determining a therapeutically effective dose of an agent.  However, determination of the therapeutically effective dose would have been within the knowledge and skill of a POSA.

346.     WO '128 claims a method for treating or delaying the progression or onset of the various diseases and symptoms listed in claim 14 of the '117 patent and a method for treating type II diabetes, as required by claim 16 of the '117 patent, using a therapeutically effective amount of the claimed compound.  WO '128 at 112-13 (claims 26 and 28).

347.     WO '128 discloses that "[t]he dose for adults is preferably between 10 and 2,000 mg per day, which can be administered in a single dose or in the form of individual doses from 1-4 times per day."  *Id.* at 51-52.  Based on these disclosures and the knowledge of a POSA, it is within the skill of a POSA to arrive at the therapeutically effective amount of the compound as defined in claim 1 when administering the compound to a human.

348.     A POSA reading WO '128 would have reasonably expected that a compound disclosed by WO '128 as being therapeutically effective would also be effective to treat or delay the progression or onset of diabetes, at least one of the diseases and symptoms listed in claim 14, including type II diabetes (as required by claim 16).

349.     A POSA would have been motivated to administer a therapeutically effective amount of dapagliflozin to a mammalian species in need of treatment and would have had a

reasonable expectation of success in treating or delaying the progression or onset of diabetes, including type II diabetes.

350.    Further, the prior art reference Scheen discloses that, in 1997, four classes of drugs—sulphonylureas, biguanides (metformin), α-glucosidase inhibitors (acarbose), and insulin—were available for glycemic regulation and "each … has a different mode and site of action."  Scheen at Summary.  Scheen further discloses that "[t]hese standard pharmacological treatments may be used individually for certain types of patients, or *may be combined* in a stepwise fashion to provide more ideal glycaemic control for most patients."  *Id.* (emphasis added).

351.    Scheen states:

> *Adjunct treatments comprise a few pharmacological approaches which may help to improve glycaemic control by correcting some abnormalities frequently associated with [non-insulin-dependent diabetes mellitus]*, such as obesity (serotoninergic anorectic agents) and hyperlipidaemia (benfluorex).
>
> There is intensive pharmaceutical research to find new drugs able to stimulate insulin secretion (new sulphonylurea or nonsulphonylurea derivatives, glucagon-like peptide-1), improve insulin action (thiazolidinediones, lipid interfering agents, glucagon antagonists, vanadium compounds) or reduce carbohydrate absorption (miglitol, amylin analogues, glucagon-like peptide-l).  Further studies should demonstrate the superiority of these new compounds over the standard antidiabetic agents as well as their optimal mode of administration, alone or *in combination with currently available drugs*.

*Id.* (emphasis added).

352.    Scheen also discloses that "[n]umerous new pharmacological approaches [to treat type II diabetes] are under active investigation with the aim of promoting insulin secretion, improving the action of insulin or slowing carbohydrate absorption" and that "the development of novel therapeutic approaches remains highly desirable."  *Id.* at 361, 365.

353.    A POSA seeking to identify or develop a novel method of treatment of diabetes would have been motivated to combine the disclosures of Scheen with those of WO '128, WO

'697, and EP '359, with a reasonable expectation of success, as each of these references discusses treatments for diabetes.

354.    Therefore, based on the combined disclosures of the prior art, a POSA would have had a reasonable expectation that an SGLT2 inhibitor, such as dapagliflozin, could be administered in combination with other antidiabetic agents, such as glycemic regulation drugs, as well as many others, to effectively treat type II diabetes.

355.    Therefore, a POSA would have been motivated to administer a therapeutically effective amount of dapagliflozin, alone or in combination with another antidiabetic agent, an agent for treating the complications of diabetes, an anti-obesity agent, an antihypertensive agent, an antiplatelet agent, an anti-atherosclerotic agent and/or a hypolipidemic agent, to a mammalian species in need of treatment and would have had a reasonable expectation of success in treating or delaying the progression or onset of type II diabetes.

356.    As discussed in preceding sections, the compound as defined in claim 1 is invalid under 35 U.S.C. § 103 as obvious over: (1) WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations; (2) WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally further in view of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations; and/or (3) EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

357.    Claim 16 differs from claim 1 only in its recitation of the method of treatment which, as shown above, are found in one or more of WO '128, WO '697, EP '359, and/or Scheen, and thus is invalid under 35 U.S.C. § 103 as obvious.

## VI.    ASTRAZENECA'S EVIDENCE OF ALLEGED OBJECTIVE INDICIA OF NON-OBVIOUSNESS DO NOT SUPPORT THE VALIDITY OF THE ASSERTED CLAIMS

358.    Dapagliflozin does not possess unpredictable, surprising, or unexpected results.

359.    Dapagliflozin did not meet a long-felt but unmet need.

360.    Others did not fail to make SGLT2 inhibitors to treat type II diabetes.

361.    The industry did not acquiesce to the validity of the '117 patent.

362.    Others did not copy dapagliflozin.

363.    Skilled artisans were not skeptical of SGLT2 inhibitors.

### A.    No Unpredictable, Surprising, or Unexpected Results

364.    Dapagliflozin was identified through a routine SAR study and optimization and does not possess unpredictable, surprising, or unexpected results.

365.    A routine SAR study is usually conducted by making minor changes to the structure of the lead compound and assessing the effect that those minor changes have on the biological activity of the compound.

366.    A POSA would have expected that some of the compounds synthesized in a routine SAR study would possess better properties than others.

367.    To the extent there are differences between the properties of dapagliflozin and lead compound Example 12, those differences were not unpredictable, surprising, or unexpected.

368.    During the reissue prosecution for the '117 patent, Dr. William Washburn, one named inventor of the '117 patent submitted two Rule 1.32 declarations reporting alleged

unexpected results of dapagliflozin over Example 12 of the WO '128, the closest prior art, to overcome the Patent Office's rejection of pending claims as obvious over WO '128.

369.    The initial declaration discusses Dr. Washburn's opinion that "dapagliflozin possesses unpredictable and unexpected benefits relative to example 12 of WO '128, including enhanced selectivity for SGLT2 versus SGLT1, enhanced ability to reduce blood glucose concentration in short term animal models [STZ rats], and enhanced ability to reduce plasma glucose concentration in longer term animal models [ZDF rats]."  Washburn Initial Declaration at 3.  The initial declaration discussed the results of a ZDF rat study in which there were five rats per group.

370.    The supplemental declaration discusses "additional data for vehicle and drug treated rats in the same head-to-head ZDF study that was described in the March 2019 Declaration."  Washburn Supplemental Declaration at 2.  The supplemental declaration discussed the results of a ZDF rat study in which there were six rats per group.

371.    The USPTO issued Notice of Allowance for U.S. Reissue Patent Application No. 16/014,479 on June 21, 2019 based on the declarations by Dr. Washburn on both five-rat data and six-rat data.  The USPTO did not have access to the Excel spreadsheet containing the six-rat data and had no opportunity to evaluate the reliability of the six-rat data in Washburn's April 24, 2019 declaration.  On June 24, 2019, AstraZeneca expressly abandoned the reissue application.

372.    Any difference between dapagliflozin and Example 12 is not a difference in kind nor does it reflect a marked superiority of dapagliflozin over Example 12.

### 1.    Dapagliflozin's selectivity for SGLT2 was not surprising or unexpected

373.    Compounds that preferentially bind to one target over another are said to be "selective" for their preferred target.  For example, a compound could be selective for SGLT2

over SGLT1 or vice versa.  Selectivity can be assessed by comparing a compound's potency against one target to another.

374.    A compound's potency can be measured *in vitro* and is often reported as an $EC_{50}$ value.  An $EC_{50}$ value is the concentration at which the compound produces 50% of the maximum of some specified biological effect.

375.    When the specified biological effect is *inhibition* of a target, such as SGLT2, a compound's potency is often reported as an $IC_{50}$.  The $IC_{50}$ value is the concentration at which 50% inhibition of the target is achieved.

376.    The lower a compound's $IC_{50}$, the more potent the compound is said to be.  A lower $IC_{50}$ means that a lower concentration of the compound is needed to achieve the same level of inhibition.

377.    BMS investigated the potency and selectivity of the C-glucoside compounds it was developing as part of its routine SAR study in the SGLT2 program.

378.    BMS apparently reported the potency of these compounds as $EC_{50}$ instead of $IC_{50}$ or reported the two interchangeably.  Although this is technically incorrect, the principles described above remain the same.  Thus, a lower $EC_{50}$ as reported by BMS would indicate a higher potency for the compound.

379.    For dapagliflozin, BMS determined its $EC_{50}$ values to be 1.1 nM for SGLT2 and 1390 nM for SGLT1.  Thus, BMS determined the selectivity for SGLT2 over SGLT1 of dapagliflozin to be 1263-fold.

380.    For Example 12, BMS determined its $EC_{50}$ values to be 1.0 nM for SGLT2 and 762 nM for SGLT1.  Thus, BMS determined the selectivity for SGLT2 over SGLT1 of Example 12 to be 762-fold.

381. 

386.     The selectivity of dapagliflozin for SGLT2 over SGLT1 is not unpredictable, surprising, or unexpected.

> **2.     Background on statistical analyses relating to AstraZeneca's assertion of unexpected or surprising results in support of non-obviousness**

387.     BMS investigated the potential antidiabetic effects of the compounds it was developing as part of its routine SAR study in the SGLT2 program.

388.     One of the ways in which BMS investigated the potential antidiabetic effects of these compounds was by conducting studies in animal models.

389.     Statistics can be used to analyze the results of these preclinical studies in animals.

390.     More specifically, statistics can be used to compare the antidiabetic effect of one compound to that of another or to a vehicle or placebo.

391.     A test for statistical significance helps quantify whether an observed effect is likely due to chance or some other factor of interest.

392.      The p-value that is measured in a statistical test tells whether a difference truly exists between two tested groups or if the difference is could have been due to chance or to the fact that the test was not sufficiently powered.

393.     P-values range between 0 and 1.

394.     The closer the p-value is to 1, the more likely it is that the "random chance" scenario is true.

395.     The closer the p-value is to 0, the less likely it is that the "random chance" scenario is true.

396.     By convention, when the p-value is less than 0.05, the observed difference in is said to be "statistically significant."

397.     The p-value is the result of a statistical test that depends upon several factors, including the size of the observed effect, the degree of variability in the measurement of the observed effects, the number of subjects involved in the comparison, and the specifics of how the data were collected.

398.     For any given dataset, different statistical tests, i.e., parametric or nonparametric, can result in different p-values.  Whether statistical significance can be observed in a given dataset often depends on which type of test (parametric or nonparametric) a biostatistician employs.

399.     In reality, a biostatistician has several statistical tests at her disposal, not all of which result in the same p-value. Further, not all statistical tests are equivalent—which test a biostatistician could or should use depends on the data she will analyze.

85

400.    Biostatisticians use two main families of tests—parametric and non-parametric.

401.    These tests differ in their assumptions regarding the distribution of underlying data.

402.    Parametric tests assume the underlying data are sampled from a Gaussian (i.e., "normal") distribution.  The t-test is a commonly used parametric test. Parametric tests generally utilize mean data.

403.    Non-parametric tests, on the other hand, make no assumptions regarding the distribution of underlying data.  Biostatisticians generally employ non-parametric tests when the underlying data are not distributed normally, the sample size is small, the central tendency of the underlying data is better represented by the median (rather than the mean), or the influential outliers in the underlying data cannot be removed.

404.    The Mann-Whitney and Wilcoxon tests are commonly used non-parametric tests. These tests are the non-parametric equivalents of the parametric unpaired and paired t-tests, respectively.

405.    In general, the biostatistician selects the appropriate test based on assumptions about the underlying data.

406.    If the distribution of the underlying data is skewed (i.e., non-normal) such that there is a substantial difference between the central tendency (e.g., median) and average (i.e., mean), the biostatistician should analyze the data using a non-parametric test.

407.    If the biostatistician uses an inappropriate test (e.g., a parametric test like the t-test) to analyze a dataset that does not have a normal distribution, that inappropriate parametric test will be more likely to indicate that a given difference between two samples is statistically significant than the more appropriate non-parametric test.

408.     Smaller sample sizes confer less power on a statistical test.  Said another way, a smaller sample size generally results in a lower probability that a statistical test will detect statistically significant differences when they actually exist.

409.     When choosing the sample size for an experiment, researchers must consider several factors, such as anticipated effect size (e.g., the difference between two groups), distribution shape and variance of the analysis sample, measurement error, and choice of the statistical method.

410.     Preclinical studies in various animal models are considered to be of a small sample size.  In such preclinical studies, one can only make inferences about whether the distribution of data in the population from which the small sample is derived is normal or non-normal using the only experimentally determined data one possesses—the sample.

411.     Early clinical studies (e.g., Phase 1) are also considered to be of a small sample size.  Late stage clinical studies in drug development, such as Phase 3, are considered to be of a larger sample size.

412.     The preclinical studies are of a learning nature, i.e., they are designed to collect information without specific considerations for statistical analysis or tests to be performed.  They are designed to be performed in a set number of animals without in-depth consideration of the anticipated effect size or statistical test to be performed.  Animal studies are not typically designed to prove statistical significance.

413.     To make reliable inferences about the population, a skilled biostatistician must apply her statistical test to a sample of adequate size.  If the sample size is too small, a skilled biostatistician cannot make any reliable inferences about the population, such as about the

distribution of the theoretical population of data.  This is because studies of small sample sizes do not have sufficient power.

414.    The power of a statistical test is essentially a measure of the test's ability to distinguish reliably between what is true and what is false.  It is the probability that a test correctly rejects the null hypothesis.

415.    For example, if the "truth" is that a population of data has a non-normal distribution, but the statistical test used to make an inference about the normality of that distribution has low power, then that statistical test will not have a high likelihood of demonstrating that the distribution is indeed non-normal. *See, e.g.,* Katherine Button et al., *Power Failure: Why Small Sample Size Undermines the Reliability of Neuroscience,* 14 NAT. REV. NEUROSCIENCE 365 (2013) ("Button") ("A study with low statistical power has a reduced chance of detecting a true effect, but it is less well appreciated that low power also reduces the likelihood that a statistically significant result reflects a true effect.").

416.    Low power also makes p-values less reliable. *See, e.g.,* David Colquhoun, *An Investigation of the False Discovery Rates and the Misinterpreation of* P-*Values,* ROYAL SOC'Y OPEN SCI., Nov. 1, 2014, at 1 ("If you use p = 0.05 to suggest that you have made a discovery, you will be wrong at least 30% of the time.  If, as is often the case, experiments are underpowered, you will be wrong most of the time.").

417.    Additional consequences of low power include "overestimates of effect size and low reproducibility of results." Button at 365.

418.    Statistical tests generally have two types of errors—Types I and II. A Type I error, or a false positive, occurs when a test incorrectly rejects the null hypothesis when it was true and should not have been rejected.  A Type II error, or a false negative, occurs when a test

fails to reject or accepts the null hypothesis when the null hypothesis was false and should have been rejected.

419.    If a sample size is too small, any statistical test may not be sufficiently powered and may lead to an unacceptable Type II error rate.

420.    Small sample sizes can impart lower power to both parametric and nonparametric tests.  Therefore, it is important to consider the possibility of a Type II error when any of the performed statistical tests fail to reject the null hypothesis, i.e., when the p-value is high such that there appears to be no difference between the two groups.

421.    Further, for example, the two datasets depicted in the figure below have the same mean but two very different distributions:



422.    A conclusion based on the assumption that the two sets of data above—one having the red distribution line and the other the black distribution line—are the same merely because the means of the two sets of data are not statistically significantly different (in this case, they are the same), could be flawed.

423.    Small sample sizes may also introduce the problem of bias, which causes a computed statistic (e.g., mean value) to either over- or underestimate the true value—and could

reduce the likelihood that a statistically significant result reflects a true effect and could overestimate effect sizes and lead to low reproducibility of results.

424.    A p-value of 0.05 means that there is a one-in-twenty chance that there are no actual differences in the observed effects.

425.    "Statistical significance" means that the data show differences between the compounds that are sufficiently great that they cannot plausibly be attributed to chance.

426.

427.    An observed difference may be sufficiently large to be clinically or scientifically important whether or not that difference attains statistical significance in a particular study.

428.    Statistical significance is not equivalent to scientific, human, or economic significance.

429.    While $p<0.05$ is the typical threshold for a result to be called statistically significant, the 0.05 threshold is merely a convention.

430.    Dr. Thisted agrees that, "Scientific conclusions and business or policy decisions should not be based only on whether a p-value passes a specific threshold.  Practices that reduce data analysis or scientific inference to mechanical 'bright-line' rules (such as 'p < 0.05') for justifying scientific claims or conclusions can lead to erroneous beliefs and poor decision making.  A conclusion does not immediately become "true" on one side of the divide and 'false' on the other."  Ronald L. Wasserstein & Nicole A. Lazar, *The ASA's Statement on P-Values: Context, Process, and Purpose*, 70 THE AMERICAN STATISTICIAN 129, 132 (2016).

431.    A meta-analysis can be useful when there are multiple studies, each of which measures similar outcomes, using similar or identical protocols, in similar or identical populations. When the studies are sufficiently similar in outcome, protocol, and populations, the

information from each study can be combined statistically to produce a better estimate of treatment effects based on more information than any individual study can provide.

432.     Because meta-analysis is often used to combine information from studies that have some differences in outcome measurement, protocol, and/or populations, a first step in carrying out a meta-analysis is to determine whether the results from the various studies are sufficiently homogeneous that they can be considered to be estimating the same thing—and thus, the results can be combined.

433.     Biostatisticians can perform meta-analyses using either aggregate or individual participant data.  Examples of aggregate data include the mean (i.e., average) and other summary statistics. Individual participant data, as the phrase clearly indicates, includes only the data specific to each participant or subject in a study.

434.     The aggregate data from multiple studies should only be analyzed in a meta-analysis when individual participant data are unavailable.

435.     Meta-analysis of individual participant data provides a more statistically powerful tool to integrate data across studies and quantify true effects, especially when the underlying studies have a small sample size.

436.     Effect size represents an important measure of the magnitude (i.e., size) of the difference between two groups.  A skilled biostatistician will often find effect size to be a more important measure of clinical relevance than the p-value.  The p-value tells the skilled biostatistician whether a difference truly exists between two groups, but it does not tell the skilled biostatistician anything about the size of that difference.

437.     For example, if the difference between two drugs (e.g., in their ability to lower glucose levels) is statistically significant but the effect size is small, the skilled biostatistician

would likely find that there is no clinically relevant difference between the two drugs. In other words, the skilled biostatistician would be unimpressed by a "true" but small difference between two drugs.

### 3.     The difference in STZ rat data was not surprising or unexpected

438.    One of the animal models in which BMS conducted studies was the STZ rat.



443.    A meta-analysis of individual participant data provides a more powerful comparison than a meta-regression of aggregated mean data.

















479.    Dr. Thisted selectively analyzes the STZ data in a way that is more favorable to AstraZeneca.

480.    Dr. Thisted's calculation of the p-value contained no mathematical errors, but his conclusion that ███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

███  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████

███  ██████████████████████████████████

████████

███  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

███  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

485.    If the differences between studies are not random, then they should be accounted for using a study covariate and not treated as random.

486.    ███████████████████████████████████████████

████████████████████████████████████████████████████



492.    As Dr. Thisted is aware, the approach that normalizes observation to the baseline is inferior compared to the analysis of actual data in the analysis of longitudinal pharmacodynamic response, and often leads to biased results. *See* Chantaratsamon Dansirikul et al., *Approaches to Handling Pharmacodynamic Baseline Responses,* 35 J. PHARMACOKINETICS & PHARMACODYNAMICS 269, 269–70 (2008).

493.



498.    Dr. William Washburn submitted two different Rule 1.32 declarations during the reissue prosecution—one reporting on data from ZDF rat studies involving five rats (March 29, 2019 declaration) and then a second reporting on data from ZDF rat studies involving six rats. (April 24, 2019 declaration).

499.    There is a dispute as to whether each group in the ZDF studies contained five or six rats.

500.



| Group | Mean of Five-Rat Plasma Glucose on Day 15 (mg/dL) | Sixth Rat Plasma Glucose on Day 15 (mg/dL) | Mean of Six-Rat Plasma Glucose on Day 15 (mg/dL) |
|---|---|---|---|
| 1 | 295.20 | 295 | 295.22 |
| 2 | 132.84 | 132 | 132.70 |
| 3 | 228.84 | 229 | 228.87 |
| 4 | 266.76 | 267 | 266.80 |
| 5 | 195.96 | 196 | 195.97 |
| 6 | 226.32 | 226 | 226.60 |
| 7 | 283.92 | 284 | 283.93 |
| 8 | 138.24 | 138 | 138.20 |
| 9 | 189.48 | 189 | 189.40 |

502.   This table shows a comparison of the five-rat mean glucose level on Day 15 to the sixth rat and the six-rat mean glucose level on Day 15.

503.   





510.    Moreover, a skilled statistician would have appreciated that adding another data point to match the mean of the dataset for any given group will decrease the variance of the distribution and make the distribution more normal such that the mean and the median of the

dataset will become closer. 

518.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

519.    This bias arises from a well-known phenomenon in pharmacology at steady state wherein the magnitude of a study subject's drug response is amplified when that subject's baseline is substantially higher than the median baseline of the study population as a whole.

520.    In other words, when one treatment group contains rats with higher baseline plasma glucose levels compared to the rest of the rats in the study, that group, if small, will likely show greater treatment effect (i.e., drug response) relative to the other rat groups because the rats with higher baseline plasma glucose levels will shift the mean to a higher value, away from the median.

521.    This phenomenon is obvious in the figures below, where one can observe a strong correlation between baseline value and efficacy:



522.



532.     As noted above, however, the skilled biostatistician uses this parametric test only when the distribution of the underlying data is normal, meaning the distribution is symmetrical (i.e., not skewed) and the mean and median values are comparable.  The difference can be seen in the following illustration (mode, in this illustration, denotes the value that occurs most frequently in the data set):



533.     As shown below, the distribution of the ZDF data is not normal as indicated in Figures 2A–E below.  Dr. Thisted should have used an appropriate non-parametric test to evaluate the statistical significance of the ZDF data.

534.     



536. 





551.











573.

574.





579.

121



588.     For example, consider a hypothetical wherein five tenants having a modest mean household income live in an apartment building in a neighborhood where the mean household income is also of a modest amount. If two of the tenants in the apartment building are replaced with two high-income earning tenants, the mean household income of the tenants in that apartment building would increase dramatically. Inclusion of the two high-income tenants in the calculation would cause the mean household income of the apartment building to appear inflated and not representative of the modest mean income of the neighborhood surrounding it.

589.     . *See, e.g.,* Xi Wang et al., *Variability in Zucker Diabetic Fatty Rats: Differences in Disease Progression in Hyperglycemic and Normoglycemic Animals*, 7 DIABETES METAB. SYNDR. OBES.

531, 534–35 (2014) ("Wang") ("Although there was a trend for lower blood glucose in [drug]-treated diabetic animals, the extremely high variability in ZDF animals precluded interpretation of any potential effects of drug treatment.").

591. ███████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

███ ██████████████████████████████

██████████████████████████████████

█████████████████████████████████

█████████████████████████

███ ██████████████████████████████

█████████████████████████████████

███████████████████████████

███ ████████████████████████████████

██████████████████████████████████

██████████████████████████████ *See, e.g.,* Wang at 534 (Figure 1).

595. ███████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████

596. 



605.    It is also well known that there is a problem of bias when analyzing data from small samples such that in general, it is good practice not to rely on any p-value statistics when analyzing data from small samples. *See* Button at 367.

606.    Relying on statistical significance when analyzing data from small samples could undermine the purpose of scientific research by reducing the chance of detecting a true effect. Therefore, it is preferable and more defensible to estimate and reach conclusions based on effect sizes when analyzing data from small sample sizes.













633.   A difference (███████████████████████████████████████

███████████████████████ and dapagliflozin (BMS-512148), respectively) when altering

substituents as part of a standard SAR study because prior art references, including Kees, teach

that a slight change of substituents at the distal aryl ring could lead to compounds with a

difference in activities (*e.g.*, 57±1 and 38±2 (or close to a 1.5 fold difference) for Examples 4 and

8 in Kees, respectively) on a similar scale (a 1.5 fold difference).  (*See*, *e.g.*, Kees at 3922, Table

1, compounds 4, 8, 9 and 10 have db/db[c] changes of -57±1, -38±2, -32±5, and -3±9, respectively,

at a 20 mg/kg dose.) ███████████████████████████████████████

██████████████████████████████████

634.    For all of the reasons discussed above, dapagliflozin does not possess unpredictable, surprising, or unexpected results.

### 5.    Any alleged unexpected medical benefits are irrelevant

635.    When unexpected results are relied upon as evidence of nonobviousness, the results must be shown to be unexpected as compared to the closest prior art.  Any allegation that dapagliflozin has a number of surprising properties such as reduction of HbA1c and systolic blood pressure, and enhanced weight loss lacks support as AstraZeneca cites two studies in support of this point which compare dapagliflozin to placebo or placebo and insulin, which are not the closest prior art.  However, here, the closest prior art is Example 12 of WO '128.  Therefore, these opinions of Dr. Cohen's do not support any alleged nonobviousness.

636.    Any allegation that dapagliflozin surprisingly reduced the risk of hospitalization for heart failure in adult patients with type 2 diabetes and established cardiovascular (CV) disease or multiple cardiovascular risk factors is not relevant to the subject matter of claims 14 and 16 of the '117 patent.

637.    The primary endpoints for the clinical studies used to support this new indication for dapagliflozin are not related to any one of the claimed disorders or conditions in claims 14 and 16.  Therefore, any unexpected or surprising efficacy of dapagliflozin in patients with cardiovascular disease has no bearing on obviousness.

### B.    Background Facts Relating to AstraZeneca's Assertion of Additional Secondary Considerations

#### 1.    Treatment options for type 2 diabetes before SGLT2 inhibitors obtained FDA approval

638.    As mentioned above, the oral treatments for type 2 diabetes that were available in the late 1990s included sulfonylureas, meglitinides, biguanides such as metformin, thiazolidinediones ("TZDs"), and alpha-glucosidase inhibitors.  Insulin was also available as an

injectable treatment for type 2 diabetes.  Each of these treatment options employed a different mechanism of action to control glucose levels, for example, by stimulating insulin secretion, increasing insulin action, or reducing glucose absorption.  Additionally, in the 1990's, glucagon-like peptide 1 ("GLP-1") injectables and dipeptidyl peptidase-4 ("DPP-4") which act as incretin agents were under active investigation.   Each of these classes of agents have subsequently been brought to market and have increased the pharmacologic choices for treatment and impacted the approach to the treatment of diabetes.

639.    Many of these agents have different but complimentary mechanisms of action and are often used in combination to treat patients.

### a)    GLP-1 Agents

*640.*    GLP-1 agents (or GLP-1 receptor agonists) are characterized as incretins, which are hormones that have multiple biological effects that impact gut metabolism, gastrointestinal motility, satiety, and insulin release in response to orally ingested nutrients.  Incretins were noted in the 1960s after the development of assays for insulin and have been a target of research and drug development.

641.    Drugs in this class are now on the market and include Byetta® (exenatide), Victoza® (liraglutide), Trulicity® (dulaglutide), Ozempic® (semaglutide injection), and Rybelsus® (semaglutide tablets). Byetta® (exenatide) was the first of the GLP-1 agents to be approved by the FDA, which occurred in 2005, before Farxiga® (dapagliflozin) obtained FDA approval in 2014.

642.    GLP-1 agents can be administered daily or weekly, and come in injectable and oral formulations.

643.    GLP-1 agents may reduce cardiovascular and cerebrovascular events.  In addition, a meta-analysis of twenty-one trials of GLP-1 agents showed a weight reduction in all of the

trials.  This class of drugs has also "demonstrated positive effects on blood pressure and lipid parameters."

644.    GLP-1 agents "fill longstanding unmet needs: antihyperglycemic agents that can be used safety and effectively in patients with moderate to severe [chronic kidney disease], and agents that will slow [estimated glomerular filtration rate] eGFR decline in patients with eGFR <30 mL/min per 1.73 m$^2$."

645.    GLP-1 agents have been found to have preferred treatment outcomes as compared to SGLT2 inhibitors.

### b)    DPP-4 Agents

646.     DPP-4 agents block the clearance of the active incretin GLP-1 and thereby augment the effect of GLP-1 on post-prandial insulin release.

647.    Potential side effects caused by DPP-4 agents are similar to those caused by the GLP-1 agents, but do not include weight loss or nausea.  DPP-4 agents carry a higher risk for angioedema as compared to the GLP-1 agents.

648.    Some examples of FDA-approved DPP-4 agents are Onglyza® (saxagliptin), Januvia® (sitagliptin), Tradjenta® (linagliptin), and Nesina® (alogliptin).  These agents differ in how they interact with the catalytic site on DPP-4 but generally are all equally efficacious.

### 2.    Treatment of patients with type 2 diabetes

649.    In patients with type 2 diabetes, glycemic control is an imperative attribute of treatment.  In order to achieve glycemic control, the American Association of Clinical Endocrinologists ("AACE") and American College of Endocrinology ("ACE") provide guidelines for treatment, as shown in the below image.



The AACE/ACE Consensus Statement also suggests reevaluating type 2 diabetes treatment every two to three months, in addition to making lifestyle modifications.

650.    Medications for possible treatment of type 2 diabetes available today include biguanides, sulfonylureas, meglitinides, TZDs, DPP-4 inhibitors, GLP-1 receptor agonists, SGLT2 inhibitors, and insulin therapy, if diet and exercise are not sufficient.

651.    A physician, therefore, relies on a wide range of both clinically objective and patient-focused factors when selecting an antidiabetic medication for a particular patient from the universe of available medications, including those medications listed above.

652.    A treating physician will choose diabetic therapies for patients based on a drug's safety side effect profile and the expected needs or physiology and pathophysiology documented

in that individual patient within the options my patients have based on the formulary or health insurance.

653.     Metformin, in addition to diet and exercise is the suggested standard initial therapy for a type 2 diabetic patient.  Metformin has been available for over fifty years and remains the first-line therapy, even though it can present with renal and gastrointestinal issues. Side effects also include a potential risk of lactic acidosis.

654.     The guidelines on what other diabetic therapies to use are much less clear.

655.     The GLP-1 injectables are generally favored because of their superior efficacy compared to sulfonylureas, DPP-4 agents, and relative superiority to insulin therapy, as well as the benefits of minimal hypoglycemia, and weight loss.

656.     In patients unable to tolerate GLP-1 injectables due to their method of administration or gastrointestinal side effects,  SGLT2 inhibitors should be considered due to their benefit in preventing/treating heart failure and their renal protective effects.  However, SGLT2 agents should be avoided in patients with a history of recurrent urinary tract infections.

657.     The  DPP-4 agents are a relatively weak class in regard to overall A1c lowering with a good safety profile.

658.     The TZDs have a number of issues that can limit their use but may be of benefit in individuals with insulin resistance and a prior history of stroke.

659.     Sulfonylureas and meglitinides are used in a limited sense due to the risk of hypoglycemia.

660.     Each agent has its own unique therapeutic role and side effects, and many patients require additional combinations of treatments and/or insulin therapy.

**C.     Alleged Long Felt, Unmet Need**

661.    Even if dapagliflozin were the first invented SGLT2 inhibitor for the treatment of diabetes, the class benefits of gliflozins do not necessarily inure to the benefit of dapagliflozin.

> **1.     There has been and continues to be a long-felt, unmet need for improved type 2 diabetes treatments**

662.    There was an unmet need for improved oral drug treatment options that were both safe and effective for type 2 diabetes patients in addition to diet and exercise and the then available oral agents, in the late 1990s, and this need for improved treatment options for type 2 diabetes still exists today.  Type 2 diabetes still cannot be cured, to date.

663.    Additionally, because type 2 diabetes is a progressive condition, it requires the need for the escalation of therapy, and access to a range of therapies.

664.    Because of the significant likelihood of primary and secondary failure, many patients may require treatment by multiple agents.

665.    Even after dapagliflozin was approved by the FDA in 2014 as "an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus", FDA noted that a need for improved treatments for type 2 diabetes still existed.  In the later-occurring 2017 review process for the SGLT2 inhibitor ertugliflozin, FDA stated that a need for antihyperglycemic treatment options still existed.

666.    Furthermore, any alleged long-felt, unmet need for type 2 diabetes treatments is not commensurate with the scope of asserted claim 14 of the '117 patent.  AstraZeneca does not allege that any unmet need exists for sixteen of the diseases and conditions listed in claim 14 of the '117 patent, including diabetic retinopathy and wound healing.  Furthermore, although one of the conditions listed in claim 14 is diabetes, AstraZeneca only alleges an unmet need for a subset of this condition (i.e., type 2 diabetes).  Diabetes encompasses types of diabetes other than type

2, such as type 1 and type 3C.  As the alleged unmet need is not reasonably commensurate to the full scope of claim 14 of the '117 patent, such evidence is not probative of nonobviousness.

### 2. Dapagliflozin is one of many therapies a physician may use today to treat type 2 diabetes and has associated risks

667.    Although many of the drug therapies available at the time of the invention often failed to effectively manage critical disease markers, such as HbA1c, lipid levels, blood pressure, and body weight, the same can be said, today, for dapagliflozin.  There is no cure for type 2 diabetes today.

668.    Dapagliflozin is one of several therapies a physician may use to treat type 2 diabetes today, is often used in conjunction with other available therapies, and may also require use of additional therapies as treatment progresses to treat type 2 diabetes.

669.    Many, if not all, of those drug therapies in a physician's armamentarium at the time of invention of dapagliflozin are still being prescribed today and are certainly available for use today.

670.    A physician's decision on which SGLT2 inhibitor to prescribe to a patient is basically governed by the formulary (that is, which drugs are covered by a patient's health insurance) and has less to do with the merits of each of the individual SGLT2 inhibitors.  As is supported by the analysis of cardiac and renal outcome trials and the removal of the amputation labeling for Invokana® (canagliflozin), each of the various SGLT2 inhibitors have comparable efficacy and safety such that the difference between each of them are less meaningful to a physician.

671.    Risks still exist in prescribing dapagliflozin.  For example, FDA has noted that "SGLT2 inhibitors are contraindicated in patients with severe renal dysfunction" and that "SGLT2 inhibitors may be associated with genital mycotic infections and urinary tract infections

(including urosepsis and pyelonephritis), as well as volume depletion/orthostatic hypotension and acute kidney injury." Further, the FDA also noted that metabolic acidosis (such as lactic acidosis and ketoacidosis) has occurred with the use of SGLT2 inhibitors.

672.    The prescribing information for Farxiga® indicates that "[s]erious urinary tract infections including urosepsis and pyelonephritis requiring hospitalization have been reported in patients receiving SGLT2 inhibitors, including FARXIGA" and that "[t]reatment with SGLT2 inhibitors increases the risk for urinary tract infections."

673.    There are safety concerns with the administration of dapagliflozin.  In particular, further reassurance was required on safety issues relating to dapagliflozin, including the safety profile in patients older than 75 years and pediatric patients; the efficacy profile in estimated GFR < 60 mL/min/1.73 m$^2$; and cancer safety data, in particular with respect to bladder cancer in view of the increased glucose load passing through the urinary system.

674.    There is a possible association of SGLT2 inhibitors with bladder cancer and bone fractures.  Therefore, the use of dapagliflozin in patients with active or history of bladder cancer should be avoided.

675.    Diabetic ketoacidosis ("DKA") is a fatal acute complication of diabetes mellitus that is caused by severe insulin deficiency.  It is not entirely clear which patients are at risk for DKA, though these patients may have a variant in the enzymes associated with ketones.

676.    Euglycemic diabetic ketoacidosis ("eu-DKA") is a type of DKA that is "characterized by metabolic acidosis (pH <7.3), a decreased level of serum bicarbonate (<18mEq/L), and a relatively low blood glucose level (<200 mg/dL)."  It has been proposed that SGLT2 inhibitors may induce eu-DKA and there have been increased reports of DKA associated with SGLT2 inhibitors.

677.     The FDA has adjusted the labels of the class of SGLT2 inhibitors to recommend that treatment with SGLT2 inhibitors be temporarily stopped before surgery due to the risk of ketoacidosis. Canagliflozin, dapagliflozin, and empagliflozin should each be discontinued at least three days before scheduled surgery; ertugliflozin should be discontinued at least four days before scheduled surgery.  Blood glucose levels should be carefully monitored after discontinuation of the SGLT2 inhibitor and appropriately managed before surgery.  SGLT2 inhibitor therapy may be restarted once the patient's oral intake is back to baseline and any other risk factors for ketoacidosis are resolved.

678.     Although an SGLT2 inhibitor was recommended as the preferable add-on therapy for patients with established atherosclerotic cardiovascular disease (ASCVD) or indicators of ASCVD high risk, the second-line medication options include many classes of drugs, not only SGLT2 inhibitors.

679.     Where atherosclerotic cardiovascular disease predominates, two categories of drugs may be added, in addition to the first-line therapy of metformin and lifestyle management, not just (i) an SGLT2 inhibitor, to be used if levels of eGFR are adequate, but also (ii) a GLP-1 receptor agonist with proven cardiovascular disease benefit.

680.     Although an SGLT2 inhibitor was recommended as an initial add-on therapy for patient with a compelling need to minimize hypoglycemia, SGLT2 inhibitors are one of four classes of drugs (the other three classes being DPP-4 inhibitors, GLP-1 RAs, and TZDs) which are also recommended as initial add-on therapies in this scenario.

681.     Although an SGLT2 inhibitor was recommended as an initial add-on therapy for patients with a compelling need to minimize weight gain or promote weight loss, SGLT2 inhibitors are again only one of two classes of drugs (the other class being GLP-1 RAs with good

efficacy for weight loss) which are recommended as initial add-on therapies in this scenario.

Examples of such GLP-1 RAs are semaglutide, liraglutide, dulaglutide, exenatide, and

lixisenatide.  The American Diabetes Association recommends not only SGLT2 inhibitors in

patients with other conditions occurring alongside type 2 diabetes, but also recommends diabetes

treatments such as GLP-1 RAs.

> ### 3. AstraZeneca's comparison of dapagliflozin to other agents as add-on therapy fails to sufficiently take GLP-1 RAs into account

682.    GLP-1 RAs have been shown to have preferable outcomes for the treatment of

diabetes as compared to SGLT2 inhibitors.

683.    For example, in a double-blind study consisting of 788 patients, patients who

received the GLP-1 RA semaglutide had "significantly greater reductions in HbA$_{1c}$ and

bodyweight from baseline to week 52" compared to patients who received the SGLT2 inhibitor

canagliflozin.

684.    In the PIONEER 2 clinical trial, semaglutide 14 mg once daily was compared the

empagliflozin 25 mg once daily; semaglutide was shown to be superior with respect to

reductions in HbA$_{1c}$ and "the proportion of patients reaching the HbA$_{1c}$ target of lower than 7."

685.    Both GLP-1 RAs and SGLT2 inhibitors were shown to improve glucose control,

have a low risk of hypoglycemia, and also provide moderate weight loss and reduction of arterial

blood pressure.

> ### 4. It is irrelevant that additional classes of monotherapy treatments have not been developed since SGLT Inhibitors

686.    Although there have not been any new classes of monotherapy drugs introduced

to treat type 2 diabetes, since the advent of SGLT2 inhibitors, this is not relevant to any alleged

long-felt but unmet need.  The development of dapagliflozin and/or the other SGLT2 inhibitors

did not satisfy any alleged long-felt need such that companies have stopped the development of

new type 2 diabetes treatments altogether.  There is always room for improvement when it comes to treatments for type 2 diabetes.

687.    Invokana® (canagliflozin) obtained FDA approval in 2013, before Farxiga® (dapagliflozin) obtained FDA approval in the United States.

688.    The alleged invention claimed in the '117 patent did not satisfy any alleged long-felt but unmet need.

689.    Dapagliflozin is merely one of many options a physician has in his or her arsenal to treat type 2 diabetes today.  Moreover, there are safety concerns associated with the administration of dapagliflozin such as risk of diabetic ketoacidosis and increased risk of lower limb amputation.

690.    Additionally, any evidence from the recent Hatch-Waxman case regarding Invokana® (canagliflozin) is not relevant to the instant litigation.

**D.    Phlorizin and Other "Gliflozins" are not Failures of Others**

691.    The fact that phlorizin was not commercialized is not a failure of others to develop a safe and effective SGLT2 inhibitor.

692.    It was known that phlorizin was a nonspecific SGLT1/SGLT2 inhibitor, which often caused adverse side effects such as life-threatening diarrhea and dehydration.  It was also known that phlorizin concurrently inhibited facilitative glucose transporters (GLUTs), which could exacerbate peripheral insulin resistance and promote hypoglycemia in the central nervous system.

693.    Phlorizin was a starting point for Bristol-Myers Squibb's and its competitors' development of SGLT2 inhibitors.

694.    Even if others were to have failed to develop an effective O-glucoside, that is irrelevant because WO '128 is a prior art reference that discloses C-glucoside compounds, and the instability of O-glucoside compounds—including the problematic hydrolysis of such compounds—and the stability of C-glucoside compounds in comparison, were well known at the time of the claimed invention and was disclosed in WO '128.

695.    There is nothing in the asserted claims 14 and 16 of the '117 patent that requires approval by the FDA of a compound or that a compound progress through a certain stage of clinical trial testing.  Claims 14 and 16 are simply directed to, among other things, a method for treating or delaying the progression or onset of various diseases and conditions by administering a therapeutically effective amount of a compound.  Therefore, based on the scope of the asserted claims, the fact that any gliflozin did not secure FDA approval should not be considered a failure of others.

696.    Sotagliflozin should not be considered a failure of others, as it has been approved in the European Union for the treatment of type 1 diabetes in adults.

697.    With respect to Invokana® (canagliflozin), though FDA previously required the prescribing information for the drug to contain a warning that the drug causes an increased risk of leg and foot amputations, FDA recently removed the black box warning about amputation risk.  In fact, in an August 2020 "Drug Safety Communication" regarding Invokana®, FDA stated, "Safety information from recent clinical trials also suggests that the risk of amputation, while still increased with canagliflozin, is lower than previously described, particularly when appropriately monitored. Based upon these considerations, we have concluded that the *Boxed Warning* should be removed."

698.    There is no evidence to support that the "black box warning" for Invokana® was considered a significant set-back by the industry.

699.    The development of canagliflozin and its administration to treat patients with diabetes was not a failure.

700.    With respect to Steglatro® (ertugliflozin), it contains a warning in its prescribing information that physicians should consider factors that may increase risk of amputation. However, the prescribing information states, "A causal association between STEGLATRO and lower limb amputation has not been definitively established."  The prescribing information also states, "An increased risk for lower limb amputation (primarily of the toe) has been observed in clinical studies with *another SGLT2 inhibitor*. Across seven Phase 3 clinical trials in the STEGLATRO development program, non-traumatic lower limb amputations were reported in 1 (0.1%) patient in the comparator group, 3 (0.2%) patients in the STEGLATRO 5 mg group, and 8 (0.5%) patients in the STEGLATRO 15 mg group."  Because the low incidence of amputations disclosed support that Steglatro® has not been found to cause lower limb amputations, the development and use of ertugliflozin was not a failure.

701.    Considering that Invokana® (canagliflozin) and Steglatro® (ertugliflozin) are still available to physicians to use as part of their armamentarium to treat diabetes, they should not be considered failures.

702.    The different study designs and populations may explain why certain SGLT2 inhibitors were not required to add amputation warnings in their labels when others initially were required to do so (and subsequently permitted to remove them).  This is supported by an analysis of two nationwide registers of SGLT2 inhibitors, reporting that 61% of patients were using dapagliflozin.  This analysis discloses that the use of SGLT2 inhibitors, as compared with GLP-1

receptor agonists ("GLP-1 RAs"), was associated with an increased risk of lower limb

amputation (incidence rate of 2.7 v 1.1 events per 1000 person years, hazard ratio of 2.32, and

95% confidence interval of 1.37 to 3.91) and diabetic ketoacidosis (incidence rate of 1.3 v 0.6,

hazard ratio of 2.14, and 95% confidence interval of 1.01 to 4.52).

**E.     Filing of Paragraph III Certifications does not Constitute Industry Acquiescence**

703.     Whether generic drug companies have sought permission to market generic copies

of dapagliflozin and whether they have filed so-called "Paragraph III" certifications is not

probative of any industry acquiescence.

704.     The filing of a Paragraph III certification does not grant a license to the generic

applicant.

705.     When the generic applicants filed Paragraph III certifications (instead of

challenging the asserted patent by filing a Paragraph IV certification), the '117 patent was set to

expire on October 4, 2020.

706.     There may be a variety of reasons why a generic applicant submitted a "Paragraph

III" certification.

707.     The circumstances surrounding the Paragraph III certifications do not suggest an

acquiescence by the generic companies and therefore this evidence is not relevant to the inquiry

and do not support any alleged nonobviousness.

**F.     AstraZeneca's Evidence of Alleged Copying by Others does not Support the Non-Obviousness of the Asserted Claims**

708.     Prior art references disclose all the claimed features that AstraZeneca alleges were

copied.

709.     WO '697 and WO '128 discloses the C-glucoside structure (*see, e.g.* WO '128 at 1, 53, 57, 60, 63, 66, 69, 72, 76, 80, 83, 87; WO '697 at 232–34), and it was well known at the time of the claimed invention of the asserted claims, that C-glucoside compounds are more stable than O-glucoside compounds.  (WO '697 at 1, 6-7.)

710.     Kees discloses that the methylene linker between the two aromatic rings is critical for activity.   (Kees at 3922, Tables 1–2.)

711.     Multiple references teach that chlorine is a metabolically stable substituent.  (*See e.g.* Patrick at 118; Patani at 3154.)

712.     Hongu discloses 4-OEt substituents at the distal aromatic ring.  (Hongu at 25, Table 1.)

713.     Dapagliflozin is an obviousness modification from prior art.  AstraZeneca's competitors also copied the key features of the prior art.

714.     Whether generic drug companies have sought permission to market generic copies of dapagliflozin is not probative of nonobviousness.

### G.     Subjective opinions are not demonstrative of industry skepticism

715.     AstraZeneca's evidence to demonstrate skepticism by others that SGLT2 inhibitors like dapagliflozin would be effective to treat or delay the progression or onset of diabetes at the time of the invention does not support that the '117 patent is not obvious.

716.     Opinions by individual practitioners of whether they were unsure how or if the SGLT2 inhibitors would provide any significant medical benefits over the DPP-4 class of treatments for type 2 diabetes—whether accepted as accurate or not—is not objective evidence. Rather, such opinions are subjective, do not demonstrate skepticism by the *industry*, and are therefore not suggestive of the nonobviousness of the asserted claims.

717.    Any such uncertainty can be directed generally at new compounds that are synthesized and patented without administration in animals and humans to establish safety and efficacy.

718.    Until dapagliflozin was administered to patients with type 2 diabetes and its safety and efficacy reported in peer review journals, there could have been some doctors who felt the same caution, like they would feel about any new drug product.  That does not suggest the nonobviousness of the claimed invention.

719.    In 2011, at least some doctors expected dapagliflozin to be approved by FDA, thereby contradicting any alleged industry skepticism.

## VII.   CLAIMS 14 AND 16 OF THE '117 PATENT ARE INVALID UNDER 35 U.S.C. § 112

### A.   Claims 14 and 16 are Invalid under 35 U.S.C. § 112, ¶ 1 for Lack of Enablement

720.    As set forth above, a POSA would have understood based on the prior art and his or her own skill in the art that dapagliflozin would treat or delay the progression or onset of type II diabetes (in claim 16).  However, if the Court were to find that the prior art does not teach a POSA that dapagliflozin would treat or delay the progression or onset of type II diabetes, in the alternative, the methods of claims 14 and 16 are not enabled because the '117 patent specification lacks any data or discussion about the use of dapagliflozin to allow a POSA to treat or delay the progression or onset of each and every condition and disease of claim 14 or to treat type II diabetes of claim 16.

#### 1.   Claim 14 is not enabled to its full scope

721.    There is no evidence that dapagliflozin was administered to humans before the earliest effective priority date.

147

722.     The specification of the '117 patent does not contain any clinical data resulting from the administration of dapagliflozin to humans, nor any preclinical data demonstrating dapagliflozin's safety, tolerability, and/or efficacy in animals.

723.     The '117 patent states only that "SGLT2 inhibitor activity of the compounds of the invention may be determined by use of an assay system as set out below" and provides details to describe such an assay.  '117 patent col. 20, ll. 26-64.

724.     There is no discussion in the specification of the '117 patent that dapagliflozin would be effective in treating each and every condition and disease listed in claim 14.

725.     That the '117 patent specification notes that type II diabetes is characterized by hyperglycemia and insulin resistance does not link diabetes to each of the conditions and diseases of claim 14.

726.     Syndrome X (one of the diseases and conditions of claim 14) is comprised of several cardiovascular disease risk factors, and a POSA generally would have to treat each risk factor separately for efficacy, instead of trying to treat all factors at once by administering a single treatment.

727.     Further, there is no discussion in the specification about the specific amount of dapagliflozin that would be therapeutically effective in treating or delaying the progression or onset of each and every condition and disease of claim 14, except the broad dosage range of "between 10 and 2,000 mg per day" (Id. col. 20 ll. 16-17) disclosed in the '117 patent specification.

728.     For example, one of the conditions listed in claim 14 is obesity.  There is no discussion in the specification of the '117 patent that would direct a POSA to a specific dosage

amount of dapagliflozin, within the range of 10 and 2000 mg, without undue experimentation, that would effectively treat or delay the progression or onset of obesity.

729.    Only if it was assumed that it was known in the prior art that dapagliflozin would be effective in treating, delaying the progression or onset of each and every one of the claimed conditions and diseases of claim 14, would the disclosures in the specification be sufficient to support AstraZeneca's argument that a compound that treats diabetes would be potentially effective in treating or delaying the progression or onset of each and every one of the claimed conditions and diseases in claim 14 (which it is not).

730.    Farxiga is not indicated for the treatment of each and every disease or condition of claim 14.

731.    AstraZeneca provides no basis within the '117 patent specification to select 10 mg out of the broad dosage range disclosed in the '117 patent specification to effectively treat and delay the progression or onset of, for example, wound healing.

732.    Because the specification does not provide any guidance to the POSA as to the specific amount of dapagliflozin that would be therapeutically effective to treat or delay the onset of each and every disease and condition of claim 14 without undue experimentation, claim 14 is not enabled to its full scope.

## 2.    Claims 14 and 16 lack utility and therefore lack enablement

733.    There is nothing in the '117 patent specification reporting any data or information that would guide a POSA to the specific amount of the compound defined in claim 1 (dapagliflozin) that, when administered, would be effective to treat or delay the onset of each and every one of the conditions and diseases of claim 14 or to treat type II diabetes of claim 16, except for the conclusory statement that "[t]he compound of formula I possesses activity as

inhibitors of the sodium dependent glucose transporters found in the intestine and kidney of mammals and is useful in the treatment of diabetes." '117 patent col. 4 ll. 44-49.

734.    Because of the lack of data in the patent specification, if a POSA would not have had a reasonable expectation based on the prior art that the compound defined in claim 1 (dapagliflozin) would be effective or useful in treating or delaying the onset of these diseases and conditions (*i.e.*, if the method of claim 14 is not obvious), then claim 14 of the '117 patent is not enabled and lacks utility.

735.    If the method of claim 14 is not obvious over the prior art, then a POSA would not be able to treat or delay the progression or onset of each and every one of the diseases and conditions recited in claim 14 by administering the compound of claim 1 (dapagliflozin) or identify a specific amount of dapagliflozin that, when administered, would be effective in treating or delaying the progression or onset of those diseases and conditions.

736.    For the same reasons, if the method of claim 16 is not obvious over the prior art, then the specification of the '117 patent does not disclose to a POSA sufficient information to allow the POSA to effectively treat type II diabetes or administer a therapeutically effective amount of the compound of claim 1 (dapagliflozin) to effectively treat type II diabetes.

737.    Claims 14 and 16 are invalid for lack of enablement.

**B.    Claims 14 and 16 are Invalid under 35 U.S.C. § 112, ¶ 1 for Lack of Written Description**

738.    The specification of the '117 patent does not convey to a POSA that the inventors were in possession of the methods of claims 14 and 16.

739.    Rather than demonstrate possession of the method for treating or delaying the progression or onset of each and every one of these disorders and conditions referenced in claim 14 of the '117 patent, the patentee simply makes the conclusory and blanket statement that:

> [I]n accordance with the present invention, a method is provided for treating or delaying the progression or onset of diabetes, especially type I and type II diabetes, including complications of diabetes, including retinopathy, neuropathy, nephropathy and delayed wound healing, and related diseases such as insulin resistance (impaired glucose homeostasis), hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, obesity, hyperlipidemia including hypertriglyceridemia, Syndrome X, atherosclerosis and hypertension, and for increasing high density lipoprotein levels, wherein a therapeutically effective amount of a compound of structure I is administered to *a human patient* in need of treatment.

'117 patent col. 4 ll. 54-67 (emphasis added).

740.    Seeing as there is nothing more in the specification that provides support for this method, this statement is only a *desired* outcome of the alleged invention.

741.    There is no language or data in the '117 patent specification to reveal to a POSA that the inventors possessed the invention (*i.e.,* method for treating or delaying) set forth in claim 14 because the specification does not describe a method for treating or delaying the progression or onset of each and every disorder and condition claimed. Because of this, a POSA would not have reasonably concluded that the inventors had possession of methods to broadly treat all mammals with the compound of claim 1, as required by the claim language.

742.    There is no evidence in the '117 patent specification that dapagliflozin in particular was administered to animals, let alone humans, before the earliest effective priority date.

743.    Similarly, with respect to claim 16 of the '117 patent, rather than demonstrate possession of the method for treating type II diabetes using the compound of claim 1, the patentee simply and conclusorily states:

> [I]n accordance with the present invention, a method is provided for treating diabetes and related diseases as defined above and hereinafter, wherein a therapeutically effective amount of a combination of a compound of structure I and another type of antidiabetic agent and/or another type of therapeutic agent such as a hypolipidemic agent is administered to *a human patient* in need of treatment.

151

*Id.* col. 5 ll. 1-7 (emphasis added).

744.    Again, this statement only states a desired outcome.  There is no data or language in the '117 patent specification to show a POSA that the inventors possessed the invention set forth in claim 16 because the specification does not describe a method for treating type II diabetes using the compound of claim 1.  Because of this, a POSA would not have reasonably concluded that the inventors had possession of methods to broadly treat all mammals, as required by the claim language.

745.    Claims 14 and 16 are invalid for lack of written description.

**C.    Claims 14 and 16 are Invalid under 35 U.S.C. § 112, ¶ 2 as Indefinite**

      **1.    Claim 14**

746.    A POSA reading the specification and the prosecution history of the '117 patent would not have been informed, with reasonable certainty, about the scope of the alleged invention of claim 14, as it contains the following terms, which to a POSA would be indefinite:

    i)   "treating,"

    ii)  "delaying the progression … of,"

    iii) "delaying the … onset of," and

    iv)  "therapeutically effective amount."

747.    There is no language in the '117 patent or its prosecution history that would inform a POSA with a reasonable certainty of the meaning of the words "treating," "delaying the progression … of," or "delaying the … onset of" any of the claimed conditions and diseases, what amount of the claimed compound is a "therapeutically effective amount," or how to determine if said amount of the claimed compound is "treating," "delaying the progression … of," or "delaying the … onset of" any of the seventeen claimed conditions and diseases: "diabetes, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound

healing, insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X, diabetic complications, atherosclerosis or hypertension, or for increasing high density lipoprotein levels."

748.   There is no language or discussion in the specification of the '117 patent or its prosecution history regarding the administration of the claimed compound for the practice of any method, let alone a method for treating or delaying the progression or onset of "diabetes, diabetic retinopathy, diabetic neuropathy, diabetic nephropathy, delayed wound healing, insulin resistance, hyperglycemia, hyperinsulinemia, elevated blood levels of fatty acids or glycerol, hyperlipidemia, obesity, hypertriglyceridemia, Syndrome X, diabetic complications, atherosclerosis or hypertension, or for increasing high density lipoprotein levels."  Thus, one skilled in the art would not be able to determine the scope of claim 14 with reasonable certainty, even when viewed in light of the specification and prosecution history of the '117 patent.

749.   There is no support for what "treating" would mean in the context of sixteen[1] of the seventeen total diseases or conditions in claim 14 of the '117 patent.

750.   The patent specification does not provide detailed information on all of the diseases and conditions of claim 14—what they encompass and how they manifest.

751.   AstraZeneca does not describe what a POSA would have understood about each of those diseases and conditions.

752.   For example, with respect to "delayed wound healing," it is unclear what type of wound is being healed.

---

[1] Those sixteen diseases or conditions are:  diabetic retinopathy; diabetic neuropathy; diabetic nephropathy; delayed wound healing; insulin resistance; hyperglycemia; hyperinsulinemia; elevated blood levels of fatty acids or glycerol; hyperlipidemia; obesity; hypertriglyceridemia; Syndrome X; diabetic complications; atherosclerosis; hypertension; and increasing high density lipoprotein levels.

753.     With respect to "atherosclerosis," it is unclear whether this pertains to the buildup of substances in the arteries of the periphery, heart, and/or brain.

754.     Each of the diseases and conditions of claim 14 are quite complex and neither the patent specification nor AstraZeneca makes clear how a POSA would have understood what each of the conditions are, to provide context on what "treating" them would mean.

755.     With respect to "delaying the progression … of"; and "delaying the … onset of," AstraZeneca asserts that these terms would mean to "'slow' the progression or onset of a disease state." However, AstraZeneca fails to describe what "slow[ing]" means with respect to length of time and effect and  how this "slow[ing]" would have been measured by a POSA for each of the different diseases or conditions of claim 14.  For example, it is unclear how a POSA would have measure slowing of wound healing and retinopathy.

756.     AstraZeneca does not sufficiently address the meaning of "therapeutically effective amount" in the context of the seventeen conditions or diseases listed in claim 14.

757.     Claim 14 is invalid for indefiniteness.

**2.      Claim 16**

758.     Similarly, as set forth above, a POSA would have understood based on the prior art and his or her own skill in the art that dapagliflozin would treat or delay the progression or onset of each and every one of the diseases and conditions recited in claim 14, as well as type II diabetes (in claim 16).  However, if the Court were to find that the prior art does not teach a POSA that dapagliflozin would treat or delay the progression or onset of each and every one of the diseases and conditions recited in claim 14, as well as type II diabetes (in claim 16), a POSA would not have been informed, with reasonable certainty, about the scope of the alleged invention of claim 16, as it contains the following indefinite terms:

i)   "treating"

ii) "therapeutically effective amount."

759.    There is no discussion in the '117 patent specification or its prosecution history that would inform a POSA with a reasonable certainty what "treating" type II diabetes means, what amount of the claimed compound is a "therapeutically effective amount," or how to determine if said amount of the claimed compound is "treating" type II diabetes.

760.    There is no language or discussion in the specification of the '117 patent and its prosecution history regarding the administration of the claimed compounds for the practice of any method, let alone a method for treating type II diabetes.  Thus, one skilled in the art would not be able to determine the scope of claim 16 with reasonable certainty, even when viewed in light of the specification and prosecution history of the '117 patent.

761.    AstraZeneca does not sufficiently address the meaning of "therapeutically effective amount" in the context of type 2 diabetes as in claim 16.

762.    Claim 16 is invalid for indefiniteness.

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

    Plaintiff,

  v.

ZYDUS PHARMACEUTICALS (USA) INC.,

    Defendant.

C.A. No. 1:18-cv-00664-RGA

**ASTRAZENECA'S STATEMENT OF**
**ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

1.      Pursuant to Local Rule 16.3(c)(5), AstraZeneca respectfully submits the following joint statement of issues of law that remain to be litigated. By submitting this statement, AstraZeneca is in no way waiving their rights to amend or supplement their submission after they consider Zydus's submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, the trial itself, or post-trial briefing.

2.      To the extent this exhibit contains issues of fact, those issues are incorporated into AstraZeneca's Statement of Facts that Remain to be Litigated by reference. To the extent AstraZeneca's Statement of Facts that Remain to be Litigated contains issues of law, those issues are incorporated by reference into this exhibit.

3.      AstraZeneca is not aware of any disputed issue of law related to any issue on which it bears the burden of proof. However, to the extent that Zydus disputes any fact or issue presented in Exhibit A, AstraZeneca reserves the right to include and address that disputed fact or issue in Exhibit D.

4.      In light of the fact that ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

## I.      Validity

5.      An issued patent is statutorily presumed valid. 35 U.S.C. § 282; *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).

6.      The party challenging validity has the burden of overcoming the presumption of validity by clear and convincing evidence, and that burden never changes. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 97 (2011); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1346 (Fed. Cir.

2008). Clear and convincing evidence is evidence that gives rise to an "abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

7.      Where the examiner considered the asserted prior art during prosecution, the burden placed on the challenger is particularly heavy. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004); *see also Shire LLC v. Amneal Pharm., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015) (When the examiner has considered the asserted prior art during prosecution, the challengers "ha[ve] the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more patent examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.") (citations omitted).

### A.      Obviousness Under 35 U.S.C. § 103(a)

8.      35 U.S.C. § 103 provides that a patent may not be obtained if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

9.      A party seeking to challenge the validity of an issued patent based on obviousness must demonstrate by clear and convincing evidence that the invention described in the patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. *Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, 619 F.3d 1329, 1336 (Fed. Cir. 2010).

10.      The burden of proof on obviousness is always with the challenger and "never shifts." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001) ("Throughout the obviousness

3

determination, a patent retains its statutory presumption of validity, *see* 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts.").

11.     The challenger must show, *inter alia*, a teaching or suggestion of all the claimed elements. *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (citing *In re Royka*, 490 F.2d 981, 985 (C.C.P.A. 1974)) (stating that obviousness requires a suggestion of all limitations in a claim); *see also In re Ochiai*, 71 F.3d 1565, 1572 (Fed. Cir. 1995) (holding that obviousness requires "a searching comparison of the claimed invention—including all its limitations—with the teaching of the prior art.").

12.     The obviousness determination turns on factual inquiries involving: (1) the scope and content of the prior art as a whole; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) any objective indicia of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also KSR Int'l v. Teleflex Inc.*, 550 U.S. 398 (2007) (re-affirming the *Graham* factor analysis as the proper test for determining obviousness).

13.     The objective evidence of nonobviousness, the fourth *Graham* factor, "may often be the most probative and cogent evidence" available. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) (quoting *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288 (Fed. Cir. 2002)); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010).

14.     Defendants have the burden of proof with respect to *all* of the *Graham* factors, including any alleged absence of objective indicia of nonobviousness. *Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 8 (Fed. Cir. 1984).

15.     It is imperative to consider how a person of ordinary skill would have viewed the relevant art to ascertain whether the subject matter as a whole "would have been obvious at the time the invention was made;" that is, to avoid the insidious attraction of hindsight. 35 U.S.C. §103(a) (2004); *KSR*, 550 U.S. at 421; *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co*., 655 F.3d 1364, 1375 (Fed. Cir. 2011) ("Importantly, the great challenge of the obviousness judgment is proceeding without any hint of hindsight."); *Sanofi-Synthelabo v. Apotex, Inc*., 550 F.3d 1075, 1088 (Fed. Cir. 2008) ("Only with hindsight knowledge that the dextrorotatory enantiomer has highly desirable properties, can Apotex argue that it would have been obvious to select this particular racemate and undertake its arduous separation. The application of hindsight is inappropriate where the prior art does not suggest that this enantiomer could reasonably be expected to manifest the properties and advantages that were found for this particular dextrorotatory isomer.").

16.     The patentability of an invention "shall not be negated by the manner in which the invention was made." 35 U.S.C. § 103; *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A.*, 865 F.3d 1348, 1356 (Fed. Cir. 2017) (explaining that this provision "was enacted to ensure that routine experimentation does not necessarily preclude patentability").

17.     When a patent challenger contends that a patent is obvious in light of a combination or modification of prior art references, the challenger must point to clear and convincing evidence that shows that there existed a reason to make the change. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (accused infringer "failed to show that there existed a reason, based on what was known at the time of the invention, to perform the chemical modifications necessary to achieve the claimed compounds"). Modifications of a lead compound cannot be made in isolation. *Yamanouchi Pharm. Co., Ltd. v.*

5

*Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1344-45 (Fed. Cir. 2000) (affirming that Defendants "did not show sufficient motivation for one of ordinary skill in the art at the time of invention to take any one of the following steps, let alone the entire complex combination"); *Hybritech*, 802 F.2d at 1383 ("Focusing on the obviousness of substitutions and differences instead of on the invention as a whole . . . was a legally improper way to simplify the difficult determination of obviousness.").

18.     The obviousness analysis requires a comparison of both the structure and the properties of the claimed inventions with those of the prior art. *Sanofi-Synthelabo*, 550 F.3d at 1086 ("[T]he structure of the compound and its properties are inseparable considerations in the obviousness determination.").

19.     The prior art as a whole must be considered in selecting a lead compound. *Takeda Chem. Indus.*, 492 F.3d at 1358 (rejecting a proposed lead compound in favor of compounds a later prior art reference identified as most favorable in terms of toxicity and activity); *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1293 (Fed. Cir. 2012) (affirming the district court's conclusion that two prior art compounds marketed as antipsychotics would have been considered viable lead compounds); *Daiichi Sankyo Co., Ltd. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1354-55 (Fed. Cir. 2010) (holding that the district court did not err in rejecting a proposed lead compounds in favor of second-generation compounds that demonstrated greater potency and had been more thoroughly studied); *Mitsubishi Tanabe Pharma et al. v. Sandoz Inc.*, No. 17-531, slip op. at *29-30 (D.N.J. Mar. 22, 2021) (rejecting argument that a person of ordinary skill in the art would not have selected O-glucosides for further development in view of prior art showing other companies in the field focusing on O-glucosides during the relevant time period).

6

20.     A lead compound should not be selected merely because it is structurally similar to the patented compound. *Daiichi*, 619 F.3d at 1354 ("Potent and promising activity in the prior art trumps mere structural relationships."); *Onyx Therapeutics Inc. v. Cipla Ltd.*, No. 16-998-LPS, 2020 WL 2214443, at *24 (D. Del. May 4, 2020) (rejecting a proposed lead compound in favor of FDA-approved compound that had an "established data package" and "was the most clinically-advanced" at the time).

21.     In an unpredictable field like drug development, a lack of relevant data in the prior art can weigh heavily in favor of nonobviousness. *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1384-85 (Fed. Cir. 2019) (stating that prior art references that did not disclose any *in vitro* or *in vivo* efficacy data relating to the target cancer "provide no more than hope—and hope that a potentially promising drug will treat a particular cancer is not enough to create a reasonable expectation of success in a highly unpredictable art such as this"); *Mitsubishi Tanabe Pharma*, No. 17-531, at *32 n.28 ("[T]he '117 patent simply did not disclose the type of biologic activity data that would have prompted a POSA to choose dapagliflozin as a lead compound.").

22.     For a patent challenger to establish a motivation to combine or modify prior art references, it is insufficient to allege a general motivation to discover an undefined solution that could take many possible forms. "There must . . . still be prior art that suggests the [specific] claimed compound in order for a *prima facie* case of obviousness to be made out." *In re Deuel*, 51 F.3d 1552, 1558-59 (Fed. Cir. 1995) (holding that an overall knowledge of scientific techniques and a motivation to produce a general type of compound does not render obvious the particular compound actually produced and claimed); *see also Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008) ("[K]nowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references to reach the

particular claimed method."); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004) ("Recognition of a need does not render obvious the achievement that meets that need. . . . Recognition of an unsolved problem does not render the solution obvious.").

23.     An invention is not obvious over a proposed modification or combination of the prior art that is taught away from, *i.e.*, when a person of ordinary skill, upon examining the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant. *Unigene Labs., Inc. v. Apotex Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011); *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308–09 (Fed. Cir. 2010) (criticisms of patent challenger's proposed modification taught away from claimed invention); *Takeda Chem. Indus.*, 492 F.3d at 1359 (rejecting a proposed lead compound because a later prior art reference identified negative side effects associated with the compound); *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1358 (Fed. Cir. 2008) (finding no motivation to modify a lead compound by removing its advantageous property).

24.     For an invention to be both "obvious to try" and obvious under § 103, there must have been, *inter alia*, a small number of predictable solutions. *See Unigene Labs.*, 655 F.3d at 1361 (citations omitted) (stating that an invention is not obvious to try, nor therefore obvious, when prior art gives "no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful."); *Abbott Labs.*, 544 F.3d at 1351 ("[O]bviousness of selection of components, when there is no prediction in the prior art as to the results obtainable from a selected component, differs from the issue in KSR . . . ."); *Onyx Therapeutics*, 2020 WL 2214443, at *30 (finding that a proposed modification was not obvious "[g]iven the uncertainty and relative lack of data surrounding [the proposed lead compound] as a whole").

25.     For example, it is not obvious to: (1) "vary all parameters or try each of numerous possible choices until one possibly arrive[s] at a successful result, where the prior art [gives] either no indication of which parameters [are] critical or no direction as to which of many possible choices is likely to be successful;" or (2) "explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 996-97 (Fed. Cir. 2009).

26.     "[T]o the extent an art is unpredictable, as the chemical arts often are, *KSR*'s focus on . . . 'identified, predictable solutions' may present a difficult hurdle [for patent challengers] because potential solutions are less likely to be genuinely predictable." *Eisai*, 533 F.3d at 1359; *Sanofi-Synthelabo*, 550 F.3d at 1088, 1090 ("Only with hindsight knowledge that the dextrorotatory enantiomer has highly desirable properties, can Apotex argue that it would have been obvious to select this particular racemate and undertake its arduous separation. The application of hindsight is inappropriate where the prior art does not suggest that this enantiomer could reasonably be expected to manifest the properties and advantages that were found for this particular dextrorotatory isomer."); *Deuel*, 51 F.3d at 1558 ("[Due to the unpredictability in the art], one could not have conceived the subject matter of claims 5 and 7 based on the teachings in the cited prior art because, until the claimed molecules were actually isolated and purified, it would have been highly unlikely for one of ordinary skill in the art to contemplate what was ultimately obtained. What cannot be contemplated or conceived cannot be obvious.").

27.     This holds true even where the technique used in the claimed invention is known in the art, but the experimental process and its results are complex or unpredictable and there is no reasonable expectation of success. *See, e.g.*, *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368,

1378-80 (Fed. Cir. 2006); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 531 (D. Del. 2016), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018) ("In the context of drug development, data is a necessary prerequisite to predicting the impact of modifying a chemical compound. This is especially so because of the unpredictability of drug development."); *Forest Labs., Inc. v. Ivax Pharm., Inc.*, 438 F.Supp.2d 479, 492-93 (D. Del. 2006) (holding that the claimed enantiomer was nonobvious where resolution of a racemate, while a known technique, is difficult and complex, the properties of enantiomers are not known until separated and tested, and the complexity of the technique did not permit a reasonable expectation of success).

28.      As part of the obviousness analysis, the burden is on the challenging party to establish that a person of ordinary skill would have a reasonable expectation of success. *Yamanouchi*, 231 F.3d at 1345. Whether a person of ordinary skill would expect to obtain the properties of the claimed compound is part of the "reasonable expectation of success" analysis. *Id.*

29.      Furthermore, in the chemical arts, while "[a] known compound may suggest its homolog, analog, or isomer because such compounds" may have similar properties, in order to find "[obviousness] in such instances, a showing that the 'prior art would have suggested making the *specific molecular modifications* necessary to achieve the claimed invention' is also required." *Takeda Chem. Indus.*, 492 F.3d at 1356 (citing *Deuel*, 51 F.3d at 1558) (emphasis added); *see also Eisai*, 533 F.3d at 1359 (holding that obviousness requires a reason to make particular changes to chemical structure). This test "is consistent with the legal principles enunciated in *KSR*." *Takeda*, 492 F.3d at 1356.

**B.      Objective Indicia of Non-Obviousness**

30.      Objective evidence is often the most probative and cogent evidence of nonobviousness in the record. *Ortho-McNeil*, 520 F.3d at 1365. It "is not just a cumulative or

confirmatory part of the obviousness calculus, but constitutes independent evidence of nonobviousness." *Id.*

31.    Objective evidence such as unexpected results, failure of others, long-felt but unmet need, commercial success, and industry praise must be considered before a conclusion on obviousness is reached. *Id.* ("[T]his evidence is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness."); *Hybritech*, 802 F.2d at 1380 ("Objective evidence . . . is not merely 'icing on the cake.'"); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (holding that the district court erred by determining that the patents were obvious before considering the objective evidence of nonobviousness).

32.    Objective evidence of nonobviousness must be commensurate in scope with the claims, but "absolute identity" is not required. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1308-09 (Fed. Cir. 2011).

33.    Objective evidence relating to a single claimed embodiment should be considered even if the claim covers multiple embodiments. *See In re Glatt Air Techs., Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011); *see also Genetics Inst.*, 655 F.3d at 1309 (applying *Glatt* in the context of unexpected results).

34.    A presumption of nexus arises when the product relied on to show the objective indicia of nonobviousness is coextensive with the claims. *WBIP, LLC, v. Kohler Co.*, 829 F.3d 1317,1329 (Fed. Cir. 2016) ("[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent." (internal quotations and citations omitted)). It is not necessary that the patented invention be solely responsible for the objective

11

indicia in order for this factor to be given weight. *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).

35.     A compound and its properties are inseparable. *In re Papesch*, 315 F.2d 381, 391 (C.C.P.A. 1963) ("From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing."); s*ee also Genetics Inst.*, 655 F.3d at 1307-08 (indicating Federal Circuit precedent "contains no such requirement" of explicit expression of unexpected properties in the patent specification).

### 1.     Unexpected Results

36.     Evidence that the claimed invention produces results that are unexpected in view of the closest prior art supports a finding of nonobviousness. *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1306-07 (Fed. Cir. 2015); *In re Wagner*, 371 F.2d 877, 885 (C.C.P.A. 1967) ("Whether the difference between the claimed invention and the prior art is a difference 'in kind' or a difference 'in degree' is not mentioned in section 103. Section 103 simply requires a determination as to whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time of appellants' invention."); *but see Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013); *Janssen Pharm., Inc. v. Watson Labs., Inc.*, No. 08-5103, 2012 WL 3990221, at *19-20 (D.N.J. Sept. 11, 2012) ("Defendants' suggestion that Plaintiffs are vulnerable because they have failed to show what a skilled artisan would have expected is simply misdirection . . . .").

37.     The unexpectedness of a result may be gauged against the later-disclosed properties of the prior art. *Sanofi-Synthelabo v. Apotex Inc.*, 492 F. Supp. 2d 353, 390 (S.D.N.Y. 2007), *aff'd,* 550 F.3d 1075 (Fed. Cir. 2008) (rejecting the defendant's contention that a claimed compound's lack of toxicity should not be viewed as unexpected because the toxicity of the closest prior art compound was not known at the time of the invention and noting "any and all

12

properties of [the prior art] compounds must be considered, even where the prior art has not disclosed the relevant properties of the prior art").

38.     Unexpected results that inherently flow from the claimed invention are evidence of nonobviousness and need not be described or proven in the patent's specification. *See Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (later-developed evidence of unexpected results is relevant to nonobviousness); *In re Zenitz*, 333 F.2d 924, 927 (C.C.P.A. 1964) (later-developed advantages that inherently flow from the invention are relevant to nonobviousness regardless of whether they are disclosed in the patent's specification).

39.     The patent challenger has the burden of proving that none of the properties were unexpected. *See Am. Hosp.*, 745 F.2d at 8 ("[Patent holder] is under no compulsion either to prove a new and surprising result . . . . Rather, the burden was on [challenger] to establish the lack of new and surprising results or the lack of criticality.").

### 2.     Failure of Others

40.     Evidence that others tried and failed to develop an invention similar to the claimed invention supports a finding of nonobviousness. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 21 F. Supp. 2d 366, 374-75 (S.D.N.Y. 1998), *aff'd sub nom.* 231 F.3d 1339 (stating that the evidence showing that "the pharmaceutical industry at large was attempting to improve upon existing [anti-ulcer drugs] with only a small number of producers coming close to success" supports a finding of nonobviousness).

41.     Evidence of failures occurring after the patent's issuance may be more persuasive than failures occurring before. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, No. 09-2118-SLR, 2010 WL 3766530, at *2 (D. Del. Sept. 21, 2010) ("Because science necessarily builds upon past discoveries, failure of others after a patent's issue date may be more persuasive than failures that occur before."); *see Knoll*, 367 F.3d at 1385 (reversing

13

summary judgment of invalidity and finding that the district court erred in not viewing post-filing failures of others to obtain FDA approval in a light most favorable to the plaintiff).

42.    Failure to obtain FDA approval is an "appropriate benchmark for failure of others." *Cyclobenzaprine*, 2010 WL 3766530, at *1.

### 3.    Long-Felt but Unmet Need

43.    Evidence of a long-felt but unmet need for the claimed invention supports a finding of nonobviousness. *Procter & Gamble*, 566 F.3d at 998.

44.    Whether a long-felt need is unmet must be evaluated as of the patent's filing date and not as of the date the patented product first enters the market if the date of market entry is later than the filing date. *Id*.

45.    Even a persistent need may be satisfied. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713, 758 (N.D.W. Va. 2004) (finding that an antibiotic, which was inevitably rendered less effective by drug resistant strains of bacteria and therefore could not permanently solve the long-felt need, nonetheless supported a finding of nonobviousness).

46.    Evidence of industry praise weighs in favor of non-obviousness. *Artic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1364-65 (Fed. Cir. 2017) (determining that a patentee's press release is "evidence of industry recognition of the significance and value of the claimed invention," and "weighs in favor of nonobviousness"); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) ("Evidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claimed invention would have been obvious."); *WBIP*, 829 F.3d at 1335 (finding that awards received by the patentee is "strong evidence of industry recognition of the significance and value of the claimed invention," and "weighs in favor of nonobviousness"); *Janssen Pharmaceutica N.V. v. Mylan Pharms., Inc.*, 456 F. Supp. 2d 644, 672 (D.N.J. 2006) (finding that awards and

14

appreciation bestowed on the invention and its inventors were "further evidence that the invention would not have been obvious").

47.     "Industry participants, especially competitors, are not likely to praise an obvious advance over the known art." *Apple v. Samsung*, 839 F.3d at 1048; *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1366 (Fed. Cir. 2013) (observing that business publications hailing the claimed invention is probative of non-obviousness); *Genzyme Corp. v. Dr. Reddy's Labs., Ltd.*, Nos. 13-1506-GMS, 13-1508-GMS, 2016 WL 2757689 at *15 (D. Del. May 11, 2016) (determining that awards bestowed on the claimed invention is recognition of "widespread praise in the US and Europe and this weighs in favor of nonobviousness"); *Pfizer Inc. v. Mylan Pharms. Inc.*, 71 F. Supp. 3d 458, 476 (D. Del. 2014) (finding that the claimed invention "was a breakthrough in the industry, widely praised by researchers and doctors"), *aff'd*, 628 Fed. App'x 764 (Fed. Cir. 2016); *Research Found. of State Univ. of New York v. Mylan Pharms. Inc.*, 723 F. Supp. 2d 638, 653 (D. Del. 2010) (noting that *inter alia*, industry praise for the invention is "strong evidence of secondary indicia of non-obviousness").

### 4.     Industry Acquiescence

48.     Acquiescence to the validity of a patent by a substantial portion of the competitors in a market has been regarded as evidence supporting validity. *Dentsply Int'l, Inc. v. Great White, Inc.*, 132 F. Supp. 2d 310, 314 (M.D. Pa. 2000) ("[W]here the products covered by the patents have enjoyed considerable, and undisputed, commercial success, and where competitors have avoided the patents, the presumption of patent validity is especially strong."); *Alcon Labs. Inc. v. Bausch & Lomb Inc.*, No. 4:99-CV-111-Y, 1999 WL 1186221, at *4 (N.D. Tex. Oct. 29, 1999) (citing fact that defendant was first to challenge patent in the more than seven years since it had been challenged as objective evidence of nonobviousness).

### 5.     Copying

49.     Copying the patented invention is also evidence of non-obviousness. 21 C.F.R.

§ 314.94(a)(8)(iv) (a generic applicant's proposed label does not have to be identical to that of

the reference listed drug if the generic drug product and the reference listed drug are produced or

distributed by different manufacturers); *Forest Labs.*, 438 F. Supp. 2d at 496 ("The success of

Lexapro® and its benefits compared with other SSRIs is also supported by the efforts of generic

drug manufacturers, including Defendants to copy the claimed invention . . . . In the Court's

view, the copying of others is particularly telling in this case, because citalopram is currently

available as a generic drug. Indeed, citalopram is sold generally by Defendants, yet Defendants

seek to copy and sell Lexapro®." (internal citations omitted)), *aff'd*, 501 F.3d 1263 (Fed. Cir.

2007); *Janssen v. Mylan*, 456 F. Supp. 2d at 671 (finding copying based on multiple ANDAs

filed with the FDA to market generic versions of the patented drug).

50.     Copying the claimed invention, rather than one in the public domain, is evidence

that the claimed subject matter would not have been obvious. *Specialty Composites v. Cabot*

*Corp.*, 845 F.2d 981, 991 (Fed. Cir. 1988).

### 6.     Skepticism

51.     General skepticism of those in the art is persuasive evidence of non-obviousness.

*See Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1478-79 n.3 (Fed. Cir. 1984). If industry

participants or skilled artisans are skeptical about whether or how a problem could be solved or

the workability of the claimed solution, it favors non-obviousness. *WBIP*, 829 F.3d at 1335.

52.     Expressions of disbelief or skepticism from the time of invention by experts in the

field, including the independent technical experts hired by each party during the litigation,

"constitute strong evidence of nonobviousness." *See Env't Designs, Ltd. v. Union Oil Co. of*

*Cal.*, 713 F.2d 693, 697-98 (Fed. Cir. 1983) (citing *United States v. Adams*, 383 U.S. 39, 52

(1966)).

53.     Skepticism need not be premised on an idea that the claimed invention would be "impossible," "unworkable," or "technically infeasible" to be evidence of non-obviousness. *Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019). Indeed, a range of opinions by third parties can be probative, including mere "worry" or "surprise." *See id.* (citing *Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1337 (Fed. Cir. 2015)).

###     C.     Written Description

54.     The written description requirement is satisfied when the original disclosure describes the claimed subject matter in sufficient detail for persons of ordinary skill in the art to reasonably conclude that the inventor possessed the claimed subject matter at the time of the original filing. *See Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1320-21 (Fed. Cir. 2003). It is well-settled that originally filed claims constitute their own description. *See In re Koller*, 613 F.2d 819, 823 (C.C.P.A. 1980). Indeed, "[p]ossession means possession as shown in the disclosure and requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (quotations omitted). Skilled artisans read a patent with knowledge of the relevant art. *See Capon v. Eshhar*, 418 F.3d 1349, 1357-59 (Fed. Cir. 2005) (vacating a finding of lack of written description support that failed "to consider the state of the scientific knowledge" because "[t]he 'written description' requirement must be applied in the context of the particular invention and the state of the knowledge.").

55.     Actual clinical data regarding efficacy of the claimed method is not required to adequately describe a patented method of treatment and comply with the written description requirement of § 112. *See e.g.*, *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 657 (E.D. Tex. 2017) (specification need not describe use of claimed treatment in human clinical trial to satisfy the written description requirement), *aff'd*, 739 Fed. App'x 643 (Fed. Cir.

2018) (per curiam); *Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, 862 F. Supp. 2d 790, 809-10 (N.D. Ill. 2012) ("[T]he test under § 112 is not how much data [the specification] provides to substantiate the invention . . . , but rather what a [person of ordinary skill in the art] would understand the [specification] to reasonably convey.").

56.     It is well established that "the written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." *See, e.g., Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (en banc) (citation omitted).

**D.     Enablement**

57.     A party seeking to challenge the validity of an issued patent must demonstrate a lack of enablement by clear and convincing evidence. *See, e.g., Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013) ("Because we must presume a patent enabled, the challenger bears the burden, throughout the litigation, of proving lack of enablement by clear and convincing evidence.").

58.     Factors to be considered include "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) (citation omitted)*.*

59.     "To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'" *Alcon Research Ltd. v. Barr Labs., Inc.* 745 F.3d 1180, 1188 (Fed. Cir. 2014) (citing *Wands*, 858 F.3d at 736-37). "After the

challenger has put forward evidence that some experimentation is needed to practice the patented claim, the factors set forth in *Wands* then provide the factual considerations that a court may consider when determining whether the amount of that experimentation is either 'undue' or sufficiently routine such that an ordinarily skilled artisan would reasonably be expected to carry it out." *Alcon*, 745 F.3d at 1188. A patent "does not need to guarantee that the invention works for a claim to be enabled." *Id.* at 1189.

60.     When evaluating the amount of experimentation needed to practice the invention, "the key word is 'undue,' not 'experimentation.'" *Wands*, 858 F.2d at 737 (quoting *In re Angstadt*, 537 F.2d 498, 504 (C.C.P.A. 1976)). "The test is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed." *Id.* (quoting *Ex parte Jackson*, 217 U.S.P.Q. (BNA) ¶ 804 (B.P.A.I. Nov. 12, 1982)); see also *Cephalon*, 707 F.3d at 1336 ("a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance.") (internal quotation omitted). The need for a significant number of experiments is not fatal when the experimentation is routine. *See, e.g., Angstadt*, 537 F.2d at 502-504 (inclusion of some inoperative embodiments within an otherwise enabled generic claim is not fatal).

61.     Post-filing evidence may be used to support enablement. *See Eli Lilly*, 435 Fed. App'x at 925; *In re Brana*, 51 F.3d at 1567 n.19; *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1336 (Fed. Cir. 2003) (relying on post-filing date information to show enablement).

62.     It is well-settled law that the enablement requirement is separate and distinct from the written description requirement. *See, e.g., Ariad*, 598 F.3d at 1351; *id.* at 1352 (the written description doctrine does not impose a "super enablement" standard for chemical and biotechnology inventions).

63.     It is well established that a specification which contains a teaching of the manner and process of making and using an invention must be deemed enabled unless a party challenging validity presents reason to doubt the objective truth of the statements relied upon for enabling support. *See Eli Lilly*, 435 Fed. App'x at 924-25 (teachings in patent "must be taken as in compliance with the enabling requirement of the first paragraph of § 112 unless there is reason to doubt the objective truth of the statements contained therein") (quoting *In re Brana*, 51 F.3d at 1566).

64.     The specification need not disclose clinical data to enable the claimed treatment methods. *See Eli Lilly*, 435 Fed. App'x at 924-25 (finding enablement of method of treatment claims despite absence of clinical or other data in the specification); *Tas v. Beachy*, 626 Fed. App'x 999, 1005 (Fed. Cir. 2015) (treatment method enabled despite lack of human clinical data in specification); *In re '318 Pat. Infringement Litig.*, 583 F.3d 1317, 1324 (Fed. Cir. 2009) ("[H]uman trials are not required for a therapeutic invention to be patentable.").

### E.     Indefiniteness

65.     To comply with the definiteness requirement, "the boundaries of the claim, as construed by the court, must be discernible to a skilled artisan based on the language of the claim, the specification, and the prosecution history, as well as her knowledge of the relevant field of art." *Power-One, Inc. v. Artesyn Tech., Inc.*, 599 F.3d 1343, 1350 (Fed. Cir. 2010). The patent challenger bears the burden of proving indefiniteness by clear and convincing evidence. *See, e.g., id.* The standard, as articulated by the U.S. Supreme Court, is "reasonable certainty,"

not absolute predictability. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014).

66.     A patent need only provide, however, "general guideline and examples" sufficient for a person of ordinary skill in the art to determine the scope of the claims. *N.A. Water Sys., LLC v. Aquatech Int'l Corp.*, No. 10-484, 2012 WL 3597825, at *17 (W.D. Pa. Aug. 20, 2012).

67.     The concept of an "effective dose" or "therapeutically effective amount" is well understood and has long been accepted in the pharmaceutical arts. Courts have defined this amount formally as "from the least effective amount to the amount beyond which no further beneficial effect is observed," and informally as "enough to work but not too much." *In re Caldwell*, 319 F.2d 254, 258 (C.C.P.A. 1963).

68.     Whether formal or informal, recitation of this functional language is never necessarily indefinite, and there is no legal requirement for the recitation of a precise, actual effective amount in therapeutic method of treatment claims. *See, e.g.*, *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1383-84 (Fed. Cir. 2003) (the term "effective amount" is a common and generally acceptable term for pharmaceutical claims and is not ambiguous or indefinite, provided that a person of ordinary skill in the art could determine the specific amounts without undue experimentation) (citing *In re Halleck*, 422 F.2d 911, 914 (C.C.P.A. 1970)).

69.     The well understood concepts of "treating" or "treatment" have been addressed in numerous pharmaceutical cases and the terms have routinely been construed to have their plain and ordinary meaning. *See, e.g., Gilead Scis., Inc. v. Abbott Labs., Inc.*, No. 13-2034-GMS, 2015 WL 7306206, at *1 n.1 (D. Del. Nov. 3, 2015) (construing "treatment for HCV" as having its plain and ordinary meaning and noting that "[t]he plain meaning does not support a construction in which the method for measuring effectiveness defines the term treatment itself"); *see also*

*Novartis Pharms. Corp. v. Actavis, Inc*., No. 12-366-RGA-CJB, 2013 WL 614274, at *11 (D. Del. Nov. 21, 2013).

70.     Moreover, it is well established that "breadth is not to be equated with indefiniteness."  *In re Miller*, 441 F.2d 689, 693 (C.C.P.A. 1971).

71.     Zydus has not proven by clear and convincing evidence that any of claims 1-3, 14, and 16 of the '117 patent is invalid.

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

                Plaintiff,

     v.

ZYDUS PHARMACEUTICALS (USA)
INC.,

                Defendant.

C.A. No. 1:18-cv-00664-RGA



**ZYDUS PHARMACEUTICALS (USA) INC.'S
STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

## I.     INTRODUCTION

1.      In accordance with Local Rule 16.3(c)(5), Zydus Pharmaceuticals (USA) Inc. ("Zydus" of "Defendant") respectfully submits the following issues of law that remain to be litigated at trial.  Zydus's identification of these legal issues is based on its understanding of the pleadings served and discovery taken in this action to date.  By submitting this statement, Zydus is in no way waiving its right to amend or supplement its submission after it considers Plaintiff's submissions, whether made part of the Pretrial Order or otherwise made apparent in pretrial proceedings, the trial itself, or post-trial briefing.  Moreover, nothing in this statement should be construed as Zydus's agreement or acquiescence to Plaintiff's statement of issues of law that remain to be litigated.

2.      If the Court concludes that any issue of law that Zydus identifies in this Exhibit should instead be considered an issue of fact, that issue should be treated as if it were an issue of fact that remains to be litigated as listed by Zydus in Exhibit C to this Pretrial Order.

3.      The substantive issues of law that remain to be litigated at trial include:

- Whether the asserted claims 1-3, 14, and 16 of U.S. Patent No. 6,515,117 ("the '117 patent") are invalid as obvious under 35 U.S.C. § 103(a); and

- Whether the asserted claims 14 and 16 of the '117 patent are enabled, indefinite, or lack written description under 35 U.S.C. § 112.

4.      The authorities on which Zydus may rely include, but are not limited to, those cited below.

## II.     INVALIDITY

### A.     Priority Date

5.      To establish priority to an earlier parent application, the application must provide a sufficient disclosure of the claimed invention under 35 U.S.C. § 112.  *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994).

6.     Additionally, in order to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, *each* application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997).

7.     Regarding the written description requirement to demonstrate entitlement of a patent to the priority date of an earlier application, ''[i]t is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112.'' *PowerOasis, Inc. v. T-Mobile USA, Inc*., 522 F.3d 1299, 1306 (Fed. Cir. 2008) (citing *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995)). ''Different claims of [a CIP] application may therefore receive different effective filing dates … Subject matter that arises for the first time in [a] CIP application does not receive the benefit of the filing date of the parent application.'' *Augustine Med., Inc. v. Gaymar Indus., Inc*., 181 F.3d 1291, 1302–03 (Fed. Cir. 1999). In this context, "[t]o satisfy the written description requirement the disclosure of the prior application must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the inventor] was in possession of the invention.'" *PowerOasis*, 522 F.3d at 1306 (quoting *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991)).

8.     Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. *Lockwood*, 107 F.3d at 1571–72. Although the exact terms need not be used *in haec verba*, the specification must contain an equivalent description of the claimed subject matter. A description which renders obvious the invention for which an earlier filing date is sought is not sufficient. *Id.* at 1572 (internal citation omitted).

2

9.      In determining whether a patent is entitled to the benefit of the filing date of an earlier application, the question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification.  Rather, a prior application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.  *Id.*

10.     The written description requirement of 35 U.S.C. § 112 is satisfied by an earlier parent application to which the patentee alleges a right of priority only if the specification "describe[s] an invention understandable to [a] skilled artisan and show[s] that the inventor actually invented the invention claimed."  *Bone Care Int'l, LLC v. Pentech Pharm., Inc*., 741 F. Supp. 2d 865, 874 (N.D. Ill. 2010) (citing *Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010)).  Compliance with the section 112 written description requirement by a parent application is a question of fact.  *Ariad*, 598 F.3d at 1351.

11.     The parent application must enable a person skilled in the art to make and use the claimed invention without "undue experimentation" as of the filing date of the earlier application.  *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004) (citing *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988)).  Whether an earlier application sufficiently enables a later application is a question of law based on underlying facts.  *Id.*

12.     Further, in the context of invalidating prior art, once a patent challenger shows invalidity first by clear and convincing evidence, the burden switches to patent owner to show evidence that the patent is entitled to an earlier priority date.  *PowerOasis*, 522 F.3d at 1305 ("Once T–Mobile established by clear and convincing evidence that the MobileStar Network was § 102(b) prior art to the asserted claims of the 8658 and 8400 patents, the burden was on PowerOasis to come forward with evidence to the contrary.  The district court therefore correctly

placed the burden on PowerOasis to come forward with evidence to prove entitlement to claim priority to an earlier filing date.").

13.     Plaintiffs have failed to prove by a preponderance of the evidence that claims 1–3, 14, and 16 of the '117 patent are entitled to an effective priority date prior to May 20, 2002.

### B.     Obviousness

14.     The determination of obviousness under 35 U.S.C. § 103(a) is a question of law based on underlying facts.  *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1346 (Fed. Cir. 2009).  *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc*., 752 F.3d 967, 972 (Fed. Cir. 2014).

15.     "A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007) ("the results of ordinary innovation are not the subject of exclusive rights under the patent laws").

16.     "Obviousness under 35 U.S.C. § 103(a) is ultimately a legal question, based on underlying factual determinations."  *Richardson-Vicks Inc. v. Upjohn Co*., 122 F.3d 1476, 1479 (Fed. Cir. 1997) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966).). "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors, also known as objective indicia of non-obviousness."  *Id.* (citing *Graham.*, 383 U.S. at 17)); *see also KSR.*, 550 U.S. at 406; *Bristol-Myers ,* 752 F.3d at 973.

17.     A patent is invalid if it is proven to be obvious by clear and convincing evidence. *See, e.g.*, *Pfizer, Inc. v. Apotex, Inc*., 480 F.3d 1348, 1359 (Fed. Cir. 2007).

18.     Obviousness is demonstrated when "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Pfizer,* 480 F.3d at 1361; *Bristol-Myers*, 752 F.3d at 973.

19.     Prior art need not contain "an explicit teaching that the claimed compound will have a particular utility" in order to support a reasonable expectation of success. *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007).  "It is sufficient to show that the claimed and prior art compounds possess a sufficiently close relationship to create an expectation, in light of the totality of the prior art, that the new compound will have similar properties to the old." *Id.* (internal citations omitted); *Bristol-Myers*, 752 F.3d at 973 (internal citations omitted.)

20.     The fact that a reference was previously considered by the PTO does not increase the burden of proof or preclude a finding of invalidity but merely speaks to the weight of that reference's evidence. *See Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259–60 (Fed. Cir. 2012) ("Whether a reference was previously considered by the PTO, the burden of proof is the same: clear and convincing evidence.") (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 109 (2011)).  A finding of invalidity may be appropriate where the reference was considered by the PTO, but the examiner failed to give proper consideration to the teachings of that reference. *See Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1366 (Fed. Cir. 2007).

### i.     Scope and Content of the Prior Art

21.     The scope of the prior art includes art that is "reasonably pertinent to the particular problem with which the inventor was involved." *In re GPAC Inc.*, 57 F.3d 1573, 1577

5

(Fed. Cir. 1995) (citation omitted).  In determining whether the claimed invention falls within the scope of the relevant prior art, a court first examines, "the field of the inventor's endeavor" and "the particular problem with which the inventor was involved" at the time the invention was made.  *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1339 (Fed. Cir. 2005).  "A reference is reasonably pertinent if, even though it may be in a different field of endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem."  *Id.* (citation omitted).

22.    In determining obviousness, printed publications, patents, and patent applications all constitute prior art under 35 U.S.C. § 102.  Specifically, art is prior art under section 102(a) if it was "patented" or "described in a printed publication . . . before the invention thereof by the applicant for patent."  35 U.S.C. § 102(a); *see also Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("under section 102(a), a document is prior art only when published before the invention date").

23.    A reference is prior art under § 102(b) if it was "patented or described in a printed publication . . . one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b).

24.    Prior art references in an obviousness evaluation must be considered as a whole and are not limited to the particular invention they describe.  *See, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (citing *EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) ("A reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect.").  This is true even if a particular embodiment of the invention is not the preferred embodiment.  *See, e.g.*, *In re Arora*, No. 2009-1506, 2010 WL 816569, at *2 (Fed. Cir.  Mar. 10,

2010) ("Dr. Arora argues that Andersson should be understood as limited to the narrow teaching that a smaller amount of a drug is needed when delivered via Andersson's inventive dry powder inhaler instead of a metered dose inhaler.  It is well-settled, however, that a prior art reference must be considered for all that it teaches to those of ordinary skill in the art, not just the embodiments disclosed therein.  Andersson teaches the broad principle that different drugs are equipotent at different dosages, and even provides an example of that principle."); *Purdue Pharma Prods., L.P. v. Par Pharm., Inc.*, Nos. 2009-1553, 2009-1592, 2010 WL 2203101, at *3 (Fed. Cir. June 3, 2010) ("[Prior art reference] renders the selection of tramadol obvious regardless of whether or not the patent lists tramadol as a preferred embodiment.").

25.     Additionally, prior art references may be combined with the knowledge and/or experience of a POSA to "fill in the gap when limitations of the claimed invention are not specifically found in the prior art."  *Belden Techs., Inc. v. Superior Essex Commc'ns LP*, 802 F. Supp. 2d 555, 563 (D. Del. 2011) (citing *Purdue Pharma Prods., L.P. v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 360 (D. Del. 2009)); *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362–63 (Fed. Cir. 2013) ("[T]he knowledge of such an artisan is part of the store of public knowledge that must be consulted when considering whether a claimed invention would have been obvious.").

26.     "What a reference teaches a [POSA] is not . . . limited to what a reference specifically 'talks about' or what is specifically 'mentioned or 'written' in the reference."  *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005).

27.     In addition, in reaching a determination that a claimed invention would be obvious, a court "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."  *KSR*, 550 U.S. at 418.

### ii.        Person of Ordinary Skill in the Art

28.     A patent and its prior art are viewed through the eyes of a person of ordinary skill in the art ("POSA") at the time the invention was made.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  The POSA is a legal construct—a hypothetical person who is presumed to know all of the teachings of the relevant prior art in the field of the invention at the time the invention was made.  *See In re GPAC*, 57 F.3d at 1579; *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1576 (Fed. Cir. 1984) (describing the POSA as "the inventor working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him").  "A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *KSR*, 550 U.S. at 421.

29.     "Factors that may be considered in determining level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co., Ltd. v. Apotex Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (internal quotation and citations omitted); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–67 (Fed. Cir. 2000).  "Not all such factors may be present in every case, and one or more . . . may predominate." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696–97 (Fed. Cir. 1983).

30.     The actual inventor's skill or knowledge is not relevant.  *Standard Oil, Co. v. Am. Cyanamid, Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).

### iii.        Differences Between the Claimed Invention and the Prior Art

31.     In determining the differences between the claimed invention and the prior art, obviousness is judged under "an expansive and flexible approach" driven by "common sense." *KSR*, 550 U.S. at 401, 403; *see also id.* at 421 (finding that the Federal Circuit "drew the wrong

conclusion from the risk of courts and patent examiners falling prey to hindsight bias," because "[r]igid preventative rules that deny factfinders recourse to common sense . . . are neither necessary under our case law nor consistent with it."); *Senju Pharm. Co. Ltd. v. Apotex Inc.*, 836 F. Supp. 2d 196, 208 (D. Del. 2011) ("The Supreme Court has emphasized the need for courts to value common sense over rigid preventative rules . . . .") (citation omitted).

32.     In making this determination, the court must consider both the claimed invention and the prior art as a whole in light of the court's construction of the claims at issue.  *See Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1479–80 (Fed. Cir. 1998) ("In determining obviousness, the invention must be considered as a whole and the claims must be considered in their entirety.").

33.     "For obviousness, a single reference need not disclose every element of the claimed invention."  *See, e.g.*, *Hospira, Inc. v. Amneal Pharm., LLC*, 285 F. Supp. 3d 776, 783 (D. Del. 2018) (citing *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d at 1361).

34.     "While it may be easier to prove obviousness if each limitation of the claimed invention is found in the prior art, the level of skill of one of ordinary skill in the art can, at times, fill in the gap when limitations of the claimed invention are not specifically found in the prior art."  *Belden Techs.*, 802 F. Supp. 2d at 563.

35.     A conclusion of obviousness may be based on a single reference or a combination of prior art references.  *See Senju*, 836 F. Supp. 2d at 208 ("[A] defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed."); *see also In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("We see no clear error in the Board's determination as to the teachings of the prior art references, in combination.").

36.     Where the issue of obviousness is based on a combination of elements, a claim is invalid for obviousness if "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Pfizer*, 480 F.3d at 1361.

37.     "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 550 U.S. at 416; *see also Q.I. Press Controls, B.V. v. Lee*, 752 F.3d 1371, 1379 (Fed. Cir. 2014) (same).  This is because "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *KSR*, 550 U.S. at 402; *see also id.* at 427 ("We build and create by bringing to the tangible and palpable reality around us new works based on instinct, simple logic, ordinary inferences, extraordinary ideas, and sometimes even genius.  These advances, once part of our shared knowledge, define a new threshold from which innovation starts once more.  And as progress beginning from higher levels of achievement is expected in the normal course, the results of ordinary innovation are not the subject of exclusive rights under the patent laws.").

38.     "Obviousness exists when 'a finite, and in the context of the art, small or easily traversed, number of options . . . would convince an ordinarily skilled artisan of obviousness.'" *Purdue Pharma*, 642 F. Supp. 2d at 368 (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008)); *see also C.W. Zumbiel Co., Inc. v. Kappos*, 702 F.3d 1371, 1387 (Fed. Cir. 2012) (finding obviousness where the invention involved "no more than the exercise of common sense in selecting one out of a finite—indeed very small—number of options").  In such a case, an invention is considered "obvious to try." *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1332 (Fed. Cir. 2014) (finding claimed dosage obvious to try).

Further, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill." *KSR*, 550 U.S. at 401. "When the prior art provides the means of making the invention and predicts the results, and the patentee merely verifies the expectation through 'routine testing,' the claims are obvious." *Purdue Pharma*, 642 F. Supp. 2d at 368 (citing *Pfizer*, 480 F.3d at 1367).

39.     "Obviousness does not require absolute predictability of success"; rather, "[a]ll that is required is a reasonable expectation of success" in making the invention via the combination. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citation omitted); *see also Duramed Pharm., Inc. v. Watson Labs., Inc.*, No. 2010-1331, 2011 WL 1086573, at *5 (Fed. Cir. Mar. 25, 2011) ("[T]here is no requirement that a teaching in the prior art be scientifically tested or even guarantee success before providing a reason to combine. Rather, it is sufficient that one of ordinary skill in the art would perceive from the prior art a reasonable likelihood of success.") (internal citations omitted).

40.     The Federal Circuit "has long rejected a requirement of '[c]onclusive proof of efficacy' for obviousness." *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018) (and cases cited therein).

41.     Prior to *KSR*, the Federal Circuit imposed a rigid "teaching-suggestion-motivation" test for obviousness. Under this test, the patent challenger was required to prove that "some motivation or suggestion to combine the prior art teachings" could be found "in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." *KSR*, 550 U.S. at 407. The Supreme Court in *KSR* rejected the Federal Circuit's test in favor of a more flexible obviousness standard, stating that "the analysis need not seek out precise

teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418.

42.    This more flexible standard expands the obviousness analysis beyond just "published articles and the explicit content of issued patents." *Id.* at 419.  In broad terms, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 420; *see also Perfect Web Tech., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) ("We therefore hold that . . . an analysis of obviousness . . . may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion.").

43.    Courts have sought to determine whether a person of ordinary skill, before the time of invention and without knowledge of that invention, would have found the invention merely an easily predictable and achievable variation or combination of the prior art.  *See KSR.*, 550 U.S. at 417   To preclude hindsight, the courts will take into account evidence from before the time of the invention in the form of some teaching, suggestion, or even mere motivation . . . to make the variation or combination.  *See Ortho-McNeil Pharm.*, 520 F.3d at 1363-65; *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1346-53 (Fed. Cir. 2008).

44.    "[A] suggestion, teaching, or motivation to combine the relevant prior art teachings to achieve the claimed invention does not have to be found explicitly in the prior art references sought to be combined, but rather 'may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself.'" *Pfizer*, 480

F.3d at 1362 (quoting *DyStar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006)).

45.     "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls.  What matters is the objective reach of the claim.  If the claim extends to what is obvious, it is invalid under § 103." *KSR*, 550 U.S. at 419.  "[T]he path that leads an inventor to the invention is expressly made irrelevant to patentability by statute." *Life Techs., Inc. v. Clontech Lab., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000); *see also Standard Oil*, 774 F.2d at 454 ("[O]ne should not go about determining obviousness under § 103 by inquiring into what patentees . . . would have known or would likely have done").  The inquiry into whether prior art teachings would have rendered the claimed invention obvious to one of ordinary skill in the art, is, as a matter of law, "independent of the motivations that led the inventors to the claimed invention." *Life Techs.*, 224 F.3d at 1325.

46.     "One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claim." *KSR*, 550 U.S. at 419–20; *see also Norgren Inc. v. ITC*, 699 F.3d 1317, 1324–26 (Fed. Cir. 2012) (affirming invalidity of claims under § 103 where the claimed invention solved known problems by the use of an obvious solution).  Even more, the discovery of a problem does not always result in a patentable invention.  *Norgren*, 699 F.3d at 1327.  An alleged invention is obvious in view of "evidence of known problems and an obvious solution." *Id.*  Where a claim "simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR*, 550 U.S. at 417 (quotation omitted).

13

47.     "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under § 103."  *KSR*, 550 U.S. at 421.

48.     "When a work is available in one field, design incentives and other market forces can prompt variations of it, either in the same field or in another.  If a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability.  Moreover, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill."  *KSR*, 550 at 401.

49.     None of "the length, expense, [or] difficulty of the techniques used are dispositive since many techniques that require extensive time, money, and effort to carry out may nevertheless be arguably 'routine' to one of ordinary skill in the art."  *Pfizer*, 480 F.3d at 1367.

50.     A "claim to a product does not become nonobvious simply because the patent specification provides a more comprehensive explication of the known relationships between the variables and the affected properties."  *In re Applied Materials, Inc.*, 692 F.3d 1289, 1297 (Fed. Cir. 2012).

51.     Even if a reference does not rise to the level of prior art, a court may consider it as motivation to combine.  *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 537 F. Supp. 2d 1095,

1102 (S.D. Cal. 2008) (citing *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1337–38 (Fed. Cir. 2004)).

52.     The motivation to combine inquiry is not limited to what products are forthcoming or currently available on the market, particularly given the lengthy FDA approval process. *Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1324 (Fed. Cir. 2017); *see also id.* at 1326 ("'Motivation to combine may be found in many different places and forms; it cannot be limited to those reasons the FDA sees fit to consider in approving drug applications.'") (quoting *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013)). "Obviousness does not require that the motivation be the *best* option, only that it be a *suitable* option from which the prior art does not teach away." *Id.* at 1328 (emphasis in original).

53.     "To establish obviousness in cases involving new chemical compounds, the accused infringer must identify some reason that would have led a chemist to modify a known compound." *Bristol-Myers*, 752 F.3d at 973; *see also Mead Johnson & Co. v. Premo Pharm. Labs*, No. 75-1230, 1980 WL 30332, at *103–04 (D.N.J. Sept. 11, 1980). "Generally, an obviousness inquiry concerning such 'known compounds' focuses on the identity of a 'lead compound.'" *Bristol-Myers*, 752 F.3d at 973.

54.     "A lead compound is a compound in the prior art that would be 'a natural choice for further development efforts.'" *Bristol-Myers*, 752 F.3d at 973 (quoting *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1008 (Fed. Cir. 2009).) As part of its assessment of obviousness under the lead compound analysis, (i) the structural similarity between the claimed compound and lead compound; (ii) teachings of secondary references regarding the modification; (iii) whether modification is a small conservative change; and (iv) the teachings in

15

the prior art as a whole regarding the motivation and expectation of success of modifying the lead compound, are considered. *See Bristol-Myers,752 F.3d.* at 973–76.

55.     A claimed compound was found obvious where it results from the addition of a single carbon (an exocyclic methylene group) to a prior art compound. *Bristol-Myers*, 752 F.3d at 969, 973, 975.

56.     In drug development, it is common to modify a lead compound in an effort to obtain a compound with better activity. *Bristol-Myers*, 752 F.3d at 974.  Once a lead compound is identified, "the motivation to modify that lead compound can come from any number of sources and need not necessarily be explicit in the art." *Id*. at 973 (internal citations omitted.) After selecting a lead compound, a POSA in drug development with the motivation to "obtain a compound with better activity" would seek to make small, conservative changes to that structure. *Id*. at 974; *see also id.* at 976 ("Evidence of obviousness is insufficient unless it indicates that the possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention.") (citation omitted).

57.     "[I]t is sufficient to show that the claimed and prior art compounds possess a 'sufficiently close relationship ... to create an expectation,' in light of the totality of the prior art, that the new compound will have 'similar properties' to the old." *Bristol-Myers,* 752 F.3d at 973 (internal citations omitted.)  Whether a lead compound and a claimed compound have a sufficiently close relationship frequently turns on their "structural similarities and differences." *Id.* (quoting *Daiichi Sankyo Co. v. Matrix Labs., Ltd.,* 619 F.3d 1346, 1352 (Fed. Cir. 2010)).

58.     However, a "lead compound analysis must, in keeping with *KSR*, not rigidly focus on the selection of a single, best lead compound." *Daiichi Sankyo*, 619 F.3d at 1354.  Rather,

any known compound that has "promising useful properties" can be a lead compound that would have motivated "a chemist to make structurally similar compounds." *Id.*; *see also Altana*, 566 F.3d at 1008 ("[T]o the extent Altana suggests that the prior art must point to only a single lead compound for further development efforts, that restrictive view of the lead compound test would present a rigid test similar to the teaching-suggestion-motivation test that the Supreme Court explicitly rejected in *KSR*."); *see also Bristol-Myers*, 752 F.3d at 973 ("Based on the prior art and testimony, the district court properly found strong evidence of obviousness, because the record shows that a skilled artisan would have selected 2′–CDG as a lead compound and made the minor modification to arrive at entecavir.").

59.     Conversely, the fact that many other compounds also could have been selected does not diminish the motivation to select a particular lead compound. *See Altana*, 566. F.3d at 1008 ("Altana suggests that the prior art would not have directed one of skill in the art to select compound 12 over the approximately 90 compounds claimed to be improvements in . . . prior art patents, or, for that matter, over the thousands of other compounds included in the prior art disclosures. . . . [T]he district court had a sufficient evidentiary basis for rejecting that position.").

60.     An analysis selecting a lead chemical compound is not required to find obviousness, when the relevant chemical compound is known in the prior art. *See generally Pfizer*, 480 F.3d 1348 (finding obviousness of a claim directed to amlodipine besylate, where amlodipine was claimed in the prior art); *see also Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.*, 923 F.3d 1051, 1060 (Fed. Cir. 2019) (where the patent-in-suit claimed a method of using the compound everolimus, the case did "not require lead compound analysis or analysis of whether a particular dose in a range of prior art doses would have been obvious", stating that "[t]o

17

the extent the district court required a showing that a person of ordinary skill would have selected everolimus over other prior art compounds, it erred").

61.    "[S]tructural similarity is an important factor in assessing the motivation to combine and reasonable expectation of success. It has been long recognized that chemical compounds with similar structures often have similar properties and that similarity in properties can be inferred from structural similarity." *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1384 (Fed. Cir. 2018).

62.    "Structural relationships may provide the requisite motivation or suggestion to modify known compounds to obtain new compounds." *Valeant Pharms. Int'l, Inc. v. Mylan Pharms. Inc.*, 955 F.3d 25, 32 (Fed. Cir. 2020)(internal quotations omitted.)

63.    "[I]t is well settled that structurally similar compounds often have similar properties." *Bristol-Myers*, 752 F. 3d at 976 (internal citations omitted); *Altana,* 566 F.3d at 1007).

64.    "[If] an examiner considers that he has found prior art close enough to the claimed invention to give one skilled in the relevant chemical art the motivation to make close relatives (homologs, analogs, isomers, etc.) of the prior art compound(s), then there arises what has been called a presumption of obviousness or a prima facie case of obviousness." *In re Dillon*, 919 F.2d 688, 696 (Fed. Cir. 1990).

65.    Bioisosteric replacement is the "substitution of one atom or group of atoms for another …[and] provides moelecules having the same type of biological activity." *In re Merck*, 800 F.2d at 1096.   It has been "commonly used by medicinal chemists [for decades] in an effort to design and predict drug activity." *Id.*   Thus, using a "known bioisosteric replacement … along with structural similarity, leads to a 'reasonable expectation' that the desired activity will result."

*Imperial Chem. Indus., PLC v. Danbury Pharmacal., Inc.*, 777 F. Supp. 330, 370 (D. Del. 1991) aff'd, 972 F.2d 1354 (Fed. Cir. 1992 (finding obviousness based on bioisosteric replacement" and "structural similarity ")

66.     "Structural similarity, alone, may be sufficient to give rise to an expectation that compounds similar in structure will have similar properties."  *In re Merck.*, 800 F.2d at, 1096.

67.     Independently, and optionally, "[o]bviousness based on structural similarity *may* be proven by identification of some motivation that would have led one of ordinary skill in the art to select and modify a known compound in a particular way to achieve the claimed compound."  *Altana*, 566 F.3d at 1007 (emphasis added); *see also Ex Parte Cao*, No. 10/696,862, 2011 WL 4434514, at *4 (B.P.A.I. Sept. 19, 2011) ("The *Eisai* court did not promulgate a per se rule that chemical compounds can only be held obvious if a lead compound is first identified.").

68.     "[F]or chemical compound claims, a prima facie case of obviousness frequently turns on the structural similarities and differences between the compounds claimed and those in the prior art."  *Valeant Pharms.*, 955 F.3d at 32 (internal citations omitted).

### iv.     Secondary Considerations/Objective Indicia of Non-Obviousness

69.     As part of the obviousness analysis, courts must evaluate evidence that the patentee puts forward to show the existence of any "secondary considerations" or "objective indicia" of non-obviousness.  *See KSR*, 550 U.S. at 406.

70.     While secondary considerations must be taken into account, they do not necessarily control the obviousness determination.  *Bristol-Myers*, 752 F.3d at 974 (finding obviousness despite presence of certain secondary considerations); *Allergan*, 726 F.3d at 1293 (finding obviousness despite findings of unexpected results); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1365 (Fed. Cir. 2012) (same); *Pfizer*, 480 F.3d at 1372 (same).

71.     To weigh against a finding of obviousness, "objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support." *Asyst Techs., Inc. v. Emtrack, Inc.,* 544 F.3d 1310, 1316 (Fed. Cir. 2008); *see also In re Dill*, 604 F.2d 1356, 1361 (C.C.P.A. 1979) ("The evidence presented to rebut a prima facie case of obviousness must be commensurate in scope with the claims to which it pertains."); *see also In re Grasseli*, 713 F.2d 731, 743 (Fed. Cir. 1983) ("It is well settled that objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support); *In re Peterson*, 315 F.3d 1325, 1331 (Fed. Cir. 2003) (affirming finding by the Board that unexpected results commensurate in scope with claimed range of 1–3% were not shown where unexpected results were only associated with 2%); *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) ("Because the claims are broad enough to cover devices that either do or do not solve the 'short fill' problem, Abbott's objective evidence of non-obviousness fails because it is not 'commensurate in scope with the claims which the evidence is offered to support.'") (citation omitted); *MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013) (district court erred where its "analysis of the secondary considerations of nonobviousness involved only fragrance-specific uses, but the [asserted claims] are not fragrance-specific").

72.     Secondary considerations of non-obviousness do not rebut a clear showing of invalidity.  *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364–65 (Fed. Cir. 2012) ("This case presents a strong case of obviousness based on the prior art references of record," and "even in light of the evidence of secondary considerations," the claim at issue would have been obvious.); *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008) ("Secondary considerations of nonobviousness—considered here by the district

court—simply cannot overcome this strong prima facie case of obviousness."); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008) ("In this case, the objective evidence of nonobviousness simply cannot overcome such a strong prima facie case of obviousness."); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007); *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 923 F. Supp. 2d 602, 686 (D. Del. 2013) (stating that despite finding the objective indicia of nonobviousness, "[t]he totality of that evidence did not strongly persuade the Court as to [the invention's] nonobviousness").  In other words, when there is significant motivation and reasonable expectation of success from the prior art and/or the POSA's knowledge and ordinary skill, a claim may be invalid even if the patentee can demonstrate secondary consideration(s) of non-obviousness exist.

73.    Secondary considerations of non-obviousness include but are not limited to: results achieved by the claimed invention that were unexpected by a POSA ("unexpected results"); long-felt but unmet need for the claimed invention ("long-felt need"); and copying of the claimed invention ("copying").  *See, e.g.*, *Hospira*, 285 F. Supp. 3d at 783 (citations omitted).

74.    Each secondary consideration is to be analyzed on a claim-by-claim basis.  *See, e.g.*, *MeadWestVaco*, 731 F.3d at 1264–65 ("The central problem with the district court's analysis is that if fails to treat claims 15 and 19, which are not limited to fragrance products, differently from the asserted fragrance-specific claims.  Obviousness, like other grounds of invalidity must be analyzed on a claim-by-claim basis.").

75.    The patentee must present evidence to support a finding that a given secondary consideration exists by a preponderance of the evidence.  *See, e.g.*, *Hospira*, 285 F. Supp. 3d at 784 (citing *Apple Inc. v. Samsung Elec. Co., Ltd.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016)); *Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

### a.    Nexus

76.    To have relevance to an obviousness analysis, the patentee must show with factual evidence that any asserted secondary considerations have a "nexus" between the consideration and the novel features of the claimed invention. *See, e.g.*, *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention. Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention.") (quotations omitted); *In re GPAC*, 57 F.3d at 1580 ("[F]or objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention.").

77.    A "nexus" is "a causal connection" between the secondary consideration and the novel and claimed features of the invention(s). *See, e.g.*, *Merck & Co. Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1376–77 (Fed. Cir. 2005).

78.    Even "impressive" evidence of secondary considerations is not "entitled to weight" unless "it is relevant to the claims at issue." *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).

79.    If the secondary consideration is tied to either an unclaimed feature or a claimed feature in the prior art (*i.e.*, the feature is not novel), then there is no nexus to the merits of the claimed invention. *See, e.g.*, *In re Kao*, 639 F.3d at 1068.

80.    Nexus must be established through specific evidence. *See In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (party asserting secondary considerations "must submit some factual evidence that demonstrates the nexus"); *see also In re DeBlauwe*, 736 F.2d 699, 705 (Fed. Cir.

1984) ("[U]nexpected results must be established by factual evidence.  Mere argument or conclusory statements in the specification does not suffice.").

81.     In order for failure of others evidence to be probative of nonobviousness, "its proponent must establish a nexus between the evidence and the merits of the claimed invention." *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (finding that evidence of failure of others should be "accorded only little weight as evidence of nonobviousness" because patentee failed to show that the failure of others evidence was "rooted in the subject matter" claimed in the patent at issue).  "The purpose of evidence of failure of others is to show indirectly the presence of a significant defect in the prior art, while serving as a simulated laboratory test of the obviousness of the solution to a skilled artisan." *Cephalon Inc. v. Mylan Pharms. Inc.*, 962 F. Supp. 2d 688, 721 (D. Del. 2013) (citation omitted) (finding that the proposed evidence of failure of others did not show that others struggled to solve a prior art defect that the patents at issue solved). And where there are already numerous drug products on the market, it is hard to say a failure of others exists. *See Bristol-Myers*, 923 F. Supp. 2d at 680–81 (finding no failure of others due to the "numerous drugs for the treatment of hepatitis B have been developed and approved by the FDA.") (emphasis in original).

82.     When a patentee relies on evidence of copying as evidence of nonobviousness, "just as with the commercial success analysis, a nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley*, 683 F.3d at 1364 (citing Iron Grip Barbell, 392 F.3d at 1325) (quotation marks omitted).

83.     A party asserting skepticism must demonstrate that the requisite nexus between the merits of the claimed invention and the evidence of skepticism exists.  See *Muniauction, Inc.*

*v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008) (abrogated on other grounds) (holding that "market-force skepticism also lacks the requisite nexus to the claimed invention"). Skepticism that is not directed at the solution provided by the patented invention "is not the type of skepticism that amounts to evidence of non-obviousness." *In re Youngblood,* 215 F.3d at *11.

84.     Courts have routinely excluded evidence of secondary considerations absent a showing of nexus.  *See., e.g.*, *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 626, 651 (D. Del. 2014), *aff'd sub nom. Cot'n Wash Inc. v. Sun Prods. Corp.*, 606 F. App'x 1009 (Fed. Cir. 2015) (excluding expert testimony regarding industry praise where no nexus existed); *Inventio AG v. Thyssenkrupp Elevator Corp.*, No. 08-00874, 2014 WL 5786668, at *8 (D. Del. Nov. 6, 2014), *aff'd*, 622 F. App'x 906 (Fed. Cir. 2015) (evidence of secondary considerations properly excluded where plaintiff failed to show nexus to claimed inventions).

85.     Plaintiff has failed to establish that there was a nexus between the claimed invention and each of the secondary considerations of non-obviousness it asserts, to support the non-obviousness of the asserted claims.

### b.     Unexpected Results

86.     Whether there are unexpected results is a question of fact.  *See, e.g.*, *In re Peterson*, 315 F.3d at 1331.

87.     An invention that otherwise appears obvious from the prior art may, in certain circumstances, not be obvious if the evidence (not conclusory statements or argument) shows that the claimed invention produces some superior property or advantage that was unexpected by or surprising to a POSA at the time of the invention.  *See, e.g.*, *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, No. CV 14-882-LPS, 2017 WL 1199767, at *39 (D. Del. Mar. 31, 2017), *aff'd*, 903 F.3d 1310 (Fed. Cir. 2018); *Bristol-Myers*, 752 F.3d at 977 ("To be particularly probative, evidence of unexpected results must establish that there is a difference between the

24

results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention.").

88.      The relevant time-period for the "unexpected results" inquiry is whether the results would have been unexpected by one of ordinary skill in the art at the time of the patentee's application and based on knowledge available at that time.  *See, e.g.*, *In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997); *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 460 F. Supp. 2d 659, 667 (D.N.J. 2006) ("[S]everal cases . . . preclude reliance by an inventor or patentee on undisclosed, later-discovered advantages.").  This showing requires "factual evidence," not merely the unsupported assertions of counsel.  *In re Youngblood*, No. 98-1518, 1999 WL 504243, at *7 (Fed. Cir. July 6, 1999) (deeming unsupported assertions "insufficient").  And any evidence that is in fact provided should be "weighed against contrary evidence indicating that the results were not unexpected or not a substantial improvement over the prior art."  *Santarus Inc. v. Par Pharm., Inc.*, 720 F. Supp. 2d 427, 457 (D. Del. 2010).

89.      Unexpected results that are not tied to a disclosure in the patent are given little weight.  *See, e.g.*, *Pfizer*, 460 F. Supp. 2d at 667 ("The fact that the hypothetical [POSA] would have been surprised to learn that the particular combination of elements created an unexpected benefit completely unrelated to the desired outcome does not logically imply that it would not have been obvious to combine those elements to achieve the desired result.").

90.      Any superior property or advantage must be unexpected at the time the application was filed and the court should consider what properties were expected by a POSA. *See, e.g.*, *Pfizer*, 480 F.3d at 1371 ("[I]n order to properly evaluate whether a superior property was unexpected, the court should have considered what properties were expected.").  A patentee fails to show unexpected results if there is no evidence of what the POSA would have expected

25

at the time of the invention. *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 348 (D. Del. 2010) ("the patent owner must first show what properties were expected") (citation omitted).

91.     Evidence of unexpected results must make a comparison of the results achieved by the claimed invention with the results from the closest prior art. *See, e.g.*, *Wm. Wrigley*, 683 F.3d at 1363 ("Wrigley needed to demonstrate that the results were unexpected to a significant degree beyond what was already known about the effect of combining" the prior art); *In re DeBlauwe*, 736 F.2d at 705; *In re Johnson*, 747 F.2d 1456, 1460 (Fed. Cir. 1984).

92.     A party advancing evidence of unexpected results must therefore provide evidence of what would have been expected by a skilled artisan. *Pfizer*, 480 F.3d at 1371.  Only by comparison to what would have been expected can the patentee then show that its claimed invention has superior properties that were unexpected. *Id.*

93.     To be probative in the validity inquiry, the supposedly unexpectedly superior result must be "different in kind and not merely in degree from the results in the prior art." *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) ("[i]n this case, the expected result was an increase, by some percentage, in the prevalence of certain side effects. The failure of that percent increase to materialize, though unexpected, constitutes only a difference in degree from the prior art results.") (quotation and citation omitted); *see also Bristol-Myers*, 752 F.3d at 977–78 (A claimed compound's unexpected property of high potency against a target was insufficient to overcome obviousness where the prior art compound also demonstrated efficacy against the target. The court explained that "[u]nexpected properties, … do not necessarily guarantee that a new compound is nonobvious.  While a 'marked superiority' in an expected property may be enough in some circumstances to render a compound patentable,

a 'mere difference in degree' is insufficient."); *see also In re Hoch,* 428 F.2d 1341, 1344 n.5 (C.C.P.A. 1970) (unexpected "differences in properties" can mean "significant difference in degree of the same property" amounting to a "marked superiority" that is an unexpected result); *Santarus*, 720 F. Supp. 2d at 457 (stating that a party claiming unexpected results must "produce evidence demonstrating substantially improved results that are unexpected in light of the prior art") (citation omitted); *In re Aller*, 220 F.2d 454, 457–59 (C.C.P.A. 1955) (finding no evidence of unexpected results where claimed conditions allegedly contributed to roughly 20 percent improvement in yield); *Allergan, Inc. v. Teva Pharm. USA, Inc.*, No. 2:15-CV-1455-WCB, 2017 WL 4803941, at *19 (E.D. Tex. Oct. 16, 2017), *aff'd*, 742 Fed. App'x 511 (Fed. Cir. 2018) ("To be probative of nonobviousness, unexpected results must be 'different in kind and not merely in degree from the results of the prior art.'") (quoting *Galderma*, 737 F.3d at 739); *E.I DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1011–12 (Fed. Cir. 2018) (evidence of alleged unexpected results was insufficient where patentee only presented evidence for one point in the claimed range and had failed to show that a 20% increase in yield was a difference in kind rather just a difference in degree); *In re Merck*, 800 F.2d at 1099 (finding evidence that the new drug was a more potent sedative and has stronger anticholinergic effect than the prior art was insufficient to outweigh the evidence of obviousness); *Novo Nordisk A/S v. Caraco Pharm. Lab'ys, Ltd.*, 719 F.3d 1346, 1348 (Fed. Cir. 2013) (affirming district court's ruling that the patent challenger had proved by clear and convincing evidence that a POSA would have expected the allegedly unexpected synergistic results of combination therapy for the treatment of diabetes where prior art taught that similar combination therapy produced synergistic results).

94.    "A showing that a drug was slightly more or less effective than the prior art would suggest does not constitute an 'unexpected result' for purposes of assessing obviousness."

*Acorda*, 2017 WL 1199767, at *39 (citing *Galderma*, 737 F.3d at 739); *In re Merck*, 800 F.2d at 1098–99), *aff'd*, 903 F.3d 1310 (Fed. Cir. 2018).

95.     Typically, a patentee must provide objective factual evidence to show that a POSA would not have expected the magnitude of superior results achieved by the claimed invention.  *See, e.g.*, *In re Youngblood*, 215 F.3d at *7 (deeming unsupported assertions "insufficient").

96.     In order to assert unexpected results, a patentee must present evidence that the results claimed to be unexpected actually occurred.  *See In re DeBlauwe*, 736 F.2d at 705 ("It is well settled that unexpected results must be established by factual evidence.").  Speculation or unproven hypotheses about what might become an unexpected result are simply not enough.  *See In re Geisler*, 116 F.3d at 1470 (finding a statement that it was "common sense" that an effect was unexpected unpersuasive).

97.     Any evidence to support supposed unexpected results provided should be "weighed against contrary evidence indicating that the results were not unexpected or not a substantial improvement over the prior art."  *See Santarus*, 720 F. Supp. 2d at 457.

98.     "Mere recognition of latent [*i.e.*, intrinsic] properties in the prior art does not render nonobvious an otherwise known invention."  *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

99.     When a result is a product of routine optimization that would have been obvious to the POSA, it is not unexpected or surprising.  *See, e.g.*, *Pfizer*, 480 F.3d at 1368 ("[D]iscovery of an optimum value of a variable in a known process is usually obvious.  Similarly, we hold that the optimization of the acid addition salt formulation for an active pharmaceutical ingredient would have been obvious."); *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1353 (Fed. Cir.

2015) (the alleged unexpected result did not support non-obviousness because it "is not unexpected or surprising, but is a product of routine optimization that would have been obvious to one of skill in the art").

100.     The results must be truly unexpected and not the product of the POSA's desire to achieve the optimum value or performance.  *See, e.g.*, *In re Peterson*, 315 F.3d at 1330 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages.").

101.     Like other secondary considerations, unexpected results may be insufficient to rebut a finding of obviousness.

102.     "Unexpected properties are insufficient to overcome an obviousness finding where the unexpected properties do 'not upset an already established motivation to modify a prior art compound based on the expected properties of the resulting compound.'"  Dillon, 919 F. 2d at 693."  *Bristol-Myers*, 752 F.3d at 976 (quoting *Dillon*, 919 F. 2d at 693.)

103.     "[U]nexpected results do not per se defeat, or prevent, the finding that a modification to a lead compound will yield expected, beneficial properties." *Bristol-Myers*, 752 F. 3d at 976-977.

104.     Plaintiff has failed to establish unexpected results to support the non-obviousness of the asserted claims.

### c.     Long-Felt Need

105.     "Evidence of a long-felt need is only probative of nonobviousness . . . when both a demand existed for the patented invention, and others tried but failed to satisfy that demand." *In re Copaxone Consolidated Cases*, Case No. 14-cv-1171-GMS, 2017 WL 401943, at *23 (D.

Del. 2017) (quoting *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1083 (Fed. Cir. 2012)).

106.   "[T]he patentee must point to an articulated and identified problem and evidence of efforts to solve the problem that were, before the invention, unsuccessful." *Apple Inc. v. Samsung Elecs. Co.*, 816 F.3d 788, 804-05 (Fed. Cir. 2016), *vacated in part on other grounds on reh'g en banc*, 839 F.3d 1034 (Fed. Cir. 2016).

107.   "Evidence of the long-felt need factor must squarely address the need satisfied by the asserted claims themselves." *AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 387 (D.N.J. 2015), *aff'd*, 603 F. App'x 999 (Fed. Cir. 2015).  A long-felt but unmet need must be "sufficiently connected with the novel elements of the asserted claims." *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 838 (Fed. Cir. 2015).  And even if the patentee introduces evidence of a long-felt need ostensibly tied to the patent claims, where the differences between the prior art and the claimed invention are minimal, "it cannot be said that any long-felt need was unsolved." *Martin*, 618 F.3d at 1304.

108.   Federal Circuit precedent "requires that the applicant submit actual evidence of long-felt need, as opposed to argument." *In re Kahn*, 441 F.3d 977, 990–91 (Fed. Cir. 2006). "[A]bsent a showing of long-felt need or the failure of others, the mere passage of time without the claimed invention is not evidence of nonobviousness." *Id.* (citing *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)).  A lack of demand because of general satisfaction with the prior art is contrary to a finding of long-felt need.  *Nat'l Steel*, 357 F.3d at 1340 ("finding of no customer demand is flatly contradictory with [the district court's] conclusion that a long-felt need existed").

109.    "Long-felt need is evaluated from the date of the closest prior art." *Warner*

*Chilcott Co., LLC v. Teva Pharm. USA, Inc.*, 37 F. Supp. 3d 731, 739 (D. Del. 2014) (citing

*Graham*, 383 U.S. at 36).

110.    Like other secondary considerations, long-felt need may be insufficient to rebut a

finding of obviousness.  *Graham*, 383 U.S. at 36 (long-felt need did not overcome invention that

was clearly obvious in view of prior art).

111.    Plaintiff has failed to establish a long-felt unmet need to support the non-

obviousness of the asserted claims.

### d.    Industry Praise

112.    Self-referential commendation falls "well short of demonstrating true industry

praise."  *Bayer Healthcare Pharms., Inc. v. Watson Pharms., Inc.*, 713 F.3d 1369, 1377 (Fed.

Cir. 2013).

113.    "[I]ndustry praise of what was clearly rendered obvious by published references is

not a persuasive secondary consideration."  *Id.*

114.    To support a finding of nonobviousness, "[i]ndustry praise must … be linked to

the patented invention." *Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1305

(Fed. Cir. 2010); *see also Paulsen*, 30 F.3d at 1482 (evidence of praise, while "impressive," was

not relevant to the claims and was thus entitled to no weight).  A patentee must show that any

industry praise is "attributable to … material difference[s] between [the prior art] and the

patented invention." *Asyst*, 544 F.3d at 1316.

115.    Like other secondary considerations, industry praise of what was clearly rendered

obvious by published references is not a persuasive secondary consideration.  *Bayer*, 713 F.3d at

1377.

116.    Plaintiff has failed to establish industry praise to support the non-obviousness of the asserted claims.

### e.    Failure of Others

117.    Evidence that others in the art tried and failed to develop the claimed inventions may, in certain circumstances, be relevant to obviousness.  *See, e.g.*, *Acorda*, 2017 WL 1199767, at *39 (quoting *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578–79 (Fed. Cir. 1991).

118.    "[A]n unsolved problem is not evidence of non-obviousness unless skilled workers in the art have tried and failed to solve the problem." *Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000). In conducting a failure of others analysis, the relevant problem is solely that which the patent-in-suit purports to solve. *See Symbol Techs.*, 935 F.2d at 1578 ("[n]onobviousness is suggested by the failure of others to find a solution to the problem which the patent[s] in question purport[ ] to solve.") (citation omitted); *Oscar Mayer Foods Corp. v. ConAgra, Inc.*, 45 F.3d 443, at *4 (Fed. Cir. 1994) ("[T]he failure of others is probative only if they sought to overcome the problem the applicant claims to have solved.").

119.    Generally, the cause of the failures must be attributable, in at least some degree, to the absence of the claimed aspects of the invention in the attempt for this consideration to have relevance to obviousness.  *See Cubist Pharm., Inc. v. Hospira, Inc.*, 805 F.3d 1112, 1126 (Fed. Cir. 2015); *see also DyStar*, 464 F.3d at 1371–72 (holding that failed attempt was not evidence of secondary consideration of obviousness when failure was due to cost and not technical difficulty).

120.    For example, courts have rejected this consideration where the company that supposedly failed had other drug products and lacked financial incentive to attempt to develop the claimed inventions because they would cannibalize their sales by introduction of a substitutable drug.  *See, e.g., Cubist Pharm.*, 805 F.3d at 1126.

121.     Alleged failures of others that are based on economic decisions, and not with

documented difficulties in implementing the technology, generally do not provide a valid

secondary consideration of non-obviousness.  *See, e.g., DyStar*, 464 F.3d at 1371–72; *Purdue*

*Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1354–55 (Fed. Cir. 2016) (alleged failure

was not a proper secondary consideration where there was no evidence that company actually

tried to make the product and failed when it agreed to delayed production proposed by FDA).

122.     Additionally, a patentee must show that the failure, if such failure exists, was due

to the other products lacking the claimed features of the patent. *Ormco*, 463 F.3d at 1313

(concluding that the evidence of failure of others was inadequate to raise any doubt as to

obviousness because "the evidence does not suggest that these prior attempts failed because the

devices lacked the claimed features").

123.     Like other secondary considerations, failure of others may be insufficient to rebut

a finding of obviousness.  *See Am. Sterilizer Co. v. Sybron Corp.*, 614 F.2d 890, 893 (3d Cir.

1980).

124.     Plaintiff has failed to establish the failure of others to support the non-obviousness

of the asserted claims.

### f.      Copying

125.     Because copying "is required for FDA approval" of generic drugs, "evidence of

copying in the ANDA context is not probative of nonobviousness."  *Bayer Healthcare Pharm.,*

*Inc. v. Watson Pharm., Inc.*, 713 F.3d 1369, 1377 (Fed. Cir. 2013); *accord Purdue Pharma*, 642

F. Supp. 2d at 373–74; *Galderma*, 737 F.3d at 740 ("The mere fact that generic pharmaceutical

companies seek approval to market a generic version of a drug . . . does not support a finding of

non-obviousness."); *Allergan, Inc. v. Watson Labs., Inc.-Fla.*, 869 F. Supp. 2d 456, 485 (D. Del.

2012) ("[A]s several courts have recognized, demonstration that a defendant has copied a

patented invention is not compelling evidence of non-obviousness in the Hatch–Waxman context due to the unique nature of the ANDA process."); *UCB, Inc. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 540 (D. Del. 2016) ("[T]he Federal Circuit stated that 'evidence of copying in the [generic drug] context is not probative of non-obviousness.'"), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018); *Watson*, 869 F.Supp.2d at 485; *Aventis Pharma*, 743 F. Supp. 2d at 349; *Purdue Pharma*, 642 F. Supp. 2d at 373–74 ("[A] showing of copying, which Plaintiffs have provided here, is not compelling evidence of non-obviousness in the Hatch–Waxman context.").

126.    More than the mere fact of copying is needed to make that action significant to determination of the obviousness issue.  *See, e.g., Apple*, 816 F.3d at 805-06 ("Evidence of copying of a feature in a patent owner's commercial product is 'not sufficient to demonstrate nonobviousness of the claimed invention' where, as here, there is a 'substantial question of validity raised by the prior art references' cited by the accused infringer."); *Wm. Wrigley*, 683 F.3d at 1364 (rejecting patentee's evidence of copying because the patentee's gum product that the accused infringer copied had features that differed from the claimed invention and thus the patentee failed to show a nexus between the copying and the claimed invention).

127.    Copying does not automatically strengthen a conclusion that an invention is not obvious as many reasons may exist for copying (e.g., lack of concern of patents, accepted practices in the industry).  *See, e.g.*, *Cable Elec. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985) ("Rather than supporting a conclusion of obviousness, copying could have occurred out of a general lack of concern for the patent property, in which case it weights neither for nor against the nonobviousness of a specific patent.  It may have occurred out of contempt for the specific patent in question, only arguably demonstrating obviousness, or for the ability or willingness of the patentee financially or otherwise to enforce the patent right,

which would call for a deeper inquiry.  Even widespread copying could weigh toward opposite

conclusions, depending on the attitudes existing toward patent property and the accepted

practices in the industry in question.  It is simplistic to assert that copying per se should bolster

the validity of a patent."), overruled on other grounds by *Midwest Industries, Inc. v. Karavan*

*Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999)).

128.    Not every competing product that arguably falls within the scope of a patent is

evidence of copying.  *See, e.g., Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1370

(Fed. Cir. 2011) (stipulation of infringement is unpersuasive evidence of copying because

copying "requires evidence of efforts to replicate a specific product.") (quoting *Wyers v. Master*

*Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)); *Iron Grip Barbell*, 392 F.3d at 1325 (holding

that adoption of a design similar to that of a patented product after issuance of the patent did not

establish that the competitor engaged in copying); *id.* ("Not every competing product that

arguably falls within the scope of a patent is evidence of copying.  Otherwise every infringement

suit would automatically confirm the nonobviousness of the patent.  Rather, copying requires the

replication of a specific product.").

129.    Like other secondary considerations, copying may be insufficient to rebut a

finding of obviousness.  *Stone Strong, LLC v. Del Zotto Prod. of Fla., Inc.*, 455 F. App'x 964,

971 (Fed. Cir. 2011).

130.    Plaintiff has failed to establish copying to support the non-obviousness of the

asserted claims.

### g.    Acquiescence

131.    "[A]cquiescence ceases to be probative of probable validity if the evidence

suggests that such acquiescence was caused by factors other than belief by the industry in the

validity of the patent."  *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F. Supp. 397,

401 (D. Del. 1989); *see also Jenn-Air Corp. v. Modern Maid Co.*, 499 F. Supp. 320, 324 (D. Del. 1980), aff'd, 659 F.2d 1068 (3d Cir. 1981).  The licensing of an invention to competitors may be evidence of nonobviousness, but the mere fact of licensing alone may not be enough to prove a patent not obvious if it cannot also be shown that the licensees did so out of respect for the patent rather than to avoid litigation expense.  *See Pentec*, 776 F.2d at 316.

132.    Like other secondary considerations, acquiescence may be insufficient to rebut a finding of obviousness.  *Jenn-Air Corp.*, 499 F. Supp. at 327.

133.    Plaintiff has failed to establish industry acquiescence to support the non-obviousness of the asserted claims.

### h.    Skepticism

134.    In order to assert skepticism as a secondary consideration of nonobviousness, a party must provide actual evidence of skepticism through direct testimony or written or published statements; mere testimony to alleged out-of-court statements is not sufficient. *See Allergan*, 869 F. Supp. 2d at 490–91 ("[T]his testimony refers only to out-of-court statements of unnamed Bayer employees, no Bayer employees testified at trial, and no written or published statements of skepticism from Bayer were introduced into evidence to support Bayer's alleged rationale.").  Further, evidence that one person was skeptical is insufficient to support a finding of nonobviousness. Rather, a patentee must show that "those of skill in the art were generally skeptical as to whether [the invention] was possible." *Id*. at 491. And more than "slight evidence" of skepticism must be shown to overcome strong teachings in the prior art. *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1583 (Fed. Cir. 1996).

135.    Where the record "does not express any direct skepticism concerning the feasibility" of the invention, the "assertion that there were secondary indicia of skepticism that rendered the invention of the asserted claims nonobvious is supported only by evidence that is

irrelevant and not supportive." *Dow Jones & Co. v. Ablaise Ltd.,* 606 F.3d 1338, 1352 (Fed. Cir. 2010); *see also Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 1274-75 (Fed. Cir. 2004) (where the record actually "does not show that [the industry] doubted that [the claimed invention] would work," the evidence of "skepticism of experts [i]s weak").

136.     A request by FDA for clinical safety and efficacy data may not demonstrate expert skepticism, but rather "attention to the FDA's normal duties ensuring the safety and efficacy of new drugs by requiring actual data to corroborate statements in a new drug application." *Bayer,* 713 F.3d at 1377.

137.     Like other secondary considerations, skepticism may be insufficient to rebut a finding of obviousness. *See Dow Jones,* 606 F.3d at 1352.

138.     Plaintiff has failed to establish skepticism to support the non-obviousness of the asserted claims.

### C.     Lack of Written Description

139.     A patent specification must "contain a written description of the invention." 35 U.S.C. § 112, ¶ 1.

140.     To comply with the written description requirement of § 112, a patentee must describe "the invention, with all its claimed limitations." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1379 (Fed. Cir. 2009) (citation omitted).

141.     The test for written description is "whether the disclosure of the application . . . reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351; *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). An adequate written description of a chemical invention requires a precise definition, such as by structure, formula, chemical name, or physical properties, not a mere wish or plan for obtaining the claimed invention. *Univ. of*

37

*Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004) (citations and internal quotations omitted).

142.    Possession of a claimed invention is established by describing the claimed invention with all of its claimed limitations. *Lockwood*, 107 F.3d at 1572.

143.    A specification provides adequate written description if the information within the four corners of the specification reasonably conveys to a POSA that "the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351; *Boston Sci. Corp. v. Johnson & Johnson Inc.*, 647 F.3d 1353, 1362 (Fed. Cir. 2011).

144.    "[T]he specification must describe an invention understandable to [a POSA] and show that the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351.  The written description requirement curtails claims that "have not been invented, and thus cannot be described." *Id*. at 1352.

145.    "The written description requirement exists to ensure that inventors do not attempt to preempt the future before it has arrived." *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011) (citation and internal quotation marks omitted).  The pharmaceutical industry cannot be left to "complete an unfinished invention." *Ariad*, 598 F.3d at 1353.

146.    Similarly, "[a] mere wish or plan for obtaining the claimed invention" fails the written description requirement. *Centocor Ortho Biotech, Inc. v, Abbott Labs.,* 636 F.3d 1341, 1348 (Fed. Cir. 2011) (citation and internal quotation marks omitted). A disclosure that is a "mere mention of a desired outcome" does not satisfy the requirement. *Ariad*, 598 F.3d at 1357.

147.    Additionally, describing one embodiment of a claimed invention does not necessarily satisfy the written description requirement; rather, description of a "single

embodiment would support [] a generic claim only if the specification would reasonably convey to a person skilled in the art that [the inventor] had possession of the claimed subject matter at the time of filing." *LizardTech*, 424 F.3d at 1346 (citation and internal quotation marks omitted). "Thus, a patentee cannot always satisfy the requirements of section 112, in supporting expansive claim language, merely by clearly describing one embodiment of the thing claimed." *Id.* The specification itself must demonstrate that the inventor was in possession of the claimed invention. *See Ariad*, 598 F.3d at 1351–52.

148. When a result is expressly claimed, "that result must be supported by adequate disclosure in the specification." *Nuvo Pharm. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1384 (Fed. Cir. 2019). Claiming therapeutic effectiveness without adequately describing the efficacy fails to meet the written description requirement. *Id.*

149. "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351 (citations omitted). For generic claims, the Federal Circuit has set forth a number of factors for evaluating the adequacy of the disclosure, including (1) the existing knowledge in the particular field, (2) the extent and content of the prior art, (3) the maturity of the science or technology, and (4) the predictability of the aspect at issue. *See id.* at 1351 (citing *Capon v. Eshhar*, 418 F.3d 1349, 1359 (Fed. Cir. 2005)) (internal quotations omitted).

150. The determination that a patent is invalid for failure to meet the written description requirement is a question of fact. *See PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002).

### D.   Lack of Enablement

151.   An enablement analysis begins with the disclosure in the specification.  *Sitrick v. Dreamworks*, 516 F.3d 993, 1000 (Fed. Cir. 2008).  A patent specification must provide sufficient information to allow a person of ordinary skill in the art to make and use the invention claimed.  35 U.S.C. § 112, ¶ 1 states that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

 35 U.S.C. § 112.

152.   A specification lacks enablement if it fails to teach one of skill in the art "how to make and use the full scope of the claimed invention without 'undue experimentation.'"  *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (internal citations omitted).

153.   A patent specification that simply sets forth an unproved hypothesis or research plan cannot satisfy the utility/enablement requirement:

> If mere plausibility were the test for enablement under section 112, applicants could obtain patent rights to "inventions" consisting of little more than respectable guesses as to the likelihood of their success.  When one of the guesses later proved true, the "inventor" would be rewarded the spoils instead of the party who demonstrated that the method actually worked.  That scenario is not consistent with the statutory requirement that the inventor enable an invention rather than merely proposed an unproved hypothesis.

*In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1327 (Fed. Cir. 2009) (internal citations omitted); *see also In re Fisher,* 421 F.3d 1365, 1371 (Fed. Cir. 2005) ("It thus is clear that an application must show that an invention is useful to the public as disclosed in its current form, not that it may prove useful at some future date after further research."); *Hitzeman v. Rutter*, 243 F.3d 1345, 1357 (Fed. Cir. 2001) (stating that the policy behind the patent laws is to "promote

40

disclosure of inventions not research plans"). A patent specification that "even read in the light of the knowledge of those skilled in the art, does no more than state a hypothesis and propose testing to determine the accuracy of that hypothesis," is insufficient to establish the patentability of a method of treatment claim. *In re '318*, 583 F.3d at 1327.

154.    The enablement "doctrine prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise attempt to cover more than was actually invented. Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *See, e.g.*, *MagSil Corp.*, 687 F.3d at 1381. With respect to the breadth of a claim, the relevant concern is whether the scope of enablement provided to one skilled in the art by the disclosure is commensurate with the scope of protection sought by the claims. *AK Steel Corp. v. Sollac & Ugine,* 344 F.3d 1234, 1244 (Fed. Cir. 2003); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) ("The irony of this situation is that Liebel successfully pressed to have its claims [construed broadly], but, having won that battle, it then had to show that such a claim was fully enabled, a challenge it could not meet. The motto, 'beware of what one asks for,' might be applicable here.").

155.    A specification's disclosure must be enabling to the skilled artisan when it is filed. *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997). Such a skilled artisan can only be expected to know what is generally and reasonably available to an ordinary skilled artisan at the time. *In re Howarth*, 654 F.2d 103, 107 (C.C.P.A. 1981). The level of skill in the art is used in conjunction with the specification's disclosure in evaluating compliance with the enablement requirement. *Genentech Inc.*, 108 F.3d at 1365-66. A claim is invalid "if it is reasonable to conclude that one skilled in the art would be unable to carry out the claimed invention." *In re Buchner,* 929 F.2d 660, 661 (Fed. Cir. 1991). Furthermore, the knowledge of

the person of skill in the art cannot substitute for the disclosure of the novel aspects of the invention, particularly in the pharmaceutical arts. *See ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 941–42 (Fed. Cir. 2010).

156.     The scope of enablement must reasonably correspond to the scope of the claims. *Genentech, Inc.*, 108 F.3d 1365. The full scope of the claims must be enabled, and a claim that reads on an embodiment that is not enabled is invalid. *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007). A specification that does little more than provide an overview of an embodiment without providing any details of how the embodiment operates is insufficient. *Id.* If a purported invention is inoperative, the claims "also fail to meet the enablement requirement because a person skilled in the art cannot practice the invention." *In re Swartz*, 232 F.3d 862, 863 (Fed. Cir. 2000).

157.     Enablement of the ordinarily skilled artisan does not preclude minor omissions of details from the patent specification. *Genentech*, 108 F.3d at 1366. The knowledge of the skilled artisan, however, cannot be used to supply patentable aspects of the invention, and a patentee cannot simply rely on the knowledge of the skilled artisan to substitute for information that is missing from the specification. *Id.* at 1366–68; *ALZA*, 603 F.3d at 941.

158.     "[T]he specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993). "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *In re Wands*, 858 at 737. These factors, often called the *Wands* factors, include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention,

42

(5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.*

159.    A court need not consider every *Wands* factor in its analysis.  Rather, a court is only required to consider those factors relevant to the facts of the case. *See, e.g.*, *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

160.    Enablement is a question of law based on underlying factual inquiries. *See ALZA*, 603 F.3d at 940.

### E.    Indefiniteness

161.    35 U.S.C. § 112, ¶ 2 provides that a patent's specification:

shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112 (emphasis added).  Addressing the proper reading of the statute's demand for clarity and precision, the Supreme Court has held "that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

162.    Whether a claim is invalid for indefiniteness is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).

163.    "'Definiteness is measured from the viewpoint of a person skilled in [the] art at the time the patent was filed.'" *Nautilus*, 134 S. Ct. at 2128 (emphasis omitted).

164.    "[A] patent must be precise enough to afford clear notice of what is claimed,

thereby 'appris[ing] the public of what is still open to them.'"  *Nautilus*, 134 S. Ct. at 2129

(quoting *Markman v. Westview Instruments, Inc.* 517 U.S. 370, 373 (2002)) (alterations in

original)).  "It cannot be sufficient that a court can ascribe some meaning to a patent's claim; the

definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent

application, not that of a court viewing matters post hoc."  *Id.* at 2130; *see also DDR Holdings,*

*LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) (citing *Nautilus*, 134 S. Ct. at

2129–30).

165.    Claim language cannot be "ambiguous, vague, incoherent, opaque, or otherwise

unclear in describing and defining the claimed invention."  *In re Packard*, 751 F.3d 1307, 1311

(Fed. Cir. 2014).  A claim must be comprehensible to the ordinary skilled artisan and precise

enough to provide clear notice of what is claimed; otherwise, the claims are indefinite.  *Nautilus*,

134 S. Ct. at 2129.

166.    Not only can individual claim terms be indefinite, but a claim that fails to

interrelate essential claimed elements of the invention can also be indefinite.  *In re Collier*, 397

F.2d 1003, 1005 (C.C.P.A. 1968).  It is not enough that each claim term be clearly understood by

the POSA, but definiteness also requires a clear description of how those claim terms are

combined together to arrive at the claimed invention.  *Id.*

## III.    REMEDIES

### A.  Permanent Injunction

167.    Permanent injunctive relief is not guaranteed.  "[A] plaintiff seeking a permanent

injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must

demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 391 (2006) (emphasis added); see also *Voda v. Cordis Corp*., 536 F.3d 1311, 1329 (Fed. Cir. 2008) (affirming the denial of a permanent injunction where patent challenger lost infringement decision).

168.     In order to establish that an injunction is warranted, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Alcon, Inc. v. Teva Pharm. USA, Inc.*, No. 06-cv-234-SLR, 2010 WL 3081327, at *2 (D. Del. Aug. 5, 2010).

169.     "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court … ." *eBay Inc.*, 547 U.S. 388 (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–13 (1982)).

170.     A patentee's "statutory right to exclude alone [does not justify] [a] general rule in favor of permanent injunctive relief," and that "injunctive relief 'may' issue only 'in accordance with the principles of equity.'" *Id.* at 392; *Alcon*, 2010 WL 3081327, at *2.

171.     Plaintiff has failed to prove that they are entitled to a permanent injunction enjoining Defendant from infringing the asserted claims of the patents-in-suit.

### B.  Exceptional Case

172.     In exceptional cases, a court may award reasonable attorneys' fees to the prevailing party.  *See* 35 U.S.C. § 285.

173.    In deciding whether to award attorneys' fees, the court must undertake a two-step

inquiry.  *See TruePosition, Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400, 413 (D. Del. 2009) (citing

*Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994)).

174.    First, the court "must determine whether there is clear and convincing evidence

that the case is exceptional."  *TruePosition, Inc.*, 611 F. Supp. 2d at 413 (citation and quotation

marks omitted).  In deciding whether a case is exceptional, the court must evaluate whether it

"stands out from others with respect to the substantive strength of a party's litigation position

(considering both the governing law and the facts of the case) or the unreasonable manner in

which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct.

1749, 1756 (2014).  This determination is a "case-by-case exercise" to be made "considering the

totality of the circumstances."  *Id.*  The burden of proof rests with the prevailing party.  *See*

*Otsuka Pharm. Co. v. Sandoz, Inc.*, No. CV 07-1000 (MLC), 2015 WL 5921035, at *8 (D.N.J.

Oct. 9, 2015).

175.    Second, the court must determine whether an award of attorneys' fees to the

prevailing party is warranted.  *Id.*  Absent serious misconduct, courts have been reluctant to

award fees to a prevailing party.  *See Otsuka*, 2015 WL 5921035, at *6–*7.  Examples of such

serious misconduct include misleading statements "coupled with affirmative, false declarations

submitted to the PTO in order to procure patents," filing of frivolous lawsuits, and re-litigation of

issues already decided by the court.  *Intellect Wireless, Inc. v. Sharp Corp.*, 45 F. Supp. 3d 839,

853 (N. D. Ill. 2014); *Chalumeau Power Sys. LLC v. Alcatel–Lucent*, No. 11–1175-RGA, 2014

WL 4675002, at *3 (D. Del. Sept. 12, 2014), *aff'd*, 611 F. App'x 1008 (Fed. Cir. 2015); *Cognex*

*Corp. v. Microscan Sys., Inc.*, No. 13-cv-2027, 2014 WL 2989975, at *4 (S.D.N.Y. June 30,

2014).  Such conduct is akin to the "'pattern of deceit' recognized by the Federal Circuit" in

determining whether a case is exceptional under Section 285. *Intellect Wireless*, 45 F. Supp. 3d at 853; *see also Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1548 (Fed. Cir. 1984); *Hoffmann-La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1365 (Fed. Cir. 2000); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346–47 (Fed. Cir. 2000).

176.    Plaintiff has failed to prove that this is an exceptional case warranting an award of attorneys' fees, costs, and expenses.

177.    A Defendant may be awarded attorneys' fees pursuant to 35 U.S.C. § 285, where Plaintiff's litigation position is meritless. *Blackbird Tech LLC v. Health In Motion LLC*, 944 F.3d 910, 914 (Fed. Cir. 2019).

# EXHIBIT F

AstraZeneca Pharmaceuticals LP v. Aurobindo Pharma Ltd., No. 18-664-RGA

Plaintiff's Trial Exhibit List

May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0001 | 7/2/2002 | United States Patent No. 6,414,126 - Ellsworth et al. | AZ-DAPA-00000001 | AZ-DAPA-00000043 | |
| PTX0002 | 2/4/2003 | United States Patent No. 6,515,117 - Ellsworth et al. | AZ-DAPA-00001513 | AZ-DAPA-00001532 | |
| PTX0003 | 7/2/2002 | Certified File History for United States Patent No. 6,414,126 - Ellsworth et al. | AZ-DAPA-00000044 | AZ-DAPA-00001451 | |
| PTX0004 | 2/4/2003 | Certified File History for United States Patent No. 6,515,117 - Ellsworth et al. | AZ-DAPA-00001533 | AZ-DAPA-00001945 | |
| PTX0005 | 9/25/2018 | United States Patent No. 6,414,126 Assignment | AZ-DAPA-00001452 | AZ-DAPA-00001453 | A, F, H, R |
| PTX0006 | 11/8/2000 | United States Patent No. 6,414,126 Assignment | AZ-DAPA-00001454 | AZ-DAPA-00001457 | A, F, H, R |
| PTX0007 | 5/9/2014 | United States Patent No. 6,414,126 Assignment | AZ-DAPA-00001458 | AZ-DAPA-00001470 | A, F, H, R |
| PTX0008 | 3/4/2014 | United States Patent No. 6,414,126 Assignment | AZ-DAPA-00001471 | AZ-DAPA-00001506 | A, F, H, R |
| PTX0009 | 3/27/2014 | United States Patent No. 6,414,126 Assignment | AZ-DAPA-00001507 | AZ-DAPA-00001512 | A, F, H, R |
| PTX0010 | 9/25/2018 | United States Patent No. 6,515,117 Assignment | AZ-DAPA-00001946 | AZ-DAPA-00001946 | A, F |
| PTX0011 | 3/4/2014 | United States Patent No. 6,515,117 Assignment | AZ-DAPA-00001947 | AZ-DAPA-00001982 | A, F |
| PTX0012 | 5/28/2002 | United States Patent No. 6,515,117 Assignment | AZ-DAPA-00001983 | AZ-DAPA-00001987 | A, F |
| PTX0013 | 12/5/2019 | Notice of Subpoena commanding deposition testimony to Wei Meng | | | F, H, R |
| PTX0014 | 6/4/2019 | Notice of Subpoena to produce documents, information or objections to Wei Meng | | | F, H, R |
| PTX0015 | | Curriculum Vitae of Wei Meng | BMS-DAPA-00088482 | BMS-DAPA-00088489 | A, F, H, R |
| PTX0016 | 1/19/1999 | Lab Notebook No. 45133 | BMS-DAPA-00002325 | BMS-DAPA-00002543 | A, F, H, R |
| PTX0017 | 12/8/1999 | Lab Notebook No. 47036 | BMS-DAPA-00002544 | BMS-DAPA-00002756 | A, F, H, R |
| PTX0018 | 12/4/2000 | Lab Notebook No. 48225 | BMS-DAPA-00002757 | BMS-DAPA-00002967 | A, F, H, R |
| PTX0019 | 12/15/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00018043 | BMS-DAPA-00018066 | A, F, H, R |

Case 1:18-cv-00664-RGA Document 139 Filed 05/11/21 Page 412 of 502 PageID #: 2353
AstraZeneca Pharmaceuticals LP et al. v. Aurobindo Pharma Ltd.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|-----|------|-------------|---------------|---------------|------------|
| PTX0020 | 3/10/2000 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00011896 | BMS-DAPA-00011923 | A, F, H, R |
| PTX0021 | 6/13/2000 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00017719 | BMS-DAPA-00017750 | A, F, H, R |
| PTX0022 | 10/22/2000 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00017752 | BMS-DAPA-00017779 | A, F, H, R |
| PTX0023 | 12/5/2019 | Notice of Subpoena commanding deposition testimony to Philip Sher | | | F, H, R |
| PTX0024 | | Curriculum Vitae of Philip Sher, Ph.D. | | | A, F, H, R |
| PTX0025 | 10/1/2011 | Curriculum Vitae of Philip Sher | BMS-DAPA-00089082 | BMS-DAPA-00089102 | A, F, H, R |
| PTX0026 | 3/9/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00011727 | BMS-DAPA-00011751 | A, F, H, R |
| PTX0027 | 6/22/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00017853 | BMS-DAPA-00017871 | A, F, H, R |
| PTX0028 | 5/1/1999 | 1998 Performance Evaluation of Philip M. Sher | AZ-DAPA-02629845 | AZ-DAPA-02629847 | A, F, H, R, U |
| PTX0029 | 10/15/1999 | BMS Employee Evaluation for Employee: Gang Wu, Supervisor: Philip M. Sher, Evaluation Period 1/1/99-10/15/99 | BMS-DAPA-00105543 | BMS-DAPA-00105544 | A, F, H, R, U |
| PTX0030 | | Subpoena to Testify at a Deposition in a Civil Action to Gang Wu | | | F, H, R |
| PTX0031 | | Curriculum Vitae of Gang Wu | BMS-DAPA-00105575 | BMS-DAPA-00105581 | A, F, H, R |
| PTX0032 | 1/27/1999 | SGLT2SE Report | BMS-DAPA-00022735 | BMS-DAPA-00022740 | A, F, H, R |
| PTX0033 | 5/1/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00017833 | BMS-DAPA-00017851 | A, F, H, R |
| PTX0034 | 10/5/2003 | Letter from Bill Washburn to Dr. Robert Zahler re Promotion of Gang Wu to Senior Research Scientist (Level 15) | BMS-DAPA-00105635 | BMS-DAPA-00105635 | A, F, H, R |

AstraZeneca AB, et al. v. Zydus Pharmaceuticals (USA) Inc., No. 18-664
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0035 | 2/27/2008 | Kuribayashi, Takeshi, et al. "c-Glycosylated Aryl tins: Versatile Building Blocks for Aryl C-Glycoside Glycomimetics." (1999): 371-382. | ZYD_DAPA_0013883 | ZYD_DAPA_0013903 | |
| PTX0036 | 9/18/2018 | E-mails re: Laboratory notebook | BMS-DAPA-00105409 | BMS-DAPA-00105409 | A, F, H, R |
| PTX0037 | 6/4/2019 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action to Bruce Ellsworth | | | F, H, R |
| PTX0038 | 8/19/1998 | Lab Notebook No. 44196 | BMS-DAPA-00000407 | BMS-DAPA-00000614 | A, F, H, R |
| PTX0039 | 2/2/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00011775 | BMS-DAPA-00011792 | A, F, H, R |
| PTX0040 | | Sodium-Glucose Transporter (SGLT2) Report | BMS-DAPA-00018326 | BMS-DAPA-00018329 | A, F, H, I, IC, ID, R |
| PTX0041 | 11/7/2002 | DP3 - Early Candidate Nomination - BMS Number: 02148 | BMS-DAPA-00028330 | BMS-DAPA-00028339 | A, F, H, R |
| PTX0042 | | The road to Farxiga, including divestiture and other rarely discussed topics Presentation | BMS-DAPA-00072286 | BMS-DAPA-00072324 | A, F, H, R |
| PTX0043 | | The road to Farxiga, including divestiture and other rarely discussed topics Presentation | BMS-DAPA-00072558 | BMS-DAPA-00072604 | A, F, H, R |
| PTX0044 | | Curriculum Vitae of William N. Washburn | | | A, F, H, R |
| PTX0045 | 9/10/1997 | Lab Notebook No. 42599 | BMS-DAPA-00002115 | BMS-DAPA-00002324 | A, F, H, R |
| PTX0046 | | Sodium-Glucose Transporter Report | BMS-DAPA-00111488 | BMS-DAPA-00111513 | A, F, H, I, IC, ID, R |
| PTX0047 | 9/11/2000 | Lab Notebook No. 48216 | BMS-DAPA-00117136 | BMS-DAPA-00117235 | D |
| PTX0048 | 6/1/2008 | Han, Songping, et al. "Dapagliflozin, a selective SGLT2 inhibitor, improves glucose homeostasis in normal and diabetic rats." Diabetes 57.6 (2008): 1723-1729. | AZ-DAPA-00941308 | AZ-DAPA-00941314 | F, H, R |
| PTX0049 | 12/9/1997 | Confidential Memo from S.A. Biller to D.M. Floyd re Metabolic Diseases Chemistry Significant Events - December | BMS-DAPA-00117714 | BMS-DAPA-00117725 | A, F, H, R |

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0050 | 1/8/1998 | Confidential Memo from S.A. Biller to D.M. Floyd re Metabolic Diseases Chemistry Significant Events - January | BMS-DAPA-00117726 | BMS-DAPA-00117735 | A, F, H, R |
| PTX0051 | 2/2/1998 | Confidential Memo from S.A. Biller to D.M. Floyd re Metabolic Diseases Chemistry Significant Events - February | BMS-DAPA-00117736 | BMS-DAPA-00117749 | A, F, H, R |
| PTX0052 | 10/20/1997 | Lab Notebook No. 42826 | BMS-DAPA-00117877 | BMS-DAPA-00118088 | A, F, H, R |
| PTX0053 | 1/1/1997 | Scheen, André J. "Drug treatment of non-insulin-dependent diabetes mellitus in the 1990s." Drugs 54.3 (1997): 355-368. | ZYD_DAPA_0014145 | ZYD_DAPA_0014158 | |
| PTX0054 | 9/11/2020 | Rebuttal Expert Report of Joshua L. Cohen, M.D., F.A.C.P. | | | B, F, H, R, U |
| PTX0055 | | Curriculum Vitae of Joshua Lewis Cohen, M.D., F.A.C.P. | | | D, F, H |
| PTX0056 | 10/22/2019 | ECF 73 - Stipulation and Order regarding Claim Construction | | | |
| PTX0057 | 11/11/2020 | Zydus Pharmaceuticals (USA) Inc.'s Notice of Deposition of Ronald A. Thisted, Ph.D. | | | F, H, R |
| PTX0058 | 9/8/2020 | Rebuttal Expert Report of Ronald A. Thisted, Ph.D. and Exhibits thereto | | | B, F, H, R, U |
| PTX0059 | 6/9/2016 | Wasserstein, Ronald L., and Nicole A. Lazar. "The ASA statement on p-values: context, process, and purpose." (2016): 129-133. | AZ-DAPA-02630572 | AZ-DAPA-02630576 | F, H, R |
| PTX0060 | 9/11/2000 | Excerpts from Lab Notebook No. 48216 (PTX0047) | BMS-DAPA-00117136; BMS-DAPA-00117170 | BMS-DAPA-00117140; BMS-DAPA-00117171 | D |
| PTX0061 | 7/9/2001 | MD072501 Data Spreadsheet | BMS-DAPA-00034576 | BMS-DAPA-00034576 | |
| PTX0062 | 11/1/2020 | Zydus Pharmaceuticals (USA) Inc.'s Notice of Deposition of Kenneth W. Batchelor, Ph.D. | | | F, H, R |
| PTX0063 | 9/1/2020 | Rebuttal Expert Report of Dr. Kenneth W. Batchelor and Exhibits thereto | | | B, F, H, R, U |
| PTX0064 | 10/1/1980 | Batchelor, K. W., and D. R. Stanworth. "A comparison of the histamine-releasing properties of rat pleural and peritoneal mast cells." Immunology 41.2 (1980): 271-278. | | | F, H, R, U |

AstraZeneca Pharmaceuticals LP, et al. v. Zydus Pharmaceuticals (USA) Inc., et al., No. 18-664 (RGA)
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0065 | 1/1/1986 | Batchelor, K. W., R. A. Smith, and N. S. Watson. "Dicyclohexylamine is not an inhibitor of spermidine synthase." Biochemical Journal 233.1 (1986): 307-308. | | | F, H, R, U |
| PTX0066 | 10/15/1996 | United States Patent No. 5,565,467 - Batchelor et al. | | | F, H, I, R, U |
| PTX0067 | 12/28/2018 | Statement of Substance of Interview and Amendment in re Reissue Application of U.S. Patent No. 6,515,117 B1 | AZ-DAPA-02593972 | AZ-DAPA-02594011 | I |
| PTX0068 | 6/21/2019 | Notice of Allowance and Fee(s) Due in Application No. 16/014,479 | AZ-DAPA-02594476 | AZ-DAPA-02594482 | I |
| PTX0069 | 4/19/2001 | WO 01/27128 - Ellsworth et al. | ZYD_DAPA_0014206 | ZYD_DAPA_0014325 | |
| PTX0070 | 5/31/1996 | K. Tsujihara et al., Na(+)-Glucose Cotransporter Inhibitors as Antidiabetics. I. Synthesis and Pharmacological Properties of 4'-Dehydroxyphlorizin Derivatives Based on a New Concept, 44 CHEM. PHARM. BULL. 1174,-1180 (1996) | ZYD_DAPA_0014199 | ZYD_DAPA_0014205 | |
| PTX0071 | 5/4/1998 | Proposal to Convert the SGLT2 Early Phase Program to a Full Program | BMS-DAPA-00107996 | BMS-DAPA-00108002 | A, F, H, R |
| PTX0072 | 9/27/1996 | Kees, Kenneth L., et al. "New potent antihyperglycemic agents in db/db mice: Synthesis and structure– activity relationship studies of (4-substituted benzyl)(trifluoromethyl) pyrazoles and-pyrazolones." Journal of medicinal chemistry 39.20 (1996): 3920-3928. | ZYD_DAPA_0013866 | ZYD_DAPA_0013874 | |
| PTX0073 | 3/15/1998 | Hongu, Mitsuya, et al. "Na+-glucose cotransporter inhibitors as antidiabetic agents. II. Synthesis and structure-activity relationships of 4'-dehydroxyphlorizin derivatives." Chemical and pharmaceutical bulletin 46.1 (1998): 22-33. | ZYD_DAPA_0013854 | ZYD_DAPA_0013865 | |
| PTX0074 | 7/23/1998 | WO 98/31697 - Sato et al. | ZYD_DAPA_0014397 | ZYD_DAPA_0014667 | |

AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc., No. 18-664-RGA

Plaintiff's Trial Exhibit List

May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0075 | 1/1/1999 | Takeshi Kuribayashi et al., Bis C-glycosylated Diphenylmethanes for Stable Glycoepitope Mimetics, 6 SYNLETT 737-740 (1999) | ZYD_DAPA_0013922 | ZYD_DAPA_0013936 | |
| PTX0076 | 9/22/1997 | Lab Notebook No. 42647 | BMS-DAPA-00000206 | BMS-DAPA-00000406 | A, F, H, R, U |
| PTX0077 | 3/21/2019 | Declaration Under 37 C.F.R. § 1.132 of Dr. William N. Washburn | AZ-DAPA-02617977 | AZ-DAPA-02617985 | I |
| PTX0078 | 4/20/2019 | Supplemental Declaration Under 37 C.F.R. § 1.132 of Dr. William N. Washburn | AZ-DAPA-02594470 | AZ-DAPA-02594473 | I |
| PTX0079 | 10/3/2014 | Washburn, William N. "Case History: Forxiga™ (Dapagliflozin), a Potent Selective SGLT2 Inhibitor for Treatment of Diabetes." Annual Reports in Medicinal Chemistry. Vol. 49. Academic Press, 2014. 363-382. | AZ-DAPA-02585299 | AZ-DAPA-02585318 | F, H, R, U |
| PTX0080 | 11/25/2000 | J.T. Link & Bryan K. Sorenson, A Method for Preparing C-glycosides Relating to Phlorizin, 41 TETRAHEDRON LETTERS 9213-9217 (2000) | AZ-DAPA-02587141 | AZ-DAPA-02587145 | F, H, R |
| PTX0081 | 7/31/2020 | Opening Expert Report of Gordon W. Gribble, Ph.D., in support of the Invalidity of the Asserted Claims of U.S. Patent No. 6,515,117 | | | |
| PTX0082 | | Curriculum Vitae of Gordon Wayne Gribble | | | |
| PTX0083 | 10/16/2020 | Reply Expert Report of Gordon W. Gribble, Ph.D., in support of the Invalidity of the Asserted Claims of U.S. Patent No. 6,515,117 and Exhibits thereto | | | |
| PTX0084 | 10/16/2020 | Reply Expert Report of Gordon W. Gribble, Ph.D., in support of the Invalidity of the Asserted Claims of U.S. Patent No. 6,515,117 List of Materials Considered | | | |

AstraZeneca AB v. Mylan Pharmaceuticals, Inc., No. 18-cv-00664-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0085 | 5/4/1998 | Confidential Memo from S.A. Biller to D.M. Floyd re Metabolic Diseases Chemistry Significant Events | BMS-DAPA-00117660 | BMS-DAPA-00117678 | A, F, H, R |
| PTX0086 | 12/16/2008 | United States Patent No. 7,465,712 - Fujikura et al. | | | |
| PTX0087 | 1/27/2004 | United States Patent No. 6,683,056 - Washburn et al. | AZ-DAPA-02630320 | AZ-DAPA-02630348 | |
| PTX0088 | | Distribution of Substituents for Examples of WO '128 (FRE 1006 Summary of PTX0069) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0089 | 11/12/1993 | EP 0 598 359 - Tsujihara et al. | ZYD_DAPA_0013773 | ZYD_DAPA_0013846 | |
| PTX0090 | 1/4/2011 | United States Patent No. 7,863,327 - Gribble et al. | | | F, H, I, R, U |
| PTX0091 | 3/22/2005 | Dinkova-Kostova, Albena T., et al. "Extremely potent triterpenoid inducers of the phase 2 response: correlations of protection against oxidant and inflammatory stress." Proceedings of the National Academy of Sciences 102.12 (2005): 4584-4589. | | | F, H, R |
| PTX0092 | 9/13/2000 | Honda, Tadashi, et al. "Synthetic oleanane and ursane triterpenoids with modified rings A and C: a series of highly active inhibitors of nitric oxide production in mouse macrophages." Journal of medicinal chemistry 43.22 (2000): 4233-4246. | | | F, H, R |
| PTX0093 | 11/14/2016 | Reata Pharmaceuticals Press Release: Reata Announces Plan for Global Phase 2/3 Trial in Chronic Kidney Diseases Caused by Alport Syndrome | | | A, F, H, R, U |
| PTX0094 | 10/10/2019 | AbbVie exits $850M Nrf2 deal with Reata, recouping $330M | | | A, F, H, R, U |
| PTX0095 | 9/25/2020 | Mitsubishi v. Sandoz Trial Volume 2 Transcript | | | A, F, H, I, O, R, U |
| PTX0096 | 8/10/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00017948 | BMS-DAPA-00017970 | A, F, H, R |

Case 1:18-cv-00664-RGA Document 139 Filed 05/11/21 Page 418 of 502 PageID #: 2359

AstraZeneca Pharmaceuticals LP, et al. v. Aurobindo Pharma Ltd., No. 18-664-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0097 | 10/28/1999 | SGLT2 Inhibitor PWG Kick-Off Meeting BMS-356103 Presentation | BMS-DAPA-00026168 | BMS-DAPA-00026226 | A, F, H, R |
| PTX0098 | 5/1/2001 | Confidential Memo from R. Zahler to D.M. Floyd re Significant Events | BMS-DAPA-00086848 | BMS-DAPA-00086889 | A, F, H, R |
| PTX0099 | 6/1/2001 | Confidential Memo from R. Zahler to D.M. Floyd re Significant Events | BMS-DAPA-00014837 | BMS-DAPA-00014871 | A, F, H, R |
| PTX0100 | 6/11/2001 | SGLT2 Biology Significant Events Report | BMS-DAPA-00018234 | BMS-DAPA-00018235 | A, F, H, R |
| PTX0101 | 8/1/2001 | Confidential Memo from R. Zahler to D.M. Floyd re Significant Events | BMS-DAPA-00086716 | BMS-DAPA-00086751 | A, F, H, R |
| PTX0102 | 8/28/2001 | Significant Events SGLT2 Inhibitor Biology Report | BMS-DAPA-00111124 | BMS-DAPA-00111126 | A, F, H, R |
| PTX0103 | 10/1/2001 | Significant Events: SGLT2 Inhibitor Biology Program Report | BMS-DAPA-00018280 | BMS-DAPA-00018280 | A, F, H, R |
| PTX0104 | 5/1/2002 | Confidential Memo from R. Zahler to Distribution List re Hopewell Discovery Updates | BMS-DAPA-00017155 | BMS-DAPA-00017187 | A, F, H, R |
| PTX0105 | | Sodium Dependent Glucose Transporter (SGLT2) Inhibitor BMS-512148 Development Plan | BMS-DAPA-00028292 | BMS-DAPA-00028328 | A, F, H, R |
| PTX0106 | 12/10/2014 | Mujahid A. Saeed & Parth Narendran, Dapagliflozin for the treatment of type 2 diabetes: a review of the literature, 8 DRUG DESIGN DEV. THER. 2493-2505 (2014) | AZ-DAPA-02628829 | AZ-DAPA-02628841 | F, H, R, U |
| PTX0107 | 7/15/2019 | Li, Yangxiong, et al. "First-generation structure-activity relationship studies of 2, 3, 4, 9-tetrahydro-1H-carbazol-1-amines as CpxA phosphatase inhibitors." Bioorganic & medicinal chemistry letters 29.14 (2019): 1836-1841. | | | F, H, R, U |

Case 1:18-cv-00664-RGA Document 139 Filed 05/11/21 Page 419 of 502 PageID #: 2360
AstraZeneca AB, et al. v. Zydus Pharmaceuticals (USA) Inc., et al.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0108 | 11/1/1983 | Strickland, Sidney, et al. "Structure-activity relationships of a new series of retinoidal benzoic acid derivatives as measured by induction of differentiation of murine F9 teratocarcinoma cells and human HL-60 promyelocytic leukemia cells." Cancer research 43.11 (1983): 5268-5272. | | | F, H, R |
| PTX0109 | 10/16/2020 | Expert Report of Radojka Savic, Ph.D. | | | |
| PTX0110 | 8/6/2020 | Curriculum Vitae of Radojka Savic, BS, MS, PhD | | | |
| PTX0111 | 10/16/2020 | Data Group 5/8. Data summary & statistics - Exhibit C to Expert Report of Radojka Savic, Ph.D. | | | |
| PTX0112 | 10/16/2020 | STZ Rat Data Calculations and Analyses - Exhibit D to Expert Report of Radojka Savic, Ph.D. | | | |
| PTX0113 | 10/16/2020 | Exhibit B to Expert Report of Radojka Savic, Ph.D. List of Materials Considered | | | |
| PTX0114 | 11/16/2020 | Amended Expert Report of Radojka Savic, Ph.D. | | | |
| PTX0115 | 11/16/2020 | Amended STZ Rat Data Calculations and Analyses - Exhibit D to Amended Expert Report of Radojka Savic, Ph.D. | | | |
| PTX0116 | | Blowup of ZDF Notebook Data | | | |
| PTX0117 | | Native Testing File - 50101.csv | | | |
| PTX0118 | | Native Testing File - 51801.csv | | | |
| PTX0119 | | Native Testing File - 60303.csv | | | |
| PTX0120 | | Native Testing File - 71400.csv | | | |
| PTX0121 | | Native Testing File - 81800.csv | | | |
| PTX0122 | | Native Testing File - 82500.csv | | | |
| PTX0123 | | Native Testing File - 82900.csv | | | |
| PTX0124 | | Native Testing File - run111.phi | | | |
| PTX0125 | | Native Testing File - run112.phi | | | |
| PTX0126 | | Native Testing File - run113.phi | | | |
| PTX0127 | | Native Testing File - run114.phi | | | |
| PTX0128 | | Native Testing File - run115.phi | | | |

Takeda Pharmaceuticals U.S.A., Inc. et al.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0129 | | Native Testing File - run116.phi | | | |
| PTX0130 | | Native Testing File - sdtab111 | | | |
| PTX0131 | | Native Testing File - sdtab112 | | | |
| PTX0132 | | Native Testing File - sdtab113 | | | |
| PTX0133 | | Native Testing File - sdtab114 | | | |
| PTX0134 | | Native Testing File - sdtab115 | | | |
| PTX0135 | | Native Testing File - sdtab116 | | | |
| PTX0136 | | Native Testing File - dm.rs_v2.csv | | | |
| PTX0137 | | Native Testing File - run111_2.phi | | | |
| PTX0138 | | Native Testing File - run112_2.phi | | | |
| PTX0139 | | Native Testing File - run113_2.phi | | | |
| PTX0140 | | Native Testing File - run114_2.phi | | | |
| PTX0141 | | Native Testing File - run115_2.phi | | | |
| PTX0142 | | Native Testing File - run116_2.phi | | | |
| PTX0143 | 7/31/2020 | Opening Expert Report of Garry Tobin, M.D. on the Invalidity of Certain Asserted Claims of U.S. Patent No. 6,515,117 | | | |
| PTX0144 | | Curriculum Vitae of Garry Stuart Tobin, M.D. | | | |
| PTX0145 | | List of Testimony of Garry Stuart Tobin, M.D. | | | |
| PTX0146 | 7/31/2020 | Opening Expert Report of Garry Tobin, M.D. on the Invalidity of Certain Asserted Claims of U.S. Patent No. 6,515,117 List of Materials Considered | | | |
| PTX0147 | 10/16/2020 | Reply Expert Report of Garry Tobin, M.D. on the Invalidity of the Asserted Claims of U.S. Patent No. 6,515,117 | | | |
| PTX0148 | 10/16/2020 | Reply Expert Report of Garry Tobin, M.D. on the Invalidity of the Asserted Claims of U.S. Patent No. 6,515,117 List of Materials Considered | | | |

Case 1:18-cv-00664-RGA Document 139 Filed 05/11/21 Page 421 of 502 PageID #: 2362
AstraZeneca Pharmaceuticals LP, et al. v. Zydus Pharmaceuticals (USA) Inc., No. 18-664-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0149 | 9/30/1993 | Diabetes Control and Complications Trial Research Group. "The effect of intensive treatment of diabetes on the development and progression of long-term complications in insulin-dependent diabetes mellitus." New England journal of medicine 329.14 (1993): 977-986. | TOBIN0000030 | TOBIN0000039 | |
| PTX0150 | 8/22/2018 | Rieg, Timo, and Volker Vallon. "Development of SGLT1 and SGLT2 inhibitors." Diabetologia 61.10 (2018): 2079-2086. | | | R |
| PTX0151 | 6/4/2016 | Gurgle, Holly E., Karen White, and Carrie McAdam-Marx. "SGLT2 inhibitors or GLP-1 receptor agonists as second-line therapy in type 2 diabetes: patient selection and perspectives." Vascular health and risk management 12 (2016): 239. | | | R |
| PTX0152 | 10/2/2020 | Mitsubishi v. Sandoz Trial Volume 5 Transcript | | | A, F, H, I, O, R, U |
| PTX0153 | 8/10/2004 | United States Patent No. 6,774,112 - Gougoutas | | | F, H, I, R, U |
| PTX0154 | 4/13/2018 | Defendant Zydus Pharmaceuticals (USA) Inc.'s Invalidity Contentions for U.S. Patent Nos. 7,943,788; 8,222,219; & 8,785,403 in Mitsubishi v. Sandoz | | | A, F, H, I, O, R, U |
| PTX0155 | 11/24/2020 | Defendant Zydus Pharmaceuticals (USA) Inc.'s Proposed Findings of Fact and Conclusions of Law in Mitsubishi v. Sandoz | | | A, F, H, I, IC, O, R, U |
| PTX0156 | 5/17/2011 | United States Patent No. 7,943,582 - Nomura et al. | | | F, H, I, R, U |
| PTX0157 | 7/17/2012 | United States Patent No. 8,222,219 - Nomura et al. | | | F, H, I, R, U |
| PTX0158 | 8/20/2013 | United States Patent No. 8,513,202 - Nomura et al. | | | F, H, I, R, U |
| PTX0159 | 10/8/2013 | United States Patent No. 8,551,957 - Dugi et al. | | | F, H, I, R, U |

AstraZeneca Pharmaceuticals LP, et al. v. Aurobindo Pharma Ltd., et al.

Plaintiff's Trial Exhibit List

May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0160 | 9/10/2019 | United States Patent No. 10,406,172 - Eickelmann et al. | | | F, H, I, R, U |
| PTX0161 | 1/1/2007 | AM. DIABETES ASSOC., Standards of Medical Care in Diabetes – 2007, 30 (Suppl. 1.) DIABETES CARE S4-S41 (2007) | AZ-DAPA-01586667 | AZ-DAPA-01586704 | F, H, R |
| PTX0162 | 1/1/2020 | American Diabetes Association, Classification and Diagnosis of Diabetes: Standards of Medical Care in Diabetes – 2020, 43 (Suppl. 1) DIABETES CARE S14-S31 (2020) | AZ-DAPA-02629986 | AZ-DAPA-02630003 | F, H, R |
| PTX0163 | 1/1/2020 | American Diabetes Association, Pharmacologic Approaches to Glycemic Treatment: Standards of Medical Care in Diabetes – 2020, 43 (Suppl. 1) DIABETES CARE S98-S110 (2020) | AZ-DAPA-02630577 | AZ-DAPA-02630589 | F, H, R |
| PTX0164 | 10/21/2019 | AstraZeneca Press Release, Farxiga approved in the US to reduce the risk of hospitalization for heart failure in patients with type-2 diabetes | AZ-DAPA-02629897 | AZ-DAPA-02629902 | A, F, H, R, U |
| PTX0165 | 12/1/1999 | Barbara A. Ramlo-Halsted and Steven V. Edelman, The Natural History of Type 2 Diabetes: Implications for Clinical Practice, 26(4) PRIMARY CARE: CLINICS IN OFFICE PRACTICE 771-789 (1999) | AZ-DAPA-02630149 | AZ-DAPA-02630169 | F, H, R |
| PTX0166 | 7/31/2008 | Bruce A. Ellsworth, et al., Aglycone Exploration of C-arylglucoside Inhibitors of Renal Sodium-Dependent Glucose Transporter SGLT2, 18 BIOORGANIC & MED. CHEM. LETTS. 4470-4473 (2008) | BMS-DAPA-00028736 | BMS-DAPA-00028740 | F, H, R |
| PTX0167 | 1/1/2014 | Centers for Disease Control and Prevention, National Diabetes Statistics Report (2014) | AZ-DAPA-02629910 | AZ-DAPA-02629921 | F, H, R, U |
| PTX0168 | 1/1/2020 | Centers for Disease Control and Prevention, National Diabetes Statistics Report (2020) | AZ-DAPA-02629922 | AZ-DAPA-02629953 | F, H, R, U |

AstraZeneca Pharmaceuticals LP, et al. v. Aurobindo Pharma Ltd., et al.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|-----|------|-------------|---------------|---------------|------------|
| PTX0169 | 7/31/2019 | Clifford J. Bailey, Stefano Del Prato, Cheryl Wei et al., Durability of glycaemic control with dapagliflozin, an SGLT2 inhibitor, compared with saxagliptin, a DPP4 inhibitor, in patients with inadequately controlled type 2 diabetes, 21 DIABETES, OBESITY & METABOLISM 2564-2569 (2019) | AZ-DAPA-02630301 | AZ-DAPA-02630306 | F, H, R, U |
| PTX0170 | 2/1/1998 | Daniel J. Drucker, Perspectives in Diabetes: Glucagon-Like Peptides, 47 DIABETES 159-169 (1998) | AZ-DAPA-02630004 | AZ-DAPA-02630014 | F, H, R |
| PTX0171 | 3/1/2006 | Daniel J. Drucker, The biology of incretin hormones, 3 CELL METABOLISM 153-165 (2006) | AZ-DAPA-02630015 | AZ-DAPA-02630027 | F, H, R, U |
| PTX0172 | 7/1/1999 | Darwin L. Brown and David Brillon, New Directions in Type 2 Diabetes Mellitus: An Update of Current Oral Antidiabetic Therapy, 91(7) J. NAT. MED. ASSOC'N 389-395 (1999) | AZ-DAPA-02629903 | AZ-DAPA-02629909 | F, H, R |
| PTX0173 | | David M. Nathan, John B. Buse, Mayer B. Davidson et al., Management of Hyperglycemia in Type 2 Diabetes: A Consensus Algorithm for the Initiation and Adjustment of Therapy, 29(8) DIABETES CARE 1963-1972 (2006) | AZ-DAPA-02630139 | AZ-DAPA-02630148 | F, H, R, U |
| PTX0174 | 3/12/2019 | David Matthews, Qiang Li, Vlado Perkovic et al., Effects of canagliflozin on amputation risk in type 2 diabetes: the CANVAS Program, 62 DIABETOLOGIA 926-938 (2019) | AZ-DAPA-02630126 | AZ-DAPA-02630138 | F, H, R, U |
| PTX0175 | 10/17/2015 | Fioretto et al., Efficacy and safety of dapagliflozin, a sodium glucose cotransporter 2 (SGLT2) inhibitor, in diabetes mellitus, 14 CARDIOVASC. DIABETOL. 142 (2015) | AZ-DAPA-02630307 | AZ-DAPA-02630319 | F, H, R, U |

Case 1:18-cv-00664-RGA Document 139 Filed 05/11/21 Page 424 of 502 PageID #: 2365
AstraZeneca Pharmaceuticals LP, et al. v. Zydus Pharmaceuticals (USA) Inc., et al.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|-----|------|-------------|---------------|---------------|------------|
| PTX0176 | 7/11/2013 | FOOD & DRUG ADMIN., CENTER FOR DRUG EVALUATION AND RESEARCH, Medical Review(s), Application Number 202293Orig1s000 at 15 (2013) | AZ-DAPA-02628890 | AZ-DAPA-02629383 | F, H, R, U |
| PTX0177 | 5/16/2017 | FOOD & DRUG ADMIN., FDA Drug Safety Communication: FDA confirms increased risk of leg and foot amputations with the diabetes medicine canagliflozin (Invokana, Invokamet, Invokamet XR) | AZ-DAPA-02628584 | AZ-DAPA-02628586 | F, H, R, U |
| PTX0178 | 8/1/1999 | Ingrid De Meester et al., CD26, Let It Cut or Cut It Down, 20 IMMUNOL. TODAY 367-375 (1999) | AZ-DAPA-02629954 | AZ-DAPA-02629962 | F, H, R |
| PTX0179 | 4/1/2009 | James F. List et al., Sodium-Glucose Cotransport Inhibition with Dapagliflozin in Type 2 Diabetes, 32 DIABETES CARE 650-657 (2009) | AZ-DAPA-02368533 | AZ-DAPA-02368540 | F, H, R, U |
| PTX0180 | 12/1/1998 | Jens J. Holst and Carolyn F. Deacon, Perspectives in Diabetes: Inhibition of the Activity of Dipeptidyl-Peptidase IV as a Treatment for Type 2 Diabetes, 47 DIABETES 1663-1670 (1998) | AZ-DAPA-02630041 | AZ-DAPA-02630049 | F, H, R |
| PTX0181 | 1/1/2000 | John E. Gerich, Physiology of Glucose Homeostasis, 2 DIABETES, OBESITY & METAB. 345-350 (2000) | AZ-DAPA-02630028 | AZ-DAPA-02630033 | F, H, R |
| PTX0182 | 5/18/2018 | Julio Rosenstock, Chantal Mathieu, Hungta Chen et al., Dapagliflozin versus saxagliptin as add-on therapy in patients with type 2 diabetes inadequately controlled with metformin, 62 ARCHIVES OF ENDOCRINOLOGY & METABOLISM 424-430 (2018) | AZ-DAPA-02630119 | AZ-DAPA-02630125 | F, H, R, U |

AstraZeneca AB and AstraZeneca Pharmaceuticals LP v. Zydus Pharmaceuticals (USA) Inc. et al., No. 18-664-RGA

Plaintiff's Trial Exhibit List

May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0183 | 9/1/2000 | Kacie Doyle-Delgado, James J. Chamberlain, Jay H. Shubrook et al., Pharmacologic Approaches to Glycemic Treatment of Type 2 Diabetes: Synopsis of the 2020 American Diabetes Association's Standards of Medical Care in Diabetes Clinical Guidelines, ANNALS OF INTERNAL MED. Clinical Guidelines (2020) | AZ-DAPA-02630561 | AZ-DAPA-02630571 | F, H, R |
| PTX0184 | 4/1/2014 | M. A. Abdul-Ghani and R. A. DeFronzo, Lowering plasma glucose concentration by inhibiting renal sodium-glucose cotransport, 276 J. OF INTERNAL MED., 352-363 (2014) | AZ-DAPA-02629885 | AZ-DAPA-02629896 | F, H, R, U |
| PTX0185 | 8/1/2011 | M. A. Abdul-Ghani, Luke Norton and Ralph DeFronzo, Role of Sodium-Glucose Cotransporter 2 (SGLT 2) Inhibitors in the Treatment of Type 2 Diabetes, 32(4) ENDOCRINE REVIEWS. 515-531 (2011) | AZ-DAPA-02629868 | AZ-DAPA-02629884 | F, H, R, U |
| PTX0186 | 10/31/2018 | Marc S. Rendell, Sotagliflozin: a combined SGLT1/SGLT2 inhibitor to treat diabetes, 13(6) EXPERT REV. ENDOCRIN. METAB. 333-339 (2018) | AZ-DAPA-02628821 | AZ-DAPA-02628828 | F, H, R, U |
| PTX0187 | 5/14/1992 | Mark Gutniak et al., Antidiabetogenic Effect of Glucagon-Like Peptide-1 (7-36) Amide in Normal Subjects and Patients with Diabetes Mellitus, 326(20) N. ENGL. J. MED. 1316-1322 (1992) | AZ-DAPA-02630034 | AZ-DAPA-02630040 | F, H, R |
| PTX0188 | 2/9/2008 | Meng et al., Discovery of Dapagliflozin: A Potent Selective Renal Sodium-Dependent Glucose Cotransporter 2 (SGLT2) Inhibitor for the Treatment of Type 2 Diabetes, 51 J. MED. CHEM. 1145-1149 (2008) | BMS-DAPA-00101540 | BMS-DAPA-00101544 | F, H, R, U |

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0189 | 3/1/2016 | Michael A. Weber et al., Blood pressure and glycaemic effects of dapagliflozin versus placebo in patients with type 2 diabetes on combination antihypertensive therapy: a randomized, double-blind, placebo-controlled, phase 3 study, 4 LANCET DIABETES ENDOCRIN. 211-220 (2016) | AZ-DAPA-02628880 | AZ-DAPA-02628889 | F, H, R, U |
| PTX0190 | 9/1/1998 | Nicholas A. Tritos and Christos S. Mantzoros, Syndromes of Severe Insulin Resistance, 83(9) J. CLIN. ENDOCRIN. MET. 3025-3030 (1998) | AZ-DAPA-02628874 | AZ-DAPA-02628879 | F, H, R |
| PTX0191 | 8/17/1999 | Ralph A. DeFronzo, Pharmacologic Therapy for Type 2 Diabetes Mellitus, 131 ANNALS INTERNAL MED. 281-303 (1999) | AZ-DAPA-02629963 | AZ-DAPA-02629985 | F, H, R |
| PTX0192 | 7/1/2001 | Richard A. Harrigan et al., Oral Agents for the Treatment of Type 2 Diabetes Mellitus: Pharmacology, Toxicity, and Treatment, 38 ANNALS EMERGENCY MED. 68-78 (2001) | AZ-DAPA-02630229 | AZ-DAPA-02630239 | F, H, R, U |
| PTX0193 | 6/1/2015 | S. Del Prato, M. Nauck, S. Durán et al., Long-term glycemic response and tolerability of dapagliflozin versus sulphonylurea as add-on therapy to metformin in patients with type 2 diabetes: 4-year data, 17 DIABETES, OBESITY & METABOLISM 581-590 (2015) | AZ-DAPA-02630551 | AZ-DAPA-02630560 | F, H, R, U |
| PTX0194 | 3/1/2004 | Sarah J. Beaton et al., Adequacy of Glycemic, Lipid, and Blood Pressure Management for Patients With Diabetes in a Managed Care Setting, 27 DIABETES CARE 694-698 (Mar. 2004) | AZ-DAPA-02628575 | AZ-DAPA-02628579 | F, H, R, U |

AstraZeneca AB, et al. v. Zydus Pharmaceuticals (USA), Inc., No. 18-664-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0195 | 1/1/2017 | Se Hee Min, Jeong-Hwa Yoon, Seokyung Hahn, Young Min Cho, Comparison between SGLT2 inhibitors and DPP4 inhibitors added to insulin therapy in type 2 diabetes: a systematic review with indirect comparison meta-analysis, 33 DIABETES/METABOLISM RESEARCH & REVIEWS, e2818 (2017) | AZ-DAPA-02630170 | AZ-DAPA-02630180 | F, H, R, U |
| PTX0196 | 11/18/1999 | Zimmet et al., Etiology of the Metabolic Syndrome: Potential Role of Insulin Resistance, Leptin Resistance, and Other Players, ANNALS NEW YORK ACADEMY OF SCIENCES, 25-44 (1999) | AZ-DAPA-02630209 | AZ-DAPA-02630228 | F, H, R |
| PTX0197 | 1/1/2020 | Highlights of Prescribing Information - Farxiga® Revised 1/2020 | AZ-DAPA-02629384 | AZ-DAPA-02629423 | H, R |
| PTX0198 | 10/1/2018 | Highlights of Prescribing Information - Invokana® Revised 10/2018 | AZ-DAPA-02630050 | AZ-DAPA-02630099 | A, F, H, R, U |
| PTX0199 | 8/1/2020 | Highlights of Prescribing Information - Invokana® Revised 08/2020 | AZ-DAPA-02630100 | AZ-DAPA-02630118 | A, F, H, R, U |
| PTX0200 | 1/1/2020 | Highlights of Prescribing Information - QTern® Revised 1/2020 | AZ-DAPA-02629424 | AZ-DAPA-02629463 | A, F, H, R, U |
| PTX0201 | 5/1/2019 | Highlights of Prescribing Information - QTernmet® XR Revised 5/2019 | AZ-DAPA-02630240 | AZ-DAPA-02630293 | A, F, H, R, U |
| PTX0202 | 1/1/2020 | Highlights of Prescribing Information - Steglatro™ Revised 1/2020 | AZ-DAPA-02630181 | AZ-DAPA-02630208 | A, F, H, R, U |
| PTX0203 | 1/1/2020 | Highlights of Prescribing Information - Xigduo® XR Revised 1/2020 | AZ-DAPA-02629464 | AZ-DAPA-02629518 | A, F, H, R, U |
| PTX0204 | 10/18/2011 | E-mail re 2011-10-6-cleveland-clinic-unveils-top-10-medical-innovations-for-2012.htm | AZ-DAPA-02628580 | AZ-DAPA-02628582 | A, F, H, R, U |
| PTX0205 | 11/26/2007 | To Pee or Not to Pee (Glucose): The Saga of Dapagliflozin Drug Discovery and Development - A Brief History of the Brand Presentation | BMS-DAPA-00039179 | BMS-DAPA-00039203 | A, F, H, R, U |

Case 1:18-cv-00664-RGA Document 139 Filed 05/11/21 Page 428 of 502 PageID #: 2369
AstraZeneca Pharmaceuticals LP et al. v. Mylan Pharmaceuticals Inc., No. 18-664 (RGA)
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0206 | 11/1/2011 | E-mails re Bloomberg: "Bristol-AstraZeneca Diabetes Drug Revived as Doctors Urge Option" | BMS-DAPA-00090191 | BMS-DAPA-00090194 | A, F, H, R, U |
| PTX0207 | 9/11/2020 | Rebuttal Expert Report of Joshua L. Cohen, M.D., F.A.C.P. List of Materials Considered | | | F, H, R, U |
| PTX0208 | 1/28/2000 | Lab Notebook No. 47024 | BMS-DAPA-00009696 | BMS-DAPA-00009806 | D, R |
| PTX0209 | 9/11/2000 | Lab Notebook No. 48217 | BMS-DAPA-00009807 | BMS-DAPA-00009919 | D, R |
| PTX0210 | 7/2/2003 | Lab Notebook No. 56826 | BMS-DAPA-00010006 | BMS-DAPA-00010265 | D, R |
| PTX0211 | 9/8/2020 | Rebuttal Expert Report of Ronald A. Thisted, Ph.D. List of Materials Considered | | | F, H, R, U |
| PTX0212 | 9/8/2020 | STZ Studies - Exhibit C to Rebuttal Expert Report of Ronald A. Thisted, Ph.D. | | | F, H, R, U |
| PTX0213 | 9/8/2020 | ZDF Study - Exhibit D to Rebuttal Expert Report of Ronald A. Thisted, Ph.D. | | | F, H, R, U |
| PTX0214 | 9/28/1998 | SGLT2 Significant Events Report | BMS-DAPA-00011938 | BMS-DAPA-00011940 | A, F, H, R |
| PTX0215 | 4/7/1999 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00011753 | BMS-DAPA-00011773 | A, F, H, R |
| PTX0216 | 3/1/1997 | Johannsson, Gudmundur, et al. "Growth hormone treatment of abdominally obese men reduces abdominal fat mass, improves glucose and lipoprotein metabolism, and reduces diastolic blood pressure." The Journal of Clinical Endocrinology & Metabolism 82.3 (1997): 727-734. | AZ-DAPA-02629541 | AZ-DAPA-02629548 | F, H, R |
| PTX0217 | 8/1/2000 | SGLT2 Biology Significant Events Report | BMS-DAPA-00018236 | BMS-DAPA-00018241 | A, F, H, R |
| PTX0218 | 9/25/2000 | SGLT2 Biology Significant Events | BMS-DAPA-00018247 | BMS-DAPA-00018251 | A, F, H, R |
| PTX0219 | 10/1/2000 | Sodium-Glucose Transporter (SGLT2) Report | BMS-DAPA-00109642 | BMS-DAPA-00109643 | A, F, H, IC, R |
| PTX0220 | 4/1/2001 | Confidential Memo from R. Zahler to D.M. Floyd re Significant Events | BMS-DAPA-00086757 | BMS-DAPA-00086787 | A, F, H, R |

AstraZeneca Pharmaceuticals, LP, et al. v. Aurobindo Pharma Ltd., et al.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0221 | 8/1/2002 | Confidential Memo from R. Zahler to Distribution List re Hopewell Discovery Significant Events | BMS-DAPA-00015522 | BMS-DAPA-00015556 | A, F, H, R |
| PTX0222 | 10/1/2002 | Confidential Memo from R. Zahler to Distribution List re Hopewell Discovery Significant Events | BMS-DAPA-00017119 | BMS-DAPA-00017152 | A, F, H, R |
| PTX0223 | 4/1/2003 | Confidential Memo from R. Zahler and R. Wexler to Distribution List re Hopewell Discovery Significant Events | BMS-DAPA-00015831 | BMS-DAPA-00015863 | A, F, H, R |
| PTX0224 | 11/1/2003 | Confidential Memo from R. Zahler/R. Wexler/S. Taylor to C. Decicco/R. Kramer re Hopewell Discovery Significant Events-October 2003 | BMS-DAPA-00014629 | BMS-DAPA-00014635 | A, F, H, R |
| PTX0225 | 12/1/2003 | Confidential Memo from R. Zahler/R. Wexler/S. Taylor to C. Decicco/R. Kramer re Hopewell Discovery Significant Events | BMS-DAPA-00014588 | BMS-DAPA-00014591 | A, F, H, R |
| PTX0226 | | The road to Farxiga, including divestiture and other rarely discussed topics Presentation | BMS-DAPA-00071983 | BMS-DAPA-00072031 | A, F, H, R |
| PTX0227 | 7/10/2004 | SGLT2 SAR for ortho-Benzyl C-Aryl Glucosides | AZ-DAPA-02594544 | AZ-DAPA-02594559 | A, D, F, H, I, R |
| PTX0228 | 11/1/2000 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00017781 | BMS-DAPA-00017807 | A, F, H, R |
| PTX0229 | 4/29/2004 | BMS-512148 (SGLT2) FORM Team Report: Interim Form Recommendation | BMS-DAPA-00033264 | BMS-DAPA-00033274 | A, F, H, R |
| PTX0230 | | SGLT2 281010 History | BMS-DAPA-00039604 | BMS-DAPA-00039608 | A, F, H, I, IC, R |
| PTX0231 | | Discovery of Dapagliflozin: A novel approach to diabetes with potential as an anti-obesity agent Presentation | BMS-DAPA-00041434 | BMS-DAPA-00041473 | A, F, H, R |
| PTX0232 | 6/22/1998 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00117679 | BMS-DAPA-00117696 | A, F, H, R |
| PTX0233 | 9/6/1998 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00117697 | BMS-DAPA-00117713 | A, F, H, R |
| PTX0234 | 7/10/2004 | SGLT2 Data Table | BMS-DAPA-00038772 | BMS-DAPA-00038782 | A, D, F, H, I, R |

AstraZeneca Pharmaceuticals LP, et al. v. Zydus Pharmaceuticals (USA) Inc., et al.
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0235 | 4/23/2001 | BMS-437133 (ECN #2) SGLT-2 Inhibitor Sodium-Dependent Glucose Transporter -2 EDOC Presentation | BMS-DAPA-00113078 | BMS-DAPA-00113124 | A, F, H, R |
| PTX0236 | 5/9/2001 | ECN Document: BMS-437133, SGLT2 Antagonist for Treatment of Diabetes | BMS-DAPA-00022627 | BMS-DAPA-00022635 | A, F, H, R |
| PTX0237 | | SGLT2 Inhibitors Containing C-Glucosides derived from Dapagliflozin in Active Clinical Trials | BMS-DAPA-00092067 | BMS-DAPA-00092068 | A, F, H, I, R, U |
| PTX0238 | | C-Glucoside SGLT2 Inhibitors Inspired by Dapagliflozin | BMS-DAPA-00094348 | BMS-DAPA-00094348 | A, F, H, I, R, U |
| PTX0239 | | Selected Properties and Clinical Status of SGLT2 Inhibitors in the Clinic | BMS-DAPA-00098732 | BMS-DAPA-00098732 | A, F, H, I, R, U |
| PTX0240 | | Astellas SGLT2 Inhibitor | BMS-DAPA-00102308 | BMS-DAPA-00102311 | A, F, H, I, R, U |
| PTX0241 | 11/13/2019 | Zydus Pharmaceuticals (USA) Inc.'s First Amended Invalidity Contentions | | | R, U |
| PTX0242 | 6/21/2018 | Certified File History for United States Patent Application No. 16/014,479 | AZ-DAPA-02587256 | AZ-DAPA-02594496 | |
| PTX0243 | | BMS Results Table | AZ-DAPA-02594535 | AZ-DAPA-02594542 | A, F, H, I, R, U |
| PTX0244 | 1/1/2018 | RES. DEV. COUNCIL OF NEW JERSEY, Edison Patent Award Information and Application, available at http://www.rdnj.org/ awards-recognitions/apply2018/ | AZ-DAPA-02628583 | AZ-DAPA-02628583 | A, F, H, I, R, U |
| PTX0245 | 1/1/2004 | Carol E. Koro et al., Glycemic Control From 1988 to 2000 Among U.S. Adults Diagnosed with Type 2 Diabetes, 27 DIABETES CARE 17 (2004) | AZ-DAPA-02630349 | AZ-DAPA-02630352 | F, H, R, U |
| PTX0246 | 6/19/2002 | A. Liebl et al., Evaluation of Risk Factors for Development of Complications in Type II Diabetes in Europe, 45 DIABETOLOGIA S23 (2002) | AZ-DAPA-02630353 | AZ-DAPA-02630358 | F, H, R, U |
| PTX0247 | 10/12/1999 | U.S. Provisional Application No. 60/158773 | AZ-DAPA-02630359 | AZ-DAPA-02630444 | |
| PTX0248 | 4/5/2000 | U.S. Provisional Application No. 60/194615 | AZ-DAPA-02630445 | AZ-DAPA-02630537 | |
| PTX0249 | 12/15/2017 | Affidavit of William N. Washburn | AZ-DAPA-02630538 | AZ-DAPA-02630550 | F, H, I, R, U |
| PTX0250 | 6/2/2000 | Lab Notebook No. 47694 | BMS-DAPA-00010719 | BMS-DAPA-00010872 | A, F, H, R |

AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc., No. 18-664-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0250A | 6/2/2000 | Excerpts from Lab Notebook No. 47694 | BMS-DAPA-00010719;<br>BMS-DAPA-00010721;<br>BMS-DAPA-00010750;<br>BMS-DAPA-00010756;<br>BMS-DAPA-00010806;<br>BMS-DAPA-00010808;<br>BMS-DAPA-00010830 | BMS-DAPA-00010719;<br>BMS-DAPA-00010721;<br>BMS-DAPA-00010751;<br>BMS-DAPA-00010756;<br>BMS-DAPA-00010806;<br>BMS-DAPA-00010808;<br>BMS-DAPA-00010831 | A, D, F, H, R |
| PTX0251 | 2/2/2001 | Lab Notebook No. 48891 | BMS-DAPA-00010873 | BMS-DAPA-00011016 | A, F, H, R |
| PTX0251A | 2/2/2001 | Excerpts from Lab Notebook No. 48891 | BMS-DAPA-00010873;<br>BMS-DAPA-00010875;<br>BMS-DAPA-00010935 | BMS-DAPA-00010873;<br>BMS-DAPA-00010875;<br>BMS-DAPA-00010935 | A, D, F, H, R |
| PTX0252 | 6/5/2002 | Lab Notebook No. 53435 | BMS-DAPA-00011198 | BMS-DAPA-00011301 | A, F, H, R |
| PTX0252A | 6/5/2002 | Excerpts from Lab Notebook No. 53435 | BMS-DAPA-00011198;<br>BMS-DAPA-00011298 | BMS-DAPA-00011198;<br>BMS-DAPA-00011298 | A, D, F, H, R |
| PTX0253 | 10/1/2010 | DAPA Gazette Volume 3, Issue 11 | BMS-DAPA-00038234 | BMS-DAPA-00038240 | F, H, R, U |
| PTX0254 | | Note of Thanks re Thomas Alva Edison Patent Award for Emerging Technologies | BMS-DAPA-00040097 | BMS-DAPA-00040097 | A, D, F, H, I, R |
| PTX0255 | 12/9/2009 | E-mail re: Patent Award | BMS-DAPA-00048739 | BMS-DAPA-00048739 | A, F, H, R |
| PTX0256 | 5/18/2001 | BMS-512148 pcris.db | BMS-DAPA-00111071 | BMS-DAPA-00111071 | A, F, H, I, R |
| PTX0257 | 8/25/2000 | BMS Pharmaceutical Research Institute Department of Metabolism and Pharmacokinetics Scientific Report on Compound Number BMS-356103 | BMS-DAPA-00112123 | BMS-DAPA-00112193 | A, F, H, R |
| PTX0258 | 9/7/2000 | Lab Notebook No. 48213 | BMS-DAPA-00117448 | BMS-DAPA-00117659 | A, F, H, R |
| PTX0259 | 8/6/1998 | Confidential Memo from S.A. Biller to D.M. Floyd re Significant Events/Metabolic Diseases Chemistry | BMS-DAPA-00117763 | BMS-DAPA-00117785 | A, F, H, R |
| PTX0260 | 1/11/2011 | BMS# BMS-281005 | BMS-DAPA-00117876 | BMS-DAPA-00117876 | A, F, H, I, R |
| PTX0261 | 5/22/2020 | Deposition Transcript of Gang Wu with Errata | | | F, H, R |
| PTX0262 | 1/1/1999 | Takeshi Kuribayashi et al., C-glycosylated Diphenylmethanes and Benzophenones: The Stille Coupling Reaction of C-glycosylated Aryl Tins with Benzyl Bromides and Acid Chlorides, 18 J. CARBOHYDRATE CHEM. 393 (1999) | ZYD_DAPA_0013904 | ZYD_DAPA_0013921 | |

AstraZeneca Pharmaceuticals LP, et al. v. Zydus Pharmaceuticals (USA) Inc., et al.

Plaintiff's Trial Exhibit List

May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|-----|------|-------------|---------------|---------------|------------|
| PTX0263 | 12/19/1996 | George A. Patani & Edmond J. LaVoie, Bioisosterism: A Rational Approach in Drug Design, 96 CHEM. REV. 3147 (1996) | ZYD_DAPA_0013950 | ZYD_DAPA_0013979 | |
| PTX0264 | 6/8/1995 | Graham L. Patrick, AN INTRODUCTION TO MEDICINAL CHEMISTRY (1st ed. 1995) | ZYD_DAPA_0013980 | ZYD_DAPA_0014144 | |
| PTX0265 | 12/1/2000 | Gareth Thomas, MEDICINAL CHEMISTRY: AN INTRODUCTION (2000) | ZYD_DAPA_0014159 | ZYD_DAPA_0014198 | |
| PTX0266 | 9/1/2020 | Rebuttal Expert Report of Dr. Kenneth W. Batchelor List of Materials Considered | | | F, H, R |
| PTX0267 | 11/30/2020 | Supplement to Rebuttal Expert Report of Ronald A. Thisted, Ph.D. | | | B, F, H, R, U |
| PTX0268 | 11/30/2020 | Appendix 1 to Supplement to Rebuttal Expert Report of Ronald A. Thisted, Ph.D. | | | F, H, R, U |
| PTX0269 | 11/30/2020 | Appendix 2 to Supplement to Rebuttal Expert Report of Ronald A. Thisted, Ph.D. (provided in native format) | | | F, H, R, U |
| PTX0270 | 11/30/2020 | Appendix 3 to Supplement to Rebuttal Expert Report of Ronald A. Thisted, Ph.D. (provided in native format) | | | F, H, R, U |
| PTX0271 | 1/1/1999 | ECN Document: SGLT2 Inhibitor BMS-356103 for the Treatment of NIDDM | BMS-DAPA-00022543 | BMS-DAPA-00022546 | A, F, H, I, R |
| PTX0272 | | Curriculum Vitae of Kenneth William Batchelor | | | F, H, R |
| PTX0273 | 8/1/2020 | Curriculum Vitae of Ronald A. Thisted | | | F, H, R |
| PTX0274 | 7/8/2020 | Agreement to by Bound by Protective Order of Gordon W. Gribble | | | F, H, R |
| PTX0275 | 7/9/2020 | Agreement to by Bound by Protective Order of Garry Stuart Tobin | | | F, H, R |
| PTX0276 | 11/25/2020 | Curriculum Vitae of Radojka Savic, BS, MS, PhD | | | |
| PTX0277 | | MD071400 Data Spreadsheet | BMS-DAPA-00034531 | BMS-DAPA-00034531 | |
| PTX0278 | | MD081800 Data Spreadsheet | BMS-DAPA-00034534 | BMS-DAPA-00034534 | |
| PTX0279 | | MD082500 Data Spreadsheet | BMS-DAPA-00034537 | BMS-DAPA-00034537 | |

Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0280 | | MD082900 Data Spreadsheet | BMS-DAPA-00034538 | BMS-DAPA-00034538 | |
| PTX0281 | | MD050101 Data Spreadsheet | BMS-DAPA-00034571 | BMS-DAPA-00034571 | |
| PTX0282 | | MD051801 Data Spreadsheet | BMS-DAPA-00034574 | BMS-DAPA-00034574 | |
| PTX0283 | | MD060303 Data Spreadsheet | BMS-DAPA-00034631 | BMS-DAPA-00034631 | |
| PTX0284 | 5/29/2020 | Deposition Transcript of Bruce Ellsworth with Errata | | | F, H, O, R |
| PTX0285 | 5/20/2020 | Deposition Transcript of Wei Meng with Errata | | | F, H, O, R |
| PTX0286 | 6/12/2020 | Deposition Transcript of William Washburn with Errata | | | F, H, O, R |
| PTX0287 | 8/22/2019 | Opening Expert Report of Thomas D. Bannister, Ph.D. in Mitsubishi v. Sandoz | | | A, F, H, I, O, R, U |
| PTX0288 | 12/12/2013 | FDA Briefing Document: NDA 202293 Advisory Committee Meeting | BMS-DAPA-00018350 | BMS-DAPA-00018524 | F, H, R |
| PTX0289 | 7/29/2004 | WO 04/063309 - Deshpande et al. | | | F, H, R, U |
| PTX0290 | | Excerpt from Lab Notebook No. 48216 (PTX0047) | | | F, H, I, IC, N, NTP, R |
| PTX0291 | | FRE 1006 Summary of Data from Lab Notebook Nos. 47694 (PTX0250), 48891 (PTX0251), and 53435 (PTX0252) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0292 | | FRE 1006 Summary of Data from Lab Notebook Nos. 47024 (PTX0208), 48217 (PTX0209), and 56842 (PTX0210) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0293 | | Curriculum Vitae of Joshua Lewis Cohen, M.D., F.A.C.P. | | | D, F, H, R, U |
| PTX0294 | 9/25/2020 | Mitsubishi v. Sandoz Trial Volume 1 Transcript | | | A, F, H, I, O, R, U |
| PTX0295 | 1/28/2000 | Excerpts from Lab Notebook No. 47024 (PTX0208) | BMS-DAPA-00009696; BMS-DAPA-00009785; BMS-DAPA-00009793; BMS-DAPA-00009795 | BMS-DAPA-00009697; BMS-DAPA-00009787; BMS-DAPA-00009795; BMS-DAPA-00009802 | D |
| PTX0296 | 9/11/2000 | Excerpts from Lab Notebook No. 48217 (PTX0209) | BMS-DAPA-00009807; BMS-DAPA-00009854; BMS-DAPA-00009861 | BMS-DAPA-00009810; BMS-DAPA-00009856; BMS-DAPA-00009863 | D |
| PTX0297 | 7/2/2003 | Excerpts from Lab Notebook No. 56826 (PTX0210) | BMS-DAPA-00010006; BMS-DAPA-00010041 | BMS-DAPA-00010008; BMS-DAPA-00010045 | D |
| PTX0298 | 3/22/2021 | Opinion in Mitsubishi v. Sandoz | | | A, F, H, I, O, R, U |
| PTX0299 | 3/22/2021 | Order in Mitsubishi v. Sandoz | | | A, F, H, I, O, R, U |

AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc., No. 18-664-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|---|---|---|---|---|---|
| PTX0300 | 10/1/2020 | Mitsubishi v. Sandoz Trial Volume 4 Transcript | | | A, F, H, I, O, R, U |
| PTX0301 | 7/9/2015 | L. Prasad-Reddy & Diana Isaacs, A clinical review of GLP-1 receptor agonists: efficacy and safety in diabetes and beyond, 4 Drugs in Context 1 (2015) | | | |
| PTX0302 | 2/1/2017 | Kelly R. Burke et al., SGLT2 Inhibitors: A Systematic Review of Diabetic Ketoacidosis and Related Risk Factors in the Primary Literature, 37(2) Pharmacotherapy 187 (2017) | | | |
| PTX0303 | 11/14/2018 | P. Ueda et al., Sodium glucose cotransporter 2 inhibitors and risk of serious adverse events: nationwide register based cohort study, 363 BMJ 1 (2018) | | | |
| PTX0304 | 4/26/2021 | Acute Blood Glucose Reduction Following Oral Administration of Dapagliflozin or the Compound of Ex. 12 of WO '128 in Hyperglycemic STZ Rats (FRE 1006 Summary of PTX0208, PTX0209, and PTX0210) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0305 | 4/26/2021 | Plasma Glucose Reduction in ZDF Rats Following Oral Administration of Dapagliflozin or the Compound of Ex. 12 of WO '128 in a Two Week Subchronic Study (FRE 1006 Summary of PTX0060 and PTX0061) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0306 | 4/26/2021 | Plasma Glucose Reduction in ZDF Rats Following Oral Administration of Dapagliflozin or the Compound of Ex. 12 of WO '128 in a Two Week Subchronic Study (FRE 1006 Summary of PTX0060) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0307 | 4/26/2021 | SGLT2 and SGLT1 Inhibitory Activity for the Compound of Ex. 12 of WO '128 (FRE 1006 Summary of PTX0048, PTX0188, PTX0250, PTX0251, and PTX0252) | | | A, D, F, H, I, IC, N, NTP, O, R, U |

AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc., No. 864-RGA
Plaintiff's Trial Exhibit List
May 4, 2021

| PTX | Date | Description | Beg Bates No. | End Bates No. | Objections |
|-----|------|-------------|---------------|---------------|------------|
| PTX0308 | 4/26/2021 | Distribution of Substituents for Examples Falling Within Structure IB of WO '128 (FRE 1006 Summary of PTX0069) | | | A, D, F, H, I, IC, N, NTP, O, R, U |
| PTX0309 | 5/3/2021 | SGLT2 and SGLT1 Inhibitory Activity for the Compound of Ex. 12 of WO '128 (FRE 1006 Summary of PTX0048, PTX0188, PTX0250, PTX0251, and PTX0252) | | | A, D, F, H, I, IC, N, NTP, O, R, U |

**ZYDUS'S TRIAL EXHIBIT OBJECTION KEY**

| Code | Objection |
|------|-----------|
| A | Authentication (FRE 901—authentication) |
| B | Not best evidence (FRE 1002—best evidence rule) |
| D | Duplicative |
| F | Foundation |
| H | Hearsay (FRE 802) |
| I | Incomplete (FRE 106—completeness) |
| IC | Improper compilation (FRE 403—unfair prejudice; FRE 1002—best evidence; FRE 104(b)—foundation) |
| ID | Inaccurate description |
| N | Not previously produced, lacks production numbers, or illegible |
| NTP | Not timely produced/identified during discovery (FRCP 26/37(c)) |
| O | Improper opinion testimony (FRE 701–704) |
| OC | Offer to compromise under FRE 408 |
| R | Relevance (FRE 401–402) |
| S | Subject to motion *in limine* |
| U | Unduly prejudicial, confusing, or misleading (FRE 403—unfair prejudice) |

# EXHIBIT G

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ▮▮▮▮▮▮▮▮▮▮▮▮▮

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---|---|---|---|---|
| 001 | U.S. Patent No. 6,414,126 | AZ-DAPA-00000001 | AZ-DAPA-00000043 | |
| 002 | Prosecution History of U.S. Patent No. 6,414,126 (U.S. Patent Application No. 09/679,027) | AZ-DAPA-00000044 | AZ-DAPA-00001451 | |
| 003 | U.S. Patent No. 6,515,117 | AZ-DAPA-00001513; ZYD_DAPA_0014740 | AZ-DAPA-00001532; ZYD_DAPA_0014755 | |
| 004 | Prosecution History of U.S. Patent No. 6,515,117 (U.S. Patent Application No. 10/151,436) | AZ-DAPA-00001533 | AZ-DAPA-00001945 | |
| 005 | Gribble CV | | | |
| 006 | Mitsuya Hongu et al., *Na$^+$-Glucose Cotransporter Inhibitors as Antidiabetic Agents. II. Synthesis and Structure-Activity Relationships of 4'-Dehydroxyphlorizin Derivatives*, 46 Chem. Pharm. Bull. 22 (1998) | ZYD_DAPA_0013854 | ZYD_DAPA_0013865 | |
| 007 | International Patent Application Publication No. WO 01/27128 | ZYD_DAPA_0014206 | ZYD_DAPA_0014325 | |
| 008 | Kenji Tsujihara et al., *Na$^+$-Glucose Cotransporter Inhibitors as Antidiabetics. I. Synthesis and Pharmacological Properties of 4'-Dehydroxyphlorizin Derivatives Based on a New Concept*, 44 Chem. Pharm. Bull. 1174 (1996) | ZYD_DAPA_0014199 | ZYD_DAPA_0014205 | |
| 009 | European Patent Application Publication No. 0598359 | ZYD_DAPA_0013773 | ZYD_DAPA_0013846 | |
| 010 | Kenneth Kees et al., *New Potent Antihyperglycemic Agents in db/db Mice: Synthesis and Structure-Activity Relationship Studies of (4-Substituted Benzyl)(Trifluoromethyl)Pyrazoles and -Pyrazolones*, 39 J. Med. Chem. 3920 (1996) | ZYD_DAPA_0013866 | ZYD_DAPA_0013874 | |
| 011 | International Patent Application Publication No. WO 98/31697 | ZYD_DAPA_0014397 | ZYD_DAPA_0014667 | |
| 012 | Graham Patrick, *An Introduction to Medicinal Chemistry* (1st ed. 1995) | ZYD_DAPA_0013980 | ZYD_DAPA_0014144 | |

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ████████████

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---|---|---|---|---|
| 013 | Gareth Thomas, *Medicinal Chemistry: An Introduction* (2000) | ZYD_DAPA_0014159 | ZYD_DAPA_0014198 | |
| 014 | George Patani & Edmond LaVoie, *Bioisosterism: A Rational Approach in Drug Design*, 96 Chem. Rev. 3147 (1996) | ZYD_DAPA_0013950 | ZYD_DAPA_0013979 | |
| 015 | André Scheen, *Drug Treatment of Non-Insulin-Dependent Diabetes Mellitus in the 1990s: Achievements and Future Developments*, 54 Drugs 355 (1997) | ZYD_DAPA_0014145 | ZYD_DAPA_0014158 | |
| 016 | Bing-Kou Tang, *Drug Glucosidation*, 46 Pharmacology & Therapeutics 53 (1990) | GRIBBLE-0000001 | GRIBBLE-0000004 | R, A, F, U |
| 017 | Jeffrey Dodge et al., *Synthesis and Estrogen Receptor Binding Affinities of the Major Human Metabolites of Raloxifene (LY139481)*, 7 Bioorganic & Med. Chem. Letters 993 (1997) | GRIBBLE-0000005 | GRIBBLE-0000008 | R, A, F, U |
| 018 | U.S. Provisional Patent Application No. 60/158,773 | AZ-DAPA-02630359 | AZ-DAPA-02630444 | |
| 019 | U.S. Provisional Patent Application No. 60/194,615 | AZ-DAPA-02630445 | AZ-DAPA-02630537 | |
| 020 | U.S. Patent No. 6,683,056 | AZ-DAPA-02630320 | AZ-DAPA-02630348 | |
| 021 | U.S. Patent No. 7,465,712 | | | |
| 022 | Excerpt of Prosecution History of U.S. Patent Reissue Application No. 16/014,479 | | | R, F, I, U |
| 023 | Prosecution History of U.S. Patent Reissue Application No. 16/014,479 | AZ-DAPA-02587256 | AZ-DAPA-02594496 | |
| 024 | Significant Events Report (June 2001) | BMS-DAPA-00014837 | BMS-DAPA-00014871 | |
| 025 | Significant Events Report (August 2001) | BMS-DAPA-00086716 | BMS-DAPA-00086751 | |
| 026 | Takeshi Kuribayashi et al., *C-Glycosylted Aryl Tins: Versatile Building Blocks for Aryl C-Glycoside Glycomimetics*, 18 J. Carbohydrate Chem. 371 (1999) | ZYD_DAPA_0013892 | ZYD_DAPA_0013903 | |
| 027 | Takeshi Kuribayashi et al., *C-Glycosylated Diphenylmethanes and Benzophenones: The Stille Coupling Reaction of C-Glycosylated Aryl Tins with Benzyl Bromides and Acid Chlorides*, 18 J. Carbohydrate Chem. 393 (1999) | ZYD_DAPA_0013904 | ZYD_DAPA_0013921 | |
| 028 | Takeshi Kuribayashi et al., *Bis C-Glycosylated Diphenylmethanes for Stable Glycoepitope Mimetics*, 6 Synlett 737 (1999) | ZYD_DAPA_0013922 | ZYD_DAPA_0013936 | |
| 029 | Tobin CV (July 31, 2020) | | | |

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ███████████

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---|---|---|---|---|
| 030 | UK Prospective Diabetes Study (UKPDS) Group, *Intensive Blood-Glucose Control with Sulphonylureas or Insulin Compared with Conventional Treatment and Risk of Complications in Patients with Type 2 Diabetes (UKPDS 33)*, 352 Lancet 837 (1998) | TOBIN0000001 | TOBIN0000017 | R, A, F, U |
| 031 | UK Prospective Diabetes Study (UKPDS) Group, *Effect of Intensive Blood-Glucose Control with Metformin on Complications in Overweight Patients with Type 2 Diabetes (UKPDS 34)*, 352 Lancet 854 (1998) | TOBIN0000018 | TOBIN0000029 | R, A, F, U |
| 032 | Diabetes Control & Complications Trial Research Group, *The Effect of Intensive Treatment of Diabetes on the Development and Progression of Long-Term Complications in Insulin-Dependent Diabetes Mellitus*, 329 New Eng. J. Med. 977 (1993) | TOBIN0000030 | TOBIN0000039 | |
| 033 | Muhammad Kamran et al., *Overexpression of GLUT2 Gene in Renal Proximal Tubules of Diabetic Zucker Rats*, 8 J. Am. Soc'y Nephrology 943 (1997) | TOBIN0000040 | TOBIN0000045 | R, A, F, U |
| 034 | W.T. Noonan et al., *Renal Glucose Reabsorption During Hypertonic Glucose Infusion in Female Streptozotocin-Induced Diabetic Rats*, 68 Life Sci. 2967 (2001) | TOBIN0000046 | TOBIN0000056 | R, A, F, U |
| 035 | C.E. Mogensen, *Maximum Tubular Reabsorption Capacity for Glucose and Renal Hemodynamics During Rapid Hypertonic Glucose Infusion in Normal and Diabetic Subjects*, 28 Scandinavian J. Clin. Lab. Investigation 101 (1971) | TOBIN0000057 | TOBIN0000066 | R, A, F, U |
| 036 | Herbert Chasis et al., *The Action of Phlorizin on the Excretion of Glucose, Xylose, Sucrose, Creatinine and Urea by Man*, 12 J. Clin. Investigation 1083 (1933) | TOBIN0000067 | TOBIN0000074 | R, A, F, U |
| 037 | Savic CV (November 25, 2020) | | | |
| 038 | Savic Amended Reply Report Exhibit C | | | |
| 039 | Savic Amended Reply Report Exhibit D | | | |
| 040 | Washburn Initial Declaration (Mar. 21, 2019) | AZ-DAPA-02594019 | AZ-DAPA-02594027 | |
| 041 | Washburn Supplemental Declaration (Apr. 20, 2019) | AZ-DAPA-02594470 | AZ-DAPA-02594473 | |

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ▓▓▓▓▓▓▓▓

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---|---|---|---|---|
| 042 | Excerpt of Lab Notebook No. 47024 | BMS-DAPA-00009696 | BMS-DAPA-00009802 | |
| 043 | Excerpt of Lab Notebook No. 48217 | BMS-DAPA-00009807 | BMS-DAPA-00009863 | |
| 044 | Excerpt of Lab Notebook No. 56826 | BMS-DAPA-00010006 | BMS-DAPA-00010245 | |
| 045 | Excerpt of Lab Notebook No. 48216 | BMS-DAPA-00117136 | BMS-DAPA-00117171 | |
| 046 | MD071400 (Excel) | BMS-DAPA-00034531 | BMS-DAPA-00034531 | |
| 047 | MD081800 (Excel) | BMS-DAPA-00034534 | BMS-DAPA-00034534 | |
| 048 | MD082500 (Excel) | BMS-DAPA-00034537 | BMS-DAPA-00034537 | |
| 049 | MD082900 (Excel) | BMS-DAPA-00034538 | BMS-DAPA-00034538 | |
| 050 | MD050101 (Excel) | BMS-DAPA-00034571 | BMS-DAPA-00034571 | |
| 051 | MD051801 (Excel) | BMS-DAPA-00034574 | BMS-DAPA-00034574 | |
| 052 | MD072501 (Excel) | BMS-DAPA-00034576 | BMS-DAPA-00034576 | |
| 053 | MD060303 (Excel) | BMS-DAPA-00034631 | BMS-DAPA-00034631 | |
| 054 | Byetta Prescribing Information (2005) | | | R, A, F, U |
| 055 | Lalita Prasad-Reddy & Diana Isaacs, *A Clinical Review of GLP-1 Receptor Agonists: Efficacy and Safety in Diabetes and Beyond*, Drugs in Context, July 9, 2015, at 1 | | | |
| 056 | Radica Alicic et al., *Emergence of GLP-1 Receptor Agonists as a Therapy for Diabetic Kidney Disease*, ASN Kidney News, Aug. 2019, at 15 | | | R, A, F, U |
| 057 | Timo Rieg & Volker Vallon, *Development of SGLT1 and SGLT2 Inhibitor s*, 61 Diabetologia 2079 (2018) | | | |
| 058 | Bruce Neal et al., *Dapagliflozin and Cardiovascular and Renal Events in Type 2 Diabetes*, 377 New Eng. J. Med. 644 (2017) | | | R, A, F, U |
| 059 | Bernard Zinman et al., *Empagliflozin, Cardiovascular Outcomes, and Mortality in Type 2 Diabetes*, 373 New Eng. J. Med. 2117 (2015) | | | R, A, F, U |
| 060 | Vlado Perkovic et al., *Canagliflozin and Renal Outcomes in Type 2 Diabetes and Nephropathy*, 380 New Eng. J. Med. 2295 (2019) | | | R, A, F, U |
| 061 | Stephen Wiviott et al., *Dapagliflozin and Cardiovascular Outcomes in Type 2 Diabetes*, 380 New Eng. J. Med. 347 (2019) | | | R, A, F, U |

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ███████████

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---|---|---|---|---|
| 062 | Björn Pasternak et al., *Use of Sodium-Glucose Co-Transporter 2 Inhibitors and Risk of Serious Renal Events: Scandinavian Cohort Study*, Brit. Med. J., Apr. 29, 2020, at 1 | | | R, A, F, U |
| 063 | Milton Packer et al., *Cardiovascular and Renal Outcomes with Empagliflozin in Heart Failure*, 383 New Eng. J. Med. 1413 (2020) | | | R, A, F, U |
| 064 | Francesco Zaccardi et al., *Efficacy and Safety of Sodium-Glucose Co-Transporter-2 Inhibitors in Type 2 Diabetes Mellitus: Systematic Review and Network Meta-Analysis*, 18 Diabetes Obesity & Metabolism 783 (2016) | | | R, A, F, U |
| 065 | In Hee Lee & Dong Jik Ahn, *Dapagliflozin-Associated Euglycemic Diabetic Ketoacidosis in a Patient with Type 2 Diabetes Mellitus: A Case Report*, Med., May 22, 2020, at 1 | | | R, A, F, U |
| 066 | Kelly Burke et al., *SGLT2 Inhibitors: A Systematic Review of Diabetic Ketoacidosis and Related Risk Factors in the Primary Literature*, 37 Pharmacotherapy 187 (2017) | | | |
| 067 | Antonios Douros et al., *Sodium-Glucose Cotransporter-2 Inhibitors and the Risk for Diabetic Ketoacidosis*, 173 Annals Internal Med. 417 (2020) | | | R, A, F, U |
| 068 | U.S. Food & Drug Admin., *FDA Revises Labels of SGLT2 Inhibitors for Diabetes to Include Warnings About too Much Acid in the Blood and Serious Urinary Tract Infections* (Mar. 19, 2020), https://www.fda.gov/drugs/drug-safety-and-availability/fda-revises-labels-sglt2-inhibitors-diabetes-include-warnings-about-too-much-acid-blood-and-serious | | | R, A, F, U |
| 069 | Peter Ueda et al., *Sodium Glucose Cotransporter 2 Inhibitors and Risk of Serious Adverse Events: Nationwide Register Based Cohort Study*, Brit. Med. J., Nov. 14, 2018, at 1 | | | |

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ██████████

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---|---|---|---|---|
| 070 | Alan Garber et al., *Consensus Statement by the American Association of Clinical Endocrinologists and American College of Endocrinology on the Comprehensive Type 2 Diabetes Management Algorithm* - 2020 Executive Summary, 26 Endocrine Prac. 107 (2020) | | | R, A, F, U |
| 071 | Farxiga Prescribing Information (2014) | | | |
| 072 | U.S. Food & Drug Admin., Center for Drug Evaluation & Res., *Clinical Review: NDA 209803 (Ertugliflozin) / NDA 209805 (Ertugliflozin/Sitagliptin FCDP) / NDA 209806 (Ertugliflozin/Metformin FCDP)* (2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209803%2C209805%2C209806Orig1s000MedR.pdf | | | R, A, F, U |
| 073 | Farxiga Prescribing Information (2020) | | | |
| 074 | Holly Gurgle et al., *SGLT2 Inhibitors or GLP-1 Receptor Agonists as Second-Line Therapy in Type 2 Diabetes: Patient Selection and Perspective*, 12 Vascular Health & Risk Mgmt. 239 (2016) | | | |
| 075 | U.S. Dep't of Health & Human Servs., Centers for Disease Control and Prevention, *National Diabetes Statistics Report: Estimates of Diabetes and Its Burden in the United States* (2020), https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf | | | |
| 076 | Kacie Doyle-Delgado et al., *Pharmacologic Approaches to Glycemic Treatment of Type 2 Diabetes: Synopsis of the 2020 American Diabetes Association's Standards of Medical Care in Diabetes Clinical Guideline*, 173 Annals Internal Med. 813 (2020) | AZ-DAPA-02630561 | AZ-DAPA-02630571 | |
| 077 | André Scheen, *SGLT2 Inhibitor or GLP-1 Receptor Agonist in Type 2 Diabetes?*, 7 Lancet Diabetes & Endocrinology 818 (2019) | | | R, A, F, U |
| 078 | Mujahid Saeed & Parth Narendran, *Dapagliflozin for the Treatment of Type 2 Diabetes: A Review of the Literature*, 8 Drug Design Dev. & Therapy 2493 (2014) | AZ-DAPA-02628829 | AZ-DAPA-02628841 | |

*AstraZeneca AB v. Zydus Pharmaceuticals (USA) Inc.*, No. 18-664-RGA

**Defendant's Trial Exhibit List -** ████████████

| DTX No. | Description | Beginning Bates No. | Ending Bates No. | AstraZeneca's Objections |
|---------|-------------|---------------------|------------------|--------------------------|
| 079 | Eur. Meds. Agency, *Zynquista (Sotagliflozin): An Overview of Zynquista and Why it is Authorised in the EU* (2019) | | | R, A, F, U |
| 080 | U.S. Food & Drug Admin., *FDA Removes Boxed Warning About Risk of Leg and Foot Amputations for the Diabetes Medicine Canagliflozin (Invokana, Invokamet, Invokamet XR)* (Aug. 26, 2020), https://www.fda.gov/drugs/drug-safety-and-availability/fda-removes-boxed-warning-about-risk-leg-and-foot-amputations-diabetes-medicine-canagliflozin | | | R, A, F, U |
| 081 | Steglatro Prescribing Information (2020) | | | |
| 082 | Email from Chen to MG-PD-Dapagliflozin-IDT (November 1, 2011) | BMS-DAPA-00090191 | BMS-DAPA-00090194 | |
| 083 | Savic Supplement to Amended Reply Report Exhibit F | | | R, I, OSE, U |
| 084 | Katherine Button et al., *Power Failure: Why Small Sample Size Undermines the Reliability of Neuroscience*, 14 Nat. Rev. Neuroscience 365 (2013) | | | R, F, OSE, U |
| 085 | David Colquhoun, *An Investigation of the False Discovery Rates and the Misinterpretation of P-Values*, Royal Soc'y Open Sci., Nov. 1, 2014, at 1 | | | R, F, OSE, U |
| 086 | Xi Wang et al., *Variability in Zucker Diabetic Fatty Rats: Differences in Disease Progression in Hyperglycemic and Normoglycemic Animals*, 7 Diabetes Metab. Syndr. Obes. 531 (2014) | | | R, F, OSE, U |
| 087 | Chantaratsamon Dansirikul et al., *Approaches to Handling Pharmacodynamic Baseline Responses*, 35 J. Pharmacokinetics & Pharmacodynamics 269 (2008) | | | R, F, OSE, U |
| 088 | Notice of Appeal in *Mitsubishi Tanabe Pharma Corp. v. Sandoz Inc.*, No. 3:17-cv-05319-FLW-DEA (D.N.J.) (D.I. 250) | | | |

## LEGEND FOR PLAINTIFF'S OBJECTIONS

| CODE | OBJECTION | APPLICABLE RULES |
|------|-----------|------------------|
| A | The document is objectionable because it has not been properly authenticated or identified. The testimony is objectionable because it concerns a document for which authentication is lacking. | FRE 901 |
| ARG | Argumentative, or attorney argument. | FRE 611(a) |
| B | Improper bolstering of the credibility of a witness, such as before credibility is attacked. | FRE 607, 608, 801(d)(1)(B) |
| BER | Best evidence rule prohibits introduction. | FRE 1001, 1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Improper designation (designation is neither a question nor testimony). | FRE 401-403 |
| E | Improper examination (vague, ambiguous, compound, loaded, leading, harassment, etc.). | FRE 401-403, 602, 611 |
| F | Lack of foundation / personal knowledge, including calls for speculation. | FRE 602, 701, 702 |
| H | Hearsay if offered for the truth of the matter asserted. | FRE 801, 802 |
| I | Incomplete document or testimony. | FRE 106, 403 |
| IA | This testimony is objectionable because it is an incomplete answer. | FRE 402, 403, 611 |
| IH | Improper hypothetical (omits facts, assumes facts not in evidence, etc.). | FRE 705 |
| M | Offer of discussion for settlement or compromise. | FRE 408 |
| MIS | Mischaracterizes testimony or evidence, including assuming fact not in evidence. | FRE 611(a) |
| N | Exhibit not produced in discovery. | FRE 403 |
| NARR | Calls for improper narrative response. | FRE 611(a) |
| NR | Non-responsive. | FRCP 30, FRE 611(a) |
| OF | Improper testimony from a fact witness (e.g., calls for expert opinion, calls for legal conclusion). | FRCP 26, FRE 602, 701, 702, 704 |
| OSE | Outside scope of expert testimony. | FRE 611(b) |

| OX | Improper opinion testimony by expert witness (including speculation, lacks sufficient basis, improper hearsay, calls for legal conclusion). | FRE 702-704 |
|---|---|---|
| P | Privileged or attorney work product. | FRCP 26(b), FRE 501, 502 |
| R | Lacks relevance. | FRE 401-403 |
| S | Summary requiring underlying data or information. | FRE 1006 |
| T | Beyond the scope of the Rule 30(b)(6) topic for which a witness has been designated. | FRCP 30(b)(6), FRE 602 |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative. | FRE 403 |

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

       Plaintiff,

    v.

ZYDUS PHARMACEUTICALS (USA) INC.,

     Defendant.

C.A. No. 1:18-cv-00664-RGA

## ASTRAZENECA'S WITNESS LIST

I.    **Fact Witnesses**

AstraZeneca identifies the following fact witnesses whom it may call live or by deposition at trial on issues for which it bears the burden. This list is not a commitment that AstraZeneca will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial. If any third-party witness is unavailable, AstraZeneca reserves the right to use his or her deposition testimony. With respect to Defendant's witnesses, AstraZeneca reserves the right to introduce testimony through deposition or live examination, as appropriate. AstraZeneca also reserves the right to call any witnesses listed or called by Defendant and to revise this list in light of further rulings by the Court or any other changed circumstances. In addition, AstraZeneca reserves the right to call any witness, whether listed below or not, to establish authenticity and/or admissibility of any trial exhibit whose authenticity or admissibility is challenged by Defendant.

- William N. Washburn, Ph.D.

- Philip M. Sher, Ph.D.

- Bruce Ellsworth, Ph.D.

- Wei Meng, Ph.D.

- Gang Wu, M.S.

**II.     Expert Witnesses**

AstraZeneca lists below the names of the experts it may call as live witnesses at trial on issues for which it bears the burden. The listed experts' specific specialties and qualifications are set forth in detail in Exhibit N.

- Kenneth W. Batchelor, Ph.D.

- Ronald A. Thisted, Ph.D.

- Joshua L. Cohen, M.D., F.A.C.P.

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

      Plaintiff,

    v.

ZYDUS PHARMACEUTICALS (USA) INC.,

      Defendant.

C.A. No. 1:18-cv-00664-RGA

**ASTRAZENECA'S INITIAL DEPOSITION DESIGNATIONS**

| Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| Cover | | 8:2–5 | | | |
| 17:22-25 18:2-9 | H, R | 17:8–11 17:17–21 | H, R | | |
| 19:4-25 20:2-16 | H, R | | | | |
| 23:19-25 | H, I, R | 23:3–18 | H, R | | |
| 24:7-10 | H, I, R | 24:22–25 | H, R | | |
| 24:18-21 | H, I, R | 25:14–21 29:24–25 30:2 30:12–14 | H, R, I | | |
| 34:21-25 35:2-11 | H, I, R, U | 35:12–17 | H, R | | |
| 36:13-25 37:2-25 38:2 | H, I, R, U | 36:3–12 39:16–20 | H, R | | |
| 58:4-7 | H, O, R | 52:12–18 56:10–23 58:8–10 | H, R | | |
| 58:11-16 | H, O, R | | | | |
| 60:22-25 61:2-4 | H, R | 60:5–12 | H, R | | |
| 61:12-19 | H, R | 61:5–11 61:20–25 62:2–6 62:23–25 63:2 | H, R, OF, I | 62:17-22 | H, R |
| 63:23-25 64:2-4 | H, R | | | | |

| Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 64:12-14 | H, I, R | 64:15–18 66:22–25 67:2–4 | H, R | | |
| 67:5-14 | H, I, R | 67:15–19 | H, R | | |
| 67:20-25 68:2-6 | H, I, R | 68:22–25 69:2 | H, R | | |
| 69:3-9 | H, I, R | | | | |
| 69:14-19 | H, I, R | 69:23–25 70:2–25 71:2–25 72:2–25 73:2–25 74:2–25 75:2–5 78:4–25 79:2–25 80:2–8 80:10–25 81:2–8 82:15–25 83:2–25 84:2–15 87:17–19 87:21–23 88:3–8 89:5–10 89:18–24 | H, R, OF, E, I | 87:20 | H, R |
| 90:14-25 91:2-17 | H, I, R, U | | | | |

| Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 91:21-25 92:2-3 | H, I, R, U | | | | |
| 94:7-14 | H, I, R, U | | | | |
| 95:19-25 96:2-14 | H, I, R, U | 97:13–25 98:2–25 99:2–15 99:17–24 | H, R, E, F, OF | | |
| 102:5-9 | H, I, R | 101:4–10 102:10–11 102:13–21 | H, R, OF | 102:12 | H, R |
| 103:4-25 104:2-25 105:2-11 | H, I, NT, O, R, U | 105:12–19 105:22–23 106:5–11 | H, R, U | 105:24-25 106:2-4 | H, R |
| 111:6-16 | H, I, R | 111:17–21 111:24 | H, R, E | 111:22-23 | H, R |
| 115:21-25 116:2-25 117:2-13 | H, R, U | | | | |
| 118:14-16 | H, R, U | | | | |
| 119:8-25 120:2-25 | H, R, U | 125:24–25 126:2–8 127:24–25 128:2–25 129:2–8 | H, R, OF | | |

| Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 155:18-25 156:2-3 | H, I, R | 132:2–7 132:18–25 133:2–7 144:11–14 144:20–25 145:2–8 145:24–25 146:2–10 147:8–12 147: 23–25 148: 2–5 148:10–21 150:16–22 155:11–16 156:4–17 157:15–25 158:2–13 | H, R, I, OF | 147:13-22 148:6-9 | H, R |
| 159:3-25 | H, R, U | | | | |
| 160:3-14 | H, R, U | 160:18–25 161:2 161:7 161:14–22 163:20–24 164:4–9 | H, R, E | 164:2 | H, R |

| | | Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 185:4-20 | H, I, R, U | 174:6–14 174:22–25 175:2–25 176:2 176:25 177:2–17 177:24–25 178:2–5 | H, R, OF | | |
| 186:4-25 187:2-25 188:2-6 | H, I, R, U | | | | |
| 188:20-25 189:2 | H, I, R, U | | | | |
| 189:5-25 190:2-25 191:2-25 192:2-25 193:2-17 | H, I, NT, R, U | 193:24–25 194:2–13 195:12–25 196:2–21 197:14–25 198:2–25 199:2–24 200:6–25 | H, R, OF | 194:14-25 195:2-3 | H, R |
| 193:21-23 | H, I, R | 201:14–20 203:7–22 204:4–9 205:2–7 206:4–25 207:2–15 208:5–11 | H, R, OF | 205:8-25 206:2-3 | H, R |
| 208:12-25 209:2-5 | H, I, R | 209:19–23 | | | |

| Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 209:19-23 | H, I, R | 209:24–25 210:2–23 214:6–14 214:16–20 215:22–24 216:2–6 216:8–12 216:14–15 217:3–7 217:9–11 | H, R, OF, E | 214:15 215:16-17 215:25 216:7 216:13 217:8 | H, I, R |
| 247:18-25 248:2-25 | H, I, L, R | | | | |
| 249:6-10 249:12-25 250:2-22 250:24-25 251:2-25 252:2-16 252:18-21 252:23-25 253:2-22 | H, I, L, R, U | 249:11 250:23 252:17 252:22 253:23 | H, R, D | | |

| Deposition Testimony of Bruce Ellsworth (May 29, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 254:11-25 255:2-16 255:18-25 256:2-22 256:24-25 257:2-20 257:22-25 258:2-7 258:9-21 258:23-25 259:2-9 259:11-20 259:22-25 | H, I, L, O, R, U | 255:17 256:23 257:21 258:8 258:22 259:10 259:21 | H, R, D | | |
| 260:10-13 260:15-24 | H, I, L, O, R, U | 260:14 260:25 262:6–8 262:10–25 263:2–8 263:13–17 | H, R, D, E, I, U | 262:9 263:9-12 263:18-25 | H, R |

| Deposition Testimony of Gang Wu (May 22, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| Cover | | | | | |
| 6:16-25 7:2-3 | H, R | | | | |
| 15:9-13 | H, R | | | | |
| 15:25 16:2-12 | H, R | | | | |
| 16:22-24 | H, R | | | | |
| 18:6-11 | H, R | | | | |
| 20:10-25 21:2-9 | H, R | | | | |
| 21:18-25 22:2-14 | H, I, R | 23:5–21 | H, R, E, F | | |
| 23:22-25 24:2-12 | H, R | 25:5–25 26:2–3 27:18–25 28:12–20 30:3–25 31:2–25 32:2–25 33:2–18 34:5–25 35:2–25 36:2–22 36:24–25 37:2–7 | H, R, E, F, OF, NR, U | 26:6-22 28:24-25 29:2-25 30:2 33:20-25 34:2-4 36:23 | H, R |
| 46:25 47:2-25 48:2-11 | H, I, R | 48:12–20 | H, R, E, OF, U | | |
| 63:10-24 | H, I, R | 65:22–25 66:2–5 | H, R, E, I, OF | | |

| Deposition Testimony of Gang Wu (May 22, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 70:20-25 71:2-15 | H, I, R | 70:17–19 71:16–25 | H, R, E, OF | | |
| 72:8-25 73:2-4 | H, I, R | 72:2–7 73:5–21 | H, R, E, OF | | |
| 89:4-25 90:2 | H, R | | | | |
| 99:6-22 | H, R | | | | |
| 100:9-25 101:2-22 | H, I, R | 107:17–25 108:2–16 115:3–4 115:6–11 115:16–25 116:2–19 116:23–25 117:2–5 117:17–21 118:2–3 118:5–21 129:24–25 130:2–6 | H, R, E, F, OF, U, I, NR | 105:3-11 105:23-25 106:2-8 117:6-9 118:4 | H, R |
| 143:23-25 144:2-23 | H, R | 143:5–13 | H, R, E, OF | | |
| 147:8-25 148:2 | H, R | | | | |

| Deposition Testimony of Philip M. Sher, Ph.D. (May 25, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| Cover | H, NT, R, U | | | | |
| 5:21-25 6:2-11 | H, R, U | | | | |
| 24:15-18 | H, R, U | | | | |
| 25:6-17 | H, R, U | | | | |
| 29:4-18 | H, R, U | | | | |
| 32:2-25 33:2-10 | H, R, U | 31:23–25 33:11–12 33:14 | H, R, F | | |
| 33:15-20 | H, R, U | 33:21–25 34:2–6 | H, R, E | | |
| 36:12-25 37:2-25 | H, R, U | 38:2–9 | H, R, E | | |
| 41:24-25 42:2-12 | H, R, U | 39:9–25 40:2–7 40:22–25 41:2–23 | H, R, E, OF, U, I | 40:8-11 40:20-21 | H, R, U |
| 44:5-25 45:2-4 | H, R, U | 42:13–14 42:19–25 43:2–5 43:15–25 44:2–4 | H, R, E, OF, I, IA | 42:15 43:6 | H, R, U |
| 45:8-25 46:2-22 | H, R, U | 46:23–25 | H, R, I | | |
| 47:2-22 | H, NT, R, U | | | | |
| 49:17-23 | H, O, R, U | 49:24–25 50:2–9 | | | |
| 53:4-25 54:2 | H, R, U | 52:11–25 53:2–3 54:3–10 | H, R, E, OF | | |

| Deposition Testimony of Philip M. Sher, Ph.D. (May 25, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 54:11-25 55:2-3 | H, R, U | 55:23–25 56:2–17 | H, R, E, OF | | |
| 56:18-25 57:2-23 | H, I, R, U | 57:24–25 58:2–24 | H, R, E, I, IA, OF | | |
| 59:17-25 60:2 | H, R, U | | | | |
| 60:8-11 | H, R, U | | | | |
| 60:23-25 61:2-4 | H, R, U | 61:5–25 62:2–21 | H, R, F, E | 63:12-14 | H, I, R, U |
| 66:9-25 67:2-6 | H, O, R, U | 65:17–22 | H, R, F, E, OF | 65:23-25 66:2-8 | H, O, R, U |
| 75:21-25 76:2-8 | H, R, U | 76:9–12 | H, R, E, I, F, OF | | |
| 76:13-25 77:2-4 | H, R, U | | | | |
| 77:8-25 78:2-9 | H, R, U | 78:10–13 | H, R, E, I, F, OF | | |
| 80:18-20 | H, R, U | 80:4–17 80:21–25 81:2–9 | H, R, E, I, F, OF | 78:23-25 79:2-4 81:10-24 | H, R, U |
| 81:25 82:2-16 | H, R, U | | | | |
| 87:19-25 88:2-3 | H, R, U | 84:14–25 85:2–25 86:2–25 87:2–18 88:4–15 92:9–25 93:2–24 | H, R, E, OF, U | 93:25 94:2-4 94:10-18 | H, R, U |

| Deposition Testimony of Philip M. Sher, Ph.D. (May 25, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 129:3-12 | H, R, U | 115:19–24 118:23–25 119:11–23 120:16–21 121:5–24 125:21–25 126:2 127:12–25 128:2–25 129:13–18 | H, R, E, I, F, OF, U | 114:18-25 115:2-18 115:25 115:2-8 116:12-18 | H, R, U |
| 129:19-25 130:2-25 131:2-10 | H, NT, O, R, U | 131:11-25 132:2–6 | H, R, E, F, OF, U | | |
| 132:7-25 | H, NT, O, R, U | 133:2–5 | H, R, E, F, OF, U | | |
| 137:4-7 | H, R, U | 145:11–25 146:2–8 | H, R, E, F, OF, U | 146:9-17 | H, R, U |

| Deposition Testimony of Wei Meng (May 20, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| Cover | R | | | | |
| 8:17-22 | H, R | | | | |
| 21:15-25 22:2 | H, R | | | | |
| 22:13-16 | H, R | | | | |
| 22:21-25 23:2 | H, R | 23:3–4 | H, R | | |
| 27:21-25 28:2-22 | H, R | 28:23–25 29:2–4 | H, R | | |
| 29:5-25 | H, R | | | | |
| 31:3-11 | H, R | 32:5–7 | H, R | | |
| 31:19-25 32:2-4 | H, R | | | | |
| 33:16-25 34:2 | H, R | 33:10–15 34:3–9 | H, R | | |
| 35:16-18 | H, R | | | | |
| 37:2-8 | H, R | 37:9–16 39:9–20 | H, R, OF | | |
| 40:4-16 | H, R | | | | |
| 41:23-25 | H, R | | | | |
| 42:6-11 | H, R | | | | |
| 43:2-4 | H, R | | | | |
| 50:3-25 51:2-25 52:2-25 53:2-25 | H, R | | | | |
| 54:21-25 55:2-12 | H, R | 56:19–25 57:2–17 | H, R | | |
| 62:8-25 63:2-20 | H, I, R | 63:21–24 | H, R | | |

| Deposition Testimony of Wei Meng (May 20, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 65:23-25 66:2-16 | H, R | 66:17–25 67:2–22 | H, R | | |
| 67:23-25 68:2-5 | H, R | | | | |
| 68:18-25 69:2-25 70:2-8 70:13-25 71:2-25 72:2-9 | H, R | 72:10–12 | H, R | | |
| 72:13-20 | H, R | 72:21–23 | H, R | | |
| 72:24-25 73:2-23 | H, R | | | | |
| 74:16-25 75:2-25 76:2-19 | H, R | 77:2–9 | H, R, OF | | |
| 101:5-9 | H, R | | | | |
| 101:13-19 | H, R | | | | |
| 106:5-25 107:2-13 | H, R | | | | |
| 108:12-16 | H, R | | | | |
| 108:20-25 109:2-5 | H, R | 109:6–25 110:2–3 | H, R | | |
| 110:15-25 111:2-4 | H, R | | | | |
| 115:24-25 116:2-25 117:2-25 118:2-4 | H, R | 115:6–13 118:5–24 | H, R, OF | | |

| Deposition Testimony of Wei Meng (May 20, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 128:15-18 | H, R | 128:19–25 129:2 | H, R | | |
| 129:3-25 | H, R | | | | |
| 131:16-23 | H, O, R | 135:17–25 136:2 | H, R | | |
| 155:14-24 | H, R | 155:9–13 | H, R | | |
| 156:22-25 157:3-5 | H, R | | | | |
| 186:22-25 | H, R | 177:8–25 178:2–4 | H, R, OF | 178:5-25 179:2-13 | H, R |
| 187:2-4 | H, R | | | | |
| 190:17-25 191:2-16 | H, R | 191:23–25 192:2–23 193:15–25 194:2–4 195:21–25 196:2–21 216:25 217:2–5 217:8–25 218:2–8 | H, R, OF, IH | 192:24-25 193:2-14 216:13-24 217:6 | H, R |
| 209:4-24 | H, O, R | | | | |

16

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| Cover | R | | | | |
| 9:13-18 | H, R | | | | |
| 16:14-24 | H, R | 14:24–25 15:2–5 15:14–21 | H, R | | |
| 17:21-25 18:2 18:5-11 | H, R | | | | |
| 18:24-25 19:2-4 | H, R | 19:5–8 | H, R | | |
| 19:9-25 20:2-6 | H, R | | | | |
| 20:15-19 | H, I, R | 20:20 | H, R | | |
| 21:2-9 | H, R | 21:10–15 | H, R | | |
| 22:11-17 | H, R | 22:18–25 23:2–13 | H, R | | |
| 23:14-25 24:2-25 | H, R | 25:2–11 | H, R | | |
| 26:17-25 27:2-13 | H, O, R | 27:14–20 | H, R | | |
| 28:13-25 29:2-25 30:2-25 31:2-7 | H, O, R | | | | |
| 32:8-24 33:2-14 | H, I, R | | | | |

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 42:9-25 43:2-25 44:2-6 | H, R | 39:11–25 40:2–19 44:7–15 46:12–25 47:2–14 | H, R | | |
| 48:9-25 49:2-6 | H, R | | | | |
| 49:17-25 | H, R | | | | |
| 50:19-24 | H, I, R | 50:25 51:2–10 | H, R | | |
| 52:24-25 53:2-4 53:21-22 | H, I, R | 52:23 53:23–24 | H, R | | |
| 54:4-7 | H, R | 54:8–15 | H, R | | |
| 54:16-17 | H, R | | | | |
| 56:3-6 | H, R | 56:7–9 | H, R | | |
| 56:10-22 | H, R | 56:23–25 57:2–18 | H, R | | |
| 57:19-25 58:2-25 59:2-5 | H, O, R | | | | |
| 59:15-25 60:2-13 | H, R | | | | |
| 60:20-25 61:2-16 | H, O, R | 60:14–19 61:17–25 62:2–22 | H, R | | |
| 62:23-25 63:2 | H, O, R | 63:3–13 | H, R, OF | | |
| 63:14-25 64:2 | H, I, O, R | 64:3–11 | H, R | | |

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 64:12-23 | H, I, R | 64:24–25 | H, R | | |
| 65:2-25 66:2-8 | H, I, O, R | 66:9–12 | H, R | | |
| 66:13-19 | H, I, O, R | 66:20–25 67:2–11 67:20–25 68:2–5 | H, R | | |
| 73:19-23 | H, R | 71:9–25 72:2–25 73:2–6 | H, R, OF | | |
| 74:12-15 | H, R | | | | |
| 80:2-25 81:2-8 | H, I, O, R | 78:20–25 79:2–25 81:9–10 | H, R, OF | | |
| 81:11-21 | H, R | 81:22–25 82:2–12 | H, R | | |
| 83:19-25 84:2-14 | H, R | 83:17–18 85:13–25 86:2–12 87:7–15 | H, R | | |

19

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 88:15-23<br>89:7-25<br>90:2-6 | H, I, O, R | 88:24–25<br>89:2–6<br>90:7–17<br>91:23–25<br>92:2–5<br>92:15–25<br>93:2–25<br>94:2–25<br>95:2–25<br>96:2–5<br>96:7–16 | H, R, E, I | 91:11-22<br>92:6-14<br>96:6 | H, O, R |
| 99:13-25<br>100:2-25<br>101:2-11 | H, R | 97:14–15<br>97:19–24 | H, R | | |
| 101:15-17 | H, R | | | | |
| 101:25<br>102:2-3 | H, R | | | | |
| 103:20-25<br>104:2-16 | H, O, R | | | | |
| 117:3-6 | H, R | 117:7–12 | H, R, OF | | |
| 119:6-10 | H, R | | | | |
| 119:15-20 | H, I, R | 119:11–14<br>119:21–24 | H, R | | |
| 119:25<br>120:2-9 | H, R | 120:10–16 | H, R | | |
| 122:15-17 | H, R | 122:18–19 | H, R | | |
| 122:20-24 | H, R | 122:25<br>123:2–5 | H, R, OF | | |

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 125:24-25 126:2-25 127:2-24 | H, O, R | 123:19–25 124:17–25 | H, R, OF | | |
| 128:7-20 | H, O, R | 128:3–6 | H, R | | |
| 128:24-25 129:2-25 130:2-3 | H, O, R | 130:4–16 130:21–23 131:23–25 132:2–25 133:2–25 134: 2–19 135:5–25 136:2–20 137:21–25 138:2–25 139:2–23 139:25 140:2–21 140:23–25 141:2–7 | H, R, E, OF, I | 130:17-19 134:20-25 135:2-4 140:22 | H, R |
| 141:12-15 | H, R | 141:10–11 141:16–18 | H, R | | |
| 141:19-25 142:2-3 | H, R | | | | |
| 142:8-10 | H, R | 142:4–7 142:24–25 143:16–22 144:13–16 | H, R | | |
| 145:16-25 146:2-7 | H, R | 144:24–25 145:2–14 | H, R, U | | |

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| Plaintiff's Designations | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendants Counter-Designations | Plaintiff's Counter-Counter Designations | Defendant's Objections to Plaintiff's Counter-Counter Designations |
| 149:13-25 150:2 | H, I, R | 147:9–25 148:2–25 149:2 150:3–11 | H, R | | |
| 150:19-25 151:2-4 | H, O, R | 151:6–10 | H, R | | |
| 151:11-25 152:2-14 | H, O, R | 152:15–20 | H, R, OF | | |
| 152:21-25 153:2-7 | H, O, R | 153:8–18 | H, R, OF | | |
| 153:19-25 154:2 | H, O, R | | | | |
| 156:14-19 | H, R | 155:24–25 156:2–13 156:20–25 157:2–21 158:15–22 159:25 160:2–25 161:2–25 162:2–15 | H, R, OF | | |
| 162:16-21 | H, R | 162:22–23 | H, R | | |
| 171:13-22 | H, R | 167:24–25 168:2–8 170:25 171:2–12 | H, R | | |
| 172:23-25 173:2-18 | H, O, R | | | | |
| 174:9-14 | H, O, R | 174:15–21 | H, R | | |

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 175:12-25 176:2-25 177:2-16 | H, O, R | 177:17–23 | H, R | | |
| 177:24-25 178:2-7 | H, R | 178:12–14 178:25 179:2–6 179:8–25 180:2–9 181:2–11 183:11–22 | H, R, E, OF, I | 179:7 183:6-10 | H, R |
| 185:20-25 186:2-15 | H, O, R | 185:6–19 186:16–19 | H, R, E, I | 186:20-22 | H, R |
| 186:23-25 187:2-15 | H, O, R | 187:16–25 188:2–4 | H, R | | |
| 188:9-18 | H, I, O, R | 188:19–21 | H, R | | |
| 189:4-13 | H, R | | | | |
| 190:17-25 191:2-5 | H, R | 191:6–25 192:2–6 | H, R | | |
| 195:3-25 196:2-7 | H, O, R | 212:18–25 213:2–7 214:6–22 215:21–25 216:2–9 216:12–25 217:2 | H, R, OF | | |
| 223:3-7 | H, R | | | | |
| 223:10-25 | H, I, R | 224:2 | H, R | | |
| 224:21-25 225:2 | H, I, R | 224:19–20 | H, R | | |

23

| Deposition Testimony of William Washburn, Ph.D. (July 12, 2020) | | | | | |
|---|---|---|---|---|---|
| **Plaintiff's Designations** | **Defendant's Objections** | **Defendant's Counter-Designations** | **Plaintiff's Objections to Defendants Counter-Designations** | **Plaintiff's Counter-Counter Designations** | **Defendant's Objections to Plaintiff's Counter-Counter Designations** |
| 225:9-25 226:2-10 | H, L, R | | | | |
| 226:23-25 227:2-11 227:13-21 | H, L, R | 227:12 | H, R, D | | |
| 228:5-25 229:2-15 229:17-21 229:23 | H, I, L, R | 229:16 229:22 229:24–25 230:2 | H, R, D | | |
| 230:3-13 230:15-25 231:3-25 232:2 232:4-10 232:17-25 233:2-3 | H, L, R | 230:14 231:2 232:3 | H, R, D | | |
| 233:18-25 | H, R | 234:13 234:21 | H, R, D | | |
| 234:2-12 234:14-20 234:22-25 235:2-8 235:12-24 236:2-7 236:9-12 236:14 | H, L, R | 235:25 236:8 236:13 | H, R, D | | |
| 238:2-18 | H, R | | | | |

## LEGEND FOR PLAINTIFF'S OBJECTIONS

| CODE | OBJECTION | APPLICABLE RULES |
|------|-----------|------------------|
| A | The document is objectionable because it has not been properly authenticated or identified. The testimony is objectionable because it concerns a document for which authentication is lacking. | FRE 901 |
| ARG | Argumentative, or attorney argument. | FRE 611(a) |
| B | Improper bolstering of the credibility of a witness, such as before credibility is attacked. | FRE 607, 608, 801(d)(1)(B) |
| BER | Best evidence rule prohibits introduction. | FRE 1001, 1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Improper designation (designation is neither a question nor testimony). | FRE 401-403 |
| E | Improper examination (vague, ambiguous, compound, loaded, leading, harassment, etc.). | FRE 401-403, 602, 611 |
| F | Lack of foundation / personal knowledge, including calls for speculation. | FRE 602, 701, 702 |
| H | Hearsay if offered for the truth of the matter asserted. | FRE 801, 802 |
| I | Incomplete document or testimony. | FRE 106, 403 |
| IA | This testimony is objectionable because it is an incomplete answer. | FRE 402, 403, 611 |
| IH | Improper hypothetical (omits facts, assumes facts not in evidence, etc.). | FRE 705 |
| M | Offer of discussion for settlement or compromise. | FRE 408 |
| MIS | Mischaracterizes testimony or evidence, including assuming fact not in evidence. | FRE 611(a) |
| N | Exhibit not produced in discovery. | FRE 403 |
| NARR | Calls for improper narrative response. | FRE 611(a) |
| NR | Non-responsive. | FRCP 30, FRE 611(a) |
| OF | Improper testimony from a fact witness (e.g., calls for expert opinion, calls for legal conclusion). | FRCP 26, FRE 602, 701, 702, 704 |
| OSE | Outside scope of expert testimony. | FRE 611(b) |

| OX | Improper opinion testimony by expert witness (including speculation, lacks sufficient basis, improper hearsay, calls for legal conclusion). | FRE 702-704 |
|---|---|---|
| P | Privileged or attorney work product. | FRCP 26(b), FRE 501, 502 |
| R | Lacks relevance. | FRE 401-403 |
| S | Summary requiring underlying data or information. | FRE 1006 |
| T | Beyond the scope of the Rule 30(b)(6) topic for which a witness has been designated. | FRCP 30(b)(6), FRE 602 |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative. | FRE 403 |

**DEPOSITION DESIGNATION OBJECTION KEY**

| Code | Objection |
|------|-----------|
| A | Authentication (FRE 901) |
| AF | Assumes facts not in evidence (FRE 403, 602) |
| B | Not best evidence (FRE 1002) |
| C | Improper compilation of separate documents (FRE 403, 901) |
| D | Duplicative |
| F | Foundation |
| H | Hearsay (FRE 801, 802) |
| I | Incomplete (FRE 106, 403) |
| L | Leading question |
| LC | Calls for a legal conclusion (FRE 611, 701) |
| MI | Misstates prior testimony |
| N | Exhibit not previously produced, lacks production numbers, or illegible |
| NT | Not testimony (designation is neither a question nor testimony) (FRE 401, 402) |
| O | Improper opinion testimony (FRE 701–704) |
| OC | Offer to compromise under FRE 408 |
| P | Privileged or attorney work product (FRE 501, 502) |
| R | Relevance (FRE 401–402) |
| S | Summary requiring underlying data or information (FRE 1006) |
| T | Beyond the scope of the Rule 30(b)(6) topic (FRE 602, FRCP 30(b)(6)) |
| U | Unduly prejudicial, confusing, or misleading (FRE 403—unfair prejudice) |

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ASTRAZENECA AB,

              Plaintiff,

     v.

ZYDUS PHARMACEUTICALS (USA)
INC.,

              Defendant.

C.A. No. 1:18-cv-00664-RGA



**ZYDUS PHARMACEUTICALS (USA) INC.'S LIST OF WITNESSES**

## I.      INTRODUCTION

In accordance with Local Rule 16.3(c)(7) of the Local Rules of Civil Practice and

Procedure of the United States District Court for the District Of Delaware, Zydus

Pharmaceuticals (USA) Inc. ("Zydus") submits the following list of witnesses Zydus may call to

testify with respect to the invalidity of claims 1–3, 14, and 16 ("the asserted claims") of U.S.

Patent No. 6,5151,117 ("the '117 patent").

Zydus's identification of witnesses is based on its understanding of the pleadings served

and discovery taken in this action to date.  This list is not a commitment that Zydus will call any

particular witness at trial or a representation that any of the witnesses listed are available or will

appear for trial.  By identifying these witnesses, Zydus is neither required to call them at trial nor

limited in the manner in which such testimony is presented at trial.  The identification of a

witness on this list is not an admission that the witness's testimony is admissible if called by

AstraZeneca AB ("AstraZeneca"), and Zydus reserves its right to object to any witness or

testimony that is objectionable or inadmissible.

If any witness listed as a person who Zydus intends to call to testify in person is

unavailable, Zydus reserves the right to offer deposition testimony from such witness.  Zydus

reserves the right to introduce the deposition testimony of any witness who has submitted an

expert report or declaration on behalf of AstraZeneca but not called in person by AstraZeneca at

trial.  Zydus further reserves the right to call or further designate testimony from one or more

additional witnesses whose testimony is necessary to establish the authenticity or admissibility of

any trial exhibit if the authenticity or admissibility of the exhibit is challenged by AstraZeneca.

Zydus also reserves the right to call any witness for impeachment purposes.

With respect to AstraZeneca's witnesses, Zydus reserves the right to introduce testimony through deposition or live examination, as appropriate. Zydus also reserves the right to call any witnesses called by AstraZeneca or anyone appearing on AstraZeneca's witness list. Zydus reserves the right to call additional witnesses not listed below in rebuttal to those witnesses called by AstraZeneca and to revise this list in light of any further rulings by the Court or any other changed circumstances, with the permission of the Court to the extent necessary.

## II.   EXPERT WITNESSES

1.      The expert witnesses Zydus may call at trial either live or by deposition designations are listed and summarized below. In addition to the expert witnesses identified below, Zydus reserves the right to call anyone appearing on AstraZeneca's witness list.

2.      Zydus will call **Gordon Gribble, Ph.D.,** to testify live at trial. Dr. Gribble is an expert in organic chemistry. Dr. Gribble will testify on the subject matter of his reports, deposition testimony, and the reports and testimony of AstraZeneca's experts. Dr. Gribble will testify that asserted claims 1–3, 14, and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious. Dr. Gribble will also testify regarding alleged secondary considerations of nonobviousness.

3.      Zydus will call **Garry Tobin, M.D.,** to testify live at trial. Dr. Tobin is an expert in endocrinology. Dr. Tobin will testify on the subject matter of his reports, deposition testimony, and the reports and testimony of AstraZeneca's experts. Dr. Tobin will testify that asserted claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious. Dr. Tobin will also testify regarding alleged secondary considerations of nonobviousness. Dr. Tobin will further testify that asserted claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶¶ 1–2, for lack of enablement, for lack of written description, and as indefinite.

4.    Zydus will call **Radojka Savic, Ph.D.,** to testify live at trial.  Dr. Savic is an expert in biostatistics.  Dr. Savic will testify on the subject matter of her reports, deposition testimony, and the reports and testimony of AstraZeneca's experts.  Dr. Savic will testify regarding alleged secondary considerations of nonobviousness.

## III.    FACT WITNESSES

5.    The fact witnesses Zydus may call at trial either live or by deposition designations are listed below.  In addition to the fact witnesses identified below, Zydus reserves the right to call anyone appearing on AstraZeneca's witness list.

6.    Zydus may call **Bruce Ellsworth** by deposition designations.

7.    Zydus may call **Wei Meng** by deposition designations.

8.    Zydus may call **Philip Sher** by deposition designations.

9.    Zydus may call **William Washburn** by deposition designations.

10.    Zydus may call **Gang Wu** by deposition designations.

# EXHIBIT K

**ZYDUS'S DEPOSITION DESIGNATIONS**

| Deponent | Zydus's Designations | | | | AstraZeneca's Objections to Zydus's Designations | AstraZeneca's Counter-Designations | Zydus's Objections to AstraZeneca's Counter-Designations |
|---|---|---|---|---|---|---|---|
| Transcript | PgFrom | LnFrom | PgTo | LnTo | | | |
| Meng, Wei - 05/20/2020 | 7 | 20 | 8 | 6 | R, D, I | 8:17-22, 21:15-25, 22:2, 22:13-16, 22:21-25, 23:2, 27:21-25, 28:2-22, 29:5-25, 31:3-11, 31:19-25, 32:2-4, 33:16-25, 34:2 | H, R |
| Meng, Wei - 05/20/2020 | 54 | 2 | 54 | 20 | R, H, I | 35:16-18, 37:2-8, 40:4-16, 41:23-25, 42:6-11,43:2-4, 50:3-25, 51:2-25, 52:2-25, 53:2-25, 54:21-15, 55:2-12 | H, R |
| Meng, Wei - 05/20/2020 | 57 | 18 | 58 | 3 | R, H, I | 209:4-24 | |
| Meng, Wei - 05/20/2020 | 58 | 13 | 59 | 16 | R, H, MIS | 59:17-25, 60:2-8 | H, O, R |
| Meng, Wei - 05/20/2020 | 65 | 4 | 66 | 7 | R, H, I | 62:8-25, 63:2-20, 66:8-25, 67:2-9, 67:23-25, 68:2-5, 68:18-25, 69:2-25, 70:2-8, 70:13-25, 71:2-25, 72:2-9, 74:16-25, 75:2-25, 76:2-19, 101:5-9, 101:13-19, 106:5-25, 107:2-13, 108:12-16, 108:20-25, 109:2-5, 110:15-25, 111:2-4, 115:24-25, 116:2-25, 117:2-25, 118:2-4, 128:15-18, 129:3-25, 131:16-23, 155:14-24, 156:22-25, 157:3-5, 186:22-25, 187:2-4, 190:17-25, 191:2-16 | H, I, O, R |
| Meng, Wei - 05/20/2020 | 188 | 20 | 189 | 5 | R, H | | |
| Meng, Wei - 05/20/2020 | 214 | 4 | 214 | 19 | R, H, F | | |
| Meng, Wei - 05/20/2020 | 214 | 22 | 214 | 24 | R, H, F | | |
| Meng, Wei - 05/20/2020 | 215 | 2 | 215 | 10 | R, H, F, OF | | |
| Meng, Wei - 05/20/2020 | 215 | 17 | 215 | 19 | R, H, F, OF, IH | | |
| Meng, Wei - 05/20/2020 | 215 | 21 | 215 | 22 | R, H, F, OF, IH | | |

**ZYDUS'S DEPOSITION DESIGNATIONS**

| Deponent | Zydus's Designations | | | | AstraZeneca's Objections to Zydus's Designations | AstraZeneca's Counter-Designations | Zydus's Objections to AstraZeneca's Counter-Designations |
|---|---|---|---|---|---|---|---|
| Transcript | PgFrom | LnFrom | PgTo | LnTo | | | |
| Sher, Philip - 05/25/2020 | 5 | 12 | 5 | 15 | D, I | 5:21-25, 6:2-11 | H, R, U |
| Sher, Philip - 05/25/2020 | 11 | 9 | 11 | 20 | R, F, I, A | 11:21-23 | H, R, U |
| Sher, Philip - 05/25/2020 | 11 | 24 | 12 | 3 | R, I, A | | |
| Sher, Philip - 05/25/2020 | 12 | 20 | 13 | 2 | R, F, I | 12:5-19 | H, R, U |
| Sher, Philip - 05/25/2020 | 16 | 8 | 16 | 16 | R, F, I | | |
| Sher, Philip - 05/25/2020 | 16 | 22 | 17 | 7 | R, E, I | | |
| Sher, Philip - 05/25/2020 | 17 | 21 | 18 | 4 | R | | |
| Sher, Philip - 05/25/2020 | 18 | 11 | 18 | 13 | R, E, F, I | | |
| Sher, Philip - 05/25/2020 | 18 | 18 | 19 | 7 | R, E, I | 60:23-25, 61:2-4 | H, R, U |
| Sher, Philip - 05/25/2020 | 27 | 11 | 28 | 2 | R, E, F, I, H | 24:12-18, 25:6-17, 26:25, 27:2-10, 29:4-18, 32:2-25, 33:2-10, 33:15-20, 36:12-25, 37:2-25, 41:24-25, 42:2-12, 53:4-25, 54:2, 54:11-25, 55:2-3, 59:17-25, 60:2, 60:8-11, 75:21-25, 76:2-8, 76:13-25, 77:2-4 | H, R, U |
| Sher, Philip - 05/25/2020 | 46 | 2 | 46 | 22 | I | 44:5-25, 45:2-4, 45:8-25, 46:2-22 | H, R, U |
| Sher, Philip - 05/25/2020 | 47 | 2 | 47 | 12 | I | 47:2-22, 77:8-25, 78:2-9, 80:18-20, 81:25, 82:2-16, 87:19-25, 88:2-3, 129:3-12, 129:19-25, 130:2-25, 131:2-10, 132:7-25, 137:4-7 | H, NT, O, R, U |
| Sher, Philip - 05/25/2020 | 47 | 13 | 47 | 14 | E, F, I, IH | | |
| Sher, Philip - 05/25/2020 | 47 | 16 | 47 | 24 | R, E, F, I, OF, H | 49:17-25, 50:2-9 | H, O, R, U |
| Sher, Philip - 05/25/2020 | 48 | 2 | 48 | 5 | R, E, F, I, OF, H | 49:17-25, 50:2-9 | H, O, R, U |
| Sher, Philip - 05/25/2020 | 48 | 7 | 48 | 12 | R, E, F, I, OF, H | 49:17-25, 50:2-9 | H, O, R, U |
| Sher, Philip - 05/25/2020 | 48 | 13 | 48 | 14 | R, E, F, I, OF, H, IH | 49:17-25, 50:2-9, 56:18-25, 57:2-23, 66:9-25, 67:2-6 | H, I, O, R, U |
| Sher, Philip - 05/25/2020 | 48 | 22 | 49 | 16 | R, E, F, I, OF, H, IH | 49:17-25, 50:2-9 | H, O, R, U |
| Sher, Philip - 05/25/2020 | 50 | 10 | 51 | 16 | R, E, F, I, OF, H, MIS | 49:17-25, 50:2-9 | H, O, R, U |

**ZYDUS'S DEPOSITION DESIGNATIONS**

| Deponent | Zydus's Designations | | | | AstraZeneca's Objections to Zydus's Designations | AstraZeneca's Counter-Designations | Zydus's Objections to AstraZeneca's Counter-Designations |
|---|---|---|---|---|---|---|---|
| Transcript | PgFrom | LnFrom | PgTo | LnTo | | | |
| Washburn, William - 06/12/2020 | 9 | 3 | 9 | 10 | R, D, I | 9:13-18, 16:14-24 | H, R |
| Washburn, William - 06/12/2020 | 146 | 8 | 146 | 13 | R, H, F, I | 17:21-25, 18:2, 18:5-11, 18:24-25, 19:2-4, 19:9-25, 20:2-6, 20:15-19, 21:2-9, 22:11-17, 23:14-25, 24:2-25, 26:17-25, 27:2-13, 28:13-25, 29:2-25, 30:2-25, 31:2-7, 32:8-24, 33:2-14, 42:9-25, 43:2-25, 44:2-6, 48:9-25, 49:2-6, 49:17-25, 50:19-24, 52:24-25, 53:2-4, 53:21-22, 54:4-7, 54:16-17, 56:3-6, 56:10-22, 57:19-25, 58:2-25, 59:2-5, 59:15-25, 60:2-13, 60:20-25, 61:2-16, 62:23-25, 63:2. 63:14-25, 64:2, 64:12-23, 65:2-25, 66:2-8, 66:13-19, 73:19-23, 74:12-15, 80:2-25, 81:2-8, 81:11-21, 83:19-25, 84:2-14, 88:15-23, 89:7-25, 90:2-6, 99:13-25, 100:2-25, 101:2-11, 101:15-17, 101:25, 102:2-3, 103:20-25, 104:2-16, 117:3-6, 119:6-10, 199:15-20, 119:25, 120:2-9, 122:15-17, 122:20-24, 125:24-25, 126:2-25, 127:2-24, 128:7-20, 128:24-25, 129:2-25, 130:2-3, 141:12-15, 141:19-25, 142:2-3, 142:8-10, 145:16-25, 146:2-7, 149:13-25, 150:2, 150:19-25, 151:2-4, 151:11-25, 152:2-14, 152:21-25, 153:2-7, 153:19-25, 154:2, 156:14-19, 162:16-21, 171:13-22, 172:23-25, 173:2-18, 174:9-14, 175:12-25, 176:2-25, 177:2-16, 177:24-25, 178:2-7, 185:20-25, 186:2-15, 186:23-25, 187:2-15, 188:9-21, 189:4-13, 190:17-25, 191:2-5, 195:3-25, 196:2-7, 223:3-7, 223:10-25, 224:21-25, 225:2, 225:9-25, 226:2-10, 226:23-25, 227:2-11, 227:13-21, 228:5-25, 229:2-15, 229:17-21, 229:23, 230:3-13, 230:15-25, 231:3-25, 232:2, 232:4-10, 232:17-25, 233:2-3, 233:18-25, 234:2-12, 234:14-20, 234:22-25, 235:2-8, 235:12-24, 236:2-7, 236:9-12, 236:14, 238:2-18 | H, I, L, O, R |

Washburn, William

**ZYDUS'S DEPOSITION DESIGNATIONS**

| Deponent | Zydus's Designations | | | | AstraZeneca's Objections to Zydus's Designations | AstraZeneca's Counter-Designations | Zydus's Objections to AstraZeneca's Counter-Designations |
|---|---|---|---|---|---|---|---|
| Transcript | PgFrom | LnFrom | PgTo | LnTo | | | |
| Wu, Gang - 05/22/2020 | 6 | 9 | 6 | 13 | R, D, I | 6:16-25, 7:2-3 | H, R, U |
| Wu, Gang - 05/22/2020 | 12 | 4 | 12 | 14 | R, H | | |
| Wu, Gang - 05/22/2020 | 15 | 9 | 15 | 13 | I | 15:9-13 | H, R, U |
| Wu, Gang - 05/22/2020 | 15 | 18 | 15 | 22 | R, H, I | 15:25, 16:2-12, 16:22-24, 18:6-11 | H, R, U |
| Wu, Gang - 05/22/2020 | 18 | 12 | 18 | 23 | R, H | | |
| Wu, Gang - 05/22/2020 | 19 | 23 | 19 | 25 | R, H | | |
| Wu, Gang - 05/22/2020 | 20 | 2 | 20 | 25 | R, H, I | 20:10-25, 23:22-25, 24:2-12 | H, R, U |
| Wu, Gang - 05/22/2020 | 21 | 2 | 21 | 9 | I | 21:2-9 | H, R, U |
| Wu, Gang - 05/22/2020 | 21 | 10 | 21 | 17 | R, H | | |
| Wu, Gang - 05/22/2020 | 21 | 23 | 21 | 25 | R, H, I | 21:18-22, 22:2-14 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 22 | 2 | 22 | 14 | R, H, I | 21:18-25 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 22 | 15 | 22 | 19 | R, H, E, F, I, IH | 22:5-14, 22:23-25, 23:2-4 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 22 | 23 | 22 | 25 | R, H, E, F, I, IH | 22:5-19, 23:2-4 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 23 | 2 | 23 | 4 | R, H, E, F, I, IH | 22:5-19, 22:23-25 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 50 | 2 | 51 | 7 | R, H, I | 27:2-25, 28:2-11, 46:25 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 51 | 8 | 51 | 18 | R, H, I, MIS | 50:2-25, 51:2-7 | H, O, R, U |
| Wu, Gang - 05/22/2020 | 61 | 9 | 61 | 21 | R, H | 61:4-8 | H, R, U |
| Wu, Gang - 05/22/2020 | 61 | 22 | 61 | 25 | R, H, I | 62:2-4 | H, O, R, U |
| Wu, Gang - 05/22/2020 | 62 | 2 | 62 | 4 | R, H, I | 61:22-25 | H, O, R, U |
| Wu, Gang - 05/22/2020 | 63 | 10 | 63 | 24 | I | 63:10-24, 70:20-25, 71:2-15, 72:8-15, 73:2-4 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 65 | 14 | 65 | 21 | R, H, E, OF | 65:2-13 | H, R, U |
| Wu, Gang - 05/22/2020 | 74 | 5 | 74 | 9 | R, H | | |
| Wu, Gang - 05/22/2020 | 77 | 10 | 77 | 12 | R | | |
| Wu, Gang - 05/22/2020 | 77 | 13 | 78 | 2 | R, H | | |
| Wu, Gang - 05/22/2020 | 89 | 4 | 89 | 6 | I | | |
| Wu, Gang - 05/22/2020 | 89 | 12 | 90 | 7 | R, H, I | 89:4-25, 90:2 | H, R, U |
| Wu, Gang - 05/22/2020 | 95 | 14 | 95 | 18 | R, H, OF | 95:19-24 | H, R, U |
| Wu, Gang - 05/22/2020 | 99 | 6 | 99 | 22 | I | 99:6-22, 100:9-25, 101:2-22 | H, I, R, U |
| Wu, Gang - 05/22/2020 | 118 | 22 | 118 | 24 | R | | |
| Wu, Gang - 05/22/2020 | 119 | 8 | 119 | 24 | R, H | | |
| Wu, Gang - 05/22/2020 | 120 | 10 | 120 | 25 | R, H, OF | | |
| Wu, Gang - 05/22/2020 | 121 | 2 | 121 | 10 | R, H, F, I, IH, OF | 121:12-17 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 121 | 12 | 121 | 22 | R, H, F, I, IH, OF | 121:25, 122:2-4, 122:6-9 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 121 | 24 | 121 | 25 | R, H, F, I, IH, OF | 121:18-22, 122:2-4, 122:6-9 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 122 | 2 | 122 | 4 | R, H, F, I, OF | 121:18-22, 121:25, 122:6-9 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 122 | 6 | 122 | 17 | R, H, F, I, OF | 121:18-22, 121:25, 122:2-4, 122:6-9, 122:19-20 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 122 | 19 | 122 | 20 | R, H, F, I, OF | 122:10-13, 122:15-17 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 124 | 8 | 124 | 18 | R, H, F, OF | | |
| Wu, Gang - 05/22/2020 | 129 | 7 | 129 | 23 | R, H, F, I, OF, MIS | | |

**ZYDUS'S DEPOSITION DESIGNATIONS**

| Deponent | Zydus's Designations | | | | AstraZeneca's Objections to Zydus's Designations | AstraZeneca's Counter-Designations | Zydus's Objections to AstraZeneca's Counter-Designations |
|---|---|---|---|---|---|---|---|
| Transcript | PgFrom | LnFrom | PgTo | LnTo | | | |
| Wu, Gang - 05/22/2020 | 131 | 11 | 132 | 2 | R, H, F, I, IH, OF, MIS | 132:4-11, 132:17-25, 133:2-4, 143:23-25, 144:2-23, 147:8-25, 148:2 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 132 | 4 | 132 | 11 | R, H, F, I, IH, OF, MIS | 131:11-25, 132:2, 132:17-25, 133:2-4 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 133 | 8 | 134 | 5 | R, H, F, IH, OF | | |
| Wu, Gang - 05/22/2020 | 156 | 10 | 157 | 8 | R, H, F, I, OF | 157:10-16 | H, I, O, R, U |
| Wu, Gang - 05/22/2020 | 157 | 10 | 157 | 16 | R, H, F, I, OF | 156:10-157:8 | H, I, O, R, U |

Wu, Gang

## ZYDUS'S DEPOSITION DESIGNATION OBJECTION KEY

| Code | Objection |
|------|-----------|
| A | Authentication (FRE 901) |
| AF | Assumes facts not in evidence (FRE 403, 602) |
| B | Not best evidence (FRE 1002) |
| C | Improper compilation of separate documents (FRE 403, 901) |
| D | Duplicative |
| F | Foundation |
| H | Hearsay (FRE 801, 802) |
| I | Incomplete (FRE 106, 403) |
| L | Leading question |
| LC | Calls for a legal conclusion (FRE 611, 701) |
| MI | Misstates prior testimony |
| N | Exhibit not previously produced, lacks production numbers, or illegible |
| NT | Not testimony (designation is neither a question nor testimony) (FRE 401, 402) |
| O | Improper opinion testimony (FRE 701–704) |
| OC | Offer to compromise under FRE 408 |
| P | Privileged or attorney work product (FRE 501, 502) |
| R | Relevance (FRE 401–402) |
| S | Summary requiring underlying data or information (FRE 1006) |
| T | Beyond the scope of the Rule 30(b)(6) topic (FRE 602, FRCP 30(b)(6)) |
| U | Unduly prejudicial, confusing, or misleading (FRE 403—unfair prejudice) |

## LEGEND FOR PLAINTIFF'S OBJECTIONS

| CODE | OBJECTION | APPLICABLE RULES |
|------|-----------|------------------|
| A | The document is objectionable because it has not been properly authenticated or identified. The testimony is objectionable because it concerns a document for which authentication is lacking. | FRE 901 |
| ARG | Argumentative, or attorney argument. | FRE 611(a) |
| B | Improper bolstering of the credibility of a witness, such as before credibility is attacked. | FRE 607, 608, 801(d)(1)(B) |
| BER | Best evidence rule prohibits introduction. | FRE 1001, 1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Improper designation (designation is neither a question nor testimony). | FRE 401-403 |
| E | Improper examination (vague, ambiguous, compound, loaded, leading, harassment, etc.). | FRE 401-403, 602, 611 |
| F | Lack of foundation / personal knowledge, including calls for speculation. | FRE 602, 701, 702 |
| H | Hearsay if offered for the truth of the matter asserted. | FRE 801, 802 |
| I | Incomplete document or testimony. | FRE 106, 403 |
| IA | This testimony is objectionable because it is an incomplete answer. | FRE 402, 403, 611 |
| IH | Improper hypothetical (omits facts, assumes facts not in evidence, etc.). | FRE 705 |
| M | Offer of discussion for settlement or compromise. | FRE 408 |
| MIS | Mischaracterizes testimony or evidence, including assuming fact not in evidence. | FRE 611(a) |
| N | Exhibit not produced in discovery. | FRE 403 |
| NARR | Calls for improper narrative response. | FRE 611(a) |
| NR | Non-responsive. | FRCP 30, FRE 611(a) |
| OF | Improper testimony from a fact witness (e.g., calls for expert opinion, calls for legal conclusion). | FRCP 26, FRE 602, 701, 702, 704 |
| OSE | Outside scope of expert testimony. | FRE 611(b) |

| OX | Improper opinion testimony by expert witness (including speculation, lacks sufficient basis, improper hearsay, calls for legal conclusion). | FRE 702-704 |
|---|---|---|
| P | Privileged or attorney work product. | FRCP 26(b), FRE 501, 502 |
| R | Lacks relevance. | FRE 401-403 |
| S | Summary requiring underlying data or information. | FRE 1006 |
| T | Beyond the scope of the Rule 30(b)(6) topic for which a witness has been designated. | FRCP 30(b)(6), FRE 602 |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative. | FRE 403 |

# EXHIBIT L

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ASTRAZENECA AB, <br><br> Plaintiff, <br><br> v. <br><br> ZYDUS PHARMACEUTICALS (USA) INC., <br><br> Defendant. | C.A. No. 1:18-cv-00664-RGA <br><br> ██████████████ |

**ASTRAZENECA'S INITIAL STATEMENT OF INTENDED PROOFS**

A statement of the primary matters Plaintiff AstraZeneca AB intends to prove at trial is set forth below. This statement is not exhaustive, and Plaintiff reserves the right to prove any matters identified in the pleadings, in interrogatory and other discovery responses, in its expert reports, and in the accompanying statements of the facts and legal issues to be litigated at trial. Plaintiff may also provide additional proof to rebut any proof offered by Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") before and during trial, in response to rulings by the Court, or for other good cause.[1]

**I.      Ownership and Standing**

1.      Plaintiff will show that AstraZeneca AB is the owner of all rights, title, and interest of the '117 patent, and the inventions disclosed therein.

---

[1] AstraZeneca notes that there are various conflicts and inconsistencies among Zydus's intended proofs, Zydus's statement of disputed facts, Zydus's statement of disputed law, and Zydus's expert reports served in this case. AstraZeneca reserves the right to revise its statement of proofs to the extent Zydus further revises its submissions.

2.      Plaintiff will show that AstraZeneca AB is the holder of New Drug Application No. 202293 for FARXIGA® (dapagliflozin).

3.      Plaintiff will show that AstraZeneca AB has standing to bring and maintain the present action as the holder of the NDA for FARXIGA® (dapagliflozin) and as the owner of the '117 patent, and that such standing existed at the time of filing this action.

## II.      No Invalidity Based on 35 U.S.C. § 103

4.      Plaintiff will show that Defendant will not be able to prove, by clear and convincing evidence, that the asserted claims of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128, Thomas, and/or WO '697 in view of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA, taking the references alone or in any combination.

5.      Plaintiff will show that Defendant will not be able to prove, by clear and convincing evidence, that the asserted claims of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 in view of WO '697, EP '359, Hongu, and/or Kees, optionally in view of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA, taking the references alone or in any combination.

6.      Plaintiff will show that Defendant will not be able to prove, by clear and convincing evidence, that the asserted claims of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu in view of Kees, Patrick, WO '697, and Patani, optionally in view of Scheen, and further in view of the knowledge of a POSA, taking the references alone or in any combination.

7.      Plaintiff will also show that the objective indicia of non-obviousness, including but not limited to long-felt unmet need, failure of others, unexpected results, industry

2

acquiescence, copying, and skepticism of skilled artisans, further demonstrate that the asserted claims of the '117 patent would not have been obvious in view of the cited prior art.

## II.    No Invalidity Based on 35 U.S.C. § 112, ¶1

8.    Plaintiff will show that Defendant will not be able to prove, by clear and convincing evidence, that claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶ 1 for lack of written description.

9.    Plaintiff will show that Defendant will not be able to prove, by clear and convincing evidence, that claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶ 1 for lack of enablement.

## III.   No Invalidity Based on 35 U.S.C. § 112, ¶2

10.    Plaintiff will show that Defendant will not be able to prove, by clear and convincing evidence, that claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶ 2 as indefinite.

## IV.    Relief

11.    Plaintiff will show it is entitled to the relief sought in its First Amended Complaint (D.I. 37), including but not limited to a permanent injunction against Defendant under 35 U.S.C. §§ 271(e)(4)(B), 283, and/or otherwise.[2]

## V.    Exceptional Case

[2] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

12.    Plaintiff will prove that this is an exceptional case under 35 U.S.C. § 285.

13.    To the extent necessary, Plaintiff will rebut any allegation by Defendant that they are entitled to attorneys' fees under 35 U.S.C. § 285.

# EXHIBIT M

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ASTRAZENECA AB, | |
| Plaintiff, | |
| v. | C.A. No. 1:18-cv-00664-RGA |
| ZYDUS PHARMACEUTICALS (USA) INC., | ███████████████████ |
| | ████████████ |
| Defendant. | |

**ZYDUS PHARMACEUTICALS (USA) INC.'S
STATEMENT OF INTENDED PROOFS**

## I.  INTRODUCTION

In accordance with Local Rule 16.3(c)(9) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District Of Delaware, Zydus Pharmaceuticals (USA) Inc. ("Zydus") submits the following statement of what Zydus intends to prove as defenses with respect to the invalidity of claims 1–3, 14, and 16 ("the asserted claims") of U.S. Patent No. 6,5151,117 ("the '117 patent").

Zydus reserves the right to prove or respond to any issues of fact or law set forth in AstraZeneca AB's ("AstraZeneca") Statement of Issues of Fact that Remain to be Litigation and Statement of Issues of Law that Remain to be Litigated.  Zydus further reserves the right to amend and/or supplement this statement to the extent necessary to respond to issues raised by AstraZeneca and to rebut any alleged proof(s) offered by AstraZeneca before and during trial, in response to rulings by the Court, or for any other reason.

## II.  STATEMENT OF INTENDED PROOFS

### A.  INVALIDITY BASED ON 35 U.S.C. § 103

1.  Zydus will prove by clear and convincing evidence that claims 1-3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359, Hongu, Kees, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

2.  Zydus will prove by clear and convincing evidence that claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 (Example 12), optionally in view of one or more of Thomas, and/or WO '697, optionally in view of one or more of EP '359,

Hongu, Kees, Patrick, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

3.     Zydus will prove by clear and convincing evidence that claims 1-3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally in further view of one or more of Thomas, Patrick, and/or Patani, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

4.     Zydus will prove by clear and convincing evidence that claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over WO '128 (formula I of the structure IB), optionally in view of one or more of WO '697, EP '359, Hongu, and/or Kees, optionally in further view of one or more of Thomas, Patrick, Patani, and/or Scheen and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

5.     Zydus will prove by clear and convincing evidence that claims 1-3 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

6.     Zydus will prove by clear and convincing evidence that claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 103 as obvious over EP '359, Tsujihara, and/or Hongu, in view of Kees, Patrick, WO '697, Patani, and/or Scheen, and further in view of the knowledge of a POSA and AstraZeneca's asserted secondary considerations.

7.     To the extent necessary, Zydus will rebut any allegations of objective indicia of non-obviousness, including but not limited to, long-felt unmet need, failure of others, unexpected results, industry acquiescence, copying, and skepticism of skilled artisans.

### B.    INVALIDITY BASED ON 35 U.S.C. § 112

8.    Zydus will prove by clear and convincing evidence that asserted claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶ 1 for lack of enablement.

9.    Zydus will prove by clear and convincing evidence that asserted claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶ 1 for lack of written description.

10.    Zydus will prove by clear and convincing evidence that asserted claims 14 and 16 of the '117 patent are invalid under 35 U.S.C. § 112, ¶ 2 as indefinite.

### C.    RELIEF

11.    To the extent necessary, Zydus will rebut any allegation by AstraZeneca that it is entitled to a permanent injunction against Zydus, under 35 U.S.C. §§ 271(e)(4)(B), 283, and/or otherwise.

### D.    EXCEPTIONAL CASE

12.    Zydus will prove that its defense of this case renders it an exceptional case under 35 U.S.C. § 285.

13.    To the extent necessary, Zydus will rebut any allegations by AstraZeneca that Zydus's actions in defending this case render it an exceptional case under 35 U.S.C. § 285.

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing

document were caused to be served on May 4, 2021 on the following counsel in the manner

indicated:

### VIA EMAIL:

John C. Phillips, Jr.
Megan C. Haney
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
(302) 655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

Michael J. Gaertner
Myoka Kim Goodin
Zhibin Li, Ph.D.
Jennifer M. Coronel
Christopher J. Cassella
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700
mgaertner@lockelord.com
mkgoodin@lockelord.com
jennifer.coronel@lockelord.com
christopher.cassella@lockelord.com
zhibin.li@lockelord.com

*Attorneys for Defendant*

Dated: May 4, 2021

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)